Azra Hadzimehmedovic (Bar No. 239088)
azra@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260,
McLean, VA 22102
Telephone:   (703) 940-5031
Facsimile:   (650) 802-6001

*Attorneys for Defendant* AXONICS, INC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> AXONICS MODULATION TECHNOLOGIES, INC., <br><br> Defendant. | Case No. 8:19-cv-02115-DOC-JDE <br><br> **DEFENDANT AXONICS, INC.'S NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. MCDUFF** <br><br> Date:   March 6, 2023 <br> Time:   8:30 a.m. <br> Ctrm:   10A <br> Judge:  Hon. David O. Carter |

**REDACTED VERSION OF DOCUMENT**
**PROPOSED TO BE FILED UNDER SEAL**

PLEASE TAKE NOTICE that on March 6, 2023, at 8:30 a.m., or as soon thereafter as counsel may be heard by the above-entitled court in Courtroom 10A, Defendant Axonics, Inc. ("Axonics" or "Defendant") will and hereby does move the Court to exclude certain expert opinions of Medtronic's damages expert Dr. DeForest McDuff. Dr. McDuff is an expert witness proffered by Plaintiffs who offers opinions regarding lost profits and reasonable royalty that Axonics allegedly owes Medtronic Plaintiffs. Medtronic cannot meet its burden to show that certain proffered opinion testimony by this expert is admissible under Fed. R. Evid. 702 and the principles of *Daubert*.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently lodged proposed order, the Declaration of Samantha A. Jameson and Exhibits; the pleadings and papers on file herein and all other materials in the record; and any further material and argument presented to the Court at the time of the hearing or which the Court may wish to consider and direct the parties to submit.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on January 16, 2023.


Dated: January 23, 2023          Respectfully submitted


                                 */s/ Azra M. Hadzimehmedovic*
                                 Matthew D. Powers (Bar No. 104795)
                                 William P. Nelson (Bar No. 196091)
                                 Natasha M. Saputo (Bar No. 291151)
                                 TENSEGRITY LAW GROUP, LLP
                                 555 Twin Dolphin Drive, Suite 650
                                 Redwood Shores, CA 94065
                                 Telephone:  (650) 802-6000
                                 Facsimile:   (650) 802-6001
                                 matthew.powers@tensegritylawgroup.com
                                 william.nelson@tensegritylawgroup.com

natasha.saputo@tensegritylawgroup.com

Azra M. Hadzimehmedovic (Bar No. 239088)
Aaron M. Nathan (Bar No. 251316)
Samantha A. Jameson (Bar. No. 296411)
Stephen K. Shahida (admitted *Pro Hac Vice*)
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone:   (703) 940-5033
Facsimile:    (650) 802-6001
azra@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
stephen.shahida@tensegritylawgroup.com

Sterling A. Brennan (Bar No. 126019)
Christina L. Trinh (Bar No. 307879)
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, CA 92618
SBrennan@mabr.com
CTrinh@mabr.com

*Attorneys for Defendant Axonics, Inc.*

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................... 1

II.  LEGAL STANDARD .................................................................... 1

III. CERTAIN OPINIONS OF DR. MCDUFF SHOULD BE EXCLUDED ..... 2

    A.   Dr. McDuff's opinions on the finned leads and Axonics F15
        product for purposes of *Panduit* Factor 2 analysis should be
        excluded ....................................................................................... 2

        1.   No Reliable Opinion on Finned Leads Non-Infringing
                Alternative ................................................................... 3

        2.   No Reliable Opinion on F15 Non-Infringing Alternative ........ 5

    B.   Dr. McDuff's lost profits calculations, including his █████
        conversion rate applied for the entire damages period, should be
        excluded ....................................................................................... 7

    C.   Dr. McDuff's reasonable royalty opinions should be excluded ........ 10

        1.   Dr. McDuff fails to include research & development costs in
                his incremental profit calculation ............................................ 11

        2.   Dr. McDuff's baseline margin construct is unreliable ............ 13

        3.   Dr. McDuff's application of forward patent citation to split
                the excess profits is unsupported by case law, peer-reviewed
                literature, and facts of this case ................................................ 15

        4.   Dr. McDuff should be precluded from testifying about
                Medtronic's intercompany licenses ......................................... 20

        5.   Dr. McDuff's Analysis of *Georgia-Pacific* Factor 12 should
                be excluded. ............................................................................ 22

    D.   Dr. McDuff's copying opinions should be excluded ........................ 24

IV.  CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) ....................................................................... 2

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993).................................................................................. 1, 2

*Finjan, Inc. v. Blue Coat Sys.*,
   Case No. 13-CV-03999-BLF, 2015 U.S. Dist. LEXIS 91528 (N.D. Cal. July 14, 2015) ......................................................................................................... 21

*GE v. Joiner*,
   522 U.S. 136 (1997).................................................................................... 15

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................ 23

*Grain Processing Corp. v. Am. Maize-Products Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ........................................................... passim

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) ........................................................................ 2

*In re Katz Interactive Call Processing Patent Litig.*,
   No. 07-ML-01816-B-RGK (FFMx), 2009 U.S. Dist. LEXIS 114681, at *4 (C.D. Cal. Mar. 11, 2009)...................................................................................... 1

*Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue*,
   Case No. 17-1866 (8th Cir. Aug. 16, 2018)................................................. 22

*Omega Patents, LLC, v. Calamp Corp.*,
   Case 6:13-CV-01950-PGB-DCI (M.D. Fla. Dec. 23, 2015) ...................... 11

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...................................................................... 3

*Ravo v. Covidien LP*,
   55 F. Supp. 3d 766 (W.D. Penn. 2014)....................................................... 24

