Nimalka Wickramasekera (SBN: 268518)
NWickramasekera@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

George C. Lombardi (*pro hac vice*)
GLombard@winston.com
Brian Nisbet (*pro hac vice*)
BNisbet@winston.com
J.R. McNair (*pro hac vice*)
JMcNair@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   (312) 558-5600
Facsimile:    (312) 558-5700

Attorneys for Plaintiffs
MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.;
MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AXONICS MODULATION TECHNOLOGIES, INC., <br><br> Defendant. | Case No. 8:19-cv-02115-DOC-JDE <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION AND MEMORANDUM IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. MCDUFF** <br><br> **REDACTED VERSION OF DOCUMENT FILED CONDITIONALLY UNDER SEAL** |

1
2

## **TABLE OF CONTENTS**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.    INTRODUCTION ..................................................................................... 1
II.   BACKGROUND ...................................................................................... 1
   A.   Medtronic's novel InterStim system .................................................. 1
   B.   Axonics copies Medtronic's devices so it can enter the market ......... 2
   C.   Axonics targets Medtronic customers with its copycat product ......... 3
   D.   Dr. McDuff analyzes Medtronic's damages ....................................... 4
      1.   Dr. McDuff analyzes Medtronic's lost profits .............................. 4
      2.   Dr. McDuff analyzes Medtronic's reasonable royalty damages ... 8
III.  LEGAL STANDARD ............................................................................... 9
IV.   ARGUMENT ......................................................................................... 10
   A.   Axonics' speculative noninfringing alternatives were not available .............. 10
      1.   Dr. McDuff's opinion on the finned lead is reliable .................... 11
      2.   Dr. McDuff's opinion on F15 is reliable .................................... 14
   B.   Dr. McDuff's lost profits calculation using a ▮▮▮ conversion rate is reliable and admissible ........................................................................ 15
   C.   Dr. McDuff's reasonable royalty calculation is reliable ................... 17
   D.   Dr. McDuff can testify about the intercompany licenses ................. 22
   E.   Dr. McDuff's *Georgia-Pacific* factor 12 analysis is admissible .......... 23
   F.   Dr. McDuff does not opine on "copying" but his opinions on similarities of the systems is admissible .............................................. 25
V.    CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*ActiveVideo v. Verizon Communs., Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................................... 15

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ................................................................................ 10

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
    2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) ....................................................... 17

*Astra Zenica AB, et al., v. Apotex Corp., et al.*,
    782 F.3d 1324 (Fed Cir. 2015) ............................................................................. 20

*Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp.*,
    2022 WL 17584180 (D. Del. Dec. 12, 2022) ....................................................... 17

*Better Mouse Co., LLC v. SteelSeries ApS*,
    2016 WL 3611528 (E.D. Tex. Jan. 5, 2016) ........................................................ 21

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ........................................................................ 10, 17

*Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*,
    218 F. Supp. 3d 375 (E.D. Pa. 2016) .................................................................... 21

*Datascope Corp. v. SMEC, Inc.*,
    879 F.2d 820 (Fed. Cir. 1989) .............................................................................. 12

*DatCard Sys., Inc. v. PacsGear, Inc.*,
    2013 WL 12134056 (C.D. Cal. March 12, 2013) ................................................. 13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ...................................................................................... *passim*

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ............................................................................ 12

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,
    2022 WL 16957834 (C.D. Cal. Oct. 12, 2022) ......................................... 11, 13, 19

ii

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION AND MEMORANDUM IN SUPPORT OF
*DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. MCDUFF
CASE NO. 8:19-CV-02115-DOC-JDE

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ......................................................................10, 13, 14, 15

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) .............................................................................. 16

*Intel Corp. v. Future Link Sys., LLC*,
   2017 WL 2482881 (D. Del. June 1, 2017) ...........................................17, 20, 21

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) ....................................................................14, 19

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) .............................................................................4

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   2016 WL 10933024 (S.D. Cal. Mar. 25, 2016)..................................................11

*Spectralytics, Inc. v. Cordis Corp.*,
   650 F. Supp. 2d 900 (D. Minn. 2009) ................................................................11

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) .........................................................................18

*Syneron Med. Ltd. v. Invasix, Inc.*,
   2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ...................................................25

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) .........................................................................25

*W. Plastics, Inc. v. DuBose Strapping, Inc.*,
   334 F. Supp. 3d 744 (E.D.N.C. 2018) ...............................................................12

*WhereverTv, Inc. v. Comcast Cable Communications, LLC*,
   2022 WL 2115487 (M.D. Fla. June 9, 2022) .....................................................17

## I.     INTRODUCTION

Dr. DeForest McDuff is an economist engaged to evaluate the damages appropriate to compensate Medtronic for Axonics' infringement of the asserted patents. He calculated the lost profits Medtronic is entitled to recover as compensation, and he calculated damages in the form of a reasonable royalty on all accused sales.

Axonics moves to exclude certain of Dr. McDuff's opinions as unreliable.  But Axonics does not say that Dr. McDuff used the wrong (or no) methodology, or that Dr. McDuff's opinions lack any support or analysis.  No, Axonics just doesn't like Dr. McDuff's conclusions, so they are apparently "unreliable."  Axonics wants Dr. McDuff to consider a theoretical "finned" lead as a noninfringing alternative; Dr. McDuff explained why the finned lead was not available and acceptable.  Axonics wants Dr. McDuff to consider its F15 product a noninfringing alternative before it launched; Dr. McDuff explained why it was not.  Axonics thinks that Dr. McDuff used the wrong conversion rate for his lost profits calculation; Dr. McDuff explained his selected conversion rate.  Axonics opposes Dr. McDuff's reasonable royalty opinions, calling them "academically" unsupportable, whatever that means, but concedes he cited literature and case law in support.  And, finally, Axonics says Dr. McDuff should not be permitted to offer copying opinions; Dr. McDuff made clear that he is not.

None of Axonics' criticisms of Dr. McDuff's opinions have anything to do with relevance or reliability.  And that's all that matters here.  *See Daubert*, 509 U.S. at 597 (the trial judge's task is only to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").  Axonics takes disagreements with Dr. McDuff's conclusions and casts them as "unreliable" so that it can pretend to bring a proper *Daubert* motion.  Axonics can address these perceived deficiencies on cross-examination, like the Supreme Court has instructed.

## II.     BACKGROUND

### A.     Medtronic's novel InterStim system

Medtronic's InterStim system had long been the only FDA approved sacral

1

1  neuromodulation device to treat overactive bladder and fecal incontinence on the
2  market.  Ex. 1, 11/7/22 McDuff Rpt. ¶¶ 25–32. No other medical device company
3  successfully invested in the technology to treat these symptoms that predominantly
4  affect women.  And over two decades, Medtronic continued to invest time and resources
5  into its sacral neuromodulation devices to improve the therapy for patients.

