Azra Hadzimehmedovic (Bar No. 239088)
azra@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260,
McLean, VA 22102
Telephone:   (703) 940-5031
Facsimile:    (650) 802-6001

*Attorneys for Defendant* AXONICS, INC.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> AXONICS MODULATION TECHNOLOGIES, INC., <br><br> Defendant. | Case No. 8:19-cv-02115-DOC-JDE <br><br> **DEFENDANT AXONICS, INC.'S REPLY BRIEF IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. MCDUFF** <br><br> Date:   March 6, 2023 <br> Time:   8:30 a.m. <br> Ctrm:   10A <br> Judge:  Hon. David O. Carter |

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................ 1

II.   CERTAIN OPINIONS OF DR. MCDUFF SHOULD BE EXCLUDED ..... 2

      A.    Dr. McDuff failed to perform a reliable "but for" analysis ................. 2

            1.    Dr. McDuff Offers No Reliable Opinion on Finned Leads ...... 4

            2.    Dr. McDuff Offers No Reliable Opinion on F15 ..................... 9

      B.    Dr. McDuff's unreliable lost profits calculations should be excluded ........................................................................................ 12

      C.    Dr. McDuff's reasonable royalty opinions should be excluded ........ 15

            1.    Dr. McDuff improperly fails to include research and development costs in his incremental profit calculation ......... 16

            2.    Dr. McDuff's baseline margin construct is unreliable ........... 17

            3.    Dr. McDuff's forward patent citation is unsupported ............. 18

            4.    Dr. McDuff should be precluded from testifying about Medtronic's intercompany licenses ......................................... 21

            5.    Dr. McDuff's *Georgia-Pacific* Factor 12 analysis is unreliable ................................................................................. 22

      D.    Dr. McDuff's copying opinions should be excluded ........................ 24

III.  CONCLUSION ............................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) ................................................................................................ 10

*Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015)............................... 18

*Bakst v. Cmty. Mem'l Health Sys.*, No. CV 09-08241 MMM (FFMx), 2011 U.S. Dist. LEXIS 163192 (C.D. Cal. Mar. 7, 2011)....................................................... 7

*Bd. of Regents v. Bos. Sci. Corp.*, Civil Action No. 18-392-GBW, 2022 U.S. Dist. LEXIS 223143 (D. Del. Dec. 12, 2022) .................................................. 15

*Better Mouse Co. v. SteelSeries ApS*, No. 2:14-cv-198-RSP, 2016 U.S. Dist. LEXIS 16611 (E.D. Tx. Jan. 4, 2016)........................................................... 19

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ....................... 15

*Colony Holdings, Inc. v. Texaco Ref. & Mktg.*, No. 00-217 DOC (MLGx), 2001 U.S. Dist. LEXIS 26217 (C.D. Cal. Oct. 29, 2001) .......................................... 17

*Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375 (E.D. Pa. 2016) ........................................................................................... 19

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................... 7, 8, 15, 18

*Edgewell Pers. CARE Brands, LLC v. Munchkin, Inc.*, No. LACV 18-3005 PSG (JPRx), 2022 U.S. Dist. LEXIS 208857 (C.D. Cal. Oct. 12, 2022)........................... 4

*Exela Pharma Scis. v. Eton Pharm.*, No. 20-cv-365 (MN), 2022 U.S. Dist. LEXIS 50446 (D. Del. Feb. 8, 2022) ...................................................................... 6

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ...................................................................................................... 22

*Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) ..................................................................................................... 3, 6, 9

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)............... 14

*Hebert v. Lisle Corp.*, 99 F.3d 1109 (Fed. Cir. 1996) ................................................. 5

*Intel Corp. v. Future Link Sys., LLC.*, No. 14-377-LPS, 2017 U.S. Dist. LEXIS 91699 (D. Del. June 1, 2017) ................................................................................... 19

*Lanard Toys v. Anker Play Prods.*, No. CV 19-4350-RSWL-AFMx, 2020 U.S. Dist. LEXIS 221783 (C.D. Cal. Nov. 12, 2020) ................................................. 5

*Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-cv-04709-JST, 2019 U.S. Dist. LEXIS 146851 (N.D. Cal. July 12, 2019) ................................................. 13

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ........................ 21

*Mission Viejo Florist v. Orchard Supply Co.*, No. SACV 16-01841-CJC(KESx), 2019 U.S. Distr. LEXIS 240747 (C.D. Cal. Feb. 28, 2019) .............................. 14

*Omega Patents, LLC, v. CalAmp Corp.*, Case 6:13-CV-01950-PGB-DCI, Dkt. No. 117 (M.D. Fla. Dec. 23, 2015) ........................................................... 12, 18

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-CV-2061-H (BGS), 2016 U.S. Dist. LEXIS 195147 (S.D. Cal. Mar. 25, 2016) ......................... 5

*Ravo v. Covidien LP*, 55 F. Supp. 3d 766 (W.D. Pa. 2014) ........................................ 23

*Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-cv-00825-PSG, 2015 U.S. Dist. LEXIS 10423 (N.D. Cal. Jan. 27, 2015) ................................................. 13

*Sonos, Inc. v. D&M Holdings Inc.*, 297 F. Supp. 3d 501 (D. Del. 2017) .................... 24

*Syneron Med. v. Invasix*, No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220514 (C.D. Cal. Aug 27, 2018) ................................................................. 23

*Syngenta Crop Prot., LLC v. Azoxystrobin, LLC*, 267 F. Supp. 3d 649 (M.D.N.C. 2017) .................................................................................................. 11

*Thrifty Oil Co. v. Bank of Am. Nat'l & Sav. Ass'n*, 322 F.3d 1039 (9th Cir. 2002) ..... 15

*W. Plastics, Inc. v. Dubose Strapping, Inc.*, 334 F. Supp. 3d 744 (E.D.N.C. 2018) ...... 5

*WhereverTV, Inc., v. Comcast Cable Communs., LLC*, No: 2:18-cv-529-JLB-NPM, 2022 U.S. Dist. LEXIS 105230 (M.D. Fla. June 9, 2022) ......................... 15

**Rules**

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................. 9

Fed. R. Evid. 403 ............................................................................. 8, 10

Fed. R. Evid. 702 .................................................................................................. 8, 10, 14

## I.   INTRODUCTION

Medtronic fails to rebut Axonics' argument that Dr. McDuff's opinions are flawed because they are outside the scope of his expertise, not relevant, and unreliable. For the most part, Medtronic simply responds that Axonics should just cross-examine Dr. McDuff. But the reliability of Dr. McDuff's opinions is a threshold **burden that Medtronic bears before trial**, and there is no evidentiary or scientific support for his opinions or the logical leaps he makes, and thus exclusion (not cross-examination) is warranted. For example:

- Based on a single incident of a customer switching to Axonics, Dr. McDuff inexplicably calculates ▮▮▮▮ in lost profits by assuming that ▮▮ of all Axonics revenue for all times is from converted Medtronic customers;

- Applying the wrong legal principles to non-infringing alternatives, he calculates a total of more than ▮▮▮▮ in lost profits;

- Dr. McDuff opines about a purported noninfringing alternative—Medtronic's own InterStim I non-tined leads—that Axonics does not contend is a noninfringing alternative, rather than substantively address a "finned" lead which Axonics does contend is acceptable.

