Nimalka Wickramasekera (SBN: 268518)
NWickramasekera@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

George C. Lombardi (*pro hac vice*)
GLombard@winston.com
Brian Nisbet (*pro hac vice*)
BNisbet@winston.com
J.R. McNair (*pro hac vice*)
JMcNair@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   (312) 558-5600
Facsimile:    (312) 558-5700

Attorneys for Plaintiffs
MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.;
MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AXONICS MOUDLATION TECHNOLOGIES, INC., <br><br> Defendant. | **Case No.  8:19-cv-02115-DOC-JDE** <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT** <br><br> Date:  March 6, 2023 <br> Time: 8:30 A.M. <br> Place: Courtroom 10A <br> Judge: Hon. David O. Carter <br><br><br> **REDACTED VERSION OF DOCUMENT PROPOSED TO BE SEALED** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    SUMMARY JUDGMENT OF NO NONINFRINGING ALTERNATIVES ................................................................................. 2

    A.    The Finned Lead Is Not Available as A Matter of Law ............................ 5

    B.    The ████████████ Is Not Available as A Matter of Law .............. 10

    C.    F15 Is Not Available as A Matter of Law Before March–April 2022 ...................................................................................... 14

III.   SUMMARY JUDGMENT OF NO ANTICIPATION OF THE '148, '758, AND '069 PATENTS BASED ON "ADMITTED PRIOR ART SYSTEMS" ....................................................................................... 15

IV.    SUMMARY JUDGEMENT OF NO LACK OF ENABLEMENT .................. 19

    A.    No Asserted Claims Recite a Single Enclosure Charger ....................... 19

    B.    No Asserted Claims Recite Thermally Conductive Material .................. 21

    C.    Axonics Misstates the Law of Enablement ............................................. 22

V.     SUMMARY JUDGMENT OF NO INDEFINITENESS OF "ASSOCIATED WITH" ......................................................................... 24

VI.    CONCLUSION ................................................................................. 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                           **Page(s)**

*Automotive Technologies Intern., Inc. v. BMW of North America, Inc.*,
  501 F.3d 1274 (Fed. Cir. 2007) ................................................................... 23

*Baxalta Incorporated v. Genentech, Inc.*,
  579 F. Supp. 3d 595 (D. Del. 2022) ........................................................... 24

*CBOE v. ISE*,
  2013 WL 12323444 (N.D. Ill. Mar. 7, 2013) ............................................... 5

*CFMT, Inc. v. Yieldup Int'l Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) ................................................................. 21

*Conceptus, Inc. v. Hologic, Inc.*,
  771 F. Supp. 2d 1164 (N.D. Cal. 2010) ....................................................... 4

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (Fed. Cir. 1988) ................................................................. 17

*Datascope Corp. v. SMEC, Inc.*,
  879 F.2d 820 (Fed. Cir. 1989) ..................................................................... 5

*DeGeorge v. Bernier*,
  768 F.2d 1318 (Fed. Cir. 1985) ................................................................. 20

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ................................................................... 5

*Durel Corp. v. Osram Sylvania, Inc.*,
  256 F.3d 1298 (Fed. Cir. 2001) ................................................................. 23

*Edwards Lifesciences AG v. CoreValve, Inc.*,
  2011 WL 446203 (D. Del. Feb. 7, 2011), *aff'd in part, remanded in
  part*, 699 F.3d 1305 (Fed. Cir. 2012) ....................................................... 20

*EMC Corp. v. Pure Storage, Inc.*,
  154 F. Supp. 3d 81 (D. Del. 2016) ............................................................. 12

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  2019 WL 2164090 (S.D. Ohio May 17, 2019) ......................................... 4, 11

ii

*F.T.C. v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997) ................................................................. 15

*In re Fout*,
  675 F.2d 297 (C.C.P.A. 1982) ................................................................. 17

*GCP Applied Techs. Inc. v. AVM Indus., Inc.*,
  2022 WL 17081176 (C.D. Cal. Aug. 5, 2022) ................................. 16, 17

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ........................................................*passim*

*Hansen v. United States*,
  7 F.3d 137 (9th Cir. 1993) ...................................................................... 15

*Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) .............................................................. 24

*Inline Connection Corp. v. EarthLink, Inc.*,
  684 F. Supp. 2d 496 (D. Del. 2010) ........................................... 19, 21, 22

*Largan Precision Co, Ltd v. Genius Elec. Optical Co.*,
  2015 WL 2063988 (N.D. Cal. May 4, 2015) ............................................ 6

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  2011 WL 197869 (E.D. Tex. Jan. 20, 2011) ............................................. 5

*Lezama v. Clark Cnty.*,
  817 F. App'x 341 (9th Cir. 2020) ............................................................. 7

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) .............................................................. 23

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  959 F.3d 1091 (Fed. Cir. 2020) .............................................................. 19

*Micro Chem., Inc. v. Lextron, Inc.*,
  318 F.3d 1119 (Fed. Cir. 2003) ..................................................... 4, 5, 11

*Nelson v. Pima Community College*,
  83 F.3d 1075 (9th Cir. 1996) .................................................................. 14

*Neutrino Dev. Corp. v. Sonosite, Inc.*,
  410 F. Supp. 2d 529 (S.D. Tex. 2006) .................................................... 22

iii

*Nilsson v. City of Mesa*,
   503 F.3d 947 (9th Cir. 2007) ............................................................................ 14

*OPTi Inc. v. Apple, Inc.*,
   2009 WL 4727912 (E.D. Tex. Dec. 3, 2009) ........................................................ 20

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007) ........................................................................ 24

*Personalized Media Commc'ns, LLC v. Zynga, Inc.*,
   2013 WL 5962812 (E.D. Tex. Nov. 7, 2013) ........................................................ 23

*Phonometrics, Inc. v. Hosp. Int'l, Inc.*,
   120 F. App'x 341 (Fed. Cir. 2005) ...................................................................... 8

*Phytelligence, Inc. v. Washington State Univ.*,
   973 F.3d 1354 (Fed. Cir. 2020) ........................................................................ 14

*Qualcomm Inc. v. Apple Inc.*,
   24 F.4th 1367 (Fed. Cir. 2022) .................................................................... 17, 18

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
   2020 WL 1283465 (W.D. Penn. Mar. 18, 2020) ...................................................... 4

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) ........................................................................ 11

*TQP Dev., LLC v. Merrill Lynch & Co.*,
   2012 U.S. Dist. LEXIS 112613 (E.D. Tex. Aug. 10, 2012) ...................................... 11

*TriReme Med., LLC v. AngioScore, Inc.*,
   2017 WL 930777 (N.D. Cal. Mar. 9, 2017) ............................................................ 6

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,
   308 F.3d 1167 (Fed. Cir. 2002) .................................................................... 21, 22

*Urrutia v. Chipotle Mexican Grill, Inc.*,
   2017 WL 2901717 (C.D. Cal. June 16, 2017) .......................................................... 6

*Vaporstream, Inc. v. Snap Inc.*,
   2020 WL 136591 (C.D. Cal. Jan. 13, 2020) .......................................................... 18

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ............................................................................ 6

iv

*Volterra Semiconductor Corp. v. Primarion, Inc.*,
  796 F. Supp. 2d 1025 (N.D. Cal. 2011) ................................................................ 22

