1

2

3

4

Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Facsimile:   (650) 802-6001

5

6

7

David M. Stein (Bar No. 198256)
dstein@olsonstein.com
Olson Stein LLP
240 Nice Lane #301
Newport Beach, CA 92663
Telephone:  (949) 887-4600

8

9

*Attorneys for Defendant* AXONICS, INC.

10

11

12

13

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

14

15

16

17

MEDTRONIC, INC.; MEDTRONIC
PUERTO RICO OPERATIONS CO.;
MEDTRONIC LOGISTICS, LLC;
MEDTRONIC USA, INC.,

18

        Plaintiffs,

19

        v.

20

21

AXONICS MODULATION
TECHNOLOGIES, INC.,

22

        Defendant.

Case No. 8:19-cv-02115-DOC-JDE

**DEFENDANT AXONICS, INC.'S**
**REPLY BRIEF IN SUPPORT OF**
**ITS MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

Date:   June 24, 2024
Time:   8:30 a.m.
Ctrm:   10A
Judge:  Hon. David O. Carter

23

24

25

**REDACTED VERSION OF DOCUMENT**
**PROPOSED TO BE FILED UNDER SEAL**

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.   Prosecution History Estoppel Applies To The 069 Patent ........................... 1

II.   Section Intentionally Omitted ......................................................... 7

III.   Axonics Does Not Infringe The Current Declines / Voltage Increases
       Limitations ............................................................................. 7

IV.   Axonics Does Not Infringe 112 Patent "Programmable Limit" Limitations  9

V.   No Infringement Of "Temperature Indicative Of Heat" Limitation ........... 14

VI.   The 314 And 756 Patents Are Indefinite ...................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs v. Grifols Diagnostic Sols. Inc.,*
    No. 19 C 6587, 2023 U.S. Dist. LEXIS 167819 (N.D. Ill. Sep. 20, 2023) .......... 6

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007) ............................................................................ 25

*Amgen Inc. v. Coherus BioSciences, Inc.,*
    931 F.3d 1154 (Fed. Cir. 2019) .......................................................................... 17

*Axonics, Inc. v. Medtronic, Inc.,*
    73 F.4th 950 (Fed. Cir. 2023) ............................................................................ 22

*Bio-Rad Labs. Inc., v. 10X Genomics, Inc,*
    967 F.3d 1353 (Fed. Cir. 2020) ............................................................................ 5

*Dayco Prods. v. Total Containment, Inc.,*
    258 F.3d 1317 (Fed. Cir. 2001) .......................................................................... 23

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.,*
    815 F.3d 1314 (Fed. Cir. 2016) .......................................................................... 25

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co,*
    535 U.S. 722 (2002) ......................................................................................... 1, 3

*GE Lighting Sols., LLC v. AgiLight, Inc.,*
    750 F.3d 1304 (Fed. Cir. 2014) .......................................................................... 20

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003) .......................................................................... 25

*Info-Hold, Inc. v. Muzak Holdings LLC,*
    No. 1:111-cv-283, 2012 WL 3930376 (S.D. Ohio Sept. 10, 2012) ............. 10, 11

*Insituform Techs., Inc. v. Cat Contr.,* Inc.
    385 F.3d 1360 (Fed. Cir. 2004). ......................................................................... 3, 4

*Integrated Tech. Corp. v. Rudolph Techs., Inc.,*
    734 F.3d 1352 (Fed. Cir. 2013) ......................................................................... 3, 4

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015)....................................................................... 23, 25

*Mizuho Orthopedic Sys. v. Allen Med. Sys.*,
   No. 21-CV-10979, 2022 U.S. Dist. LEXIS 119567 (D. Mass. July 6, 2022) ...... 6

*Pharma Tech Sols., Inc. v. LifeScan, Inc.*,
   942 F.3d 1372 (Fed. Cir. 2019).............................................................. 1, 3, 4, 6

*PPG Indus. v. Guardian Indus. Corp.*,
   156 F.3d 1351 (Fed. Cir. 1998)....................................................................... 25

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*,
   99 F.3d 1568 (Fed. Cir. 1996)......................................................................... 23

*Zhang v. Cty. of Monterey*,
   No. 17-CV-00007-LHK, 2021 U.S. Dist. LEXIS 106693 (N.D. Cal. June 6, 2021).. 6

Medtronic's opposition to Axonics' motion for partial summary judgment applies the wrong law, attempts to stretch the claims to cover subject matter they cannot cover, and is unsupported by the factual record. Medtronic raises no genuine dispute of material fact, and Axonics' motion should be granted in its entirety.

## I.      Prosecution History Estoppel Applies To The 069 Patent

Medtronic is precluded from alleging infringement under the doctrine of equivalents because it amended the only asserted 069 Claim to surrender the subject matter that it now seeks to recapture. Medtronic cannot rebut the general disclaimer presumed to apply to surrender based on amendment. Prosecution history estoppel is a matter of law that can and should be resolved on summary judgement, and Axonics respectfully requests that its summary judgment be granted. There is no genuine dispute of material fact. Medtronic alleges infringement exclusively under the doctrine of equivalents for the only asserted claim of the 069 Patent. **SUF 8-10**. Narrowing amendments "may be ***presumed*** to be a ***general disclaimer*** of the territory between the original claim and the amended claim." *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*, 535 U.S. 722, 740 (2002).[1] Medtronic argues that the accused equivalent is ***not*** within the disclaimed scope and that the reasons for the amendment are tangential to the accused equivalent. Both arguments fail as a matter of law.

Medtronic's own amendments, expert's testimony, and contentions all confirm that the supposed equivalent Medtronic accuses falls squarely within the surrendered

---

[1] Internal citations and quotation marks omitted and emphasis added unless noted. "DAF" refers to Axonics' disputes of Medtronic's Additional Material Facts filed herewith. "SUF" refers to Axonics' Statement of Uncontroverted facts (Dkt. No. 394-1) to which Medtronic responded (Dkt. No. 405-2) as well as the responses Axonics provides to Medtronic's responses filed herewith. "Mot." refers to Axonics' Summary Judgment Motion (Dkt. No. 394). "Opp." refers to Medtronic's Opposition to Axonics' Motion (Dkt. No. 405-1), and "MDT Ex." refers to the exhibits filed with it. "Ex." Refers to exhibits filed with Axonics' Motion and concurrently herewith.

claim scope.[2] First, the applicant confirmed that the narrowing of "current *associated with*" to "current *through*" was to "clarify" by using the "more definite 'through'" and by requiring use of "the current that *passes through* the internal power source." **SUF 1-5**; **Ex. 45** at MDT-00000408, 412, 426, 430, 451-461. The amendment excluded other currents in favor of specific, narrow, "more definite" language covering the only thing Medtronic told the Patent Office it actually intended to cover. All currents other than the specific one passing through the internal battery were surrendered.