*ResQNet.com v. Lasna*,

   594 F.3d 860 (Fed. Cir. 2010) ........................................................ 12, 20

*Riles v. Shell Exploration & Prod. Co.*,

   298 F.3d 1302 (Fed. Cir. 2002) ........................................................ 12

*Sonos, Inc. v. D&M Holdings Inc.*,

   297 F. Supp. 3d 501 (D. Del. 2017) ................................................. 27

*Syneron Med. v. Invasix*,

   No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220505 (C.D. Cal. Sep. 28,

   2018) ........................................................................................ 24

*Syneron Med. v. Invasix*,

   No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220514 (C.D. Cal. Aug 27,

   2018) ........................................................................................ 24

*Uniloc USA, Inc. v. Microsoft Corp.*,

   632 F.3d 1292 (Fed. Cir. 2011) ........................................................ 21

*VirnetX, Inc. v. Cisco Sys., Inc.*,

   767 F.3d 1308 (Fed. Cir. 2015) ........................................................ 21

*Wendell v. GlaxoSmithKline LLC*,

   858 F.3d 1227 (9th Cir. 2017) ......................................................... 2

*White v. Ford Motor Co.*,

   312 F.3d 998 (9th Cir. 2002) ...................................................... 4, 25

**Rules**

Fed. R. Evid. 403 ............................................................................ 2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3

4

5

6

7

8

9

Pursuant to Fed. R. Evid. 702 and 403, Axonics seeks to exclude certain unreliable opinions offered by Medtronic's expert Dr. DeForest McDuff who opines that Axonics allegedly owes to Medtronic lost profits under the *Panduit* analysis and reasonably royalty under the *Georgia-Pacific* analysis. As described in more detail below, the opinions which Axonics moves to exclude are unreliable, not based on sufficient facts or data, and not the product of reliable principles and methods and others are outside Dr. McDuff's professed expertise.

10

## II.   LEGAL STANDARD

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert testimony is governed by both Fed. R. Evid. 702 and 403. *In re Katz Interactive Call Processing Patent Litig.*, No. 07-ML-01816-B-RGK (FFMx), 2009 U.S. Dist. LEXIS 114681, at *4 (C.D. Cal. Mar. 11, 2009). Rule 702 provides that an expert testimony is admissible only if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court explained that the trial judge plays a "gatekeeping role," which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 97. The Supreme Court emphasized that the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. It follows that a reasonable or scientifically valid methodology is unreliable if the data used is not sufficiently tied to the facts of the case. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (internal quotes omitted). *Katz*, U.S. Dist. LEXIS 114681, at *5. In accordance with *Daubert*, "the

district court judge must ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). Expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 590).

This Court has stated that Rule 403 also guides the analysis. Rule 403 states that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III. CERTAIN OPINIONS OF DR. MCDUFF SHOULD BE EXCLUDED

### A. Dr. McDuff's opinions on the finned leads and Axonics F15 product for purposes of *Panduit* Factor 2 analysis should be excluded

Dr. McDuff's analysis of Panduit factor 2, "absence of acceptable noninfringing alternatives," with respect to finned lead and Axonics' new F15 product as non-infringing alternatives for the Asserted Patents is irrelevant and unreliable, and should be excluded. The concept of an "acceptable non-infringing alternative" relates to a lost-profits damage model. For the patentee to recover lost profits, it must show a "reasonable probability that he would have made the asserted sales 'but for' the infringement." *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). The "but for" reconstruction is necessary for the patentee to prove, meaning "[w]hen basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales 'but for' the infringement." *Id*.; **Ex. 11**[1], McDuff Dep. at 137:17-138:7;

---

[1] Exhibits are attached to the concurrently filed Omnibus Declaration of Samantha A. Jameson in Support of Axonics' Motion for Summary Judgment & Daubert Motions.

138:18-20; 140:4-9. As part of that proof, the law requires the patentee to prove an "absence of acceptable noninfringing substitutes." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

### 1.    No Reliable Opinion on Finned Leads Non-Infringing Alternative

Dr. McDuff acknowledges that Axonics asserts that non-infringing alternatives exist for the Tined Lead Patents, including a "finned" lead. **Ex. 10**, McDuff Report, at ¶ 91. However, Dr. McDuff erroneously does not even consider a "but for" world that includes Axonics' "finned" leads. Dr. McDuff's failure to include "finned" leads in his "but for" world render his opinions unreliable.

Dr. McDuff relies upon Medtronic's expert Dr. Chai's opinion that "finned" leads are not "viable non-infringing alternatives." *Id.*, at ¶ 92. He separately offers his own opinions that this alternative would not be available and acceptable. *Id.*, at ¶¶ 93-96.

Regarding availability, Dr. McDuff contends that "finned" leads were not available on the market because "Axonics has put forward no evidence that it could have successfully completed the FDA approval process for these alleged non-infringing alternatives in a short enough time period to have them available during the period of infringement." *Id.*, at ¶ 93. As an initial point, Dr. McDuff's opinions regarding the FDA approval process are unreliable because McDuff testified that he is not an expert in FDA regulatory matters, never worked at the FDA, does not provide consulting regarding FDA regulatory processes to clients, and is not involved in the PMA process for the approval of the medical device applications with the FDA. **Ex. 11**, McDuff Dep. at 283:4-22. Experts may not testify outside their areas of expertise. *White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."). Additionally, non-infringing

alternatives are not limited to products on the market, but extend to otherwise alternative, non-infringing products available to the defendant. *See Grain Processing*, at 1349, 1353-54 (finding non-infringing alternative was available when the infringer could have obtained the necessary materials and had the necessary equipment, know-how, and experience). Indeed, Dr. McDuff could not identify anything that suggested Axonics did not have the know-how or equipment to make "finned" leads at the time of hypothetical negotiations. **Ex. 11**, at 183:7-184:1. He also performed no analysis to confirm that FDA approval could not have been obtained even if he were qualified to do so.