6           In 1997, Medtronic first launched the InterStim I neurostimulator using leads
7  *without* tines.  *Id*. ¶ 25.  In 2002, Medtronic introduced the *tined lead*, which is covered
8  by the asserted Tined Lead patents.  *Id*. ¶ 26.  As Axonics' Chief Executive Officer Ray
9  Cohen noted, the tined lead revolutionized sacral neuromodulation: "Once that
10 innovation was brought to bear, you saw the market just took off from there."  Ex. 16,
11 AX0701792 at 794.  In 2006, now with the tined lead, Medtronic introduced InterStim
12 II, a smaller and lighter neurostimulator than InterStim I.  *Id*. ¶ 27.  InterStim II with
13 the tined lead proved to be very successful.  *Id*. ¶ 95. In 2020, Medtronic launched
14 InterStim Micro.  *Id*. ¶ 31.  InterStim Micro, which is covered by the asserted
15 Temperature Sensor and Charge Control patents, is a smaller and rechargeable
16 neurostimulator.  *Id*. ¶ 31.  In February 2022, Medtronic launched InterStim X, which
17 is not rechargeable, but is smaller and has a much longer lifespan than InterStim II.  *Id*.
18 ¶ 32. With the InterStim system, Medtronic built the sacral neuromodulation market,
19 and delivered an important treatment to millions of patients.  *Id*. ¶¶ 77, 95.
20
21                                          *Id*. ¶ 47, Ex. 19, AX1003235 at 236.

22      **B.    Axonics copies Medtronic's devices so it can enter the market**
23           In 2013, Axonics "spun out" of the Alfred Mann Foundation (AMF), a not-for-
24 profit research foundation, and licensed certain AMF patents relating to a
25 neuromodulation device. Ex. 1, ¶ 40, n.158; Ex. 2, Dearen Dep. Tr. at 30:19-31:16, Ex.
26 20, AX1167787 at 787.                                          Axonics chose
27 to develop a sacral neuromodulation device to treat overactive bladder and fecal
28 incontinence. Ex. 1, ¶ 40, 41, Ex. 2, at 31:17-33:25, 34:23-36:5; Ex. 17, AX0857695,

2

at 715.  Mr. Cohen publicly explained why—"We looked at the size of the market then concluded our best opportunity for return on investment and return on time would be to go after the sacral neuromodulation sector.  One of the decision drivers was [having a huge] market with only one competitor"—namely, Medtronic and its InterStim system.  Ex. 1, ¶ 40, 41, Ex. 21, MDT-00060475 at 476.

Having decided to enter sacral neuromodulation, ▮▮▮▮▮▮▮▮▮▮

**C.    Axonics targets Medtronic customers with its copycat product**

In the years leading up to Axonics' launch, ▮▮▮▮▮▮▮▮▮▮

1    Second, Axonics targeted Medtronic's top 1,000 customers to convert them to

2   the accused products. *Id*. ¶ 47.  As Mr. Cohen explained to investors about Axonics'

3   plan: "about 850 physicians are generating about 75% of all the implants in the United

4   States.  So, we do not have to go out there and deal with tens of thousands or thousands

5   of physicians to convert them to the Axonics product and have them be our customers.

6   ***This is a very manageable group of physicians that we're going after and we know***

7   ***exactly who they are***, where they're located and how much volume they're doing …."

8   *Id*. ¶ 47; Ex. 18, AX0858653 at 677

9

10

11          **D.      Dr. McDuff analyzes Medtronic's damages**

12          Dr. McDuff opines on the damages Medtronic has sustained as a result of

13   Axonics' patent infringement.  He has a Ph.D. in economics, is an economics professor,

14   and has provided expert analysis in over 75 cases involving healthcare products,

15   including medical devices. Ex. 1, ¶¶ 3–4.  Dr. McDuff issued a 232-page report with

16   over 800 footnotes citing to evidence, case law, and published literature evaluating the

17   appropriate damages in this case.  He concluded that Medtronic is entitled to both lost

18   profits damages and reasonable royalty damages due to Axonics' infringement.

19              **1.      Dr. McDuff analyzes Medtronic's lost profits**

20          In calculating lost profits, Dr. McDuff analyzed the well-established factors from

21   *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

22          ***Demand for the Patented Products***: Dr. McDuff opined that sales of Axonics'

23   accused products and Medtronic's competing InterStim system show demand for the

24   patented products. Ex. 1, ¶¶ 75–84.  Axonics' damages expert Ms. Julie Davis does not

25   dispute that there is demand. Ex. 5, Davis Dep. Tr. at 230:7–14.

26          ***Noninfringing Alternatives***: Dr. McDuff opined that there are no "commercially

27   acceptable non-infringing alternative [alternatives] that would have been available to

28

4

Axonics during the alleged infringement and would have provided substantially similar features and benefits to consumers of the Accused Products." Ex. 1, ¶¶ 85–104.

First, Dr. McDuff addressed Axonics' contention that a non-tined lead design, called a ████████ constitutes an available and acceptable noninfringing alternative to the Tined Lead patents. *Id.* ¶¶ 91–96. As described in Medtronic's motion for partial summary judgment, Dkt. 201-1, the ████████ was invented by a third party, and is covered by several United States patents assigned to third-party companies. *Id.* at 12–13. ████████████████████████████████████████████████ ████████████████████████████████████████ No ████ ████ product has ever been FDA approved or marketed in the United States. *Id.* Dr. McDuff relied on Medtronic's technical expert Dr. Toby Chai, who opined that the ████████ was not an available or acceptable alternative. Ex. 1, ¶ 92. Dr. McDuff also observed that Axonics had "put forward no evidence" that it could have developed and commercialized an FDA approved ████████. *Id.* ¶ 93. ████████ ████████████████████████████████████████████ ████████████████████████████████ Given these undisputed facts, Dr. McDuff concluded that the ████████ is not an available or acceptable noninfringing alternative to Axonics. *Id.* ¶¶ 91–96.

Second, Dr. McDuff addressed Axonics' contention that its F15 product is an available and acceptable noninfringing alternative to the Temperature Control and Charge Control patents. *Id.* ¶¶ 97–103. The F15 product is not rechargeable and is larger than the accused products. Dkt. 201-1 at 14. It was FDA approved in March 2022 and first sold in the United States in April 2022. *Id.* ████████ ████████████████████████████████████████████ ████████████████████████████ Thus, Dr. McDuff found that the F15 product is not available to Axonics before March-April 2022. *Id.* ¶ 102. ████████████████████████████████████████████ ████████████████████████████████████████████

In sum, Dr. McDuff opined that "[b]ecause Axonics could not have commercialized products with the same or substantially similar benefits absent the alleged infringement," Axonics "could not have made its historical sales of Accused Products. As a result, but for the alleged infringement, customers of Axonics' Accused Products would have purchased substitute products providing substantially the same benefits: principally, Medtronic's substitute InterStim products …." Ex. 1, ¶ 104.