Dr. McDuff's reasonable royalty opinions suffer from similar methodological flaws that warrant exclusion, not cross-examination. For example, Medtronic fails to explain why its own operating income across multiple, divergent lines of business is the correct metric for determining Axonics' reasonable royalty for one line of business, or why the royalty rates applied to unidentified dental, ophthalmic, and orthopedic devices have any connection or comparability to the facts of this case involving sacral neuromodulation products.

In addition, Dr. McDuff persists in relying on outlier royalty rates from Medtronic's intercompany agreements that were born out of the IRS Commissioner's concern that the plaintiffs in this case were engaging in the classic case of a U.S. multinational taxpayer (Medtronic) shifting income from its highly profitable U.S.

operations to an offshore subsidiary operating in a tax haven (Medtronic Puerto Rico). Medtronic admits these licenses are not comparable to the license between Axonics and Medtronic and there is no issue in dispute to which they are relevant, but Medtronic still wants to introduce them to the jury. Finally, Dr. McDuff seeks to support his damages number with a never-before stated or tested patent citation analysis, which is not a product of any peer reviewed article or study and has never been accepted by any court, and which is shown to undervalue AMF patents that have been foundational to Axonics accused products. This is exactly the type of unreliable methodology that Rule 702 and *Daubert* are designed to gatekeep.

## II.   CERTAIN OPINIONS OF DR. MCDUFF SHOULD BE EXCLUDED

### A.   Dr. McDuff failed to perform a reliable "but for" analysis

Medtronic's primary defense of Dr. McDuff's unreliable opinions is to fall back on its motion for partial summary judgment of absence of non-infringing alternatives, arguing that non-infringing alternatives are not available as a matter of law. Axonics has rebutted Medtronic's motion, Dkt. 222-1 (Opp. to MDT Partial MSJ) at 1-7, 12-14, and the jury should hear the reasons finned leads and the F15 product preclude Medtronic's excessive demand of lost profits. Briefly, in an attempt to excuse why Dr. McDuff failed to do his own "but for" analysis, Medtronic argues that Axonics alone bears the burden of proving availability of a non-infringing alternative. Dkt. 208-1 ("Opp.") at 10. Medtronic's assertion is wrong (Medtronic admitted it bears the initial burden); it is also irrelevant to this motion.

First, ***Medtronic*** has already admitted it bears the initial burden of proving all four *Panduit* Factors, including "absence of acceptable non-infringing substitutes," to establish entitlement to the profits on sales it would have made absent the alleged infringement. Ex. 67[1] (MDT Memo. of Contentions of Fact and Law) at 20:16-20.

---

[1] Exhibits are attached to the concurrently filed Supplemental Omnibus Declaration of Samantha A. Jameson. Internal quotation marks and citations omitted, and emphasis added throughout unless otherwise noted.

Only if Medtronic were able to meet its initial burden—which it cannot do here—then the burden would shift to Axonics to show availability. *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999). Medtronic must show the absence of non-infringing alternatives, but it has not done so.  Second, the burden of proof at trial does not decide this motion. As discussed here and in Axonics' Opening Brief, Dr. McDuff applied the wrong legal understanding to conjure up the wrong "but for" world construct, he opined on issues outside his expertise, and he considered irrelevant facts about alternatives not at issue that will not help the jury decide disputed facts. This renders his opinions unreliable.

In addition, Medtronic argues that Axonics "intentionally tries to mislead the Court" about the finned lead alternative, Opp. at 10, but Medtronic is wrong. These are the facts: even in real life, the Greatbatch/Nuvectra finned lead products were offered to Axonics, and ████████████████████████████████████████████████████████████████████████████. Dkt. 222-1 (Opp. to MDT Partial MSJ) at 3-7; Ex. 68 (10/27/2022 Bombeck Dep.) at 221:6-13. Medtronic tried to overcome this by arguing that finned leads are not available as a matter of law because they were not offered on the market during the damages period, Opp. at 11, but the law requires consideration of the "but for" world where Axonics faces options that do not include putting its accused product on the market and examines what Axonics would have done without exiting the market altogether. *Grain Processing*, 185 F.3d at 1350-51. Substantial evidence shows that Axonics would have worked to place finned leads on the market during the damages period. *See, e.g.*, Dkt. 222-1 at 3-7. Dr. McDuff ignores both the correct legal inquiry and the evidence.

Medtronic is also wrong that the F15 product is not available during the accounting period: it is available ***literally***, it has been implanted into thousands of patients since early 2022, and Axonics had the materials, equipment, know-how, and experience to make F15 during the damages period. Dkt. 222-1 (Opp. to MDT Partial MSJ) at 12-14. Thus, Medtronic's repeat of its summary judgment arguments fails, and

it does not correct the issue with Dr. McDuff's unreliable opinions.

### 1. Dr. McDuff Offers No Reliable Opinion on Finned Leads

Medtronic misstates Axonics' argument to allege that Axonics admits "Dr. McDuff examined whether the finned lead is an acceptable non-infringing alternative available to Axonics in the 'but-for' world." Opp. at 11. Axonics said no such thing. To the contrary, Axonics contends Dr. McDuff failed to apply the correct law and consider the "but for" world that includes finned leads. Dkt. 192-1 ("Mot.") at 3-5.

Next, Medtronic attempts to salvage Dr. McDuff's opinions by characterizing Axonics' motion as a simple factual disagreement over whether the finned leads product was available and acceptable. Opp. at 11-12. But Medtronic frames the issues incorrectly, and the cases it cites are not applicable. In *Edgewell*, (i) the damages expert was not opining outside his area of expertise, like Dr. McDuff is doing here on the FDA approval process, and (ii) the damages expert was not relying upon self-serving statements about irrelevant alternatives and forming opinions not sufficiently tied to the facts of the case, as Dr. McDuff has done here. Additionally, in *Edgewell*, the expert did consider a "but-for" analysis but noted that many of the alternatives infringed—something Dr. McDuff **did not do**. *Edgewell Pers. CARE Brands, LLC v. Munchkin, Inc.*, No. LACV 18-3005 PSG (JPRx), 2022 U.S. Dist. LEXIS 208857, at *18 (C.D. Cal. Oct. 12, 2022). Under those facts, the district court found there was just a disagreement that did not require exclusion. *Id.* But this case is quite different, where the reliability issues with Dr. McDuff's opinions should preclude admissibility. *Presidio* and *W. Plastics* are inapposite for the same reasons as *Edgewell* because they do not present the unreliability issues that Dr. McDuff's opinions present. For example, in *Presidio*, the defendant took issue with only the damages expert's opinions that the alternative was not available because the alternative "was not widely available during the damages period and was sold to only one customer." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-CV-2061-H (BGS), 2016 U.S. Dist. LEXIS

195147, at *15 (S.D. Cal. Mar. 25, 2016). Axonics challenges Dr. McDuff's availability and acceptability analysis and flawed application of key legal principles. In *W. Plastics*, the court concluded that defendant's motion to exclude the damages expert's opinions did "not address the relevance or reliability" of the expert's testimony." *W. Plastics, Inc. v. Dubose Strapping, Inc.*, 334 F. Supp. 3d 744, 753 (E.D.N.C. 2018). On the other hand, here, Axonics specifically challenges Dr. McDuff's opinions as both irrelevant and unreliable. Mot. at 3-5.