*Wherevertv, Inc. v. Comcast Cable Commc'ns, LLC*,
  2022 U.S. Dist. LEXIS 131934 (M.D. Fla. May 23, 2022) ................................... 12

**Statutes**

35 U.S.C. § 102 ........................................................................... 1, 16, 17

35 U.S.C. § 311(b) ............................................................................. 17

35 U.S.C. § 315(e)(2) ..................................................................... 17, 18

## I.    INTRODUCTION

Axonics acts as though the law mandates the Court conclude—no matter how speculative, theoretical, or untethered to actual record evidence—that Axonics had available noninfringing alternatives because otherwise Axonics cannot avoid the consequences of its willful infringement.  Of course, that is wrong.  Axonics has no legal bases to support its opposition.  Ignoring its burden, Axonics parades a series of speculative events and what-ifs, stacking inference upon inference without offering evidence that reasonably supports those inferences.  This is insufficient to raise a genuine issue for trial.  Even more, its opposition reveals the lengths to which it will stretch the record, and gloss over undisputed facts that are fatal to its position.  For example, Axonics contends ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████  But needing FDA approval renders noninfringing alternatives unavailable in the real world.  Axonics' unfounded contentions are not legal bases for the Court to conclude that decidedly unavailable alternatives are anything more than speculative and theoretical possibilities.  Medtronic's motion should be granted.

Axonics' oppositions to Medtronic's motions for summary judgment regarding invalidity—all of which present questions of law—fare no better.  For anticipation, Axonics contends it can rely on multiple distinct prior art systems contrary to 35 U.S.C. § 102.  For enablement, Axonics contends the asserted claims must enable undisputedly unclaimed features of the accused products contrary to binding Federal Circuit precedent.  And for indefiniteness, Axonics contends that despite the Special Master carefully considering the same record Axonics now presents—and decidedly rejecting it in a well-reasoned claim construction opinion—a term commonly used in patents, upheld by numerous other courts, and that is undisputedly described in the asserted patents, is nevertheless indefinite (even though the Special Master has already ruled it is not).  Medtronic's motions should be granted.

## II.   SUMMARY JUDGMENT OF NO NONINFRINGING ALTERNATIVES

It is undisputed that Medtronic launched its InterStim system with a revolutionary tined lead in 2002. Dkt. 222-2 at SUF 7–8.[1] It is also undisputed that until Axonics entered the Canadian market in 2017 with its accused products, Medtronic's InterStim system was the lone player in the global sacral neuromodulation market. *Id.* at SUF 6. It is, thus, undisputed that there were no commercially available alternatives to the asserted patents when Axonics chose to willfully infringe. *See id.*

After expressly targeting Medtronic's patented technology, Axonics seeks to avoid to the full extent of damages it owes for its willful infringement by offering three purported noninfringing alternatives: (1) a failed "finned" lead that Axonics rejected and that was never used or FDA approved despite years of attempts before being abandoned in 2020 (*id.* at SUF 15–35, 56); (2) ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ (Dkt. 195-19 at 48:2–8), but that ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████; and (3) its F15 system which Axonics contends it could have launched before 2019, but which it did not launch until 2022 despite being sued for infringement two and a half years earlier (*id.* at SUF 49–52).

The undisputed facts compel summary judgment of no noninfringing alternatives.[2]   In its opposition, Axonics offers excuses for its infringement and

---

[1] Exhibits are to the Declaration of Brian Nisbet in Support of Plaintiffs' Reply; "AMF Reply" citations are to Plaintiffs' Reply to Defendant's Additional Material Facts; emphasis is added and citations and quotations omitted.

[2] Axonics asserts Medtronic "admitted" the "availability analysis involves factual determinations for the jury to decide," but cites a footnote on "acceptability" (not availability) relating to jury instructions on reasonable royalties (not lost profits). Dkt. 222-1 at 6–7 (citing *Colibri Heart Valve LLC, v. Medtronic CoreValve LLC,* 8:20-cv-00847-DOC-JDE, Dkt. No. 388-1 (Proposed JIs) at 75). That is not the issue here.

1  speculation regarding what it could have done had it chosen not to willfully infringe,

2  but none creates a genuine dispute of material fact to avoid summary judgment.

3      *First*, Axonics blames Medtronic for its infringement by contending that

7  Dkt.

8  222-1 at 8.

17  Moreover,

19  Axonics'

22  Ex. 15, AX0752042; Ex 16, AX1167675, at 677.

23  Axonics' false contention that Medtronic was obligated, much less permitted, to tell

24  Axonics it was infringing is irrelevant to the issues in this case and Medtronic's motion.

25      *Second*, Axonics' position that it can avoid summary judgment by relying on

26  speculation and theories untethered to actual "real life" evidence simply because the

27  world in which Axonics is not infringing is "hypothetical" is contrary to the law. "When

28  an alleged alternative is not on the market during the accounting period, a trial court

3

may reasonably infer that it was not available as a noninfringing substitute at that time. The accused infringer then has the burden to overcome this inference by showing that the substitute was available[.]" *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341, 1353 (Fed. Cir. 1999).  But despite this being a "hypothetical enterprise," "[m]ere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing, rather than noninfringing, product." *Id.* at 1350, 1353.  "[T]he trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement. Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not."  *Id.*  Thus, Axonics cannot hide behind the fact that it chose to infringe and resort to speculation to construct any type of hypothetical world in which it would not.[3]  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123–24 (Fed. Cir. 2003) (district court "should have granted summary judgment that [alternative] was not available at the time of infringement" when it "took over four months to convert all of its infringing" devices); *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 2019 WL 2164090, at *13–14 (S.D. Ohio May 17, 2019) (granting summary judgment excluding alternatives that "would have taken over 10 months to design around" asserted patent as "unavailable at the time of infringement"); *Sherwin-Williams Co. v. PPG Indus., Inc*., 2020 WL 1283465, *8–10 (W.D. Penn. Mar. 18, 2020) (summary judgment excluding a non-commercialized product and a litigation-generated alternative not on the market supported by "expert's reliance on conversations with personnel of infringing party"); *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1178–79 (N.D. Cal. 2010) (summary judgment excluding device not on market whose availability was supported

---

[3] The speculative nature of Axonics' proposed alternatives is compounded when considering a device that does not infringe any asserted patent.  There is no record evidence that Axonics could have secured a license and developed an FDA approved finned lead while also making the F15 product or ██████████████████████████.

only by expert report and private conversations); *CBOE v. ISE*, 2013 WL 12323444, at *2 (N.D. Ill. Mar. 7, 2013) (excluding alternative for "failure to point to any evidence that a system like the one described in the [expert] report was available during the relevant period"); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 2011 WL 197869, at *3-4 (E.D. Tex. Jan. 20, 2011) (excluding "alternative [that] was practically implemented" at a conference because it was "only speculation that it might have been theoretically possible for Quanta to produce [its] non-infringing alternatives" for commercial sale).  As in these cases, summary judgment is warranted here.