Second, Medtronic's expert confirmed specifically that the alleged equivalent was within the actual original claim language: "Q. Is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮? A. Yes." **SUF 6-7** (quoting **Ex. 13** [Mihran Dep.] at 339:14-16). Medtronic has no basis to allege that this testimony is "irrelevant" based on the "value associated with" term (Opp. at 5) because Medtronic's expert was asked expressly whether the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* This question was manifestly *not* about the term "value associated with" in the dismissed 148 Patent.

Third, as Axonics additionally explained in its motion, according to Medtronic, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was both accused of being literally "a *value* associated with *said current passing through* said internal" battery (dismissed 148 Patent term) and a "*current* associated with said internal" battery (the 069 Patent original claim term). Mot. at 4. Medtronic argues that the term of the 148 Patent and the original scope of the 069 Patent are different but fails to identify any meaningful difference. One term uses "value" and the other uses "current," but this is irrelevant because Medtronic alleged the "*value*" may be a "*current*": "'a *value* associated with said current' *is* the ▮▮▮▮▮▮▮▮▮▮." **Ex. 9, ¶ 589**. There is also no relevant difference between what Medtronic alleges the current is associated with under either limitation because the 148

---

[2] Medtronic argues that Axonics raised this argument for the first time in Dr. Irazoqui's report, but that is not true. Axonics provided contentions in an interrogatory response that Medtronic did not address. **Ex. 74, at 72-73, 76-80, 83-86, 90, 95-97**.

Patent is *narrower* in requiring association with "*said current passing through* said internal" battery, not merely "said internal" battery. Thus, accusing the "██████████" under the narrower 148 Patent "associated" term confirms it is within the broader original 069 Patent "associated" term, and was surrendered.

Medtronic's only attempt to rebut the presumption of general disclaimer is to argue "'the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question.'" *Pharma Tech*, 942 F.3d at 1380 (quoting *Festo*, 535 U.S. at 740-41). But "[t]he tangential relation exception is very narrow," and Medtronic has not rebutted the presumption. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1358 (Fed. Cir. 2013). Medtronic argues that the reason for the amendment was "peripheral" to the alleged equivalent because the prior art used a current in the external device and the █████████████████████. Medtronic misstates the law by suggesting that prosecution history estoppel applies only to the exact content of the prior art that was avoided by amendment. As the Federal Circuit has explained, when a narrowing amendment excludes equivalents besides the subject matter of the prior art reference, this does *not* mean that those other equivalents are tangentially related: "[A]n amendment made to avoid prior art that contains the equivalent in question is not tangential. *It does not follow, however*, that equivalents not within the prior art must be tangential to the amendment." *Id.* at 1358.

Medtronic cites the *Insituform* case, but that case does not support Medtronic because, although there was a tangential relation between the amendment rationale and equivalent, the *portion of the amendment* that distinguished the art was *different from* that under which there was an equivalent. The narrowing amendment in *Insituform* was added to distinguish prior art with a "large compressor at the end of the liner" from the patented invention without a "long length of tube" and "exceedingly large" compressor. 385 F.3d 1360, 1369-70 (Fed. Cir. 2004). Although the amendment also required a single cup, there was "*no indication* in the prosecution history of *any relationship between* the *narrowing amendment* and a multiple cup process, which is the *alleged equivalent* in

1    this case." *Id.* at 1369-70.

2       *Pharma Tech* found prosecution history estoppel on facts that disprove

3 Medtronic's argument here: the surrender was found to include claim scope that was ***not***

4 within the prior art the applicant distinguished to give rise to the estoppel. The *Pharma*

5 *Tech* claims were narrowed to cover "systems that ***convert a plurality of current***

6 ***readings***" and "***compare said analyte*** concentration measurements." 942 F.3d at 1381.

7 The alleged equivalent was to "***compare[] the current[s]***" and "***convert[] the current***

8 ***readings***." *Id.* The amendment overcame different prior art that "***measured and***

9 ***displayed*** a diffusion limiting ***current reading***" surrender and the Federal Circuit found

10 that full scope to be estopped. *Id.*

11       In this case, the prosecution history Medtronic quotes confirms that there is more

12 than a tangential relation. Medtronic said during prosecution that the amended claims

13 recite reporting "alignment as a function of a ***current through the internal power***

14 ***source***… ***not only*** does Wang '693 not show, disclose or suggest ***this subject matter***,

15 Wang '693 teaches away from basing the alignment indicator on the current through the

16 internal power source by teaching the use of current associated with the external power

17 source." Opp. at 3-4 (quoting AMF 54); DAF 47-58. Medtronic is alleging equivalence

18 under the same aspects of the amendment it used to distinguish the prior art, which is

19 exactly what the controlling law precludes. Medtronic argued ***separately*** as evidenced

20 by the "not only" language that the prior art relied on the external device ***and*** did not

21 disclose the use of current through the internal power source. DAF 59; *Integrated*, 734

22 F.3d at 1358 (argument that "the prior art did not 'teach or suggest such features'"

23 supported finding more than a tangential relation). Medtronic argued based on current

24 through the internal battery, and "[c]lear assertions made during prosecution in support

25 of patentability, ***whether or not actually required*** to secure allowance of the claim, may

26 also create an estoppel…because [t]he relevant inquiry is whether a competitor would

27 reasonably believe that the applicant had surrendered the relevant subject matter."

28 *Pharma Tech*, 942 F.3d at 1380; *Integrated*, 734 F.3d at 1358 (patentee may not have

needed "to surrender a lack of physical contact . . . to overcome Sato," but the "dispositive fact" is that patentee "chose to do so").

With respect to the second, separate argument, Medtronic additionally invites error by suggesting that it argued to the examiner only that "using the current in the external charger" was foreclosed. Opp. at 3-4. But that argument is belied by the very quotes on which Medtronic relies. Medtronic admits that the applicant argued that "Wang 'teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source." Opp. at 4 (quoting **AMF 54**, underline original). Medtronic argued not that it was claiming every alternative to current through the external charger, but that the current it claimed—the current ***through the internal power source***—was different from the current in Wang. As Medtronic admits, the examiner said that "***the claims never require that the internal current*** . . . be measured." Opp. at 4; **DAF 55**. Medtronic argued the prior art lacked measuring not just ***any*** internal current but ***the*** current ***through the internal power source***, and the amendments narrowed the claims to just the current through the internal power source. **SUF 5, 11**; **DAF 59** (arguing claims recite reporting alignment "by ***measuring and reporting*** alignment based on ***current . . . through the internal power source*** . . . ."). The quotes on which Medtronic relies in no way show that the amendment was tangential. Medtronic distinguished Wang based on exactly the same claimed feature on which it now seeks to assert infringement under the doctrine of equivalents. That is precluded as a matter of law.