" **Ex. 10**, McDuff Report, at ¶ 95. Dr. McDuff's opinions are irrelevant and not sufficiently tied to the facts of this case.

Finned leads are different. They are very similar to Medtronic's tined leads, and can be thought of as a drop-in replacement for a tined lead using the same surgical procedure and a similar anchoring mechanism. Mr. Swoyer, a named inventor on the Tined Leads Patents, testified that he specifically designed the finned leads to design around tined leads and that they would function as a feasible design for minimally-invasive implantation for sacral neuromodulation—a key benefit Medtronic touts for tined, but not non-tined, leads. **Ex. 20**, Swoyer Dep. at 67:9-16.

Further, Dr. McDuff's opinions are irrelevant and unreliable because he erroneously classifies "finned" leads as a

**Ex. 10**, at ¶¶ 95-96. Here, Dr. McDuff did not perform his own independent analysis as to whether "finned" leads would be commercially acceptable. Instead, Dr. McDuff relied upon                              that are irrelevant and not

helpful to discuss before the jury other than to attempt to confuse it.

Dr. McDuff's entire analysis is unreliable because "a fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed." *Grain Processing*, at 1350-51. Here, Dr. McDuff's analysis in reconstruction of the "but for" market excluding "finned" leads is unreliable. Dr. McDuff should have considered a "but for" world that includes Axonics' use of "finned" leads together with Medtronic's tined leads in the marketplace because "a rational would-be infringer is likely to offer an acceptable noninfringing alternative." *Id.*, at 1351. Thus, Dr. McDuff's analysis of *Panduit* factor 2 with respect to Tined Leads Patents should be struck and testimony precluded.

### 2.     No Reliable Opinion on F15 Non-Infringing Alternative

Dr. McDuff acknowledges that Axonics asserts that non-infringing alternatives exist for the remaining five Asserted Patents (three Recharge Patents and two Temperature Control Patents),[2] including Axonics' F15 system. **Ex. 10**, at ¶¶ 98, 102. However, Dr. McDuff erroneously does not consider a "but for" world that includes Axonics' F15 system. Dr. McDuff's failure to include the F15 system in his "but for" world renders his opinions unreliable.

Dr. McDuff relies upon Medtronic's technical expert Dr. Mihran's opinion that "there are no commercially acceptable non-infringing alternatives," including Axonics' own non-rechargeable F15 products for which there is no dispute that it does not infringe the Asserted Patents. *Id.*, at ¶ 99; **Ex. 11**, 155:21-156:4. Dr. McDuff separately offers his opinions that F15 would not be an available and acceptable non-infringing alternative. **Ex. 10**, at ¶¶ 100-103.

---

[2] Axonics does not agree with Medtronic's labels for its Asserted Patents, but uses them here so as to assist the Court's review of this motion because Dr. McDuff refers to the Asserted Patents using Medtronic's invented labels.

_Id._, at ¶ 102. F15 has been developed, approved by the FDA, and placed on the market in early 2022, and thus made available during the damages period. **Ex. 11**, McDuff Dep. at 154:22-155:10. Further, as stated above, Dr. McDuff's speculation about FDA regulatory matters is outside his area of expertise and separately unreliable for that reason too. _Id._ at 283:4-22. Additionally, non-infringing alternatives are not limited to products on the market, but extend to alternative, non-infringing products available to the defendant. _See Grain Processing_, at 1349, 1353-54 (finding non-infringing alternative was available when the infringer could have obtained the necessary materials and had the necessary equipment, know-how, and experience). Indeed, Dr. McDuff could not identify anything that suggested Axonics did not have the know-how or equipment to make the F15 system as early as at the time of hypothetical negotiations even if that sort of proof were required. **Ex. 11**, at 173:2-23.

Regarding acceptability, Dr. McDuff's opined that F15 would

**Ex. 10**, at ¶ 103. This opinion is irrelevant and unreliable in the "but for" world where the question is not what Axonics actually offered but what it would have offered (i.e., F15) when faced with the choice that it could not put its accused products on the market. _See, e.g.,_ **Ex. 11** at 163:18-24 (in the "but for" world the patients are not being offered an option to use Axonics' accused products). Further, Dr. McDuff's opinion is inconsistent with his testimony that he does "observe a lot of demand shifting to" the F15 product right after its introduction on the market. _Id._ at 171:5-18. He admitted that in the first full quarter of sales, Axonics F15 sold double the quantity of the accused R15 products and over eight times the quantity of Medtronic's InterStim Micro (rechargeable) product. _Id._ at

165:23-166:12. Despite the successful introduction of F15, Dr. McDuff gave zero credit to Axonics in his lost profits analysis for the F15 sales and concluded that all of the sales of the accused R15 products (and unaccused products sold to complete the system), even during the period F15 was actually on the market, were lost sales to Medtronic. *Id.* at 160:12-161:12 ("It is true that I am assigning all of the accused rechargeable products in 2022 Q2 to Medtronic but for Infringement…").

As stated above, "a fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed." *Grain Processing*, at 1350-51. Here, Dr. McDuff's reconstruction of the "but for" market excluding Axonics' F15 system is not a reliable analysis. Instead, Dr. McDuff should have considered a "but for" world that includes Axonics' F15 system and Medtronic's InterStim products together in the marketplace because "a rational would-be infringer is likely to offer an acceptable noninfringing alternative." *Id.*, at 1351. Thus, Dr. McDuff's analysis of *Panduit* factor 2 with respect to F15 should be struck and testimony precluded.