***Marketing and Manufacturing Capacity***:   Axonics does not challenge Dr. McDuff's opinion that Medtronic had "substantial manufacturing and marketing capacity to capture demand for Axonics' Accused Products." Ex. 1, ¶¶ 105–121.

***Profit Calculation:***  Dr. McDuff quantified Medtronic's lost profits Ex. 1, ¶ 124.

First, Dr. McDuff calculated Axonics' accused sales based on the data produced. *Id*. ¶¶ 126–135.

Second, Dr. McDuff considered likely substitutes for Axonics' accused sales in the "but-for" world. *Id*. ¶¶ 136–145. Dr. McDuff opined that since Axonics had no noninfringing alternatives, historical demand for the accused products would have to have been satisfied by other substitutes on the market. *Id*. ¶¶ 136–138. Dr. McDuff then analyzed all potential substitutes, including the InterStim System and other "third-line" therapies like Botox and PTNS. *Id*. ¶¶ 137–145. Based on the evidence, including Axonics' own statements, Dr. McDuff concluded Botox and PTNS "would not be viable as substitute products" for the accused products. *Id*. ¶ 139. But, Dr. McDuff opined, given their similar benefits, that Medtronic's InterStim system would satisfy demand for the accused products, and thus that Medtronic lost significant sales. *Id*. ¶¶ 136–145.

6

1    Third, Dr. McDuff calculated Medtronic's lost sales but-for Axonics'
2    infringement. *Id*. ¶¶ 146–165. Dr. McDuff divided the accused sales into two sources
3    of lost sales: lost sales due to conversion and lost sales due to growth. *Id*. ¶ 147.

4    Dr. McDuff first estimated lost sales due to conversion. He opined that though
5    there is evidence that the number converted sales is higher, "as a matter of conservatism,

6    [redacted]
7    [redacted]
8    [redacted] *Id*. ¶¶ 148–149. Dr.
9    McDuff also opined "evidence indicates that conversion units would have been
10   captured by InterStim II from Q4 to Q2 2020 and by InterStim Micro from Q3 2020
11   through the remainder of the damages period." *Id*. ¶ 150.

12   Dr. McDuff then calculated lost sales due to growth, which recognize that the
13   volume of sacral neuromodulation sales expanded after the introduction of rechargeable
14   devices. *Id*. ¶ 151. Reviewing the evidence, Dr. McDuff opined that, but for Axonics'
15   alleged infringement, Medtronic's InterStim Micro "would have been able to grow the
16   SNM market in a similar fashion as Axonics, resulting in Medtronic capturing
17   additional sales that were lost due to the alleged infringement and Axonics' earlier
18   release of a similar system." *Id*. ¶ 157. Dr. McDuff then ran a statistical model and
19   found [redacted]
20   [redacted]
21   [redacted]
22   [redacted]
23   [redacted] *Id*.

24   Fourth, Dr. McDuff calculated the profit margin that Medtronic would have been
25   expected to earn on lost sales. *Id*. ¶¶ 185–192.

26   Fifth, Dr. McDuff calculated the lost profits retained by each named Medtronic
27   entity. Ex. 1, ¶¶ 161–165. Axonics does not challenge this calculation, and Ms. Davis
28   did no lost profits calculation of her own. Ex. 5, at 270:13–20.

7

1    In total, Dr. McDuff calculated lost profits damages across all Medtronic

2    plaintiffs to be ███████████████

3                   2.    **Dr. McDuff analyzes Medtronic's reasonable royalty damages**

4    Dr. McDuff also calculated reasonable royalty damages.  As is customary, Dr.

5    McDuff analyzed a hypothetical negotiation between Medtronic and Axonics for a

6    license to the asserted patents on the eve of first infringement.  Ex. 1, ¶¶ 204–357.

7    Dr. McDuff used the well accepted "income approach" to valuation.  *Id*. ¶ 216.

8    Among other analyses, he calculated the incremental revenue tied to each additional

9    sale, and also considered whether Axonics incurred incremental costs.  *Id*. ¶ 226.  Dr.

10   McDuff found that certain G&A and S&M costs can reasonably be considered

11   incremental costs for the accused products.  *Id*. ¶ 227.  But based on Axonics' own

12   statements and his experience, Dr. McDuff concluded that R&D costs specific to the

13   accused products are not incremental to each additional sale.  *Id*. ¶¶ 229–231.  Dr.

14   McDuff performed a regression analysis on the G&A and S&M costs.  *Id*. ¶¶ 234–235.

15   And then calculated an incremental profit margin equal to ████████████████

16   ████████████████████████████    *Id*. ¶¶ 234–235.

17   Second, Dr. McDuff opined that the parties would reasonably seek to allocate

18   some of the incremental profit to Axonics to recognize its "time, investment, risk, and

19   capital in bringing the accused products to market."  *Id*. ¶¶ 236–243.  Dr. McDuff

20   opined that the "most economically reasonable way" to do is by deducting a "baseline

21   margin appropriate for Axonics' business …."  *Id*.  Axonics, however, is not currently

22   profitable, so Dr. McDuff considered profit margins from several competitors in the

23   industry.  *Id*.  He ultimately chose Medtronic's operating profit margin—████████

24   as a good proxy to compensate Axonics at the hypothetical negotiation for its "long-

25   term business implementation and commercialization efforts (i.e., the incremental

26   margin less the royalty paid should still allow for Axonics to earn a reasonable margin

27   to maintain economic incentives for it to stay on the market."  *Id*.

28

8

1    Third, among his consideration of other qualitative and quantitative evidence, Dr.

2    McDuff apportioned the excess profit margin—the remaining profit after the baseline

3    margin is deducted from the incremental profit margin—to isolate the value of the

4    asserted patents relative to other technologies related to the accused products. *Id.*

5    ¶¶ 244–268. Dr. McDuff performed a patent citation analysis, a recognized method to

6    assess the relative value of patents based on the frequency at which a given patent is

7    cited by later patents. *Id.* ¶¶ 248–253. Dr. McDuff included all the patents that cover

8    the accused products and controlled for relevant variables in his patent citation analysis,

9    following the literature and case law. *Id.* ¶¶ 248–253. Dr. McDuff explained that "while

10   the number of total citations to the SNM Product Patents may be indicative of their

11   value and contributions generally, the royalty analysis in this case is focused on the

12   value of the relevant SNM Product Patents (which include the Asserted Patents) to

13   Axonics and its Accused Products, specifically." *Id.* ¶ 260. Dr. McDuff used his patent

14   citation analysis as one input in his examination of the *Georgia-Pacific* factors and the

15   hypothetical negotiation to land on a range of reasonable royalties for each asserted

16   patent as appropriate damages in this case. *Id.* ¶¶ 341–357. In total, Dr. McDuff

17   calculated reasonable royalty damages in range of ▮▮▮▮▮▮.