**First**, Dr. McDuff is not an FDA expert and should not be allowed to present his opinions regarding the FDA process and approval. Mot. at 3-4; Ex. 11 (McDuff Dep.) at 283:4-22. Instead, Medtronic represents that the scope of Dr. McDuff's FDA opinions is that he only points to lack of evidence of FDA approval. Opp. at 12. That is incorrect. Dr. McDuff does opine on FDA processes and approval in paragraph 93 and footnotes 308 and 309 of his report. Ex. 10 (McDuff Rpt.), ¶ 93. Dr. McDuff is not qualified to opine on the intricacies on the FDA process.

**Second**, Dr. McDuff did not apply the correct "availability" analysis required by *Grain Processing*. Dr. McDuff opined, "[t]o the extent that Axonics did not have its own non-tined lead solution on the market during the relevant accounting period for lost profits, I understand that Axonics's alleged non-tined lead alternative would not have been available to Axonics or the consumers that purchased accused SNM systems or the accused tined lead components from Axonics. Thus, even if non-tined leads were commercially acceptable (which they are not, as discussed below), their unavailability satisfies the second *Panduit* factor for the Tined Lead Patents." *Id*. at ¶ 93. **This misstates the law.** *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) (reversing judgment based on the application of incorrect legal standard and encouraging courts to exclude experts who apply the wrong legal standard); *Lanard Toys v. Anker Play Prods.*, No. CV 19-4350-RSWL-AFMx, 2020 U.S. Dist. LEXIS 221783, at *15-16 (C.D. Cal. Nov. 12, 2020) (excluding expert's opinions that are based on an erroneous understanding or application of the law); *Exela Pharma Scis. v.*

*Eton Pharm.*, No. 20-cv-365 (MN), 2022 U.S. Dist. LEXIS 50446, at *8-9 (D. Del. Feb. 8, 2022) (excluding expert's non-infringement opinions that are based on a wrong understanding of the law). *Grain Processing* teaches when an alternative is not on the market, one must look to whether Axonics had the necessary materials, equipment, know-how, and experience to make the finned lead system during the damages period. *Grain Processing*, 185 F.3d at 1354. Dr. McDuff did not consider any of these factors in his analysis, thus rendering the methodology in forming his opinions unreliable. This is not a factual disagreement but a fundamental flaw in Dr. McDuff's methodology—he applied the law incorrectly. This warrants exclusion.

Medtronic relies on *Depuy Spine* and *Datascope Corp.* in arguing a product is not available if it is not FDA approved. Opp. at 12. Neither of these cases holds as a matter of law, however, that a proposed alternative must be FDA approved to be available. Dkt. 222-1 (Axonics' Opp. to Partial MSJ) at 4. Instead, Dr. McDuff was charged with assessing what Axonics could have done—namely, whether Axonics could have put finned leads on the market—if faced with the reality that it could not offer its accused products on the market. Dr. McDuff admits he did not do this analysis, as evidenced by the quote from his expert report cited in the preceding paragraph. Ex. 10 (McDuff Rpt.), ¶ 93.

***Third***, Medtronic's attempt to justify Dr. McDuff's failure to analyze relevant evidence regarding the similarity of finned leads to tined leads (Opp. at 13) also falls short. Medtronic claims that Axonics cites no support for its argument that a critical flaw in Dr. McDuff's opinion is that he relies on Medtronic's statements about different leads, Medtronic's legacy ***InterStim I non-tined*** leads, to opine that ***finned leads*** would not be acceptable. Opp. at 13. But as Axonics stated in its Opening Brief, Medtronic did not tie Dr. McDuff's opinion about InterStim non-tined leads to the facts of this case (i.e., the finned leads) as it was required to do under Rule 702. *See* Fed. R. Evid. 702; Mot. at 3; *see also Bakst v. Cmty. Mem'l Health Sys.*, No. CV 09-08241 MMM (FFMx), 2011 U.S. Dist. LEXIS 163192, at *49, *52-*54 (C.D. Cal.

Mar. 7, 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993)) (damages expert's testimony found unreliable and excluded as speculative because the testimony was based on factual assumptions that are unsupported in the record). Dr. McDuff relies on self-serving Medtronic witness statements about different leads—non-tined leads from Medtronic's legacy InterStim I products—without drawing any substantive connection between those leads and the finned leads, the latter being at issue here. Mot. at 3-4. However, Dr. McDuff ignored testimony from a named inventor on the Tined Leads Patents, Mr. Swoyer, that he specifically designed around tined leads when designing the finned leads and intended them to function as a feasible design for minimally-invasive implantation for sacral neuromodulation—a key benefit Medtronic touts for tined, but not non-tined leads. Mot. at 4. Medtronic does not dispute that Dr. McDuff relies on self-serving statements of Medtronic affiliated witnesses about InterStim I leads. Medtronic argues that Dr. McDuff performed his "own independent investigation in concluding that there is no evidence that non-tined leads, including a finned lead, constitute an acceptable non-infringing alternative." Opp. at 13. Medtronic's argument is unsupported. Dr. McDuff did not perform any independent investigation ***into finned leads***. His opinion on acceptability is short and presented in only two paragraphs, 95 and 96, and is about Medtronic's irrelevant InterStim I leads. Ex. 10, ¶ 95 (e.g., "This is consistent with my understanding of **Medtronic's experience with InterStim**…."; "[N]on-tined leads are no longer sold or manufactured for use with **the InterStim® systems**."). None of it is about finned leads. Medtronic simply attempts to commingle Medtronic's InterStim I non-tined leads with Greatbatch (Swoyer) finned leads without any proof of their similarity. Medtronic suggests that everything that is not a tined lead is by definition a non-tined lead, but Medtronic's characterization does not rescue Dr. McDuff's opinions from a critical failing: Medtronic and McDuff do not state a single reason why InterStim I non-tined leads (leads McDuff opines on) and finned leads (leads he did not inquire about) have anything in common such that the evidence as to one

would inform the analysis as to the other. In addition, Medtronic misconstrues Axonics' interrogatory responses by characterizing the finned lead as "a device that does not use tines." Opp. at 13. Instead, in the interrogatory response, Axonics explained that the "'finned' lead [uses] fins, e.g., protrusions with an edge perpendicular to the lead body, as a fixation mechanism" and "the finned fixation mechanism provided suitable fixation" comparable to that of the tined leads. MDT Ex. 8 (10/17/22 Axonics Resp. to Rog 8) at 29-30, 31.

Expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Dr. McDuff's opinions will not help the jury understand the evidence and instead it will confuse the jury into analyzing irrelevant, self-serving Medtronic statements about a different product that no one is contending is acceptable in Medtronic's bid to collect well in excess of ▮ ▮ in lost profits from Axonics and thus, should be excluded. Fed. R. Evid. 403. In the Supreme Court's own words, this is an example where "[e]xpert evidence can be both powerful and quite misleading" and it is the Court's gatekeeping function to keep it out. *Daubert*, 509 U.S. at 595.