### A.     The Finned Lead Is Not Available as A Matter of Law

The undisputed material facts compel summary judgment that the finned lead is not and never was available to Axonics as a matter of law.  Indeed, Axonics contends that the "finned leads" "only require FDA approval in the real world." Dkt. 222-1 at 7.  That alone compels summary judgment.  *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1332 (Fed. Cir. 2009) (alleged alternative medical device not available in part because it "had never been submitted to the Food & Drug Administration for the necessary marketing approval"); *Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 824-25 (Fed. Cir. 1989) (alleged alternative not available where it "needed FDA approval to be marketed").  But unlike in those cases, there is no question for the jury to resolve regarding whether the alleged alternatives are FDA approved.  Instead, it is undisputed that the finned leads cannot be used in the United States without FDA approval, which Axonics admits is an entirely risky, uncertain, and unpredictable endeavor.  Ex. 1, Davis Dep. Tr. 266:17–268:12; *see Micro Chem.*, 318 F.3d at 1123 (summary judgment alternative that took four months not available).  Indeed, Axonics admits the material facts: the finned lead was designed by a third-party, John Swoyer, while he was employed at Greatbatch Medical (Dkt. 222-2 at SUF 16); Axonics rejected the finned lead after a "high level" meeting with Greatbatch in June 2014, before the finned lead was complete, and before several patents covering it issued (*id.* at SUF 17–22); the finned lead is covered by multiple United States patents that Axonics never

owned, licensed, or otherwise had any rights to (*id.* at SUF 15, 22–24); Axonics is and has always been legally prohibited from making, selling, and offering to sell the finned lead (*id.* at SUF 26); Axonics never designed, developed, manufactured, or attempted to obtain FDA approval for the finned lead (*id.* at SUF 34); and the only company that tried to obtain FDA approval for the finned lead failed to after two long years of FDA review and repeated requests for information from the FDA before it was abandoned in 2020 (*id.* at SUF 27–32). It is, thus, undisputed that the finned lead has never been approved by the FDA or any regulatory body, implanted in a human, or sold in the United States.  *Id.* at SUF 33.  Axonics' physician expert, on whom Ms. Davis relies and whose testimony Axonics ignores, confirmed that "the finned lead is still not FDA approved even today," the "safety and effectiveness of the finned lead" has "not been established in a human," and "[he] would not implant this until it was FDA approved." *Id.* at SUF 33; Dkt. 195-10, Butrick Dep. Tr. 22:8–25 ("not aware" "of the finned lead ever having been implanted in a human patient")); Dkt. 222-2 at SUF 56.

Critically, Axonics cites no law denying summary judgment under similar facts. *See* Dkt. 222-1 at 8–12.  Instead, Axonics contends there are "factual bases" on which a reasonable jury can conclude that the finned lead is available.  *Id.*  But Axonics' speculation "stacks inference upon inference without offering evidence that reasonably supports those inferences—this pattern is insufficient to raise a genuine issue for trial." *See Urrutia v. Chipotle Mexican Grill, Inc.,* 2017 WL 2901717, at *17 (C.D. Cal. June 16, 2017); *Largan Precision Co, Ltd v. Genius Elec. Optical Co.*, 2015 WL 2063988, at *3 (N.D. Cal. May 4, 2015) ("The Court doubts that a reasonable jury could pile inference upon inference, as Largan urges."); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) ("At summary judgment, this court need not draw all possible inferences in Harvest's favor, but only all reasonable ones."); *TriReme Med., LLC v. AngioScore, Inc.*, 2017 WL 930777, at *14 (N.D. Cal. Mar. 9, 2017) ("Stacked inferences and speculation do not generally raise issues for trial.").  Axonics' "[m]ere allegation and speculation do not create a factual dispute for purposes of

6

summary judgment." *See Lezama v. Clark Cnty.*, 817 F. App'x 341, 345 (9th Cir. 2020).

Notwithstanding, Medtronic addresses Axonics' speculative and conclusory claims, not to lend credence to the suggestion they create material fact disputes, but to demonstrate how Axonics misstates the record.  For example, Axonics contends the finned lead could have obtained FDA approval simply because Mr. Swoyer "testified that the finned lead was 'ready for approval by the FDA' and 'suitable for its intended purpose.'" Dkt. 222-1 at 9–10.  Mr. Swoyer left Nuvectra in December 2016, before it filed for FDA approval, was not affiliated with the company thereafter, and was not involved with its failed attempts to obtain FDA approval.  *See* Ex. 3, Swoyer Dep. Tr. at 17:21–24:10; Dkt. 222-2 at SUF 27–30.  While at Nuvectra, Mr. Swoyer was not in regulatory affairs or product development—he was Vice President of Technical Operations and Supply and "mostly" helped "negotiate contracts with suppliers."  Ex. 3, Swoyer Dep. Tr. at 23:2–12.  Because Mr. Swoyer held a "different role at the time," he never saw Nuvectra's "final submission" to the FDA.  *Id*. at 88:23–89:17.  Accordingly, in deposition, Mr. Swoyer had no knowledge of the product's status before the FDA or in the development process, providing only unfounded and speculative beliefs that the finned lead might work.  When asked if he believed, as an "engineer who had designed and developed the finned lead," whether it "was suitable and ready for approval by the FDA for use in sacral neuromodulation," Mr. Swoyer testified: "I don't believe I saw the final submission, so ***I don't know exactly if everything was completed.***  But ***as far as I know***, it was, and it was suitable for its intended use."  *Id*. at 88:23–89:17.  This is not a disputed issue of material fact, especially where it is undisputed that the FDA concluded it was "not ready for approval."[4] Dkt. 222-2 at SUF 27–30.  Axonics "must have something more than [Mr. Swoyer's] conjecture and speculation to create a disputed issue of material fact."  *See*

---

[4] Mr. Swoyer is not qualified to opine on the finned lead prospects for FDA approval. Axonics is moving to exclude similar testimony in this case. Dkt. 189-1 at 29–31 ("Mr. Stevens impermissibly further speculates about what the FDA will do in the future.").

1    *Phonometrics, Inc. v. Hosp. Int'l, Inc.,* 120 F. App'x 341, 345 (Fed. Cir. 2005).

2       Axonics' assertion that "the finned lead was far along in the FDA approval

3 process when…the process was abandoned" fares no better. Dkt. 222-1 at 10. Indeed,

4 Axonics has it backwards—yes, the finned lead was far along in the process ***and yet the***

5 ***FDA still refused to approve it***. The undisputed facts—that the FDA reviewed the

6 finned lead device for two years, ***twice*** paused review because it needed more

7 information about safety and efficacy, never approved it, and after Nuvectra went

8 bankrupt the company that acquired it abandoned it in 2020—do not suggest the finned

9 lead is on track for FDA approval now, let alone in 2017. *See* Dkt. 222-2 at SUF 27–

10 30. Axonics touting that purported "[s]tudies performed by experienced physicians

11 demonstrated that the finned lead would provide safe and effective fixation in tissue,

12 superior to Medtronic tined leads" changes nothing because the FDA disagreed. *Id.*;

13 Dkt. 222-1 at 10. Axonics' Henry Lee, lead engineer who designed its infringing tined

14 lead, stated contemporaneously "these are not well designed studies with selective

15 'data' biased in favor of Nuvectra design," among other criticisms.[5] Ex. 14 at 906.