Medtronic cites *Bio-Rad*, which is inapposite. There, the patentee amended to avoid prior art with "fluorinated microchannel wall coatings that would react with the carrier fluid." *Bio-Rad Labs. Inc., v. 10X Genomics, Inc*, 967 F.3d 1353, 1365 (Fed. Cir. 2020. The Court found the presence of an insignificant, non-functional amount of fluorine in the channel walls was not a disclaimed equivalent when the fluorine had no functional purpose and the channels work in ***exactly*** the same way as the claimed fluorine-free channels. *Id.* ("As the district court explained, the inventors surrendered

microchannels coated with fluorine 'for a purpose—not those containing *de minimis* amounts of fluorine that have no effect on how the microchannel functions in the system.' As such, Bio-Rad was not barred from asserting that microchannels containing negligible amounts of fluorine are equivalent to 'non-fluorinated microchannels.' (emphasis original)). Unlike *Bio-Rad*, Medtronic has not argued and cannot show that the aspect of the accused product that takes it outside of the literal scope of the claim does not have any function or works in exactly the same way as the literal claim scope.

Medtronic's citation to *Mizuho* is similarly without merit. *Mizuho* is a non-controlling district court case from another district and cannot overturn Federal Circuit precedent, as Medtronic invites. There, the district court found that an amendment to cover a specific rotational locking mechanism and to disclaim a channel-type mechanism that does not allow rotation did not estop an equivalent that, as with the amended claim, ***did*** use a rotational locking mechanism. *Mizuho*, 2022 U.S. Dist. LEXIS 119567, *10. Here, by contrast, Medtronic accuses █████████████████
████████████.

Further, although Medtronic claims argument-based estoppel is not at issue, Axonics' motion and the prosecution history both show that the above statements during prosecution were "a clear and unmistakable surrender of subject matter" including currents other than the current through the battery. *Pharma Tech*, 942 F.3d at 1380. Medtronic cites *Zhang* in support of its argument, but *Zhang* is inapposite. In *Zhang*, the party asserted in "one sentence—without citation to any authority—that Zhang is not entitled to prejudgment interest" which the court found inadequate. *Zhang v. Cty. of Monterey*, No. 17-CV-00007-LHK, 2021 U.S. Dist. LEXIS 106693, *15 (N.D. Cal. June 6, 2021). Here, Axonics' motion explained the controlling argument-based estoppel law (Mot. at 3, quoting *Pharma Tech*), provided a recent analogous application of argument-based estoppel finding estoppel even when there are multiple bases for distinguishing the art as Medtronic argues there are here (Mot. at 5, citing *Abbott*), and the evidence of

the arguments that Medtronic made to the Patent Office that give rise to argument-based estoppel (Mot. at 4-5). Medtronic provides no response as to why argument-based estoppel does not apply, and summary judgment should be granted on this basis.

Rather than propose a narrower amendment and make narrower arguments that the current needed to be a current in the internal device, Medtronic went further, clarifying that it actually claimed current through the battery and nothing else. Medtronic cannot cover by equivalents what it abandoned to get the claims, so, as a matter of law, Medtronic's claim of infringement of the 069 Patent is appropriate for summary judgment.

**II.     Section Intentionally Omitted**

**III.    Axonics Does Not Infringe The Current Declines / Voltage Increases Limitations**

Medtronic bases its opposition to summary judgment of non-infringement of the 069 Patent on misreadings of technical documents not addressed by its experts, not disclosed in its contentions, and that no competent witness can misrepresent at trial as Medtronic has in its opposition. Medtronic's lawyers' argument is not evidence, and it cannot create a genuine dispute of material fact. Moreover, Medtronic still points to nothing that meets the Special Master's construction. Everything Medtronic attempts to rely on confirms that the *only* times the current ever declines during a charge cycle happens *after* the voltage has already increased, which is inconsistent with the Special Master's construction. Medtronic fails to raise any genuine dispute of material fact and summary judgment of non-infringement should be granted.

***First,*** Medtronic argues that . Opp. 6-7. This is a new, untimely, and incorrect attorney argument being raised for the first time in

1   summary judgment briefing that finds no support in the record, cannot be presented to

2   the jury at trial, and is contradicted by the very evidence Medtronic attempts to rely

3   upon. This does not raise a genuine dispute of material fact. This theory was not offered

4   by Medtronic's expert and is contradicted by the portions of the expert's report

5   Medtronic attempts to rely on. **SUF 23; DAF 69-72**. Medtronic's expert's own testing

6   shows ███████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ███████████████████████████████████. *Id.* Medtronic cannot present this new

12  theory at trial because its expert has no opinions on it, it is based on confidential Axonics

13  information that cannot be presented by Medtronic witnesses, and no Axonics expert or

14  fact witness is going to inaccurately describe the Axonics products. *Id.* Medtronic

15  improperly attempts to create a genuine dispute of material fact without actual evidence.

16      ***Second***, Medtronic identifies no facts meeting the Special Master's construction

17  and makes unsupported claims that cannot raise a genuine dispute of material fact.

18  Medtronic makes no attempt to meet and cannot meet the requirements of the Special

19  Master's construction that "current passing through said internal power source declines

20  as said voltage of said internal power source increases ***during a charging cycle***." R&R

21  (Dkt. No 163-1) at 85. Medtronic argues that ████████████████████████

22  █████████████████ (Opp. at 7), but that does not bring Axonics' system within the Special

23  Master's claim construction. The Special Master rejected a construction that would

24  include "an ***inverse relationship*** between voltage and current 'at any ***instance***.'" R&R

25  (Dkt. No. 163-1) at 83. ███████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████. Medtronic also misrepresents the data as showing ██████

28  ████████████████████████████████████████████████████

1  ███████████████████████" Opp. at 8. Axonics' expert zoomed in on Dr. Mihran's data and

2  confirmed the ███████████████████████████████ **DAF 73-**

3  **76**. Medtronic cannot even show an instance in which current declines while voltage

4  increases, and even that would be insufficient to raise a genuine dispute of fact.

5        ***Third***, Medtronic fails to raise a genuine dispute of fact or explain how it can meet

6  the Special Master's construction given that ████████████████████████

7  ████████████████████████████ present in the disclaimed Baumann

8  reference and that were excluded from the Special Master's construction.

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████ R&R (Dkt. No. 163-1) at 85. Medtronic argues there is a

12 dispute regarding whether Axonics has a ████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████ **DAF 77-84; SUF 26-27**. Medtronic appears to argue there may

16 be ████████████████████ but no evidence supports that and Medtronic

17 fails to raise a genuine dispute based on it. *Id*. Medtronic also has no basis to dispute

18 Axonics' reliance on Baumann, which illustrates what was disclaimed and is described

19 in the Special Master's construction. Medtronic creates no dispute of fact that would

20 show ████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████ R&R (Dkt. No. 163-1) at 85. Summary

23 judgment should be granted.