**B.  Dr. McDuff's lost profits calculations, including his ███ conversion rate applied for the entire damages period, should be excluded**

Dr. McDuff's calculation of lost profits and his proposed testimony should be excluded from trial because it uses flawed methodology and is not sufficiently tied to the facts or data in this case. Dr. McDuff concludes that Axonics owes ███████ to Medtronic in lost profits through Q2 2022. But he bases those opinions on a number of unsupported steps in his analysis.

Specifically, in determining the number of lost sales to be used in a lost profits analysis, *i.e.*, the number of products that Medtronic likely would have sold but for the alleged infringement, Dr. McDuff starts with ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



Importantly, Dr. McDuff fails to study and analyze the detailed sales data produced by both parties or other reports about lost or recouped sales. **Ex. 11**, McDuff Dep. at 188:9–191:2. Instead, he simply assumes

He never confirms that ▮ assumption by checking it against the actual and detailed sales information, on a sale-by-sale basis, produced in this case by both parties for any sales period. **Ex. 11**, McDuff Dep. at 188:9-191:2.

Dr. McDuff's failure to analyze the facts and data in this case is further exacerbated by his application of the assumed ▮ conversion rate to the entirety of the damages period beyond the sales made in Q2 of 2020—the only sales period to which the ▮ comment could be specifically attributed. Again, ignoring the actual and detailed financial data available to him and Medtronic's own wins and losses

reports, he assumes the 20% continued as a constant starting with Axonics' first entry into the market. Dr. McDuff fails to review any reports from additional earnings calls or statements made during those calls by Axonics' CEO. **Ex. 11**, McDuff Dep. at 191:11-18. He also ignores statements from Medtronic that it later captured sales back from Axonics. *Id*. 192:10-193:4; **Ex. 21,** MDT-00624196-214, at 199 (Medtronic's CEO Mr. Martha stating in a February 3, 2021 earnings calls: "We've now taken back 9 points of share from Axonics over the past 2 quarters. And when you look specifically at the U.S. rechargeable market, we gained back 14 points of share sequentially this quarter.").

It should also be noted that the ███████████████████████████ ██████████████████████████. **Ex. 10**, McDuff Report at ¶ 141. Yet, Dr. McDuff fails to account for the many reasons that would have led the customers to discontinue the use of Medtronic's InterStim II product regardless of availability of Axonics on the market. For example, he ignores the shortcomings of Medtronic's products, including the fact that the batteries had a short life and their replacement required re-surgery, the devices were not MRI compatible, they were too large, and had well-documented problems, including lead breakage, all of which led many physicians to give up the therapy. **Ex. 22**, Karen Noblett Dep., at 156:3-157:5, 239:15-24, 251:14-22; **Ex. 23**, Dan Dearen Dep., at 145:2-146:2, 165:5-166:5; **Ex. 24**, John Woock, Ph.D. Dep., at 114:12-115:22.   Additionally, as Medtronic itself knew, Axonics' competitive advantages were quickly recognized by others privy to the SNM market, ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ **Ex. 25** MDT-00079349 at 00079350.

There were other reasons why customers would not choose Medtronic's devices

including alternative therapies including Botox and tibial nerve stimulation (well-suited for certain segment of patient population). **Ex. 58**, Butrick Report at ¶¶ 91-92. ███████████████████████████████████████████████████████████ ████████ **Ex. 59,** MDT-00504470-MDT-00504514 at MDT-00504499.

Dr. McDuff's reliance on the ██████ remains arbitrary, results-oriented, not sufficiently tied to facts and data in this case and should be excluded. Tellingly, Dr. McDuff's expert opinions have been excluded by courts previously. **Ex. 11**, McDuff Dep. at 60:9-17. In one such case his opinion was excluded because, like here, he used proxy data instead of investigating specific facts of the case. **Ex. 66**, *Omega Patents, LLC, v. Calamp Corp*., Case 6:13-CV-01950-PGB-DCI, Dkt. No. 117 (M.D. Fla. Dec. 23, 2015). Specifically, in *Omega Patents*, as part of his methodology in assessing the overall financial strength of the defendant company, he utilized the weighted average costs of capital (WACC) as reported by a non-party vendor but did not attempt to calculate the WACC for the company using its own data and without investigating how the vendor had calculated that number. Not surprisingly, as in this case, his selective use of the data resulted in skewing the numbers in favor of his client.

Here, by using a ████ "conversion" rate in his lost profits analysis and concluding that ██████████████████████████████████████████ ███████████████████████████████████████████████, Dr. McDuff ignores the facts and detailed data produced in the case and rests his opinions on an assumption instead that is not reliable and that he has not confirmed through testing, analysis, or review of the record evidence (other than mere speculation that he might be conservative). As such, his lost profits analysis predicated on his ████ conversion rate should be excluded from trial because it is too speculative.

**C.    Dr. McDuff's reasonable royalty opinions should be excluded**

In addition to lost profits, Dr. McDuff offers reasonable royalty opinions applying the *Georgia-Pacific* damages analysis framework, including the so-called

hypothetical negotiation between a willing licensor and a willing licensee. Dr. McDuff's reasonable royalty opinions rest upon unreliable principles and methods, not grounded in sufficient facts and data, and ultimately yield a flawed result. Specifically, he claims to apportion to the ███████████████████████ ██████████████████████████████████████████ **Ex. 10** at ¶ 244. But to do so, he relies on constructs not supported in law, peer-reviewed literature, or fact. Courts must take care to "prevent the hypothetical [negotiation for a reasonable royalty] from lapsing into pure speculation" by requiring sound economic and factual predicates. *ResQNet.com v. Lasna*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citations omitted); *Riles v. Shell Exploration & Prod. Co*., 298 F.3d 1302, 1311 (Fed. Cir. 2002). Dr. McDuff's opinions lack both, and instead rest on legally and academically unsupportable formulations aimed merely at inflating a royalty number.