## III.   LEGAL STANDARD

19   The trial court's task is to ensure that an expert's testimony "both rests on a

20   reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

21   *Pharms., Inc.*, 509 U.S. 579, 580 (1993). Expert opinion testimony is relevant if the

22   knowledge underlying it has a valid connection to the pertinent inquiry, and it is reliable

23   if the knowledge underlying it has a reliable basis in the knowledge and experience of

24   the relevant discipline. *Id.* at 580, 592. The "traditional and appropriate means of

25   attacking" expert testimony is not exclusion, but through "[v]igorous cross-

26   examination, presentation of contrary evidence, and careful instruction on the burden

27   of proof." *Id.* at 595–96. "Basically, the judge is supposed to screen the jury from

28   unreliable nonsense opinions, but not exclude opinions merely because they are

9

impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969
(9th Cir. 2013).  Challenges that go to the weight of the evidence, not admissibility, are
not proper *Daubert* challenges.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036,
1044 (9th Cir. 2014).

## IV.    ARGUMENT

### A.    Axonics' speculative noninfringing alternatives were not available

Axonics' motion gets off on the wrong foot because it misstates the law.  Axonics
asserts that "the law requires the patentee to prove an 'absence of acceptable
noninfringing substitutes.'" Dkt. 192-1 at 8–9.  But like the case here, "[w]hen an
alleged alternative is ***not on the market*** during the accounting period, a trial court may
reasonably infer that it was ***not available*** as a noninfringing substitute at that time.  The
***accused infringer then has the burden*** to overcome this inference by showing that the
substitute was available[.]" *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d
1341, 1353 (Fed. Cir. 1999) (emphasis added); Dkt. 201-1 at 15–16.  As explained in
Medtronic's motion for partial summary judgment, Axonics has not met that burden.

Axonics intentionally tries to mislead the Court when it calls the finned lead
"Axonics' ▮▮▮▮▮▮▮▮ Dkt. 192-1 at 3.  The ▮▮▮▮▮▮ design, however, has ***never***
been "Axonics'".  Dkt. 192-1 at 9.  Even today, Axonics is legally prohibited from
making or selling a ▮▮▮▮ product, and no ▮▮▮▮▮ product has ever been FDA
approved or sold in the United States.  Dkt. 201-1 at 18–26.  As a matter of law, the
▮▮▮▮▮ is not a noninfringing alternative available to Axonics.  *Id.*

Similarly, Axonics' F15 product was first launched in the United States in April
2022.  *Id*. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Medtronic's motion for partial summary judgment of no noninfringing
alternatives should be granted, which moots Axonics' motion to exclude Dr. McDuff's
opinions on the finned lead and F15 product.

10

### 1.   Dr. McDuff's opinion on the finned lead is reliable

Axonics admits that Dr. McDuff examined whether the finned lead is an acceptable noninfringing alternative available to Axonics in the "but-for" world.  Dkt. 192-1 at 9–10 ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████; Ex. 1, ¶¶ 85–96; *see also* Ex. 6, McDuff Dep. Tr. at 138:2–139:19, 143:19–145:4, 181:20–182:8, 183:7–184:1, 184:3–21.  Axonics just subjectively disagrees that the finned lead was not available and not acceptable.

Dr. McDuff relied on Medtronic's technical expert and considered the undisputed evidence—e.g., Axonics never had rights to the patents covering the ████████; and no ████████ product has ever been approved by the FDA or sold in the United States. Ex. 1, ¶¶ 85–96. Based on that analysis, Dr. McDuff concluded that in the but-for world the ████████ was not an available and acceptable noninfringing alternative. *Id.*; *see also* Ex. 6, at 138:2–139:19, 143:19–145:4, 181:20–182:8, 183:7–184:1, 184:3–21. His method is sound, fit to the facts of the case, and similar to expert testimony that courts routinely admit on no noninfringing alternatives.  *See Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 910 (D. Minn. 2009) (permitting testimony by Axonics' damages expert Julie Davis, on the evidence she relied upon on in finding that machines were not "acceptable" noninfringing alternatives).

Axonics' problem with Dr. McDuff is that he did not accept Axonics' rank speculation about acceptability and availability, and instead formed opinions based on the undisputed facts. Dkt. 192-1 at 11. That is no reason to exclude his testimony. *See, e.g., Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 2022 WL 16957834, at *6 (C.D. Cal. Oct. 12, 2022) ("Defendant's disagreements with [Plaintiff's damages expert's] opinions concerning acceptable noninfringing alternatives do not provide a basis to exclude them under *Daubert*" as that "goes back to weight, not admissibility"); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 2016 WL 10933024, at *5

11

1  (S.D. Cal. Mar. 25, 2016) (same); *W. Plastics, Inc. v. DuBose Strapping, Inc.*, 334 F.
2  Supp. 3d 744, 753 (E.D.N.C. 2018) (same).
3          In a game of misdirection, Axonics suggests that Dr. McDuff improperly opines
4  on the FDA approval process.  Dkt. 192-1 at 9.  Axonics is wrong.  Dr. McDuff does
5  not evaluate the likelihood that the FDA would approve a theoretical ▮▮▮▮ device.
6  Rather, in opining that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. McDuff remarks on the state
8  of the undisputed evidence—there is not a single document, or any sworn testimony,
9  showing that Axonics ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 1, ¶¶ 85–96;
11  *see also* Ex. 6 at 138:2–139:19, 143:19–145:4, 181:20–182:8, 183:7–184:1, 184:3–21.
12  Notably, Axonics cites none in its motion.  It was not Dr. McDuff's job to analyze
13  whether and how Axonics could obtain FDA approval.  That's Axonics' burden.  His
14  job is to look at the facts in the record and, using his experience and expertise, draw an
15  appropriate conclusion.  Dr. McDuff did just that.  And the fact that Axonics never
16  obtained FDA approval on a ▮▮▮▮ product is enough to render it unavailable as a
17  matter of law.  *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314,
18  1332 (Fed. Cir. 2009) (medical device alternative not available in part because it "had
19  never been submitted to the Food & Drug Administration for the necessary marketing
20  approval"); *see also Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 824–25 (Fed. Cir.
21  1989) (medical device not available where it did not have the "FDA approval").
22          Axonics is also flat wrong in claiming Dr. McDuff's "could not identify anything
23  that suggested Axonics did not have the know-how or equipment to make ▮▮▮▮
24  at the time."  Dkt. 192-1 at 10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
28  ▮▮▮▮ *Id.*; Ex. 6, at 183:7–184:1. And in any event the absence of evidence is not

12

1    the affirmative proof that Axonics needs to overcome the presumption of unavailability.

2    *See Grain Processing*, 185 F.3d at 1348; *DatCard Sys., Inc. v. PacsGear, Inc.,* 2013 WL

3    12134056 at *1 (C.D. Cal. March 12, 2013) ("If the movant does not bear the burden

4    of proof, then he can obtain summary judgment simply by showing the nonexistence of

5    any essential element of the opposing party's claim or affirmative defense.")