Medtronic asserts that Dr. McDuff's testimony is "similar to expert testimony that courts routinely admit on no noninfringing alternatives" and relies on a case in which Axonics' damages expert, Ms. Julie Davis, testified successfully. Opp. at 11. That case (*Spectralytics*) does not support Medtronic. First, *Spectralytics* concerned a post-trial motion regarding whether there was substantial evidence, not a *Daubert* motion. *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900 (D. Minn. 2009). Second, the Court credited Ms. Davis's testimony based on evidence in that case that showed defendant's own dissatisfaction with the inadequate performance of the non-infringing alternative. Dr. McDuff offers no such opinion. Third, the Court noted that the jury could have discounted self-serving testimony of an interested witness, *id*. at 910, which in this case applies to self-serving statements of Medtronic affiliated witnesses that Dr. McDuff relies upon and who are not even addressing the finned

leads alternative. Finally, just as she is doing in this case, Ms. Davis opined that if the jury found that defendant could have implemented a noninfringing alternative for a smaller amount, "[defendant] would not have agreed to pay 'substantially more' than that amount for a license." *Id.* at 911. Dr. McDuff offers no such opinion. *Id*.

Next, Medtronic attempts to rehabilitate Dr. McDuff's analysis by stating without support that he relied on "evidence" that "Axonics never had rights to the patents covering the finned lead." Opp. at 11. This opinion is nowhere in Dr. McDuff's report. Ex. 10 (McDuff Rpt.) ¶¶ 91–96. Medtronic similarly suggests that Dr. McDuff did an analysis regarding know-how or equipment to make finned leads because during his deposition Dr. McDuff "expressly identified the fact that Axonics did not have a license to the finned lead patents." Opp. at 12. But that "analysis" is also nowhere in his report, and a passing reference in his deposition is both outside the scope of testimony he can offer at trial and not sufficient to render his opinion reliable. *See* Fed. R. Civ. P. 26(a)(2)(B). Moreover, a license to the finned leads was offered to Axonics, Ex. 10 at ¶ 91, and Dr. McDuff disregarded that fact and any other facts that do not support his results-oriented, conclusory opinion. To perform a fair and accurate reconstruction of the "but for" market, Dr. McDuff must take into account alternative actions Axonics foreseeably would have undertaken. *Grain Processing*, 185 F.3d at 1350-51. He failed to perform such an analysis and the opinions he offers are unreliable and should be excluded.

### 2. Dr. McDuff Offers No Reliable Opinion on F15

As with the finned leads, Medtronic misstates Axonics' argument to allege that Axonics admits that "Dr. McDuff considered the availability and acceptability of the F15 product in the but-for world." Opp. at 14. Axonics did not so admit. Instead, Axonics explained that Dr. McDuff's principles and methodology in forming his opinions were unreliable, and such error led Dr. McDuff to erroneously fail to consider the options Axonics would have had in the "but for" world including Axonics' F15. Mot. at 5-7; Ex. 69 (McDuff Dep.) at 75:4-13 ("there's no time period in the damages

period that I've evaluated where Axonics would have had a non-infringing alternative but for infringement"). Medtronic's own Opposition makes Axonics' point. Medtronic argues: "Here, Dr. McDuff opined, based on the undisputed evidence, that the F15 product was ***unavailable*** to Axonics before April 2022, and therefore, in the but-for world, Axonics cannot offer it as a noninfringing alternative any earlier." Opp. at 14-15 (emphasis in the original). This is the wrong interpretation of the law. Dr. McDuff was charged with reconstructing the "but for" world—without infringement by Axonics—in which Axonics considers whether it can make an alternative available on the market rather than exiting the market altogether.  This approach requires actually analyzing the alternatives available to Axonics whether or not they were on the market during the damages period. Dkt. 222-1 (Opp. to MDT Partial MSJ) at 2. Dr. McDuff testified that he knew an alternative can be considered available even if it were not placed on the market. Ex. 69 (McDuff Dep.) at 141:22-142:9. Moreover, Axonics made F15 **actually available** in the real world by April 2022—during the damages period. Medtronic's and Dr. McDuff's approach misapplies the law.  These arguments and opinions will only confuse the jury and not help it decide a disputed issue. Fed. R. Evid. 702 & 403.

Medtronic again relies on inapposite case law to contend that Axonics' motion goes to the weight of the expert's testimony and not to its admissibility. Opp. at 15. But as discussed, Dr. McDuff's opinions are irrelevant and unreliable, and that makes them inadmissible (not subject to cross-examination). Medtronic cites *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, where the court concluded that defendant's issues with the damages expert's opinions—i.e., the degree of comparability of the license agreements—concerned disagreements with the conclusions reached, not his methodology. 694 F.3d 1312, 1333 (Fed. Cir. 2012).  This concern does not apply here. Here, there are foundational unreliability issues with Dr. McDuff's opinions that were not present in *ActiveVideo*, namely: (i) the damages expert was not opining outside his area of expertise, like Dr. McDuff is here on the

FDA approval process; and (ii) the damages expert's "but-for" world analysis was not flawed in methodology or in the application of legal principles. This case is instead akin to *Syngenta,* where the damages expert's opinion was excluded for failing to consider a non-infringing alternative in the "but-for" world because the alternative, while available to the defendant, was not on the market. *Syngenta Crop Prot., LLC v. Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 662 (M.D.N.C. 2017). The court explained that the expert's opinions were excluded as speculative and unreliable because they did not account for acceptable non-infringing substitutes not on the market. *Id.* Likewise, here, the court should exclude Dr. McDuff's "but for" world analysis for failure to include the available F15 product.

Lastly, Medtronic's attempt to justify Dr. McDuff's opinions that F15 was unacceptable fails as well. Medtronic asserts that Dr. McDuff "accounted" for F15 in the but-for world ***after April 2022*** and that Dr. McDuff observed that "patients still opted to purchase the accused products even though the F15 product was on the market . . . ." Opp. at 15. This is flawed for multiple reasons. First, when Medtronic argues that Dr. McDuff assessed the impact of F15 in the "but-for" world after April 2022, it means that he concluded that ***all of Axonics' sales are Medtronic's lost sales***—as if F15 never existed at all. Mot. at 7. Second, Medtronic does not deny that Dr. McDuff's "but-for" world included ***both*** Axonics' R15 and F15. Ex. 10, at ¶ 103; Ex. 11 (McDuff Dep.) at 159:11-160:11, 163:18-24. Including ***both*** Axonics' R15 and F15 in the "but-for" world is a flawed methodology of the damages calculation because McDuff cannot include the R15 in the "but-for" world. Mot. at 7. Axonics' accused product, R15, by definition is assumed to be an infringing product and off the market in the "but for" world.  In the end, Medtronic cannot dispute that Dr. McDuff did not identify any evidence that Axonics did not have the necessary materials, equipment, know-how, and experience to make the F15 system, nor that he speculates about FDA processes and approval outside his expertise. His F15 opinions should be excluded.