16       Axonics' remaining purported facts are equally unavailing. For example,

17 Axonics contends that Medtronic "demonstrate[ed its] own confidence that the finned

18 lead could obtain FDA approval." Dkt. 222-1 at 10. It did not. Other than unsworn

19 speculation from its paid expert, Axonics cites one unattributed Medtronic document—

20 a "corporate development" presentation that makes assumptions and projections about

21 three hypothetical scenarios: ███████████████████████

22

---

23 [5] The "studies" are not clinical trials, never implanted leads in patients, and were not
peer reviewed or published in any reputable scientific journal. *See* Ex. 9, Davis Dep.

24 Ex. 10; Ex. 10, Davis Dep Ex. 11. Rather, they were posters presented at a conference

25 using a handful of unidentified leads. *See* Ex. 9, Ex. 10. The posters do not establish
that the "finned lead would provide safe and effective fixation in tissue, superior to

26 Medtronic tined leads." *See* Ex. 9, Ex. 10. To the contrary, one concludes that "[i]n-

27 vivo studies are required to confirm these suggestions" (Ex. 9 at 3) and the other that
"further investigation is needed to explore and define sacral lead migration from the

28 distal and proximal lead end" (Ex. 10 at 2). These further "studies" never happened.

1  [REDACTED]

2  [REDACTED]

3  [REDACTED] Dkt.

4  222-5 at 3.  None of this reflects Medtronic's "confidence" that the finned lead could

5  obtain FDA approval.  *See* Ex. 4, Bombeck Dep. Tr. at 217:13–218:3 ("[W]e were

6  trying to determine if we wanted to use it in a Medtronic product.  We didn't know

7  enough about it to make that determination.  I can't say that I wanted to use it in a

8  Medtronic product.").  In fact, Medtronic ***never*** purchased the finned lead, and the

9  company that did abandoned it.  *See* Dkt. 222-2 at SUF 27–32.  And ***no one***, including

10  Axonics, had enough confidence in it to pursue FDA approval.  It is irrelevant that

11  "Axonics has demonstrated it has the resources and know-how to obtain FDA for ***a***

12  ***neuromodulation product***," (Dkt. 222-1 at 10)—Axonics offers no admissible evidence

13  that it could obtain FDA approval of the finned lead that, in "real life," the FDA refused

14  to approve.

15        Finally, Axonics asserts that it could have licensed the finned lead patents in June

16  2016.  *See* Ex. 1, Davis Dep. Tr. at 40:9–41:15.  Axonics rests solely on the "high level"

17  and "introductory" meeting with Greatbatch in June 2014.  *See* Dkt. 222-1 at 10–11;

18  Dkt. 222-2 at SUF 18.  But Axonics' CEO, Mr. Cohen, confirmed under oath that

19  [REDACTED]

20  [REDACTED]

21  [REDACTED]

22  [REDACTED]

23  [REDACTED] Ex. 5, Cohen Dep. Tr. at 260: 21–262:18.

24  [REDACTED] *Id.* 263:9–21.  Ms. Davis's

25  speculation otherwise cannot contradict the undisputed facts.  *See* Dkt. 222-2 at SUF

26  18–21.  Even Mr. Swoyer testified he "wouldn't necessarily know all the factors that

27  would go into" whether Greatbatch or Nuvectra was willing to license its patents to

28  Axonics in 2016.  Ex. 3, Swoyer Dep. Tr. at 110:6–112:14.  As Axonics concedes, there

9

1   is no record evidence, and Ms. Davis cites none, that Greatbatch or Nuvectra was

2   willing in June 2016 to license its patents to Axonics on financially agreeable terms.

3   *See* Dkt. 222-1 at 8–12; Ex. 1, Davis Dep. Tr. at 159:9–16.  The contention is pure

4   speculation.  Atop this speculation, Axonics layers the assumptions that if it licensed

5   Greatbatch's patents, developed a finned lead that was safe and effective, and obtained

6   FDA approval, Greatbatch could have supplied the finned lead to Axonics because it is

7   a large contract manufacturer.  *See* Dkt. 222-1 at 11–12.  This is irrelevant.  Greatbatch

8   may have manufactured other medical devices, but it indisputably never manufactured

9   the finned lead.  Mr. Swoyer's inconclusive and speculative testimony does not change

10  that undisputed fact.  *See* Ex. 3, Swoyer Dep. Tr. at 109:20–111:5.  And Ms. Davis cites

11  no supporting evidence for her conclusion that Axonics "could have instead adapted

12  Greatbatch's finned lead design for use in its own products, or even had Greatbatch

13  manufacture, and supply the leads directly to Axonics." Ex. 1, Davis Dep. Tr. at 126:8–

14  128:6, 160:21–161:5.  Summary judgment regarding the finned leads should be granted.

15      **B.    The** ███████████████  **Is Not Available as A Matter of Law**

16          Axonics' ████████████████████████████████████████████████████,

17  but it is not today, and it certainly was not in mid-2016.  Axonics asserts its ████████

18  ████████████████████████████████████████████████████████████████

19  Dkt. 222-1 at 13, 16.  The undisputed facts establish the opposite: ████████████████

20  ████████████████████████████████████████████████  Dkt. 222-2

21  at SUF 36. ████████████████████████████████████████████  Dkt.

22  222-2 at SUF 38, 41, 42, 44–47. █████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ██████████████████████  Dkt. 222-2 at SUF 39, 41, 42, 44–47; Dkt. 201-27 at 2

26  ████████████████████████████████.  Accordingly, the FDA has

27  not yet approved it, and ████████████████████████████████████████████████

28  ██████████████████████████  Dkt. 222-2 at SUF 39–47.  Axonics has the

                                      10

1   burden to prove its ████████████████████. *See Grain Processing.,* 185 F.3d

2   1341, 1349–53. It cannot meet that burden based on the undisputed facts, and therefore

3   the ████████████████ as a matter of law. ████████████████

4   ████████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████

9   Axonics attempts to distinguish ████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████

19  Axonics cites no case as analogous as ████████████████. Axonics cites

20  *TQP Dev., LLC v. Merrill Lynch & Co.*, 2012 U.S. Dist. LEXIS 112613 (E.D. Tex. Aug.

21  10, 2012), but it is ***not*** a lost profits case. Rather, it evaluated whether "there were non-

22  infringing alternative cipher algorithms that would impact any hypothetical

23  negotiation." *Id.* at *4–5. Unlike here, the parties there ***stipulated*** that alternatives were

24  available and the defendant provided "***documentary evidence***" that alternative

25  algorithms were incorporated long before the date of the hypothetical negotiation. *Id.*

26  at *6–7. The only question was whether these algorithms could be accessed and used

27  in an internet browser, which the court left for the jury. *Id.* By contrast, the undisputed

28  facts here show that ████████████████████████

1   ████████████████████████████  *Wherevertv, Inc. v. Comcast Cable*

2   *Commc'ns, LLC*, 2022 U.S. Dist. LEXIS 131934, at \*18–24 (M.D. Fla. May 23, 2022)

3   is also not a lost profits case. "[T]he question for the [c]ourt [was] whether acceptable

4   non-infringing alternatives were available...thereby diminishing *the reasonable royalty*

5   amount to which [the parties] would have agreed in a hypothetical negotiation. *Id.* at

6   \*5–7. The court observed that "non-infringing alternatives have a different role in the

7   reasonable royalty context than in the lost profits damages context." *Id.* at \*13–19. In

8   the reasonably royalty context, the court denied summary judgment because the

9   defendant presented evidence that it could have changed its software to avoid

10  infringement "without altering the product's functionality or the user's experience." *Id.*

11  at \*21–22. That is in stark contrast to the undisputed facts here—███████████████

12  ██████████████████████████████████████. Dkt. 222-

13  2 at SUF 39, 41-47. Similarly, *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81,

14  118 (D. Del. 2016) did not involve a medical device, or an alternative that needed FDA

15  approval to be marketed. Instead, the court denied summary judgment because the

16  evidence suggested that small tweaks to source code and software could have been

17  implemented to avoid infringement. *See id.* That too is unlike the undisputed facts

18  here, ██████████████████████████████████████.