24 **IV.   Axonics Does Not Infringe 112 Patent "Programmable Limit" Limitations**

25       Medtronic fails to raise a genuine dispute of material fact as to the "programmable

26 limit" claim limitation in the 112 Patent. First, Medtronic ignores the Special Master's

27 construction by arguing that the ability to be programmed ***during*** manufacture is

28 enough. The Special Master expressly stated that the evidence "supports finding that

‘programmable limit’ requires that the relevant limit in the completed apparatus must be programmable *after the apparatus is shipped* to distributors or customers for use." Dkt. No. 163-1 at 60. Medtronic's suggestion that programmability during manufacture meets the Special Master's construction disregards the language of the R&R. **DAF 85-88, 96-99; SUF 28-32**.

*All* the functionality Medtronic points to for its claim that the temperature limits are ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████

The only argument Medtronic made during discovery and its expert advanced in his report is that the ███████████████████████████████████████ ███████████████████████████████████████ **DAF 88-91**. Medtronic has no substantive argument contradicting Axonics explanation as to why this is not "programmable." Medtronic's expert relied entirely on testimony that the ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████ **DAF 90**. This is not "programmed to be programmable" as required by the Special Master's construction. In short, Medtronic raises no genuine dispute of material fact. Medtronic accuses nothing other than ███████████████████████████████████████████████ ████████████████████ This is precisely what the claim construction does not allow.

Medtronic's claim that "programmed to be programmable" is not required by the Special Master's construction and was not previously raised by Axonics or its experts misstates the record. Opp. at 11-12 n.5. Medtronic states that "the Special Master cited *Info-Hold* for the proposition that 'programmable' means 'capable of being programmed' as opposed to simply 'programmed.'" *Id*. This is wrong as the Special Master quoted *Info-Hold* to explain the distinction between programmed and

programmable: "Not every computer would be infringing, because the computer must first have the basic software formatting necessary to enable it to be programmable to perform the claimed functionality (in other words, it must be programmed to be programmable)." Dkt. No. 163-1 at 60 (quoting *Info-Hold*). Medtronic's claim that Axonics never raised this is equally belied by the record as Axonics wrote during claim construction that *Info-Hold* "is consistent with Axonics' proposed construction, which would similarly exclude 'already programmed' limits and require the present ability to be changed." DAF 98. Similarly, Axonics' expert explained that Dr. Mihran accuses "████████████████████████████████████████████████████ ████████████████ the Special Master distinguished from a programmable limit. **DAF 100 (Ex. 44, ¶¶ 223, 226).**

Medtronic's reliance on ████████ to prove the programmable limit limitation is untimely and improper. It is not in Medtronic's infringement contentions or expert report, and Axonics objected when Medtronic questioned Axonics' expert about this previously undisclosed theory. **DAF 103, 144**. Medtronic's suggestion that it is allowed to add whole new theories of infringement now when it was provided ████ discovery during fact discovery is not plausible and a plain violation of Rule 26 and this Court's Scheduling Orders. Opp. at 12. Medtronic knew about ████ in time to have its expert opine about how Medtronic now claims it supposedly infringes because the same expert in the same report relied upon ████████ extensively, just ***not for that***. *Id.* Medtronic's expert had access to operable ████████ and a charging device. While Medtronic now argues about the conditions of the inspection (Opp. at 12), Medtronic identifies nothing it could not do during the inspection to explore the relevant functionality. *Id.* Axonics identified the document Medtronic now relies upon (**Ex. 53 (AX1172714), DAF 93**) by number in an August 30 email about ████████ over a month before Medtronic's final infringement contentions and over two months before Medtronic's expert report in which Medtronic's expert cited the document for a different purpose. **DAF 103, 144**. Despite this discovery, Medtronic's expert never once said that

1   ███████ renders any temperature limit programmable. **DAF 103, 144**.

2       Medtronic's original Opposition also argued that Axonics withheld ████████

3   discovery, but did so by referring to "Medtronic's forthcoming motion to strike." Dkt.

4   No. 214-1 at 12. Medtronic fails to inform the Court that its motion to strike was denied.

5   Dkt. No. 279-1 (Special Master Order No. SM-27) at 7 ("Medtronic's motion, first, does

6   not persuasively demonstrate any wrongdoing by Axonics that put Medtronic at any

7   unfair disadvantage . . . ."). Medtronic's opposition now is based on allegations of

8   procedural unfairness that are contrary to the Special Master's decision denying

9   Medtronic's motion. Medtronic never objected that decision within the time allowed by

10  Rule 53 and cannot challenge it now to oppose summary judgment. Rather than

11  withdrawing its now rejected argument, Medtronic only deleted the reference to its failed

12  motion and continued to make the same, rejected argument without informing the Court

13  that it had already been rejected by the Special Master. Opp. at 12. Medtronic provides

14  no explanation for failing to raise the infringement theory on which it now seeks to avoid

15  summary judgment.

16      Medtronic also inaccurately characterizes disparate opinions in its expert's report

17  that on their face do not disclose a theory of infringement of the programmable limit

18  limitation based on ████████ and similarly attempts to rely on testimony that never

19  mentions ████████. **DAF 104-108**. Medtronic should not be permitted to rely on its

20  improper attempt to expand its expert's opinions during deposition (Opp. at 13-14)

21  because Axonics was given no notice of his opinions in advance and he could not

22  identify anywhere in his report supporting his new opinions. **DAF 109-12**. Finding no

23  support in any of its own contentions, Medtronic now attempts to rely on the deposition

24  testimony of Axonics' expert. Opp. at 10. The quotes that Medtronic relies on are merely

25  stating Axonics' expert's understanding that ██████████████████████████████

26  ███████████████████████████████████████████████████████████████ **DAF**

27  **144-45**. But that is not sufficient to meet the claim limitation requiring a ***programmable***

28  limit. Axonics' expert testified that he did not agree that "████████████████████

1    ████████████████████████████ including because "████████████████████████

2    █████████████████████████ **DAF 144-45; Ex. 77** at **156:18-157:9**. Axonics expert's

3    testimony does not support Medtronic. Axonics' documents confirm and Medtronic does

4    not rebut that the ████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████ **SUF 40; Ex. 63** (AX1091356) at AX1091359 (███████████████

7    █████████████████████████████████████████ Medtronic also argues

8    that ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████ **DAF 144-47**. There is no basis to allow

11   Medtronic to rely on ██████████ now to avoid summary judgment when it could have

12   advanced the theory but chose not to.