### 1. Dr. McDuff fails to include research & development costs in his incremental profit calculation

Dr. McDuff starts his analysis with a hypothetical negotiation between Axonics and Medtronic, and summarily concludes that most of the licenses in evidence in this case are not "probative on the outcome." **Ex. 11** McDuff Dep. at 267:14-268:1. He then devises a novel formulation as to how the parties ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

But record evidence shows that as a start-up single device company, development and commercialization of the Accused Products required significant activities and costs for Axonics. Ignoring the R&D expenses of a nascent medical device company with the goal of commercializing a single innovative product when calculating its profits is inexplicable. As Axonics noted in its 2018 10-K submission, "[w]e currently have only one product, our r-SNM System, and our business presently depends entirely on our ability to obtain regulatory approval from the FDA for our r-SNM System and to successfully commercialize it in a timely manner." **Ex. 26** (Axonics form 10-K for the fiscal year ended December 31, 2018), at AX1333302. Axonics noted in the same submission that: "Our long-term growth depends, in part, on our ability to develop and enhance our r-SNM system, and if we fail to do so we may be unable to compete effectively; It is important to our business and our long-term growth that we continue to develop and enhance our r-SNM System; We intend to continue to invest in research and development activities focused on improvements and enhancements to our r-SNM System… Developing enhancements to our r-SNM System can be expensive and time-consuming." *Id*. at AX1333311.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████    But for a successful R&D campaign, Axonics, a start-up company established to bring a single product to the market, would not have had a royalty generating product. So, to suggest that as party to a hypothetical negotiation in the context of entering this market Axonics would not have anticipated and accounted for R&D costs in arriving at a reasonable royalty during a hypothetical negotiation is to ignore the facts of the case simply to pad the profits.

In fact Axonics spent $20.1 million on R&D in 2019 that Dr. McDuff did not include in his incremental profit margin calculation, "None of it." **Ex. 11**, McDuff Dep. at 253:16-254:3. Similarly, he failed to include $51.8 million in R&D from 2017 through 2019 in his calculation. *Id*. at 254:5-14. Ultimately Dr. McDuff admitted the obvious in his deposition: by not including R&D in calculating the incremental profit margin for Axonics, the ultimate reasonable royalty rate he calculated is much higher than it would have been had he included Axonics' R&D cost. *Id*. at 247:13-249:10.

### 2.    Dr. McDuff's baseline margin construct is unreliable

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Dr. McDuff's methodology is facially flawed and suffers from "too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Medtronic is a long-established company, having been around since 1949. **Ex. 11**, McDuff Dep. at 239:22-240:9. The company operates in 150 companies, with more than 95,000 employees. *Id*. 241:16-242:1. In its fiscal year ending April 29, 2022, Medtronic reported $31.7 billion in revenue. *Id*. 242:11-243:6. On the other hand, at the time of the hypothetical negotiation in this case, Axonics was a start-up company established to bring a single product to the market. **Ex. 26** (Axonics Modulation Technologies, Inc., form 10-K for the fiscal year ended December 31, 2018), at AX1333302. Using Medtronic's operating margin to calculate Axonics' excess profit makes no legal or economic sense.



Dr. McDuff's baseline margin construct is unsupportable, legally, factually, or academically, and should be stricken.

>   **3.**      **Dr. McDuff's application of forward patent citation to split the excess profits is unsupported by case law, peer-reviewed literature, and facts of this case**

After arriving at his incremental profit margin, and then breaking that into a baseline and excess margin, Dr. McDuff attempts to split the excess profit by assigning a value to the alleged economic value of the asserted patents. **Ex. 11**, McDuff Dep. at 214:2-12. For his profit splitting step, Dr. McDuff then uses a form of "forward patent citation" analysis, an attempt to assess the value of a patent based on the number of times that patent is cited as prior art by later issued patents. *Id.* at 213:8-15. But just like his incremental and excess profit margin constructs, his patent forward citation

methodology is flawed, not supported by caselaw or academic literature, and not tied to the facts of this case. Although Dr. McDuff cites publications and less than a handful of cases that find a patent's value can be correlated with the number of forward citations it has received in certain circumstances under a particular methodology, he fails to provide any authority, and Axonics is not aware of any, supporting the type of forward citation analysis he has performed and applied specifically to profit splitting or the tortured application of his methodology to the facts of the case, including by counting only citations by Axonics in its own patents.

Specifically, Dr. McDuff first analyzes forward citations of patents owned by three different entities: Medtronic's Asserted Patents, Axonics patents and certain patents Axonics has licensed from the Alfred Mann Foundation (AMF). *Id*. at 218:20-219:1.

---

[3] Dr. McDuff admits that Medtronic's technical experts "did not perform an evaluation of whether the Axonics Patents or AMF Licensed Patents were actually practiced by the Accused Products." **Ex. 10**, McDuff Report at ¶ 256.



In doing so, he ignores the fact that the AMF patents were a critical building block for Axonics' business, and Axonics in fact prosecuted some of the AMF patents—a fact that Dr. McDuff ignores. **Ex. 11**, McDuff Dep. at 225:20-226:23, 228:22-229:22. Having ignored such salient facts, Dr. McDuff is at a loss as to how his results would fluctuate had he not, testifying: "The royalty rates could go up. The royalty rates could go down. And I would be surprised if that was a big impact, but I can't say for sure because I have not done that analysis." **Ex. 11**, McDuff Dep. at 228:22-229:22. Perhaps unsurprisingly, inclusion of the Axonics prosecuted AMF patents in the calculation would indeed lower the royalty rate in question by ███████████████ **Ex. 60,** Comparison of Dr. McDuff's Royalty Rates vs. Corrected McDuff Royalty Rates.