6        Finally, Axonics faults Dr. McDuff's opinion that the ███████████ is not an

7    acceptable alternative because Dr. McDuff called ███████████████████████

8    Dkt. 192-1 at 10. Axonics asserts this renders Dr. McDuff's opinion "not sufficiently

9    tied to the facts of this case" because ███████████. *Id.* Axonics cites no law or

10   evidence to support this odd contention, just unadorned attorney argument about how

11   the ███████ are "very similar to Medtronic's tined leads" and are a "drop-in

12   replacement for a tined lead." *Id.* But, by definition, the ████████ is a non-tined

13   lead—that is why Axonics proposed it as an alternative. In fact, Axonics own discovery

14   responses give lie to its claims. In multiple interrogatory responses, Axonics described

15   the ████████ as a ████████████████████████████ Ex. 7,

16   9/16/22 Axonics Resp. to Rog 13 at 31; Ex. 8, 10/17/22 Axonics Resp. to Rog 8 at 29–

17   30. ██████████████████████████████ Notwithstanding Dr.

18   McDuff tied his opinions to the facts of the case and is specific in including ████████

19   █████████████████████████████ Ex.1 ¶¶ 91–96. Dr. McDuff

20   considered Medtronic's technical expert, and did his own independent investigation in

21   concluding that there is no evidence that non-tined leads, including a ████████,

22   constitute an acceptable non-infringing alternative. *Id.* Axonics is able to cross examine

23   Dr. McDuff about that conclusion, but there is nothing unreliable about his method.

24       In sum, Axonics disagrees with Dr. McDuff's opinion that in the "but-for" world

25   the ████████ is not an acceptable or available alternative, but that does not warrant

26   exclusion. *See Edgewell Pers. Care,* 2022 WL 16957834, at *6 ("That Defendant

27   disagrees with [Plaintiff's damages expert's] conclusions does not render them

28   inadmissible."). Dr. McDuff is not required to blindly accept Axonics' naked assertion

13

1    that the ▓▓▓▓ is an available and acceptable alternative.  *See Micro Chem., Inc. v.*

2    *Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("experts sometimes reach different

3    conclusions based on competing versions the facts" but cross-examination" and

4    "presentation of contrary evidence" are the appropriate means of attacking admissible

5    evidence).  Axonics cites no case dictating that Dr. McDuff must do so, and in fact the

6    law holds the opposite: where, like here, no alternative is on the market, courts have

7    repeatedly found that "[m]ere speculation" and "theoretical[] possib[ilities]" are

8    insufficient to overcome the inference of non-availability.  Dkt. 201-1 at 18–19.  Dr.

9    McDuff's opinion squares with this perfectly.

10                   **2.     Dr. McDuff's opinion on F15 is reliable**

11        Similarly flawed is Axonics' motion to exclude Dr. McDuff opinion on Axonics'

12    F15 product.  Axonics again concedes that Dr. McDuff considered the availability and

13    acceptability of the F15 product in the but-for world.  Dkt. 192-1 at 11–12.  Dr. McDuff

14    opined that the F15 product was not available to Axonics before its United States'

15    release in April 2022.  Ex. 1, ¶¶ 102–103.  And Dr. McDuff opined that ▓▓▓▓

16    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.*  Axonics does not explain why Dr. McDuff's

19    methodology is unreliable.  And it cites no case supporting exclusion.

20        Axonics instead suggests that Dr. McDuff ***had to conclude*** that the F15 product

21    was available before April 2022 because, citing *Grain Processing*, "'a rational would-

22    be infringer is likely to offer an acceptable noninfringing alternative.'" Dkt. 192-1 at

23    13.  But that is not the law.   Curiously, Axonics leaves out the rest of the court's

24    sentence, which is fatal to Axonics' position: in the but-for world "a rational would-be

25    infringer is likely to offer an acceptable noninfringing alternative, ***if available***, to

26    compete with the patent owner rather than leave the market altogether." *See Grain*

27    *Processing,* 185 F.3d at 1350–51.  Here, Dr. McDuff opined, based on the undisputed

28    evidence, that the F15 product was ***unavailable*** to Axonics before April 2022, and

14

therefore, in the but-for world, Axonics cannot offer it as a noninfringing alternative any earlier. Dkt. 201-1 at 25; Ex. 1, ¶¶ 102–103. His opinion is entirely consistent with *Grain Processing*.

Axonics also faults Dr. McDuff's opinion that the F15 product is not an acceptable alternative. Dkt. 192-1 at 12. But his opinion is rooted in the facts of the case. ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Axonics' disagreement with Dr. McDuff's underlying factual assumptions and conclusions goes to weight and not admissibility. *See, e.g.*, *ActiveVideo v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (disagreement with underlying factual assumptions and conclusions reached by expert goes to weight, not admissibility).

**B.    Dr. McDuff's lost profits calculation using a ████ conversion rate is reliable and admissible**

Axonics moves to exclude Dr. McDuff's lost profits calculations, but attacks only one discrete aspect of Dr. McDuff's overall capture rate calculation. Dkt. 192-1 at 13–16. In Q2 2020, Axonics' Chief Executive Officer Raymond Cohen stated that "over 20% of our implants to date have been associated with physicians replacing their InterStim devices with Axonics." Ex 1, ¶ 148. Dr. McDuff relied on that direct statement to estimate ███████████████████████████████████████████████ ████████████████████████████████ *Id*. ¶¶ 148–149. Axonics asserts this renders Dr. McDuff's opinion unreliable, but cites no law in support. Interestingly,

15

Axonics has not offered any expert opinion on the correct conversion rate, or any evidence as to why Dr. McDuff is wrong.  Instead, Axonics levels criticisms that, while factually incorrect and irrelevant, are appropriately addressed on cross-examination.

As noted, Axonics curiously contends that Dr. McDuff's reliance on Mr. Cohen renders his opinion "not reliable." Dkt. 192-1 at 14, 16. Unless Axonics is now saying that *Mr. Cohen was openly lying to investors* about the sales Axonics had converted, *Mr. Cohen is not reliable*, and that *Mr. Cohen's* public statements *are not true and correct*, Axonics provides no reason why Dr. McDuff should not take the statement of Axonics' Chief Executive Officer at face value.  Of course, Axonics is free to probe the reliability, context, and veracity of Mr. Cohen's statement on Dr. McDuff's cross.  Or Axonics can have Mr. Cohen testify at trial that his statement to investors was false and unreliable.  Either way, this is no reason for exclusion.  The "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it's up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004).