**B.      Dr. McDuff's unreliable lost profits calculations should be excluded**

Rather than address how Dr. McDuff's assumption about the conversion rate in Q2 2020 is applicable to the entirety of the damages period, Medtronic responds that he can be cross examined on the subject. Opp. at 17. But that is the wrong standard to apply to the kind of unreliable extrapolation Dr. McDuff used here. Here, there is no debate that Dr. McDuff's chosen rate, even if accurate, was based upon data up to Q2 2020. It is equally uncontroverted, and Medtronic fails to rebut, that record evidence establishes that number has remained in flux through today based upon many variables. Yet, rather than seek to account for market fluctuations, Dr. McDuff took a shortcut like he did in the *Omega Patents* case, which Medtronic fails to address. His opinion should similarly be excluded here based on his faulty methodology of applying one data point about a market condition as controlling the entire timeline, while ignoring the breadth of many other market variables throughout the relevant period.

Further, Medtronic's attempts to explain Dr. McDuff's extrapolation of the conversation rate to the entire damages period are also flawed for many reasons. Specifically, Medtronic notes Dr. McDuff's observation that "many" Axonics customers "███████████████████████████████████████████████ ██████████████████████████████████████████████████," without providing evidence for his opinion, and further notes that "Dr. McDuff even provided an example." Opp. at 16. Dr. McDuff did provide an example: that of a single customer. But Dr. McDuff calculated nearly ███████████ in lost profit damages based on his application of the assumed ██████ conversion rate. Medtronic then uses that speculative observation to conclude that Dr. McDuff's rate is, if anything, conservative in view of the "many" allegedly converted customers. *Id*. This is just guesswork that is inadmissible under *Daubert*.[2] Even if Dr. McDuff's assumption is conservative and the

---

[2] Medtronic's assertion that Axonics should have offered a counter opinion on the correct conversion rate is irrelevant. Axonics' expert has opined that lost profits are not

conversion rate is higher for certain time periods, "a damages theory that stems from an erroneous methodology is not admissible even if it results in a low ultimate damages figure." *Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-cv-00825-PSG, 2015 U.S. Dist. LEXIS 10423, at *16 (N.D. Cal. Jan. 27, 2015); *see also Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-cv-04709-JST, 2019 U.S. Dist. LEXIS 146851, at *14 (N.D. Cal. July 12, 2019) ("Finally, it is no answer that some of Lasinski's other intermediate assumptions, such as the discount rate itself, were 'conservative' in Microsoft's favor. The Federal Circuit has rejected this method of compensating for a flawed premise.").

Finally, Medtronic pins the entirety of Dr. McDuff's unfounded extrapolation on Axonics CEO Mr. Cohen's statement that: "over 20% of our implants ***to date*** have been ***associated with*** physicians ***replacing*** their InterStim devices with Axonics." But the statement was made in Q2 2020 and is limited in time ("to date"), and evidence shows the parties' relative market shares continued to change throughout the damages period. Dr. McDuff ignores all of the post Q2 2020 evidence, which is critical to a reliable analysis. Also, the reference to implants "associated with physicians" as opposed to patients necessitates examining actual sales data if one were to provide a reliable damages assessment. Dr. McDuff fails to do so. As Axonics detailed, the shortcomings and failures of Medtronic's products are well-established in the record evidence. Mot. at 9. Yet, Dr. McDuff did not confirm whether "replacing" refers to surgical explants of the Medtronic device due to prevalent incidents of Medtronic device failures, which is the more natural reading of Mr. Cohen's statement, as opposed to doctors choosing to switch to using Axonics' device over Medtronic's device for every new patient. If the former, Dr. McDuff's conversion theory crumbles on that basis alone as even Dr. McDuff could not count replacing a defective product

---

appropriate in this case, and she has also offered extensive criticisms of Dr. McDuff's conversion rate analysis.

with a safe alternative as a "conversion" in his analysis. Regardless, Dr. McDuff does not perform a proper analysis and evaluation of the record evidence. He simply plucks this one statement from one earnings call, ignores all subsequent data, and frames his entire narrative around this one datapoint to the tune of ███████████  Medtronic goes as far as to argue that Axonics' motion effectively attacks the truthfulness of its CEO's statement that Dr. McDuff relies upon. Opp. at 16. To the contrary, the issue is not the truth of Mr. Cohen's statement at that time, but the unreliability of assuming (without evidence) that the ████████ conversion ratio applied for all sales for all time, rather than just for the initial time period Mr. Cohen referenced.

Lastly, Medtronic's refrain, relying on *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004), that Dr. McDuff's shortcomings are curable through cross-examination rings hollow. To be admissible as a threshold matter, expert testimony must be reliable "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). "An expert's opinions are not reliable where the expert bases her conclusions on 'mere subjective beliefs or unsupported speculation.'" *Mission Viejo Florist v. Orchard Supply Co.*, No. SACV 16-01841-CJC(KESx), 2019 U.S. Dist. LEXIS 240747, *9 (C.D. Cal. Feb. 28, 2019). In *Mission Viejo*, the damages expert relied on an unsupported assumption about in-store sales to calculate lost profits, specifically the business owner's sales estimate on the ground that "if [the owner is] the one who lives and breathes this business, she ought to know that percentage." *Id.* at 11. Because the expert conducted "no independent analysis to determine whether this was accurate," the court held that the expert's opinions were inadmissible. On the other hand, the footnote in *Hangarter* that Medtronic relies upon is factually distinguishable because the focus of the expert's testimony was on his own knowledge and experience within the particular insurance industry and his selection of documents to review did not affect the reliability of his knowledge or experience. *Hangarter*, 373 F.3d at 1017 n.14, Here, just like in *Mission Viejo*, the issue is Dr. McDuff's failure to review record

evidence and instead he made an unsupported inference from a single datapoint. The "gatekeeping role" bestowed upon the courts under *Daubert* mandates exclusion of Dr. McDuff's opinion.[3]

### C.   Dr. McDuff's reasonable royalty opinions should be excluded

Medtronic tries to say the flaws in Dr. McDuff's reasonable royalty analysis are just a disagreement between experts, but Axonics' challenge relates to the unreliability of Dr. McDuff's methodology. Dr. McDuff failed to account for Axonics' R&D costs, he inexplicably used ***Medtronic's*** baseline margin to account for ***Axonics'*** contributions in bringing the Accused Products to the market, and he applied a legally insupportable and never-previously-used or tested forward patent citation analysis. Medtronic does not deny that Dr. McDuff did any of these things, and this, alone, warrants exclusion.