19       Axonics relies heavily on *Grain Processing* but that case underscores the

20  unavailability of ███████████████ (and the finned lead and F15 for that matter).

21  In *Grain Processing*, the defendant made and sold a chemical product called Lo-Dex

22  10 (maltodextrin) from 1979–1991. 185 F.3d 1343–45. During that time, the defendant

23  used three different manufacturing processes, but each produced Lo-Dex 10 that was

24  found to infringe the asserted patent. *Id.* at 1345–46. The defendant then adopted a

25  fourth process, which added a well-known enzyme, glucoamylase, to the chemical

26  reaction, resulting in noninfringing Lo-Dex 10. *Id.* The Federal Circuit noted:

27       From the time [Defendant] began experimenting with the glucoamylase-
         alpha amylase combination . . . it took only *two weeks* to perfect the

28

12

reaction and begin mass producing Lo–Dex 10 using Process IV…this two-week development and production time is "***practically instantaneous***" for large-scale production. [Defendant] simply experimented with different combinations of glucoamylase and alpha amylase, along with pH, heat, and time of the reaction. [Defendant] did not change any equipment, source starches, or other ingredients from Process III. Glucoamylase has been commercially available and its effect in starch hydrolysis widely known since the early 1970's, before the [asserted] patent issued.

*Id.* at 1346–47. Based on these factual findings, which were not challenged on appeal, the Federal Circuit held the district court did not clearly err in concluding the fourth process—simply adding glucoamylase in manufacturing—was available to the defendant as early as 1979. *Id.* at 1353–54. (the defendant "did not have to invent around the patent, the district court observed; all it had to do was use a glucoamaylase enzyme in its production process").

The instant facts could not be further from *Grain Processing*. There, in two weeks of tinkering, the defendant identified and added a readily available ingredient to its established process, without making any additional changes. Here, it is undisputed that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████. There, in the same two weeks, the defendant "instantaneously" mass produced and started selling the noninfringing Lo-Dex 10. Here, it is undisputed that, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████. In short, Axonics' reliance on *Grain Processing* is misplaced—*Grain Processing* supports Medtronic's motion for summary judgment.

Finally, the hearsay, unchallenged, and conclusory declaration of Mr. Abdeen does not create a disputed factual issue. *See* Dkt. 222-12. Mr. Abdeen cites no documents or other evidence to corroborate his speculation that ██████████████

would have been available in mid-2016.  Dkt. 222-12 at 5–6.  "[A] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007); *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) (conclusory or speculative statements in an affidavit insufficient to create genuine dispute of material fact).  And it is ironic that Axonics claims Medtronic "lacks record evidence that Axonics was not able to produce ██████ earlier."  Dkt. 222-1 at 15.  First, this is not Medtronic's burden.  Second, Medtronic deposed Mr. Abdeen on December 12, 2022, *before* Axonics first claimed in Ms. Davis's rebuttal expert report on December 16, 2022, that it could have developed the ████████████████, and well-before Mr. Abdeen submitted his declaration on February 6, 2023.  As a result of Axonics' established practice of withholding information regarding the ████████████, SM-18 and SM-19, Medtronic was deprived the opportunity to test the naked statements that Mr. Abdeen now makes in support of his employer.  Axonics' evidentiary gamesmanship should not be rewarded.

### C.     F15 Is Not Available as A Matter of Law Before March–April 2022

Axonics confuses Medtronic's motion.  Medtronic seeks partial summary judgment that F15 was not available prior to its FDA approval and United States launch in March–April 2022.  Axonics' opposition confirms that partial summary judgment is appropriate based on the undisputed facts.  Axonics does not cite any technical or development document related to its F15 product.  *See* Dkt. 222-1 at 17–18.  Nor does Axonics cite any document showing the components or technology in F15 were available in 2016.  *See* Dkt. 222-1 at 18.  To the contrary, the one 2022 marketing document Axonics cites describes its "NexCore technology" as "state-of-the-art"—indicating it was not available at the relevant time six years prior.  Dkt. 222-26 at 20.  Further, Axonics cites no evidence that it was financially able to develop F15 in mid-

14

2016.  Notably, F15 does not use any of the patents licensed from the Alfred Mann Foundation—one of Axonics' largest stakeholders.  *See* Dkt. 222-1 at 17–18.

Axonics cannot meet its burden here because it refused to and did not produce any documents related to its development of F15, despite several requests for documents related to noninfringing alternatives.  *See* Ex. 6, Medtronic's Requests for Production Nos. 56–59.  Instead, Axonics contended the F15 product was irrelevant.  Ex. 7, 6/22/22 Axonics Resp. to Interrogatory No. 1, at 9.  Thus, Axonics cannot met its burden to establish it had the necessary equipment, know-how, and experience to have developed and released F15 before March–April 2022.  *See Grain Processing*, 185 F.3d 1341, 1354.  Axonics cannot now benefit from its obstructionist tactics in discovery.

Axonics is also not saved by Mr. Abdeen's untimely, self-serving, and unsupported hearsay declaration.  Dkt. 222-12; *see F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").  Nor is Axonics helped by criticizing Medtronic for not asking Mr. Abdeen "(or any other Axonics witness) a single question about F15." Dkt. 222-1 at 19.  Again, Axonics never contended, until Ms. Davis's expert report issued after the close of fact discovery, that F15 was available before its FDA approval and United States launch in March–April 2022.  *See* Dkt. 201-16, 12/16/22 Davis Rpt. at 81–89; Ex. 8, 9/16/22 Axonics Resp. to Interrogatory No. 13, at 47.  Axonics sandbagged Medtronic with claims never disclosed in discovery, but that cannot give rise to disputed facts.

## III.  SUMMARY JUDGMENT OF NO ANTICIPATION OF THE '148, '758, AND '069 PATENTS BASED ON "ADMITTED PRIOR ART SYSTEMS"

Medtronic moved for summary judgment of no anticipation of the '148, '758, and '069 patents because Axonics failed to cite a single prior art reference that discloses

15

every limitation of any asserted claim.  Dkt. 201-1 at 26–27.  Axonics skirts this statutory requirement by suggesting—without citation to any authority—that "there is no requirement to identify…a statutory prior art basis" for its anticipation argument because of the type of evidence it is relying on (purported admissions regarding prior art). Dkt. 222-1 at 20.  But that is not the law.  "To show that a patent claim is invalid as anticipated [under 35 U.S.C. § 102], the accused infringer *must* show by clear and convincing evidence that *a single prior art reference discloses each and every element of a claimed invention*."  *GCP Applied Techs. Inc. v. AVM Indus., Inc.*, 2022 WL 17081176, at *10 (C.D. Cal. Aug. 5, 2022).  And while its opposition states in a single conclusory sentence that "Axonics showed, for example, that the applicants' admission concerning Nedungadi disclosed every element of asserted claims," (Dkt. 222-1 at 21), its response to Medtronic's undisputed facts confirms the opposite.