13       Even if Medtronic were allowed to inject this untimely theory into the case, it

14   cannot create a genuine dispute of material fact. The undisputed fact is that ████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   **SUF 32, 40; DAF 91-95**. Medtronic points to no evidence that the Axonics charger

18   temperature limits are programmed to be programmable in this sense ████████████

19   ████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████ Medtronic's theory rests on the

21   hypothetical scenario of someone ████████████████████████████████████████

22   ████████████████████ Such an ████████████████████████████████████████████

23   ████████████████████████████████████████████████████ Medtronic

24   criticizes Axonics' undisputed factual showing that ████████████████████████

25   ████████████████████████████████████████ but cites no contrary fact to create

26   genuine dispute. **DAF 100-102**. A product that is not made with limits that can be

27   changed consistent with its design is not programmable under the Special Master's

28

construction.[3] To find otherwise would effectively impose an impossible affirmative requirement that a product with software be rendered entirely immutable no matter what illicit activities are undertaken by third parties. Medtronic cites no law or fact to support such an approach. Medtronic tries to avoid this by claiming that whether ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is irrelevant because the claims only require the capability. This argument highlights the meaninglessness of Medtronic's infringement position. The fact that Medtronic has zero evidence of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ are not actually made to be changed, *i.e.*, are not programmable.

Moreover, Medtronic relies on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **DAF 94**. Medtronic identifies nothing about the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "programmed to be programmable." Medtronic merely identifies ▮▮▮▮▮▮▮▮▮▮▮▮ but memory is separately claimed in the 112 Patent, and so programmability requires more ("a *memory* configured to store the *programmable limit*," Claim 1). Medtronic actually only intends to dispute before the jury the boundaries of the claim term itself, which is not permissible. There is no genuine dispute of material fact under the Special Master's construction, and summary judgment should issue.

## V.   No Infringement Of "Temperature Indicative Of Heat" Limitation

Medtronic's opposition to summary judgment of non-infringement of the 112 Patent based on lack of a "temperature indicative of heat resulting from the transcutaneous transfer of energy" fails to raise a genuine dispute of material fact.

*First*, Medtronic argues that Axonics raised a late claim construction dispute and

---

[3] Medtronic quotes portions of Axonics' proposed construction, which was not adopted, to argue that "programmable" means "able to be changed" (**DAF 97**). But there is nothing inconsistent with that and the absence of evidence that it has happened. Medtronic argues that there is tension with Dr. Irazoqui's obviousness opinions (Opp. at 11), but there is nothing inconsistent with devices configured to be programmable being obvious and the present accused device not being so configured. **DAF 102**.

that *never* earlier presented this issue. Medtronic is wrong. Axonics is not raising a claim construction dispute. Medtronic has ignored that the claims expressly require the above limitation and effectively argued, contrary to the claim language, that all that is necessary is measuring a temperature. Medtronic impermissibly asks to be excused from showing infringement of *each element* of the claim. Similarly, Medtronic attempts to rely on the Special Master's disputed construction of "indicative of" in a different patent and different term, "output indicative of the temperature of the side of the housing," but this does not dictate the meaning of the term with different elements here. Further, Axonics' expert Dr. Irazoqui clarified more than once that he was not offering a construction of this term in the 112 Patent in his deposition. **DAF 113-17** (citing **Ex. 77,** 237:3-238:7, 240:19-242:5). Medtronic's lawyer, knowing that the claim term at issue has *not* been construed, repeatedly asked Dr. Irazoqui questions falsely premised on the Special Master already having construed the claim term, which has not happened. *Id.* (citing **Ex. 77,** 234:9-14, 231:19-22, 233:7-13). This cannot transform a longstanding fact dispute into a novel claim construction. Dr. Irazoqui's report confirms he put forward no claim construction on this term. *Id.* (citing **Ex. 44, ¶¶** 201-14).

As to Medtronic's claim that Axonics has not raised this issue before now, that is also not accurate. Throughout fact discovery, Medtronic provided minimal contentions for this limitation that alleged infringement ████████████████████████████████████ ████████████████████████████████████ ████████████ **DAF 117 (citing Ex. 78,** at 16-17**), 120**. Medtronic failed to address the language of this limitation. Axonics expressly disputed this limitation was met in its rebuttal contentions, explained the ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ *Id.* (citing **Ex. 79,** at 179-186**).** Medtronic addressed the meaning of heat from the transcutaneous transfer of energy for the first time in its expert's report. *Id.* (citing **Ex. 9, ¶** 450). There can be no dispute that Medtronic knew it needed to address this claim language given that its expert ultimately tried to.

Dr. Irazoqui addressed in his rebuttal expert report that there had been "no attempt" to determine "how much heat the charger produces as a result of transcutaneous energy transfer" as opposed to "when there is no transcutaneous energy transfer." *Id.* (citing Ex. 44, ¶ 203). Medtronic ignores this record in suggesting that this is a new issue. It is not.

*Second*, Medtronic argues that Claims 16 and 17 prove that merely measuring the temperature of the external device or its surface *can* be indicative of the heat resulting from transcutaneous energy transfer. Showing merely ███████████████████ ██████████████████████████████ (Opp. at 15) is not sufficient to meet this limitation. While these "comprising" claims show that measuring a surface temperature may be within the scope of the claims, they do not show that it is sufficient or necessary. Axonics' expert confirmed that there "may be other[]" embodiments. **DAF 118-19**. Medtronic has not shown (nor can it) that any of Axonics' products meet this limitation, whether based on ███████████████████████ or not.

*Third*, nothing about the 112 Patent IPR means that Medtronic does not have to prove that the temperature it accuses is indicative of heat from transcutaneous energy transfer. Medtronic suggests that Axonics' specification citations in the IPR on means plus function limitations in an unasserted claim of the 112 Patent that was not invalidated and for which no construction was adopted are inconsistent with Medtronic having to actually meet the claim limitation. **DAF 121-22**. Medtronic is wrong as a matter of law. Axonics was merely citing the only "temperature sensor" structure and offered no construction for the present term. *Id.* For a disclaimed claim and its unpatentable dependents, invalidity depended on an implant temperature sensor, and Medtronic identifies nothing suggesting such a temperature could not be indicative heat generated from transcutaneous transfer. **DAF 123-24**. Claims not found unpatentable require a *charger* temperature sensor, and Medtronic omits that this was how it escaped invalidity. *Id.* Axonics' invalidity arguments in this case are not relevant as they were offered under "Medtronic's own apparent interpretation of the claims." *Id.* Medtronic argues that Axonics cannot take one position for invalidity and another for infringement, citing

*Amgen*. But the claims with the external sensor requirement were not found invalid in the IPR and so Axonics' positions are not binding. **DAF 123-27**. Also, *Amgen* recognizes that parties, like Axonics, often "challenge[] the correctness of a . . . broad claim construction" and contingently "challenge[] validity." 314 F.3d at 1330.