Equally importantly, by focusing on creating a statistical construct to arrive at a predetermined goal, Dr. McDuff ignores other facts in this case. Specifically, record evidence shows that Axonics greatly valued AMF's technology. Yet, Dr. McDuff assigns little to no value to the patents covering such valued technologies. Nearly the entire Axonics executive team was deposed in this case, and they all testified, among other things, that AMF's titanium ceramic IPG construction of the implant was a key enabling factor for the Accused Products. **Ex. 11**, McDuff Dep. at 234:1-15; *see also* **Ex. 33**, Mooney Dec. 16, 2022 Report ¶ 70. For example, Dr. Woock, Chief Marketing and Strategy Officer at Axonics stated, "[t]he secret sauce for us, the innovation, to use a more appropriate word, for us was the design of our rechargeable neurostimulator being a titanium and ceramic enclosure." **Ex. 24** at 121:24-122:4.

Further, the AMF/Axonics License Agreement itself states: "█████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████" License Agreement between Alfred E. Mann Foundation for Scientific Research and Axonics Modulation Technologies, Inc., dated October 1, 2013 (**Ex. 34**, AX0337182-AX0337216 at AX0337192-AX0337193).

The evidence similarly shows the importance of frequency modulation, easy-to-use patient remote, single-piece helical anchor, multichannel test clip, external pulse generator and the architecture of the implant antenna—all of which are covered by patents. **Ex. 33**, Mooney Dec. 16, 2022 Report ¶¶ 71-76. But Dr. McDuff's patent citation analysis provides little to zero value to the patents covering certain of these

aspects of the Accused Products.

Dr. McDuff's explanation for selectively divorcing his patent forward citation from these facts in the case is that it is difficult to include such evidence in the analysis: "It's also hard to know how to weigh a qualitative assessment of an Axonics witness to convert that into a qualitative royalty rate. That's one of the benefits of patent citation analysis, is that it provides an objective quantitative weighting. So whatever the answer is the answer is." **Ex. 11**, McDuff Dep. at 235:7-13. "Whatever the answer is the answer is" hardly qualifies as the "sound economic proof" and factual predicate that the Federal Circuit requires for a reasonable royalty analysis calculation, especially in light of contrary documentary and testimonial evidence. *ResQNet.com*, 594 F.3d at 869. Nor is such cavalier disregard of the evidence useful to the jury.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████ This is even though Axonics has licensed, in some cases exclusively licensed, the AMF patents and placed significant importance on these AMF patents, especially as they relate to the Accused Products. Axonics in fact noted in its 2018 10-K: "We rely on the [AMF] License Agreement to provide us with rights to use the AMF IP to develop and commercialize the AMF Licensed Products, which are used in our r-SNM System. Any termination or loss of significant rights under the License Agreement would materially and adversely affect our development and commercialization of our r-SNM System." **Ex. 26**, Dec. 31, 2018 10-K, at AX1333307. Dr. McDuff fails to adequately support why citations by AMF's patents were not considered in his forward citation analysis.

Untethered from the facts of this case, Dr. McDuff's "reliance on a methodology discussed in empirical economics literature has little more probative value than the '25 percent rule of thumb' and Nash Bargaining Solution analysis that the Federal Circuit

rejected in *Uniloc* and *VirnetX*." *Finjan, Inc. v. Blue Coat Sys.*, 2015 U.S. Dist. LEXIS 91528, at *24 (N.D. Cal. July 14, 2015) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), and *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2015)).

### 4.   Dr. McDuff should be precluded from testifying about Medtronic's intercompany licenses

Medtronic Inc. has entered into several intercompany agreements between April 2013 and April 2018, including with other Medtronic plaintiffs in this case. Dr. McDuff testified that he does not use these agreements "as an informative starting point for the reasonable royalty analysis," and he does not perform a comparability analysis of those agreements with the hypothetical license. **Ex. 11**, McDuff Dep. at 268:15-24, 270:6-14. Indeed, these agreements are economically and technologically different from one that would be negotiated between two competitors in a hypothetical negotiation in the current context. *Id.* at 270:23-271:6. Yet, Medtronic refuses to agree that it will not be introducing Dr. McDuff's testimony at trial about these non-comparable licenses and their inflated royalty rates to skew the damages horizon under the pretext that they are "generally indicative of the royalty structure." *Id.* at 268:15-269:8. The royalty structure for a hypothetical negotiation is not in dispute: both sides agree that it is a percentage royalty rate. Dr. McDuff's potential testimony about these unrelated outlier licenses and their rates would only serve to confuse, rather than "help the trier of fact to understand the evidence or to determine a fact in issue" as required by Rule 702(a) and would run afoul of Rule 403 as well. As such, Dr. McDuff should be precluded from providing any testimony about these economically and technologically irrelevant licenses.

Although Medtronic has not produced any information related to the protracted history associated with these intercompany agreements in this case, the unusually high royalty rates under these agreements—up to 22%—have been the product of more than ten years of litigation between Medtronic and the Commissioner of Internal Revenue

Service.[4] **Ex. 35**, Axonics, Inc's Tenth Supplemental Responses and Objections to Plaintiffs' 1st Set of Interrogs. (Interrogs. Nos. 3-4, 6, 8, and 11) (Part 1 of 3), October 17, 2022, p. 54. In addition to the fact that the rates in these agreements largely resulted from litigation, their technical and economic import renders them inapposite in a hypothetical negotiation in the context of a reasonable royalty analysis.