Axonics also says Dr. McDuff failed to "study and analyze the detailed sales data produced by both parties." Dkt. 192-1 at 14–15. Even if such an analysis were required, and Axonics cites no law to support that proposition, Axonics is wrong.  Dr. McDuff studied the data, and explicitly observed that ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████  Ex. 1, ¶¶ 148–149 & n.434. Dr. McDuff even provided an example.  *Id.* But, "as a matter of conservatism," Dr. McDuff applied Mr. Cohen's ████ conversion rate. *Id.* ¶¶ 148–149.  Axonics can cross examine Dr. McDuff about that choice as well. Once again, "vigorous cross-examination, [and] presentation of contrary evidence" are the best means of addressing admissible analyses about which reasonable experts might disagree. *See Daubert*, 509 U.S. at 596.

16

1   The rest of the issues raised by Axonics do not attack Dr. McDuff's methodology

2   at all, but rather the "weight he places on the data relied about in his analysis." *See*

3   *WhereverTv, Inc. v. Comcast Cable Communications, LLC*, 2022 WL 2115487, at *10

4   (M.D. Fla. June 9, 2022). The court "is supposed to screen the jury from unreliable

5   nonsense opinions, but not exclude opinions merely because they are impeachable."

6   *City of Pomona*, 750 F.3d at 1043–44. As Axonics did at deposition, Axonics can

7   examine Dr. McDuff on why he applied the ███ conversation rate to the entire damages

8   period (*see* Ex. 6 at 191:3–192:3; Ex. 1, ¶¶ 148–149); on whether Medtronic's ability

9   to recapture market share impacts the ███ conversion rate (Ex. 6 at 192:14–195:13);

10  and whether the ███ rate accounts for Axonics customers that may have decided not to

11  use Medtronic's InterStim II system in any event (*id.* at 187:1–13, 200:15–207:8).  Dr.

12  McDuff answered each of those charges, but their ultimate resolution should be decided

13  by the jury, not by this Court on a *Daubert* motion.  At the *Daubert* stage, "the district

14  court is not tasked with deciding whether the expert is right or wrong, just whether his

15  testimony has substance such that it would be helpful to a jury." *City of Pomona*,

16  750 F.3d at 1043–44.

17  ### C.   Dr. McDuff's reasonable royalty calculation is reliable

18  Axonics seeks to exclude Dr. McDuff's reasonable royalty opinions, contending

19  that those too are "unreliable" because they are "not grounded in sufficient facts and

20  data." Dkt. 192-1 at 16–17.  But "[t]he Federal Circuit has made clear that there is no

21  single, exacting way to *conduct* an apportionment analysis, since 'damages models are

22  fact dependent.'" *Intel Corp. v. Future Link Sys., LLC*, 2017 WL 2482881, at *5 (D.

23  Del. June 1, 2017). And Axonics' own briefing shows that Dr. McDuff applied reliable

24  principles to the facts of the case to apportion value and calculate reasonable royalty

25  damages. *See Bd. of Regents Univ. of Texas Sys. v. Bos. Sci. Corp.*, 2022 WL 17584180,

26  at *2 (D. Del. Dec. 12, 2022) (admitting expert testimony apportioning incremental

27  profit to patented features based on qualitative analysis); *Alfred E. Mann Found. for*

28  *Sci. Rsch. v. Cochlear Corp.*, 2018 WL 6190604, at *15 (C.D. Cal. Nov. 4, 2018)

17

(noting income approach is well accepted valuation method). Aside from bombastic platitudes about unreliable "principles" and "methods," the only things Axonics attacks are choices Dr. McDuff made—and fully explained—and the conclusions he reached.

Axonics does not challenge Dr. McDuff's royalty structure, damages period, or royalty base. Its own expert agrees with Dr. McDuff. Ex. 9, at 44–46. And, in its briefing, Axonics recognizes that: (1) Dr. McDuff applied the smallest saleable patent-practicing unit (Dkt. 192-1 at 17; Ex. 9, at 44–46); (2) incremental profit can be used to calculate reasonable royalty damages (Dkt. 192-1 at 17–18; Ex. 5 at 273:9–19); (3) patent citation analysis can be used in calculating reasonable royalty damages (Dkt. 192-1 at 15; Ex. 5 at 197:23–200:2; Ex. 9, at 121; Ex. 10, Mooney Dep. Tr. at 166:24–168:1); (4) Dr. McDuff considered the evidence in calculating an incremental profit margin (Dkt. 192-1 at 17–19); (5) Dr. McDuff considered evidence about R&D costs and a baseline margin (*id.*); and (6) Dr. McDuff used an incremental profit margin, among other quantitative and qualitative analyses, to assess reasonable royalty damages in this case (*id.* at 10–20). Dr. McDuff's reasonable royalty opinion is, admittedly, based on reliable principles, tied to the facts of the case, and should not be excluded. *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1298 (Fed. Cir. 2015).

Axonics cites no law to the contrary. Instead, Axonics raises superficial concerns that boil down to a disagreement between experts. Dr. McDuff, based on his review of the record, ███████████████████████████████████ Ex. 1, ¶¶ 229–231; Ex. 6 at 252:23–253:14, 255:16–259:4. Axonics' expert disagrees. Ex. 10 at 59:3–61:14. ███████████████████████

███████████████████████ ██████ Ex. 1, ¶¶ 239–242; Ex. 6, at 119:15–121:4. Axonics' expert disagrees. Ex. 10 at 64:11–65:8. And Dr. McDuff executed his patent citation analysis with a focus on the technology that Axonics deemed most important. Ex. 1, ¶¶ 248–263. Axonics' expert disagrees with the way in which Dr. McDuff applied it, but admitted there is no one right way to do patent citation analysis and ultimately adopts a slightly modified

18

version of Dr. McDuff's work.  Ex. 10 at 166:24–168:20, 232:14–233:1, 236:17–237:19, 242:3–246:10. These differences should be resolved by the jury, not by a *Daubert* motion.  *Edgewell Pers. Care Brands*, 2022 WL 16957834, at *4–6 ("[D]isagreements with Milani's opinions concerning acceptable noninfringing alternatives do not provide a basis to exclude them …"). "When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem.*, 317 F.3d at 1392.

Axonics' various disagreements miss the mark anyway.  First, Axonics fundamentally misunderstands the relationship between R&D costs and Dr. McDuff's incremental profit margin analysis.  In Axonics' view R&D costs are "incremental" because R&D costs are additional monies needed bring a product to market.  Dkt. 192-1 at 18–19; Ex. 10 at 92:5–22. But Dr. McDuff's incremental profit margin analysis focuses on profit that is earned on each additional product sold.  Dkt. 192-1 at 18.  Dr. McDuff does not ignore R&D costs, but rather concluded based on the evidence that R&D costs do not increase with each product sold, and therefore do not impact the incremental profit margin.  Ex. 1, ¶¶ 229–231; Ex. 6 at 252:23–253:14, 255:16–259:4. Axonics own brief proves Dr. McDuff's point.  Axonics criticizes Dr. McDuff because he did not include R&D costs incurred in 2017, 2018, and all of 2019, well before Axonics' launched the accused products in the United States in November 2019.  Dkt. 192-1 at 19.  But those R&D costs cannot have been incremental with each additional sale, because Axonics did not have sales in the United States during that time.  Even Axonics damages expert Mr. Drew Mooney agreed that R&D costs identified in Axonics' 10-K do not increase with each product sold.  Ex. 10 at 84:7–110:11.  Still, Dr. McDuff's analysis compensates Axonics for its historical R&D expense in two ways. First, Dr. McDuff credits Axonics a baseline operating margin to reflect Axonics "time, investment, risk, and capital in bringing the accused products to market."  Ex. 1, ¶¶ 234–236.  This reflects R&D cost.  Second, Dr. McDuff ███████████

19

1 [REDACTED]

2 *Id.* ¶¶ 244–

3 245, 254–258, 266–267, Tables 10–13, & Exhibits I-1 and I-2.