Instead, Medtronic cites cases that allowed the damages testimony in light of facts not relevant here. *See, e.g.*, *WhereverTV, Inc., v. Comcast Cable Communs., LLC*, No: 2:18-cv-529-JLB-NPM, 2022 U.S. Dist. LEXIS 105230 (M.D. Fla. June 9, 2022) (permitting expert to assign a weight to each of the infringing components based on the degree to which the component in question contributed to the alleged invention); *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) (this was not a patent case, and patent damages methodology was not at issue); *Bd. of Regents v. Bos. Sci. Corp.*, Civil Action No. 18-392-GBW, 2022 U.S. Dist. LEXIS 223143 (D. Del. Dec. 12, 2022) (allowing expert qualitative apportionment analysis in view of record evidence). The broad propositions in Medtronic's cited cases explaining the general framework of Rule 702 or *Georgia Pacific* are not in dispute here. "Cases should not be cited for mere words. What counts is what the court did in a cited case." *Thrifty Oil Co. v. Bank of Am. Nat'l & Sav. Ass'n*, 322 F.3d 1039, 1047 n.10 (9th Cir. 2002). The

---

[3] The May 2022 unanimously approved proposed Amendments to Rule 702 emphasizing the "preponderance of evidence" as the proper evidentiary standard for admissibility highlight the courts' role as gatekeepers for expert testimony.

point of the instant Motion is that Dr. McDuff's opinions are unreliable, not based on sufficient facts or data, and not the product of reliable principles and methods. And none of the cases cited by Medtronic involved the construct Dr. McDuff has devised for his reasonable royalty opinions.

### 1. Dr. McDuff improperly fails to include research and development costs in his incremental profit calculation

Deducting costs to calculate profits is a basic prerequisite to a reliable damages analysis, and Medtronic admits that Dr. McDuff "decided not to deduct R&D costs from incremental profit margin." Opp. at 18. That is error, and not merely a disagreement between the experts as Medtronic argues. Faced with exclusion, Medtronic performs a sleight-of-hand, suggesting that Dr. McDuff "credits Axonics a baseline operating margin to reflect Axonics time, investment, risk and capital in bringing the accused products to market. This *reflects* R&D cost", and he "*values and assigns* a meaningful profit share to Axonics' own patents, which no doubt resulted from Axonics' research and development." Opp. 19-20. The words alone confirm this is unreliable speculation.

In any event, Dr. McDuff uses *Medtronic's* company-wide operating margin in his calculations, and not that of Axonics. It is self-evident that there cannot be a "reflection" of Axonics' R&D in Medtronic's financials. Dr. McDuff's assumption that Axonics' R&D activities are not relevant to the hypothetical negotiation here and would not be factored into the reasonable royalty that Axonics would pay for rights to the asserted patents is wrong and renders his analysis unreliable, regardless of the spin that there is some made-up, proxy crediting of the R&D in some other portion of his construct. The alleged value that Dr. McDuff assigns to Axonics' R&D is a reference to Dr. McDuff's inclusion of Axonics' patents in his forward patent citation analysis which as discussed below is independently faulty. Regardless, the cost associated with patents is but a small portion of company-wide R&D, which Dr. McDuff does not account for. Thus, in the following formula he constructed for calculating reasonable

royalties in this case Dr. McDuff miscalculates the first variable: Axonics' incremental profit (not counting R&D) – Medtronic company-wide operating margin (counting R&D) = Axonics' Excess Profits. This is not a mere expert disagreement; it is a methodological error that renders his testimony unreliable.

### 2. Dr. McDuff's baseline margin construct is unreliable

There is no justification for Dr. McDuff's use of Medtronic's operating margin to calculate Axonics' profits, and Medtronic provides none. Instead, Medtronic tries to shift the burden, demanding Axonics to "explain why the negotiators would not look to Medtronic's operating margin as a proxy . . . ." Opp. at 24. But Medtronic, as the party bearing the burden to establish admissibility and to establish damages, cannot justify its expert's illogical leap. *See Colony Holdings, Inc. v. Texaco Ref. & Mktg*., No. 00-217 DOC (MLGx), 2001 U.S. Dist. LEXIS 26217, at *9 (C.D. Cal. Oct. 29, 2001). Axonics has explained the factual and legal reasons why Medtronic's financials on a multitude of divergent products born out of Medtronic's long history and multinational presence are not relevant for Axonics, which for purposes of the hypothetical negotiation, is a one-product company in a single field.  Mot. at 13-15. Medtronic fails to address these obvious and significant differences between the two companies. Medtronic offers no justification for using Medtronic's company-wide operating margin to assess Axonics' business contributions and the time, investment, risk, and capital in bringing the Accused Products to market.

Further, Dr. McDuff compounds his error by using Medtronic's company-wide operating margins instead of the company segment focused on SNM technology, Axonics' sole business. Mot. at 14-15. Medtronic does not, and cannot, dispute that Dr. McDuff did this. Thus, in the formula he constructed for calculating reasonable royalties in this case, Dr. McDuff used the wrong input for the second variable too: Axonics' incremental profit (not counting R&D) – Medtronic company-wide operating margin (counting R&D) = Axonics' Excess Profits.

Medtronic fails to offer any legal support for Dr. McDuff's erroneous use of

Medtronic's financials to calculate Axonics' profit margins. The *Astrazeneca* case cited by Medtronic does not support Dr. McDuff's methodology here. *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015). In that case, the Federal Circuit simply reviewed and affirmed, in part, the district court's evidentiary analysis under the *Georgia-Pacific* factors, in concluding that the patent holder was entitled to a royalty as a percentage of the accused infringer's profit margin. If anything, the Court affirmed the use of ***defendant's*** own projections about ***its*** expected profit margin (such as awarding the plaintiff a portion of the defendant's expected 92.5% profit margin), and that the profit margin defendant would be left with after paying the plaintiff would be in the range of margins ***defendant*** typically earned on other products at the time. *Id.* at 1331-32, 1334. That case offers no support, legal or otherwise, for Dr. McDuff's royalty construct here, and in fact contradicts it.

The situation here is more like another case where Dr. McDuff's opinions were excluded because he used proxy data instead of investigating specific facts of the case. Ex. 66, *Omega Patents, LLC, v. CalAmp Corp.*, Case 6:13-CV-01950-PGB-DCI, Dkt. No. 117, at 26-27. (M.D. Fla. Dec. 23, 2015). Here too, Dr. McDuff's shortcut renders his opinion unreliable.

### 3.    Dr. McDuff's forward patent citation is unsupported

Even assuming Dr. McDuff's calculation of Axonics' excess profits is somehow supportable, his improvised way to apportion the alleged economic contribution of the Asserted Patents to that profits number using forward patent citation is flawed. Medtronic's suggestion that "McDuff's patent citation analysis is well-supported by literature and case law" (Opp. at 20) is without merit; Medtronic's cited sources do not support Dr. McDuff's version of forward citation analysis and neither do any prior cases or any peer-reviewed literature. *See Daubert*, 509 U.S. at 592-93 (stating one measure of expert's reliability is "whether the theory has been subjected to peer review and publication").

As Axonics previously noted, some form of forward patent citation has been

admitted in a few cases for assessing relative values of a specific patent based on apportioning value of patents in a portfolio. But Dr. McDuff's flawed methodology has never been used, and Medtronic offers no authority in support of what Dr. McDuff has done here. He compares the forward citations of patents from three different portfolios with differing vintages and he also considers only patent citations in one of the three portfolios (that of Axonics). Mot. at 16-17. He then also applies his scores to profits. No case and no article validates this approach.