Medtronic showed that Axonics submitted "anticipation" claim charts for the '148 (Dkt. 201-30), '758 (Dkt. 201-31), and '069 (Dkt. 201-32) patents.  Axonics does not dispute that for every independent asserted claim of these patents, Axonics' "anticipation" chart cites *more than one* separate and distinct "prior art system." Dkt. 222-2 at SUF 67 (conceding it alleges "asserted claims of the '148 patent are anticipated by…Admitted Prior Art *systems*"); SUF 68 (same for '758 patent); SUF 69 (same for '069 patent).  For example, none of Axonics' "anticipation" charts cite Nedungadi for the "componentry for providing a therapeutic output" limitation found in every independent system claim of the '148, '758, and '069 patents.  Instead, Axonics cites the separate "prior art system" of "Torgerson." Dkt. 201-30 at 7 ('148 patent, limitation 6[a], citing Torgerson); Dkt. 201-31 at 7, 9 (same for '758 patent, limitation 1[a]); Dkt. 201-32 at 14, 17 (same for '069 patent, limitation 5[a]); Dkt. 214-2; AMF Reply 118. Anticipation requires that a "*single prior art reference* discloses each and every element of a claimed invention" "within the four corners of the document" and "arranged as in the claim."  *GCP*, 2022 WL 17081176, at *10 (citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) and *Silicon Graphics, Inc. v. ATI Tech., Inc.*,

16

607 F.3d 784, 796 (Fed. Cir. 2010)).  Axonics' undisputed reliance on multiple prior art systems for anticipation is legally insufficient.  *Id.*; Dkt. 214-2; AMF Reply 118.

Axonics' reliance on *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569–70 (Fed. Cir. 1988), which used prior art admissions in an obviousness combination with printed publications, for the proposition that the law permits use of a "statement in a patent that something is in the prior art…for determinations of anticipation and obviousness" does not change the requirements of anticipation under Section 102.  Dkt. 222-1 at 20.  And none of Axonics' additional cases affects the applicability of *GCP Applied Techs*.[6]  Indeed, Axonics does not cite a single case where any court found claims to be ***anticipated*** based on purported admissions in the asserted patents regarding multiple prior art systems.  Because it is undisputed that Axonics cites multiple "prior art systems," including from ***both*** Nedungadi and Torgerson as together ***anticipating*** the asserted claims of the '148, '758, and '069 patents, Medtronic is entitled to summary judgment of no anticipation.  *See* AMF Reply 118.

Moreover, in asserting anticipation based on alleged "applicant admitted prior art," Axonics seeks to do what the estoppel provision intended to prevent—get a "second bite at the apple" on invalidity.  PTAB, *Consolidated Trial Practice Guide*, 12-13 (Nov. 2019).  35 U.S.C. § 315(e)(2) prevents Axonics from raising in this litigation invalidity grounds that it reasonably could have raised in its failed IPR proceedings.  Axonics does not, and cannot, dispute that the passages it cites as alleged admitted art are near-identical to passages in Nedungadi and Torgerson themselves.  *Compare* Dkt. 222-2 at SUF 83, *with* SUF 84–85; *compare id.* at SUF 86, *with* SUF 87–88.  And there is no dispute that Axonics could have raised anticipation invalidity grounds based on Nedungadi and Torgerson in IPR.  *See* 35 U.S.C. § 311(b).  Thus, Axonics' sole argument is that, under *Qualcomm*, it could not raise applicant admitted prior art as an anticipation ground in IPR.  Dkt. 222-1 at 21 (citing *Qualcomm Inc. v. Apple Inc.*,

---

[6] *Application of Nomiya*, 509 F.2d 566, 571 n.5 (C.C.P.A. 1975) (admitted prior art applied under §103); *In re Fout*, 675 F.2d 297, 300–01 (C.C.P.A. 1982) (same).

17

24 F.4th 1367, 1374 (Fed. Cir. 2022)).  Axonics ignores a critical distinction between the admitted prior art in *Qualcomm* and its anticipation theory here: in *Qualcomm*, the admitted prior art was a figure drafted by the patentee that did not exist in, let alone cite, any other patent or printed publication.  *Qualcomm*, 24 F.4th at 1370 ("Figure 1 of the patent depicts a 'prior art' 'standard POC system'"), 1371 ("Apple's second ground relied on AAPA—Figure 1 and its accompanying description in the '674 patent—in view of Majcherczak.").  In contrast, Axonics relies on disclosures in the asserted patents taken verbatim from Nedungadi.  *Compare, e.g.*, Dkt. 222-2 at SUF 83 (citing '148 patent, 2:32–48), *with* Dkt. 222-2 at SUF 85 (Nedungadi at Abstract).  Thus, while the admitted prior art in *Qualcomm* could not have been raised in an IPR petition, Axonics indisputably could have raised Nedungadi as a ground of invalidity in its failed IPR petitions for the '148, '758, and '069 patents.  Axonics should not be permitted to circumvent estoppel provisions enacted specifically to prevent serial challenges of patent validity.  *See* 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (statement of Sen. Jon Kyl) (purpose is to "ensure that if an *inter partes* review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed-publications portion of the civil litigation").  As the court noted in *Vaporstream, Inc. v. Snap Inc.*, 2020 WL 136591, at *23 (C.D. Cal. Jan. 13, 2020), "'if a patent challenge is simply swapping labels for what is otherwise a patent or printed publication invalidity ground in order to cloak its prior art ground and skirt estoppel', then § 315(e)(2) estoppel still applies."  *Id*.  Axonics is "simply swapping labels" and calling passages "admitted prior art" when they are just quotes from patent prior art that it could have raised in IPR.  As a matter of both law and policy, Axonics' attempt to end-run IPR estoppel should be denied.[7]

---

[7] Axonics mentions that estoppel does not apply to "Nedungadi admissions" under § 102(f), but cites no evidence for these alleged admissions and Axonics' expert did not opine on it.  *See* AMF Reply at 120.

## IV.   SUMMARY JUDGEMENT OF NO LACK OF ENABLEMENT

Axonics bases its enablement defense for the '324, '112, '148, '758, and '069 patents on the proposition that if a product is accused of infringement, then **all aspects** of that product define the "full scope of the claimed invention" that must be enabled. That is not the law.  According to the Federal Circuit, "a patent's specification need not 'describe how to make and use every possible variant of the claimed invention.'" *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020). Instead, "[t]his statutory requirement is limited to what is claimed.  Section 112 requires enablement of 'only the claimed invention,' not matter outside the claims." *Id.*  Thus, unclaimed features of accused products need not be enabled:

> [D]efendants ignore the rule that the specification "need not enable anything broader than the scope of the claims." This protects patentees from having someone avoid infringement merely by adding one additional element to an otherwise infringing product. This distinction is particularly important in the present matter because the accused system contains features that are not part of the claimed system, but which Waring contends must be enabled by the specification...Thus, **while defendants' ADSL service allegedly uses the claimed system to infringe, that does not mean that the patent specification must enable the ADSL service** as opposed to merely the claimed system. The court again rejects EarthLink's argument that the patents-in-suit must enable the accused product, and that the accused product embodies the full scope of the claims at issue.