*Fourth*, Medtronic argues that its expert's express admissions about temperature not being indicative of heat from transcutaneous energy transfer are somehow irrelevant. This argument lacks merit. Medtronic's suggestion that the expert's answers had "nothing to do with the claim language" is manifestly false. Opp. at 16. The expert was asked "What else would you need to know and use in order for ***temperature to provide an indication of heat resulting from the charging process***?" and he responded with what was needed. **SUF 33-37; DAF 128-32**. The expert opined again after the testimony Medtronic quotes that if there was not a measurement of total heat there would need at least to be an analysis of change of temperature over time, but he admitted that he had no evidence of Axonics doing any such thing. **DAF 128**. To whatever extent Medtronic's expert subsequently attempted to apply a completely different meaning of the same claim term he already testified about, this just establishes, again, that Medtronic's infringement case is based on *ipse dixit* and the claims are invalid as there is no discernible test as to whether the accused products fall within or without an objective scope of the claims. Summary judgment should be granted.

## VI.   The 314 And 756 Patents Are Indefinite

Medtronic's opposition to summary judgment that the asserted claims of the 314 and 756 Patents are invalid for indefiniteness with respect to the phrase "plurality of tine elements" rests not on disputes of material fact, but on a comprehensive denial of the existing factual record. Medtronic insists that it did not contend during claim construction that "element" meant simply a "part of a whole" and did not represent to the Court that "[t]here's no indication that ***anything other than the ordinary use of the term*** would be relevant here," (Opp. at 17-20), but it did, as the briefing, hearing transcript, and the recommended construction each demonstrate. Medtronic insists that

its expert Dr. Chai did not depart from that construction in his infringement opinion finding *three* "tine elements" in the accused Axonics product, and that he did not agree under oath that a person of ordinary skill in the art applying the construction could conclude that the same product had *sixteen* tine elements, rendering it noninfringing. But he did both things. Impossible readings of an unambiguous record do not create a genuine factual dispute, and that is all that Medtronic has raised here.

      Medtronic's assertion that it has contended *all along* that a "tine **element**," as part of a "plurality of tine elements," was limited to structures that fully "encircled" the lead and provided fixation "around" it—the only basis it identifies to save the term from indefiniteness—cannot be reconciled with the record. In its claim construction briefing, and its presentation at the claim construction hearing, Medtronic always (and solely) contended that the word "element" was synonymous with "portion," and meant merely "part of a whole"—*not* that a tine assembly could be an "element" only if it "encircled" the lead and provided sufficient fixation "around" it, as Medtronic relies on now to avoid indefiniteness. It said so in its briefing (Dkt. No. 115 at 6, n.5), its claim construction slides (Dkt. No. 198-1 (**Ex. 1** (Pls.' Hr'g slides)) at 14), and in its argument at the hearing. Dkt. No. 198-2 (**Ex. 2** (Claim Construction Hearing Transcript)) at 42:18-20. Medtronic's lead counsel reaffirmed the general meaning of "element" when he told the Special Master *"[t]here's no indication that anything other than the ordinary use of the term would be relevant here.*" Dkt. No. 198-2 (**Ex. 2**) at 42:18-20. **SUF 43**. In the same breath, counsel also flatly denied to the Court that "element" had any structural requirement at all, stating "there is no reference to 'structure' there. There's no reference to 'structure' there." Dkt. No. 198-2 (**Ex. 2**) at 42:23-24. That is again *in direct contradiction* to Medtronic's current position that an "element" denotes one specific structure: a circle around the lead and nothing else. And the Special Master's Report and Recommendation *adopting* Medtronic's construction specifically relied on Medtronic's representations that the "dictionary definitions of 'element' and 'portion' as referring to

a part of a whole" were what should control here. Dkt. No. 163-1 at 20. [4]

Medtronic's attempt to deny these undeniable facts rests on a series of false premises. Medtronic asserts that it told the Special Master about the special meaning of "element" it now runs to in an attempt to save the patents from invalidity, but can point only to its counsel's statement that it "is clearly stated in the specification that the tines are going to be around the lead and along the length of the lead," which is "plenty of information." Opp. at 17. But counsel's general reference to the specification in no way disclosed that "element" means "encircling and fully fixating" and should be construed as such, and simply cannot be squared with Medtronic's repeated representations to this Court that "element" means only "part of a whole." Importantly, "encircling" appears nowhere in Medtronic's proposed claim construction. Dkt. 165 at 2 (Axonics' Claim Construction Objections stating Medtronic's proposed construction). Medtronic argued to the Special Master that elements were "along the length of the lead body," but **did not include "encircling"** as part of its construction at all. *Id.* at 5. Medtronic has no argument that its actual construction is not indefinite. That Medtronic must now argue for a new construction is a telling admission that the construction Medtronic obtained from the Special Master is indefinite.

Medtronic next contends that Axonics "did not dispute that each tine element would encircle the lead body" (Opp. at 18) and in fact agreed with it. *Id.* at 18-19. DAF 135. As discussed above, there was nothing for Axonics to dispute because Medtronic **never made this argument**; Medtronic explicitly sought a construction that gave no special meaning to "element," and obtained it over Axonics' objections. Axonics' purported agreement that a "tine element would encircle the lead body" demonstrates only the wide gulf between Medtronic's arguments and reality: Axonics' claim construction brief described in passing one "**embodiment**" described in the specification,

---

[4] Medtronic now accuses Axonics of improperly relying on general dictionary definitions to construe "element" broadly. Opp. at 20-21. Those are **Medtronic's** dictionaries, used to secure its preferred construction from the Special Master.

1    "*such as*" a "tine mounting band 175 or 175' encircling the lead body." Dkt. No. 111 at

2    4. Medtronic's attempt to rely on Axonics' claim construction argument does not support

3    the definiteness of the Special Master's construction. Axonics was explaining how the

4    specification "confirms that a plurality of tine elements *excludes a single structure*." *Id.*

5    There was no dispute about encircling. Axonics reproduces here the figure from its claim

6    construction brief showing how the tine

7    elements were separate structures, including

8    what Medtronic relies on now to argue for an

9    "encircling" structure: 175 (green, top left)

10   and 175' (white, bottom right), and the

11   separate 125 (green), 130 (blue), 135 (red),



12   140 (yellow). Medtronic argued *against* "element" connoting a structure to obtain its

13   construction and now attempts to argue *for* "element" connoting a different structure not

14   addressed at claim construction to avoid indefiniteness. Medtronic cannot have it both

15   ways. The evidence either shows that Medtronic's construction is incorrect as Axonics'