Further, these agreements are between related entities ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ Furthermore, ███████████████████████████████████ ████████████████████████████████████, Medtronic had 1,800 patents licensed under the predecessor's intercompany agreements." **Ex. 10**, McDuff Report, at ¶ 275, p. 183. The hypothetical license only covers the seven asserted patents. Additionally, these intercompany agreements frequently include royalty rates far in excess of 10%, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ For at least these reasons the hypothetical negotiators would not have considered the Medtronic intercompany agreements to be informative in determining the outcome of the hypothetical negotiation.

Dr. McDuff himself highlighted the dissimilarities between the hypothetical negotiation and the intercompany agreements. **Ex. 11**, at 270:16-271:6. ████████████

---

[4] The IRS Commissioner characterizes the dispute as involving "the classic case of a U.S. multinational taxpayer (Medtronic) shifting income from its highly profitable U.S. operations and intangibles to an offshore subsidiary operating in a tax haven (Medtronic [Puerto Rico]), by charging an artificially low rate for the intangibles." *Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue*, Case No. 17-1866 (8th Cir. Aug. 16, 2018), Opinion of the United States Court of Appeals for the Eight Circuit, at 1-2 (quoting Appellant's Reply Brief).

███████████████████████████████████████████████████
█████████████████████████████████████ He also testified that he
never studied the roughly 1800 patents that are subject of those agreements. **Ex. 11** at 271:7-14. Nor is Dr. McDuff aware of anyone performing such analysis, or an apportionment analysis of the relative value of any of the covered patents within that portfolio. *Id.* 271:16-273:6. As such, Dr. McDuff's potential testimony about these intercompany licenses should be excluded as both irrelevant and unreliable.

5. **Dr. McDuff's Analysis of *Georgia-Pacific* Factor 12 should be excluded.**

Dr. McDuff has not demonstrated that the ████████████████████
███████████████████████████████████████████████████
████████████████████████████ are sufficiently tied to the facts of this case, and this portion of his expert report should be excluded as unreliable and prejudicial. *Georgia-Pacific* factor 12 assesses "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The rates Dr. McDuff relies upon are not from Axonics and Medtronic businesses and they are not for the inventions of the asserted patents. That means that for his Factor 12 analysis, he needed to identify ***comparable*** businesses allowing for the use of ***analogous*** inventions in order to use the rates from such circumstances to assess a reasonable royalty rate. Dr. McDuff made no such attempt. When relying on licenses in support of a reasonable royalty analysis, an expert "has the duty to demonstrate comparability" and must show "some 'discernible link between the comparable license and the claimed technology'" to be considered reliable. *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 775 (W.D. Penn. 2014). In *Ravo*, the Plaintiff's expert, opining on the value of patented technology in devices used in bowel surgery, was precluded from relying on supposedly comparable licenses under *Georgia-Pacific*

factor 12 based only on a "conclusory argument that the other licenses are comparable because [sic] they are in the 'medical device industry.'" *Id.* at 779. Because the expert had no evidence that the licenses dealt with comparable technology, his testimony was excluded. Likewise, in *Syneron v. Invasix*, the Plaintiff's expert was precluded from relying on four licenses under Factor 12 when he had made no effort to assess the technological comparability of licensed patents and the patents-in-suit. *Syneron Med. v. Invasix*, No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220514, at *41-43 (C.D. Cal. Aug 27, 2018); *Syneron Med. v. Invasix*, No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220505 (C.D. Cal. Sep. 28, 2018) (Special Master recommendation approved and accepted by this Court).

Dr. McDuff's comparison to royalty rates for ████████████ is just as broad, untethered to the technology at hand, and unreliable as the experts' in *Ravo* and *Syneron*. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ **Ex. 10**, McDuff Report, ¶ 334. He neither seeks nor provides any rates specific to surgical implants, neurostimulators, or other urinary incontinence treatments. He even admits that these sources are based on licenses of "████████████████████████████████████████████████████████████████████████████████████████████████. Presumably, this is because doing so would show that royalty rates that are comparable to Axonics' technological and economic position would be significantly lower than the ████████████████ rates proffered by Dr. McDuff. Instead of an analysis tailored to reasonably comparable licenses and agreements, McDuff opted for a comparison to generalized rates in the enormous ████████████ industry and provided no basis for this choice. His analysis is unreliable, not tied to the particular facts of this case, and would unjustly bias the jury in Medtronic's favor.

### D.   Dr. McDuff's copying opinions should be excluded

Dr. McDuff opines in his report that Axonics copied various Medtronic products during development of its helical tined lead and R15 rechargeable sacral neurostimulator implant and charging device. Specifically, he states, without expertise or justification, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ These statements, and any further opinion by Dr. McDuff that Axonics copied Medtronic, should be excluded for any purpose, as they are unreliable, outside of his expertise, not based on any acceptable methodology for detection of "copying," and likely to confuse the jury on matters of secondary considerations of obviousness. First, under Federal Rule of Evidence 702, experts may not make expert conclusions about areas outside their expertise. *White*, 312 F.3d at 1008-09. Here, Dr. McDuff's area of expertise is intellectual property damages. **Ex. 11**, McDuff Dep. at 300:11-17. He admitted that he does not have technical expertise in life sciences or neuromodulation in particular. *Id*. at 41:21-42:21.