4     Second, Dr. McDuff applied the facts of the case, and explained in detail the

5 reasons he deducted Medtronic's operating margin as a baseline margin. Dkt. 192-1 at

6 19-20; Ex. 1, ¶¶ 234–242. This is ultimately favorable to Axonics, and not at all required

7 by an analysis of this type. *See Astra Zenica AB, et al., v. Apotex Corp., et al.*, 782 F.3d

8 1324, 1333–40 (Fed Cir. 2015) (affirming royalty of 50% of gross profit margin). Yet

9 Axonics disagrees, and claims that Dr. McDuff erred, but cites no law or evidence to

10 the contrary. [REDACTED]

11 [REDACTED]

12 [REDACTED]

13 [REDACTED]

14 [REDACTED]

15 [REDACTED]

16 Dkt. 192-1 at 21.

17 [REDACTED]

18 [REDACTED]

19 [REDACTED]

20 Dkt. 192-1 at 19–20. This

21 factual dispute is no reason to exclude Dr. McDuff's testimony.

22     Third, contrary to Axonics' suggestion, Dr. McDuff's patent citation analysis is

23 well-supported by literature and case law. *See* Ex. 1, ¶¶ 216–217, 244–249; Ex. 6 at

24 219:11–16, 221:20–24; Ex. 11, Sidak and Skog, "Citation Weight, Patent Ranking, and

25 Apportionment of Value for Standard-Essential Patents"; *Intel Corp.*, 2017 WL

26 2482881, at *4. Specifically, in his deposition, Dr. McDuff identified academic articles

27 and case law where patent citation analysis was applied to profits to determine patent

28 value, just like he did here. Ex. 6 at 220:5–23, 221:2–7, 222:1–17, 222:22–223:3; Ex.

20

11; *Intel Corp., LLC*, 2017 WL 2482881, at *4 (admitting expert testimony that "applied the value shares from his forward citation analysis to profits for the accused products, thereby, . . . properly apportioning the profits attributable to specific accused features").

Dr. McDuff's patent citation analysis is also sufficiently tied to the facts of the case. *Better Mouse Co., LLC v. SteelSeries ApS*, 2016 WL 3611528, at *2 (E.D. Tex. Jan. 5, 2016) (admitting patent citation analysis was tied to the facts of the case); *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 218 F. Supp. 3d 375, 384 (E.D. Pa. 2016) (same).  Dr. McDuff explained why patent citation analysis applies. Ex. 1, ¶¶ 248–263.  Backed by Medtronic's technical experts, he identified all the patents that relate to the accused products.  *Id*. Most relevant to the hypothetical negotiation, Dr. McDuff did a patent citation analysis focused on assessing the value of these patents to Axonics.  *Id*. Following the literature, he controlled for relevant variables like technology comparability, patent reissues, citations to published applications, age of the patent, and self-citations.  *Id*. Finally, Dr. McDuff used the patent citation analysis in his broader examination of the hypothetical negotiation to land at a range of reasonable royalties as proper damages in this case.  *Id*.

Importantly, Axonics cites no law even hinting that Dr. McDuff's approach to patent citation analysis is unsound or not sufficiently tied to the facts.  Any criticisms leveled at Dr. McDuff's analysis go to weight and not admissibility.

Axonics seemingly demands a less precise method to patent citation analysis, one that emphasizes technologies and features that are not accused of infringement.  Dkt. 192-1 at 22–23. Axonics provides no basis for position, which should be tested through cross-examination in any event.  Similarly, Axonics' focus on "qualitative" evidence— which mostly comprises of unverified lawyer drafted interrogatory responses (*see* Ex. 10 at 183:8–184:7)—of the importance of the AMF patents is misplaced. Dkt. 192-1 at 24–25.  The importance of the AMF patents to Axonics is reflected in the scores of Dr. McDuff's citation analysis.  That is the point of patent citation analysis—to provide an objective measure of a patent's value based on its forward citations. Ex. 6 at 235:7–13.

21

And it's worth noting that Axonics' calculation of royalties with additional citations from AMF patents is a new methodology not advanced by either of their experts.  Dkt. 192-1 at 23. This new analysis is improper when considering the admissibility of Dr. McDuff's analysis.  Axonics' motion should be denied.

**D.    Dr. McDuff can testify about the intercompany licenses**

Axonics' motion to preclude Dr. McDuff from testifying about Medtronic's intercompany licenses is a poorly veiled motion *in limine* and not a proper *Daubert*.  It should be summarily denied.

Dr. McDuff has very limited opinions related to Medtronic's intercompany license agreements.  First, Dr. McDuff relies on them in part to guide the right allocation of lost profits among the plaintiff Medtronic entities.  Ex. 1, ¶ 128.  Axonics does not contest their use, relevance, or admissibility on that point.  Dkt. 191-1 at 26–27.

What Axonics does purport to contest, though, is Dr. McDuff's analysis of the intercompany license agreements in the context of the hypothetical negotiation.  But there's no disagreement about their import.  Dr. McDuff assessed the agreements and concluded they "would not have provided an informative starting point for the reasonable royalty rate analysis due to the differences noted above. However, they are generally indicative of Medtronic, Inc.'s historical licensing practices, ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████  Ex. 1, ¶¶ 274–276.  This is *exactly* what Axonics' expert concludes.  Ex. 9 at 99.  Axonics even readily acknowledge in its brief that it "is not in dispute" that the appropriate royalty structure for a hypothetical negotiation is a percentage royalty rate.  Dkt. 192-1 at 26. And Dr. McDuff will not testify that these agreements reflect a reasonable royalty rate, or are a starting point for determining the reasonable royalty rate, at the hypothetical negotiation.  Ex. 1, ¶¶ 276, 300; Ex. 6 at 268:20–23.  Axonics' motion is much ado about nothing.

Axonics cites no case law, and highlights no "undue prejudice," that supports precluding Dr. McDuff's testimony on Medtronic's intercompany license agreements.

22

1   Indeed, all points used in its motion are reasonable bases for cross-examination
2   questions that can help the jury determine the relevance of the license.  Both Axonics'
3   and Medtronic's experts examine the license terms of these agreements in detail; it
4   cannot be prejudicial to allow both parties to refer to the same evidence at trial.