The cases Medtronic cites do not support Dr. McDuff's methodology. For example, in *Comcast*, unlike here, the expert performed ***the same analysis*** for each patent of the 36 patents within ***the same portfolio license*** that contained the patent-in-suit. *Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375, 383 (E.D. Pa. 2016). Then, the expert used a form of patent citation analysis to assess the relative values of specific patents included in a portfolio. Importantly, in that case there was a previously established, arms-length negotiated, royalty rate associated with a broader patent portfolio. So, the analysis sought to find the relative value of one patent within that set. Also different from Dr. McDuff's formulation was the fact that, as the *Comcast* court found, the expert had adjusted the methodology, in view of the facts of the case, to account for the age and category of the asserted patents and the others in the same portfolio. *Id*. at 384. *See also*, *Better Mouse Co. v. SteelSeries ApS*, No. 2:14-cv-198-RSP, 2016 U.S. Dist. LEXIS 16611 (E.D. Tx. Jan. 4, 2016) (estimating the value of four patents relative to others in the same portfolio).

Dr. McDuff's methodology is also different from that applied in *Intel Corp. v. Future Link Sys., LLC*., No. 14-377-LPS, 2017 U.S. Dist. LEXIS 91699 (D. Del. June 1, 2017). There, the expert, focusing on the accused products, started with excluding value unrelated to the allegedly infringing features of the accused Intel chip, *e.g*., packaging and fabrication. This allowed him to produce percentage values for each chip, delineating which feature should be excluded and which needed further analysis. Next, he apportioned the data by excluding features within the accused products that

were attributable to Intel's own technologies not accused of infringement. He then performed the forward citation analysis by comparing the number of times the asserted patents are cited as prior art with the number of such citations to Intel patents that correspond to comparable but not accused Intel features. Finally, he applied the value shares from his forward citation analysis to profits for the accused products. Although the Intel expert's final step was to apply a value share to Intel's profits to apportion the profits attributable to the specific accused features, his derivation of the value share or calculation of the profits does not even remotely resemble what Dr. McDuff has done here. There was no artificial construct for assigning scores among three different unrelated sets of patents to boost the score of one set—the Asserted Patents; there was no subsequent discarding of the majority of the patents used to create the inflated scores; there was no singular focus on defendant's patents to ascertain the number of citations within only those patents to the asserted patents; and there was no faulty methodology to create a favorable incremental profit margin.[4]

Medtronic also attempts to minimize the import of Dr. McDuff's failure to account for Axonics' citations in the AMF patents—ones that were a critical building block for Axonics' accused products. First, Medtronic states that Axonics' focus on the importance of the AMF patents is based on "unverified lawyer drafted interrogatory responses." Opp. at 21. This is wrong. Axonics' motion cited the terms of the AMF License *itself* and the sworn testimony of several witnesses that evidence the

---

[4] Medtronic's reliance on the Sidak/Skog article to conclude "Dr. McDuff's patent citation analysis is well-supported by literature" (Opp. at 20) is misplaced. This article generally discusses among other methodologies the use of forward citation to apportion the value for standard-essential patents. Apart from its specific focus, irrelevant here, the article is not peer reviewed, and expresses only the views of authors who offer damages expert witness services. The article also says nothing about *Dr. McDuff's* methodology used in this case, his selection of the three categories of patents by different owners to assign value to them, his subsequent focus on a subset and discounting of another, his use of citations in only the defendants' own patents, or his application to the incremental profit margin splitting. Moreover, the article supports Axonics' concerns about some of the most valuable patents, such as certain AMF patents, getting very low counts. MDT Ex. 11 at 221 ("the least valuable patents and most valuable patents receive fewer citations than do patents with an average value").

importance of the AMF patents and the underlying technology they cover. Mot. at 18. Medtronic has no response and no explanation for why these foundational AMF patents receive such low citations in Dr. McDuff's analysis. Second, faced with the fact that inclusion of the AMF patents in the analysis drops Dr. McDuff's royalty from ███████████ Medtronic simply complains that this is a new methodology not previously advanced. That is exactly the point: Dr. McDuff not only advanced a new brand of citation analysis and failed to include citations from AMF patents in his analysis, although his own methodology and rationale required him to include them. And Medtronic does not dispute that had Dr. McDuff included all Axonics' own citations in his calculations his royalty rate would be reduced by 3%.

### 4. Dr. McDuff should be precluded from testifying about Medtronic's intercompany licenses

Medtronic admits that its intercompany licenses are not economically and technologically comparable and are different from one that would be relevant in a hypothetical negotiation. Opp. at 22. This by itself suffices to exclude Dr. McDuff's opinions on these licenses. *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1325-1328 (Fed. Cir. 2009) (stating "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." A patentee may not rely on license agreements that "are radically different from the hypothetical agreement under consideration."). Instead, Medtronic states that "Dr. McDuff relies on them in part to guide the right allocation of lost profits among the plaintiff Medtronic entities." Opp. at 22. Medtronic can allocate damages among the plaintiff entities without sharing the intercompany royalty rates with the jury. In the meantime, introducing technologically and economically irrelevant licenses during trial, with the imprimatur of an expert, serves only to prejudice and confuse the jury given the licenses' inflated royalty rates, even if Medtronic admits that "Dr. McDuff will not testify that these agreements reflect a reasonable royalty rate, or are a starting point for determining the reasonable royalty rate, at the hypothetical negotiation." *Id*.

Tables 20 and 21 of Dr. McDuff's Report (Dkt. 202-7, Ex. 10 at 219-220) show these licenses as having the highest, outlier rates and illustrate the prejudicial nature of including any testimony about these royalty rates, although Medtronic appears not to oppose exclusion of those tables.

Medtronic mentions Dr. McDuff's reliance on these licenses to show its ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Opp. at 22. But Medtronic admits that the parties agree on the form of royalty that would apply if it were to be awarded damages, so there is no point in referencing the intercompany agreements rates or terms for this purpose. There is no legitimate reason to expose the jury to those licenses with their artificially inflated royalty rates arrived at because of a secret tax scheme, which would risk undue prejudice and necessitate limiting jury instructions at a minimum.

### 5. Dr. McDuff's *Georgia-Pacific* Factor 12 analysis is unreliable

Medtronic does not dispute that the only point of comparison between the licensing rates Dr. McDuff relies upon under *Georgia-Pacific* Factor 12 and the royalty rate in a hypothetical negotiation—one between Axonics, with its sole business being SNM, and Medtronic for alleged inventions related to SNM products—is that both are in the medical device industry. This position reads out the requirement of *Georgia-Pacific* Factor 12 that explicitly mandates comparability with the inventions or analogous inventions: "the portion of the profit or of the selling price that may be customary in the particular business or comparable businesses ***to allow for the use of the invention or analogous inventions***." *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Medtronic repeats Dr. McDuff's admission that the agreements he used "have differing technologies and economic circumstances relative to the hypothetical negotiations for the Asserted Patents." Opp. at 27. Without adjustments to make those rates comparable and applicable to the facts of this case and make the unidentified medical device businesses

similar to Axonics, those rates are irrelevant and unreliable.