*Inline Connection Corp. v. EarthLink, Inc.*, 684 F. Supp. 2d 496, 526–27 (D. Del. 2010). Ignoring blackletter law, Axonics demands that two unclaimed features of its product— a "single enclosure charger" and low thermal conductivity material—be enabled.  Dkt. 222-1 at 25–29.  Axonics' opposition concedes that no claim limitations require these features, and summary judgment is appropriate.

### A.   No Asserted Claims Recite a Single Enclosure Charger

Axonics states that "[e]very asserted claim in the five recharge-related patents requires a charging device with a primary coil and/or a sensor as well as control circuitry or components for varying power output."  Dkt. 222-1 at 26.  But Axonics does not

19

contend these features are not enabled.  *See id.* at 25–28.  Instead, Axonics argues that the patents fail to enable "co-locating circuitry and coil in a ***single enclosure***," having "all components [] immediately adjacent within a ***single common enclosure***," and "components [] all adjacent to each other within a ***single enclosure***."  *Id.* at 25–28. Axonics then pays lip service to the law requiring it to "tie those attributes [of the accused device] back to the actual claim language or to argue that actual limitations appearing in the asserted claim are not enabled" by contending that it "identified specific claim elements."  *Id*. at 26–27; *see Edwards Lifesciences AG v. CoreValve, Inc.*, 2011 WL 446203, at *6 (D. Del. Feb. 7, 2011), *aff'd in part, remanded in part,* 699 F.3d 1305 (Fed. Cir. 2012).  Notably absent from Axonics' "specific claim elements" is a "single enclosure." Dkt. 222-1 at 26–27.  Indeed, Axonics' only citation in the patents for a "single enclosure" is to the ***specification***: "Medtronic referenced, but did not enable, an alternative embodiment in which 'charging unit 50 and antenna 52 may be combined into a single unit.'"  *Id*.  There is thus no dispute it is not claimed.[8]

Axonics, therefore, concedes (as it must) "that the claims do not 'require' a single enclosure and only the 324 Patent requires a 'housing,'" but nevertheless contends this "misses the point" because "where the components are all adjacent to each other within a single enclosure" was "not enabled."  *See* Dkt. 222-1 at 27.  But enablement must be tied to "actual claim language" or "actual limitations appearing in the asserted claim." *Edwards*, 2011 WL 446203 at *6; *DeGeorge v. Bernier*, 768 F.2d 1318, 1324 (Fed. Cir. 1985) (enablement "satisfied by disclosure of detailed, claimed TCCPI circuitry without requiring detailed disclosure of all related, unclaimed circuitry with which the TCCPI might be interfaced"); *OPTi Inc. v. Apple, Inc*., 2009 WL 4727912, at *3 (E.D. Tex. Dec. 3, 2009) ("§ 112 requires enablement of only the claimed invention, not unclaimed improvements").[9]  Axonics' circular argument otherwise fails as a matter of law.

---

[8] *See also* Dkt. 222-2 at AMF 121–159, 164–169 (citing only specification).

[9] Axonics' contention that Medtronic took "█████████████████ to make its

**B.     No Asserted Claims Recite Thermally Conductive Material**

Axonics, again, concedes the asserted claims do not require the feature they contend is not enabled: a thermally conductive material.  *See* Dkt. 222-1 at 28; Dkt. 222-2 at AMF 219–225.  Indeed, no claims require a particular housing material and only the '324 patent claims recite a housing at all.  Dkt. 222-1 at 28 (Axonics: "only the 324 patent mentions a 'housing'").  Faced with the undisputed facts, Axonics construes the temperature sensor limitations as requiring thermally conductive material.  *See* Dkt. 222-1 at 28 ("The only way Medtronic disclosed to enable those limitations was with a thermally conductive housing.").  Axonics' real motivation is to revive a rejected claim construction to contend that its product does not infringe because it contains an **unclaimed** feature: low thermally conductive material.  Dkt. 111 at 13; Dkt. 138 at 12–16; Dkt. 163-1 at 30 (Axonics: "indicative of" means "accurately measuring" because "***the housing…is thermally conductive***, and the sensor measures the temperature of the side of the side [*sic*] of the housing by touching the interior of the housing at a thermally conductive site").  But the Special Master expressly rejected this argument (Dkt. 163-1 at 28–41), and in doing so also rejected the same testimony that a "named inventor" "later invented a way to use a temperature sensor without a thermally conductive material"[10] (Dkt. 222-1 at 23) as irrelevant to the temperature sensor limitation (Dkt. 163-1 at 32).  Medtronic's work to develop its newest wireless recharger is similarly irrelevant to enablement.  *See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1186 n.9 (Fed. Cir. 2002) There is no legal basis to find the claims not enabled and summary judgment should be granted.

---

newest commercial product without tying that to any claim limitation at issue is irrelevant. Dkt. 222-1 at 26; *Inline*, 684 F. Supp. 2d at 523–24 ("There is no requirement that: a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect."); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003) ("Enablement does not require an inventor to meet lofty standards for success in the commercial marketplace.").

[10] In Axonics' view, every improvement patent renders prior related patents not enabled.

### C.     Axonics Misstates the Law of Enablement

Axonics ignores a long line of authorities that reject its enablement defense that unclaimed features of accused products must be enabled.  For example, in *Hologic, Inc. v. Minerva Surgical, Inc.*, the defendant argued that although the claims recited "monitoring for the presence of a perforation in the uterus using a pressure sensor" and two methods of treating the uterus based on the results of that monitoring, the specification failed to enable the accused device's "plasma formation feature."  325 F. Supp. 3d 507, 515, 526–27 (D. Del. 2018).  The district court disagreed: "The claims at issue herein do not recite a plasma formation feature.  Minerva's emphasis on the accused device and its plasma formation feature reflects its misguided notion that the improvements over the claimed material (the plasma formation feature) would have to have been disclosed.  That an accused product might include other, un-claimed features does not mean the accused product avoids infringement."  *Id.*; *see also Inline*, 684 F. Supp. 2d at 526 ("EarthLink's assertion that the patents must enable a system that can transmit up to 16,000 feet because that is the distance over which the accused system operates is flatly contrary to a proper enablement analysis. 'The dispositive question of enablement does not turn on whether the accused product is enabled.'"); *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 542–43 (S.D. Tex. 2006) ("[T]he claimed invention can monitor without the ability to stimulate" blood flow, thus "'whether the device described and claimed in that patent would cure erectile dysfunction by applying ultrasound energy…in order to stimulate blood flow'…is not relevant to Sonosite's enablement defense.").  Indeed, "this is not a case in which limitations in the claims were not described at all in the specification.  It is simply a case in which the description in the specification does not include a specific embodiment disclosing features that were unclaimed and were not considered an important part of the invention."  *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1109, 1111 (N.D. Cal. 2011) (granting summary judgment of no non-enablement and distinguishing *Automotive Techs.* because the "features that Defendants assert are not enabled in the

1    Burstein Patents are not the 'novel aspect' of the invention").

2         Axonics' attempt to impose an enablement requirement on unambiguously

3    unclaimed features is also legally improper under *Durel Corp. v. Osram Sylvania, Inc.*,

4    256 F.3d 1298 (Fed. Cir. 2001).  To avoid *Durel*¸ Axonics incorrectly argues that both

5    Medtronic and the court in *Imaginal* mischaracterize *Durel*.  Dkt. 222-1 at 25.  *Durel*

6    stands for the binding proposition that the "dispositive question of enablement does not

7    turn on whether the accused product is enabled," regardless of whether a court rejects

8    non-enablement because the accused product was enabled (as in *Durel*) or because the

9    defendant argued "outside the law" that the accused product was not enabled (as in

10   *Imaginal*).  *Durel Corp*, 256 F.3d at 1306–07. Despite this, Axonics' expert focused

11   entirely on the wrong inquiry.[11]  *See Personalized Media Commc'ns, LLC v. Zynga,*

12   *Inc.*, 2013 WL 5962812, at *2 (E.D. Tex. Nov. 7, 2013) (granting Daubert because "Dr.