16   pending objections explain (Dkt. 165) or the claims are indefinite under Medtronic's

17   construction—Medtronic cannot simply add new limitations to the Special Master's

18   construction to save it from indefiniteness. No law supports such a litigation-results-

19   driven approach to claim construction. Moreover, neither Axonics nor the specification

20   characterized an "encircling" tine element as anything more than an embodiment that

21   may be "preferred," but is not required. *See* Dkt. No. 198-5, **Ex. 5 (314 Patent)** at 10:42-

22   47) ("In the depicted *preferred embodiments*, the tine elements **125**, **130**, **135** and **140**

23   or **125′**, **130′**, **135′** and **140′** *preferably* comprise a tine mounting band **175** or **175′**

24   encircling the lead body..."). At *Markman*, Medtronic *never* contended that "tine

25   elements" should be limited to a preferred embodiment, and in fact contended the

26   opposite, criticizing *Axonics* for "improper[ly]" seeking to "limit the claims to only

27   certain depicted embodiments." Dkt. No. 115 at 6 (citing *GE Lighting Sols., LLC v.*

28   *AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("It is improper to read limitations

from a preferred embodiment described in the specification. . . .". DAF 136, 137.

Moreover, Medtronic's argument relying on its expert's opinions on the construction of the term "plurality of tine elements" to argue that the claims are not indefinite must be rejected. That is because Medtronic's expert based his entire argument on the incorrect definition of a POSITA. Opp. at 18. Medtronic's expert's claim construction declaration applied the level of ordinary skill for a POSITA adopted by the PTAB in IPRs, which required "at least two years of experience researching and developing medical leads for *sacral neuromodulation*." DAF 138 (Dkt.139-7, ¶ 22). This was the *only definition of a POSITA* under which Medtronic's expert offered his claim construction opinions, and the opinions that Medtronic quotes on page 18 of its Opposition (underlined below) were expressly based on and offered under an understanding that a POSITA must have knowledge of sacral neuromodulation (emphasized below):

> Rather, a POSITA *with experience in sacral neuromodulation* would understand that whether the tine elements are formed separately or as a single structure is not what is important to the invention. Rather, a POSITA would understand the important aspects of the plurality of tine elements is that there are multiple sets of tines formed around the lead body to provide fixation sufficient to engage the subcutaneous muscle tissue along a length of the lead body, (see e.g., 756 patent, 6:4-9, 6:26-30, 6:44-48, 9:61-10:6, 10:2434, 11:65-12:2, 12:8-32), and that those multiple sets of tines are positioned proximal to the electrode array to engage with the subcutaneous muscle tissue that keeps the distal electrodes in a specific and fixed relationship to the sacral 3rd nerve (see e.g., 756 patent, 5:50-57, 7:20-35, 9:61-10:6, 11:55-12:4). Dr. Irazoqui does not discuss these fixation considerations that are *specific to the sacral anatomy*, which *a POSITA would understand were important*."

DAF 138 (Dkt. 139-7, ¶ 24). The problem for Medtronic is that the Federal Circuit rejected this POSITA definition, and explicitly adopted a view of the art that does ***not*** require knowledge specific to sacral neuromodulation. *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 958-59 (Fed. Cir. 2023) ("[T]he Board erred in its definition of 'the relevant art' as limited to medical leads for sacral-nerve stimulation."). As the CAFC determined, the Board adopted an incorrect definition of the relevant art, which Dr. Chai adopted. Medtronic's original Opposition expressly recognized that its expert was applying the definition of a POSITA "with experience in sacral neuromodulation" (Dkt. 214-1 at 21). Medtronic now fails to acknowledge that the opinion it relies on was based on the incorrect definition of a POSITA. Indeed, Medtronic deletes the POSITA standard its expert applied from its Opposition as originally filed.[5] Opp. at 18. But Medtronic cannot rely on the legally baseless opinions of its expert that were premised on an erroneous definition of the POSITA merely by deleting that fact from its own brief. Medtronic's arguments based on its own claim construction should be rejected and cannot provide a basis for finding the claims not indefinite. Moreover, Medtronic's and its expert's reliance on the legally incorrect understanding of a POSITA provide another basis for rejecting Medtronic's construction that was adopted by the Special Master and to which Axonics has pending objections before the Court.

Medtronic's last defense of its retreat from the claim construction it obtained—that the parties disputed only the meaning of a "***plurality*** of tine elements," and agreed that a single "tine element" must "encircle" the lead (Opp at 18-19)—is flatly contradicted by the record, common sense, and the law. DAF 140. There was no dispute during claim construction about the word "plurality"—both sides agreed it meant "two or more." *See, e.g.,* Dkt. No. 163-1 at 11. Instead, the parties disputed what a "tine element" is, in particular whether it must be a separate "structure" from any other tine

---

[5] Medtronic also abandoned its argument that Axonics' expert Mr. Pless "lacks any background or experience in sacral neuromodulation." Dkt. 214-1 at 23; Opp. at 20.

element. Axonics contended that a "plurality of tine elements" required two or more *structures* (*see, e.g.,* Dkt. No. 111 at 3). Medtronic disagreed, insisting that "element" meant "part of a whole" and connoted no structure at all, in direct contradiction to the structural and functional interpretation it has now adopted to try to save the claims from invalidity. Dkt. No. 198-2 (**Ex. 2** (Claim Construction Tr.)) at 42:18-24. At bottom, Medtronic's argument that the parties did not address the meaning of "tine element" in the singular, and so the Special Master did not construe "tine element," rests on the indefensible premise that "tine element" means something different in connection with *one* "tine element" than it does in connection with a plurality of "tine elements." That position defies common sense. Reciting "two or more apples" does not change what an apple is; it is the same thing each time. It is also contrary to law. *See, e.g., Dayco Prods. v. Total Containment, Inc.,* 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) (plurality "***refers to two or more items*** . . ."); *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996) ("The term means, simply, 'the state of being plural.'").