Dr. McDuff's inaccurate and incomplete allegations of copying are well outside the purview of his financial and damages expertise, which he recognizes: "Q. You are not a copying expert in this case; correct? A. Insofar as you're talking about the secondary consideration, I'm not seeking to provide an opinion on that. Now, whether my views will be used towards that secondary consideration, I don't know. But I'm not drawing a conclusion on that secondary consideration." *Id.* at 304:17–305:3 (objection omitted). He further testified that, when using the term "mirror," he only did so "very generally to describe what Axonics did, which is create a very similar product." *Id*. at 305:5-14. In doing so, he steps into the role of the jury and opines as an expert on lay matters on which he does not have specialized knowledge. Despite disclaiming that he has offered any opinion on copying as a secondary consideration, he uses clear and unequivocal language that Axonics designed its products to be "the same as" and "identical" to Medtronic's, and acknowledges that the jury may be confused and

consider his opinion as that of copying. **Ex. 10**, 11/7/22 McDuff Report ¶ 45; **Ex. 11.** McDuff Dep. at 304:17–305:3. Thus, his opinion should be excluded under Rule 403 as well because it has no probative value, and even if it did, any such value would be outweighed by the risk of confusion of the jury.

Second, not only are these opinions outside Dr. McDuff's area of expertise, but they are not based in sufficient facts. Dr. McDuff acknowledges that he understood "there was no other rechargeable sacral neuromodulation product on the market at the time" Axonics developed the Accused Products, and so there was no Medtronic product for Axonics to even attempt to copy. **Ex. 11**, at 305:16-306:9. Such incomplete assessment of the facts at hand demonstrates his testimony is unreliable, and permitting him to opine on this issue, despite no demonstrated expertise in assessing copying, is certain to confuse the jury and improperly conflate his supposedly general language with legal conclusions. Dr. McDuff's statements will not help but rather will actively detract from the jury's ability to understand the evidence or make determinations of fact and should be excluded. *See, e.g.*, *Sonos, Inc. v. D&M Holdings Inc.*, 297 F. Supp. 3d 501, 521 (D. Del. 2017) (excluding even technical expert's "summaries of evidence and conclusory statements that imply [Defendant] copied [Plaintiff's] technology" because they were "not likely to be helpful to the jury, which is fully competent to evaluate the evidence and its own conclusion" on copying).

## IV.   CONCLUSION

The relevant portions of Dr. McDuff's opinions detailed above are unreliable, not based on sufficient facts or data, and not the product of reliable principles and methods. Axonics, therefore, respectfully asks the Court to exclude them from trial.

Dated: January 23, 2023                    Respectfully submitted


                                           */s/ Azra M. Hadzimehmedovic*
                                           Matthew D. Powers (Bar No. 104795)
                                           William P. Nelson (Bar No. 196091)
                                           Natasha M. Saputo (Bar No. 291151)
                                           TENSEGRITY LAW GROUP, LLP
                                           555 Twin Dolphin Drive, Suite 650
                                           Redwood Shores, CA 94065
                                           Telephone:   (650) 802-6000
                                           Facsimile:    (650) 802-6001
                                           matthew.powers@tensegritylawgroup.com
                                           william.nelson@tensegritylawgroup.com
                                           natasha.saputo@tensegritylawgroup.com

                                           Azra M. Hadzimehmedovic (Bar No. 239088)
                                           Aaron M. Nathan (Bar No. 251316)
                                           Samantha A. Jameson (Bar. No. 296411)
                                           Stephen K. Shahida (admitted *Pro Hac Vice*)
                                           TENSEGRITY LAW GROUP, LLP
                                           8260 Greensboro Drive, Suite 260
                                           McLean, VA 22102
                                           Telephone:   (703) 940-5033
                                           Facsimile:    (650) 802-6001
                                           azra@tensegritylawgroup.com
                                           aaron.nathan@tensegritylawgroup.com
                                           samantha.jameson@tensegritylawgroup.com
                                           stephen.shahida@tensegritylawgroup.com

                                           Sterling A. Brennan (Bar No. 126019)
                                           Christina L. Trinh (Bar No. 307879)
                                           MASCHOFF BRENNAN
                                           100 Spectrum Center Drive, Suite 1200
                                           Irvine, CA 92618
                                           SBrennan@mabr.com
                                           CTrinh@mabr.com

                                           *Attorneys for Defendant Axonics, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF CONFERENCE L.R. 7-3**

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place January 16, 2023.

**CERTIFICATE OF COMPLIANCE PER L.R. 11-6.2**

The undersigned, counsel of record for Axonics, Inc., certifies that this brief is 25 pages, which complies with the page limit set by Judge Carter's Procedures regarding length and format of motions.


Date: January 23, 2023                   */s/Azra Hadzimehmedovic*
                                          Azra Hadzimehmedovic


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 23, 2023, copies of the foregoing were served upon the following parties as indicated below:

| | |
|---|---|
| Nimalka Wickramasekera<br>Joe S. Netikosol<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071-1543<br>Telephone: (213) 615-1700<br>Facsimile: (213) 615-1750 | **Via E-mail**<br><br>NWickramasekera@winston.com<br>JNetikosol@winston.com |
| George C. Lombardi<br>Samantha M. Lerner<br>J.R. McNair<br>Vivek V. Krishnan<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, IL 60601-9703<br>Tel: (312) 558-5600 | GLombard@winston.com<br>SLerner@winston.com<br>JMcNair@winston.com<br>VKrishnan@winston.com<br>RKang@winston.com<br>winston-medtronic-axonics@winston.com |
| Robert Nai-Shu King<br>WINSTON & STRAWN LLP<br>101 California St., Floor 34<br>San Francisco, CA 94111-5812 | |

| Telephone: (415) 591-1400 | |
|---|---|
| ***Counsel for Plaintiff Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC.; Medtronic USA, Inc.,*** | |

*/s/ Azra Hadzimehmedovic*
Azra Hadzimehmedovic