5   ### E.   Dr. McDuff's *Georgia-Pacific* factor 12 analysis is admissible

6   *Georgia-Pacific* factor 12 relates to "the portion of the profit or of the selling
7   price that may be customary in the particular business or in comparable businesses to
8   allow for the use of the invention or analogous inventions."  *Georgia-Pacific*, 318 F.
9   Supp. at 1120.  For this factor, Dr. McDuff researched literature and publications on
10  royalty rates for medical devices—i.e., "comparable businesses" like *Georgia-Pacific*
11  instructs.  Ex. 1, ¶¶ 333–34.  All of Axonics' criticisms of Dr. McDuff's use of the
12  literature are acknowledged and accounted for by Dr. McDuff in his report.
13  Disagreements over the comparability of the licenses go to weight, not admissibility.

14      Most critically, and contrary to Axonics' unsupported assertion, Dr. McDuff is
15  not attempting to claim that all licenses surveyed in the literature are comparable.  He
16  makes this plain in his report: "[r]esearch into the literature and publications on royalty
17  rates for medical devices indicates that royalty rates in this space are frequently in the
18  4% to 10% range (sometimes greater, sometimes lower) for developed, commercialized
19  technologies like those claimed by the Asserted Patents."  Ex. 1, ¶ 334.  And based on
20  his research, Dr. McDuff concludes "[w]hile the agreements studied in these sources
21  have differing technologies and economic circumstances relative to the hypothetical
22  negotiations for the Asserted Patents, they are nevertheless indicative of a general range
23  of royalty rates for developed, commercialized medical device technologies.  The
24  apportioned reasonable royalty rate indicators discussed herein are generally consistent
25  with this overall range, suggesting that no adjustment is necessary to bring the royalty
26  rates in line with industry or business expectations."  *Id.* ¶ 335.  All Dr. McDuff is
27  saying is that based on reported royalty rates in the medical device industry no apparent
28  adjustments need to be made to his analysis.  As he explained at his deposition in

23

response to Axonics' counsel's same criticisms, "when getting an answer for damages or a royalty rate, it's helpful to know if those rates are similar to rates that are customary in an industry." Ex 6, at 297:14–17.  And Dr. McDuff's selection of the "medical device industry" is tied to the facts of the case—both Medtronic and Axonics are medical device companies; SNM products are medical devices; and Axonics compares itself to other medical device companies. Ex. 1, ¶¶ 13, 19, 24–32, 33–52, 108, 180, 238.b.

Axonics baselessly accuses Dr. McDuff's analysis of "unjustly bias[ing] the jury in Medtronic's favor," but does not explain how or why.  Neither Axonics nor its experts provide countervailing evidence that the royalties from the studies are inaccurate, unreliable, or incomparable for the narrow purpose of Dr. McDuff's *Georgia-Pacific* factor 12 opinions.  To be sure, Ms. Davis levies the same generic criticisms that Axonics does here, but nowhere does she say Dr. McDuff is wrong. *See* Ex. 9 at 115.

The cases Axonics cites are inapposite and do not compel exclusion either.  In *Ravo v. Covidien LP*, the expert was precluded from testifying about certain license agreements under *Georgia-Pacific* **factor 2**, which is a distinctly different factor, because the expert did not produce them in discovery.  55 F. Supp. 3d 766, 776 (W.D. Pa. 2014).  And though the expert tried to back-door the licenses under an after-the-fact "industry norm" *Georgia-Pacific* factor 12 analysis, the court rejected that attempt because it was clear he was "testifying with respect to *Georgia–Pacific* factor # 2, i.e., comparable licenses." *Id.* at 779.  It was only "***counsel's conclusory argument*** [at the hearing] that the other licenses are comparable because are they are in the 'medical device industry.'" *Id.*  Dr. McDuff of course provided the literature on which he relies, and there is no question that he is relying on those licenses only for industry custom under *Georgia-Pacific* factor 12.  And in *Syneron Medical*, unlike Dr. McDuff, the expert there in relied on four specific license agreements, three of which were litigation settlements and the fourth included the transfer of tangible assets, not broad-based industry reports to show licensing norms for comparable businesses. *Syneron Med. Ltd. v. Invasix, Inc.,* 2018 WL 4696969, at *12 (C.D. Cal. Aug. 27, 2018).

24

1  The bottom line is that all of Axonics' attacks on Dr. McDuff's *Georgia-Pacific*
2  factor 12 analysis are reserved for cross-examination, not the Court as a gatekeeper, so
3  that the jury can fully evaluate the relevance of the licenses. *Virnetx, Inc. v. Cisco Sys.,*
4  *Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("Moreover, all of the other differences that
5  Apple complains of were presented to the jury, allowing the jury to fully evaluate the
6  relevance of the licenses."). "No more is required in these circumstances." *Id.*

7        **F.**    **Dr. McDuff does not opine on "copying" but his opinions on**
8                  **similarities of the systems is admissible**

9  Axonics motion to exclude Dr. McDuff's opinion on copying is misplaced.  As
10  stated in his deposition, he is expressly *not* opining on the secondary consideration.  Ex.
11  6 at 304:2–15, 304:21–23.  Indeed, Dr. McDuff intentionally avoided the word "copy"
12  because he's not offering that type of opinion.  *Id.*  Though Dr. McDuff writes in his
13  report that Axonics ███████████████████████████████████████
14  ████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████
16  ███████████  Ex. 1, ¶ 45.  In other words, as it relates to demand and sales.  In any
17  event, all of Dr. McDuff's opinions about the similarities ***are taken directly from***
18  ***Axonics' own documents, executives, and statements to the FDA to gain regulatory***
19  ***approval.***  *Id.* ¶ 45 & nn.146–151.  Dr. McDuff's statements are factual and undisputed.
20  To reiterate, as Axonics is well aware, Dr. McDuff will not testify about copying, the
21  secondary consideration.  But Dr. McDuff should be allowed to testify about the
22  *undisputed factual* similarities between the InterStim system and the accused products
23  to the extent they are germane to Dr. McDuff's damages opinions.

**V.**    **CONCLUSION**

25  For the foregoing reasons, this Court should deny Axonics' motion to exclude
26  certain opinions of Medtronic's damages expert, Dr. McDuff.

1    Dated:  February 6, 2023              WINSTON & STRAWN LLP

2

3                                          By: /s/ Nimalka Wickramasekera
                                               Nimalka Wickramasekera
4                                              George C. Lombardi
                                               Brian Nisbet
5                                              J.R. McNair

6

7                                          Attorneys for Plaintiffs

8                                          MEDTRONIC, INC.; MEDTRONIC
                                           PUERTO RICO OPERATIONS CO.;
9                                          MEDTRONIC LOGISTICS, LLC;
                                           MEDTRONIC USA, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28