Medtronic's attempt to distinguish the cases Axonics cited that exclude precisely the types of analyses proposed by Dr. McDuff (Opp. at 24) fails. First, Medtronic's attempt to distinguish *Ravo* based on the differences between *Georgia-Pacific* Factors 2 and 12 is dismissed in *Ravo* itself when the court noted that "factor #12, like factor #2, requires an expert to establish that any industry customs are for 'comparable businesses' and involve 'analogous inventions.' Comparability must be proven under factor #12, just as it must be proven under factor #2. [The expert's] opinion, therefore, even if proffered pursuant to *Georgia-Pacific* factor #12, would suffer from the same deficiency with respect to comparability as does his opinion under factor #2." *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 777 (W.D. Pa. 2014). Second, in *Syneron*, although the court considered Medtronic's only point of distinction, that three of the licenses resulted from litigation settlement, the threshold question for the court was indeed comparability. *Syneron Med. v. Invasix*, No. 8:16-cv-00143-DOC-KESx, 2018 U.S. Dist. LEXIS 220514, at *41-43 (C.D. Cal. Aug 27, 2018) (stating the plaintiff "carries the threshold burden to establish that these licenses are for 'comparable businesses' and involve 'analogous inventions.'"). Thus, *Syneron* found the lack of comparability as an independent basis for rejecting the expert's reliance on them. Finally, it is telling that Medtronic does not muster a single case that supports allowing the jury to hear Dr. McDuff on *Georgia-Pacific* Factor 12.

For Factor 12, Dr. McDuff does not rely upon any Axonics licenses, any licenses relating to SNM, or any licenses for the Asserted Patents. Even among the "medical industry" licenses he chooses, the selection of specific industry segments appears random at best, e.g., dental, ophthalmic, or orthopedic apparatus. That is not the sort of comparability that *Georgia-Pacific* Factor 12 requires. Medtronic states that "Dr. McDuff is not attempting to claim that all licenses [he relies upon] are comparable." Opp at 23. That is the crux of the problem. The mere injection of these technologically and economically different licenses, with their irrelevant royalty rates,

will confuse the jury and cause undue prejudice, especially given the imprimatur of an expert.

### D.      Dr. McDuff's copying opinions should be excluded

Medtronic admits that Dr. McDuff is unqualified to opine on issues of copying, but then attempts to sidestep this issue by recharacterizing his statements as mere comparison. Opp. at 25. This is unconvincing, as his words are not comparative, but conclusory: "the same as" and "mirror" leave little room for differences. Medtronic and Dr. McDuff's assurances that this is not testimony about "copying" do not safeguard against the inevitable jury confusion on this issue, which Dr. McDuff himself admitted may occur. Mot. at 24 (citing McDuff Dep. at 304:17–305:3). Nor should his testimony on the technological "similarities" between Axonics' and Medtronic's products be permitted. He is not a technical expert, nor an expert in copying, and has no specialized knowledge on the technical similarities of the two products. *See* Mot. at 24-25; Dkt. 202-8, Ex. 11 (McDuff Dep.) at 41:9-42:21. His opinions on these matters should not be given the elevated noteworthiness of an expert when they are, by his own admission, outside his expertise. They would not help the jury decide a lay matter that is well within their understanding, and they would only risk confusing the jury. Even if Medtronic were correct that "all of Dr. McDuff's opinions about the similarities are taken directly from Axonics' own documents, executives, and statements," (Dkt. 209 at 25:17-18) then those "summaries of evidence and conclusory statements" would not be "likely to be helpful to the jury, which is fully competent to evaluate the evidence and draw its own conclusion." *Sonos, Inc. v. D&M Holdings Inc.*, 297 F. Supp. 3d 501, 521 (D. Del. 2017). Next, Axonics disputes Medtronic's assertions that Dr. McDuff states merely "undisputed factual similarities." Opp. at 25:22. Axonics is the first company in the world to create and offer to patients a rechargeable sacral neuromodulation product, and it disputes Medtronic's unfounded suggestions that it copied Medtronic's legacy **non-**rechargeable product to create Axonics' rechargeable medical device. Moreover, Medtronic has not shown that

Dr. McDuff is qualified to use the charged copying words nor has it shown that they are necessary to his damages analysis. They should be excluded.

## III.   CONCLUSION

Axonics respectfully asks the Court to exclude Dr. McDuff's opinions because they are unreliable, not based on sufficient facts or data, and not the product of reliable principles and methods.

Dated: February 21, 2023          Respectfully submitted,


                                  /s/    Azra M. Hadzimehmedovic
                                  Matthew D. Powers (Bar No. 104795)
                                  William P. Nelson (Bar No. 196091)
                                  Natasha M. Saputo (Bar No. 291151)
                                  TENSEGRITY LAW GROUP, LLP
                                  555 Twin Dolphin Drive, Suite 650
                                  Redwood Shores, CA 94065
                                  Telephone:  (650) 802-6000
                                  Facsimile:   (650) 802-6001
                                  matthew.powers@tensegritylawgroup.com
                                  william.nelson@tensegritylawgroup.com
                                  natasha.saputo@tensegritylawgroup.com

                                  Azra M. Hadzimehmedovic (Bar No. 239088)
                                  Aaron M. Nathan (Bar No. 251316)
                                  Samantha A. Jameson (Bar. No. 296411)
                                  Stephen K. Shahida (admitted *Pro Hac Vice*)
                                  Danielle C. Pfifferling (admitted *Pro Hac Vice*)
                                  Nathaniel D. Cook (admitted *Pro Hac Vice*)
                                  TENSEGRITY LAW GROUP, LLP
                                  8260 Greensboro Drive, Suite 260
                                  McLean, VA 22102
                                  Telephone:  (703) 940-5033
                                  Facsimile:   (650) 802-6001
                                  azra@tensegritylawgroup.com
                                  aaron.nathan@tensegritylawgroup.com
                                  samantha.jameson@tensegritylawgroup.com
                                  stephen.shahida@tensegritylawgroup.com

danielle.pfifferling@tensegritylawgroup.com
nathaniel.cook@tensegritylawgroup.com

Sterling A. Brennan (Bar No. 126019)
Christina L. Trinh (Bar No. 307879)
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, CA 92618
SBrennan@mabr.com
CTrinh@mabr.com

David M. Stein
Brown Rudnick LLP
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
Telephone:   (949) 752-7100
Facsimile:    (949) 252-1514
dstein@brownrudnick.com


*Attorneys for Defendant Axonics, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2023, copies of the foregoing were served upon the following parties as indicated below:

| | |
|---|---|
| Nimalka Wickramasekera<br>Joe S. Netikosol<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071-1543<br>Telephone: (213) 615-1700<br>Facsimile: (213) 615-1750 | **Via E-mail**<br><br>NWickramasekera@winston.com<br>JNetikosol@winston.com |
| George C. Lombardi<br>Samantha M. Lerner<br>J.R. McNair<br>Vivek V. Krishnan<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, IL 60601-9703<br>Tel: (312) 558-5600 | GLombard@winston.com<br>SLerner@winston.com<br>JMcNair@winston.com<br>VKrishnan@winston.com<br>RKang@winston.com<br>winston-medtronic-axonics@winston.com |
| Robert Nai-Shu King<br>WINSTON & STRAWN LLP<br>101 California St., Floor 34<br>San Francisco, CA 94111-5812<br>Telephone: (415) 591-1400<br><br>***Counsel for Plaintiff Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC.; Medtronic USA, Inc.,*** | |

*/s/ Azra M. Hadzimehmedovic*
Azra Hadzimehmedovic