13   Fox's analysis revolves around whether the specification enables Zynga's games.... Dr.

14   Fox's use of the accused games as the touchstone for enablement is contrary to the

15   Federal Circuit's mandate in *Durel*").  Indeed, each of Axonics' cited cases confirms

16   that analysis of a ***claimed*** feature—not an unclaimed feature of the accused product—

17   is required.  *See LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336,

18   1340, 1344 (Fed. Cir. 2005) (whether specification "provides only a single way of

19   creating a seamless DWT" where claim recited "performing one or more discrete

20   wavelet transformation (DWT)-based compression"); *Automotive Technologies Intern.,*

21   *Inc. v. BMW of North America, Inc.*, 501 F.3d 1274, 1277, 1285 (Fed. Cir. 2007)

22

23   [11] Ex. 11, Irazoqui Dep. Tr. at 137:2–22 ("***I asked myself did they enable the Axonics***
24   ***product*** and the answer is absolutely not.  Q.  [T]hat's the basis for why you think these
     claims are invalid if read on a single-housing charger, correct?... A.  That's my basis
25   for why I believe these claims are invalid if read on the Axonics charger..."); 98:12–16;
     103:19–104:9 ("I formulated an opinion as to whether these claims cover such a
26   charging device as the single-enclosure Axonics product.  And I found that they do
     not."); 104:10–17; 109:14–110:12 ("[I]f Medtronic is going to argue that this patent
27   covers the Axonics single-enclosure charger, then the specification needs to teach or
28   enable how to practice these claims in that single-enclosure charger."); 123:15–124:1.

(whether "[d]isclosure of only mechanical side impact sensors" enabled "electronic side impact sensors" where claim recited "a housing," "means for mounting said housing onto at least one of a side door of the vehicle...to sense an impact into the side of said vehicle," and "means responsive to said motion of said mass upon acceleration of said housing in excess of a predetermined threshold value, for initiating an occupant protection apparatus"); *Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*, 941 F.3d 1149, 1155–56 (Fed. Cir. 2019) (whether one of ordinary skill would know which 2'-methyl-up nucleosides would be effective for treating HCV where claimed "method for the treatment of a hepatitis C virus infection, comprising administering an effective amount of a ... β-D-2'-methyl-ribofuranosyl nucleoside" was construed to require "a methyl group in the 2' up position and nonhydrogen substituents at the 2' down and 3' down positions…Claim 1, therefore, encompasses any β-D nucleoside meeting both the structural limitations (including a methyl group at 2'-up) and the functional limitations (efficacy in treating HCV)," but "there are billions of potential 2'-methyl-up nucleosides"); *Baxalta Incorporated v. Genentech, Inc.*, 579 F. Supp. 3d 595, 601, 623 (D. Del. 2022) (where accused product "Emicizumab increases the procoagulant effect by approximately 10%" whether "patent [] disclose[s] an antibody that has procoagulant activity anywhere near that amount" where claims recited "[a]n isolated antibody or antibody fragment thereof that…increases the procoagulant activity of Factor IXa ***by any amount***"); *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316–18 (Fed. Cir. 2007) (considering that inventor "never attempted to create a computerized system that automatically determined tooth positions without human decision making" where claims required "automatic computer determination of the finish positions of the teeth without human adjustment of the final results").

The Court should not permit Axonics to present a legally improper and factually unsupported enablement challenges to the jury.  Medtronic's motion should be granted.

## V.     SUMMARY JUDGMENT OF NO INDEFINITENESS OF "ASSOCIATED WITH"

24

After hearing extensively from both parties on whether a "value associated with said current" in the '148 and '758 patent claims is definite (Dkt. 110 at 6; Dkt. 111 at 22–24; Dkt. 122 at 20–25; Dkt. 138 at 23–27; Dkt. 139 at 24–27), including extensive argument at the claim construction hearing (Ex. 12 at 117:4–139:20), as well as expert testimony from both sides (Dkt. 113-1 at 23–25 (Axonics' Dr. Irazoqui); Dkt. 139-8 at 16–17 (Medtronic's Dr. Berger)), the Special Master "expressly rejected" "Axonics' indefiniteness argument" (Dkt. 163-1 at 72).   Indeed, every substantive argument Axonics raises here was considered and rejected by the Special Master.  (Dkt. 163-1 at 63–74 (rejecting Axonics' "proportional to" construction); *id*. at 67–68 (rejecting Axonics' argument regarding parent application's "through" compared to "associated with"); *id.* at 67 (rejecting Axonics' argument of indefiniteness based on Medtronic's infringement contentions); and *id.* at 63–74 (rejecting Axonics' contention that the term has no known or discernable meaning by construing it to have plain meaning).  And Medtronic already addressed many of Axonics' non-substantive arguments.  Dkt. 214-1 at 11–12 (explaining how Axonics' misstates Dr. Berger's testimony by omitting testimony showing the false assumption in Axonics' question); *id.* at 13 (explaining that Dr. Mihran is Medtronic's infringement expert and was not asked to respond to Axonics' invalidity opinion served the same day).  Axonics' remaining arguments fare no better.  ***First***, Medtronic does not rely—because it does not need to—on Axonics' proposed construction for definiteness.  Axonics' citation to support its argument omits that Dr. Irazoqui never mentioned that he was applying the definition of "proportional" in his answer.  *See* Ex. 11 at 322:11–325:2; Dkt. 222-1 at 30; Dkt. 201-1 at 32.  ***Second***, Dr. Irazoqui's invalidity report does nothing more than parrot Axonics' rejected claim construction arguments.  *Compare* Dkt. 201-14 ¶¶ 427–428, *with* Dkt. 111 at 22–23, Dkt. 201-14 ¶¶ 429–430, *with* Dkt. 111 at 23–24.  This issue has already been decided against Axonics and Medtronic is entitled to summary judgement of no indefiniteness.

## VI.   CONCLUSION

The Court should grant Medtronic's Motion for Partial Summary Judgment.

1    Dated:  February 21, 2023          WINSTON & STRAWN LLP

2                                       By: /s/ Nimalka Wickramasekera

3                                           Nimalka Wickramasekera
                                            George C. Lombardi
                                            Brian Nisbet
4                                           J.R. McNair

5                                       Attorneys for Plaintiffs
                                        MEDTRONIC, INC.; MEDTRONIC
6                                       PUERTO RICO OPERATIONS CO.;
                                        MEDTRONIC LOGISTICS, LLC;
7                                       MEDTRONIC USA, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28