Medtronic fails to explain away the fatal admission of its expert Dr. Chai that persons of ordinary skill in the art who applied the meaning of "element" advanced by Medtronic and adopted by the Special Master (a part of a whole) to the Axonics helical tine structure could come to different and equally reasonable conclusions about the number of tine elements it possessed, some of which would infringe and others that would not. *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (holding "a claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'"). Medtronic ventures that when Dr. Chai testified, in regard to the Axonics product, that "***another person could look at it and say there would be 16 tine[] elements***," he meant Axonics' counsel, not a POSITA (Opp. at 21), but that does not bear even a moment of scrutiny. Dr. Chai testified that ***another*** "person" (*i.e.,* a person of ordinary skill) could reach that conclusion; he did not state to the questioning attorney that "you" or "some lawyer" would. Dkt. No. 395-1, **Ex. 4**, Chai Dep. at 170:5-24. *See*

*also id.* at 195:11-23 (testifying "***people might construe more than three*** based on the Special Master's language and Medtronic's common language definition."). Were any further demonstration of the impossibility of Medtronic's interpretation required, Dr. Chai himself confirmed that he was testifying as to the understanding of a POSITA. He was asked in deposition repeatedly to confirm, in direct reference to that testimony, that "the fact that ***different persons of ordinary skill might come up with different answers*** doesn't affect the validity of your opinion?" **Ex.70 (Chai Dep.)** at 197:3-13, 197:19-198:5). Dr. Chai never objected that he was talking about the conclusions a lawyer could reach (or that the premise of the question was otherwise wrong). *Id.* There is no real dispute that Dr. Chai's admissions demonstrate that one of ordinary skill in the art applying the construction Medtronic obtained could not determine with reasonable certainty how many tine elements there are in any given medical lead.

None of Medtronic's other complaints rescue the claims from invalidity. Medtronic asserts that Dr. Chai confidently concluded there were three tine elements, not sixteen, in the Axonics product (Opp. at 21-22), but as demonstrated by Axonics here and in connection with its *Daubert* motion, Dr. Chai did so only by contradicting the Special Master's recommended construction, which Dr. Chai admitted he viewed as just "one sentence" that he was free to modify by using a construction he believed to be "more appropriate." Dkt. No. 395-1 (**Ex. 4 (Chai Dep.** at 194:18-195:3; 110:11-19 *See also id.* at 127:1-13; **Ex. 70**, at 138-139. DAF 142, 143. When required to apply the general meaning of "element" that Medtronic obtained, Dr. Chai readily conceded that a POSITA could reasonably conclude there were sixteen (noninfringing) tine elements. Medtronic also observes that Axonics' expert Mr. Pless was able to apply the Special Master's construction to the Axonics product to conclude that it has only one tine element (Opp. at 19-21), but that "gotcha" argument carries no weight. Mr. Pless concluded that "one of skill in the art could not determine, with reasonable certainty, which tine structures would fall within, or outside, the scope of this term as construed." Dkt. No. 395-33, (**Ex. 56** (11/7/22 Pless Report) ¶¶ 233-237. Finally, Medtronic relies

on irrelevant cases which observe that the claim construction process need not resolve all issues about the application of a claim term to an accused product. *See, e.g.,* Opp. at 19 (citing *PPG Indus. v. Guardian Indus. Corp.,* 156 F.3d 1351, 1355 (Fed. Cir. 1998) *Acumed LLC v. Stryker Corp.,* 483 F.3d 800, 806 (Fed. Cir. 2007); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.,* 815 F.3d 1314, 1318-19 (Fed. Cir. 2016). But those decisions do not concern what happened here, where one party obtained a claim construction that renders the claim ***indefinite***, and now seeks to run from the consequences of its positions. *PPG Indus.* was careful to note that some ambiguity may be reserved for the jury only "[a]s long as the result complies with the statutory requirement to 'particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention,'" *PPG Indus.,* 156 F.3d at 1355.

Medtronic has come forward with no evidence to create a material dispute of fact that, under the actual construction of "plurality of tine elements" it obtained, the asserted claims are indefinite because one of ordinary skill in the art could not determine with reasonable certainty whether a given arrangement of tines has a "plurality" of tine elements and thereby infringes, or has, for example, only one tine element, and does not infringe, or even determine with any confidence how many "tine elements" there are at all. The existing factual record warrants summary judgment. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) ("A claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not."); *Media Rights Techs,* at 1371 ( "a claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'").

Dated: June 10, 2024                    Respectfully submitted

                                        */s/ Matthew D. Powers*
                                        Matthew D. Powers (Bar No. 104795)
                                        William P. Nelson (Bar No. 196091)
                                        Natasha M. Saputo (Bar No. 291151)
                                        TENSEGRITY LAW GROUP, LLP
                                        555 Twin Dolphin Drive, Suite 650
                                        Redwood Shores, CA 94065
                                        Telephone:   (650) 802-6000
                                        Facsimile:    (650) 802-6001
                                        matthew.powers@tensegritylawgroup.com
                                        william.nelson@tensegritylawgroup.com
                                        natasha.saputo@tensegritylawgroup.com

                                        Azra M. Hadzimehmedovic (Bar No. 239088)
                                        Aaron M. Nathan (Bar No. 251316)
                                        Samantha A. Jameson (Bar. No. 296411)
                                        Stephen K. Shahida (admitted *Pro Hac Vice*)
                                        Danielle C. Pfifferling (admitted *Pro Hac Vice*)
                                        Nathaniel D. Cook (admitted *Pro Hac Vice*)
                                        TENSEGRITY LAW GROUP, LLP
                                        1676 International Drive, Suite 910
                                        McLean, VA 22102
                                        Telephone:   (703) 940-5033
                                        Facsimile:    (650) 802-6001
                                        azra@tensegritylawgroup.com
                                        aaron.nathan@tensegritylawgroup.com
                                        samantha.jameson@tensegritylawgroup.com
                                        stephen.shahida@tensegritylawgroup.com
                                        danielle.pfifferling@tensegritylawgroup.com
                                        nathaniel.cook@tensegritylawgroup.com

                                        David M. Stein (Bar No. 198256)
                                        Olson Stein LLP
                                        240 Nice Lane #301
                                        Newport Beach, CA 92663
                                        Telephone: (949) 887-4600
                                        dstein@olsonstein.com

                                        *Attorneys for Defendant Axonics, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 10, 2024, copies of the foregoing

were served upon the following parties as indicated below:

| | |
|---|---|
| Nimalka Wickramasekera<br>Joe S. Netikosol<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071-1543<br>Telephone: (213) 615-1700<br>Facsimile: (213) 615-1750 | **Via E-mail**<br><br>NWickramasekera@winston.com<br>JNetikosol@winston.com |
| George C. Lombardi<br>Samantha M. Lerner<br>J.R. McNair<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, IL 60601-9703<br>Tel: (312) 558-5600 | GLombard@winston.com<br>SLerner@winston.com<br>JMcNair@winston.com |
| Robert Nai-Shu King<br>WINSTON & STRAWN LLP<br>101 California St., Floor 34<br>San Francisco, CA 94111-5812<br>Telephone: (415) 591-1400 | RKang@winston.com |
| Robert T. Vlasis III<br>Brian E. Ferguson<br>WINSTON & STRAWN LLP<br>1901 L. Street NW<br>Washington, DC 20036<br><br>***Counsel for Plaintiff Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC.; Medtronic USA, Inc.,*** | BEFerguson@winston.com<br>RVlasis@winston.com<br>winston-medtronic-axonics@winston.com |

*/s/ Nicole High*
Nicole High