Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Facsimile: (650) 802-6001

David M. Stein (Bar No. 198256)
dstein@olsonstein.com
Olson Stein LLP
240 Nice Lane #301
Newport Beach, CA 92663
Telephone: (949) 887-4600

*Attorneys for Defendant* AXONICS, INC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC.,

Plaintiffs,

v.

AXONICS MODULATION TECHNOLOGIES, INC.,

Defendant.

Case No. 8:19-cv-02115-DOC-JDE

**DEFENDANT AXONICS, INC.'S RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND REPLY TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Date: June 24, 2024
Time: 8:30 a.m.
Ctrm: 10A
Judge: Hon. David O. Carter

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

**Claim for Relief No. 1: Axonics Is Entitled to Summary Judgment on Prosecution History Estoppel On the 069 Patent**

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 1. Axonics' accused products [REDACTED]). *Evidence*: **Ex. 44**, Irazoqui 2022-12-18 Rpt. ¶ 275; **Ex. 13**, Mihran Dep. at 301:20-302:8 | **Undisputed** that Axonics' accused products [REDACTED] |
| 1. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. While Medtronic includes additional language confirming portions of the text of this fact, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. [1] | |
| 2. During prosecution of the application that issued as the 069 Patent, pending claim 1 covered "thereby generating a current associated with said internal | **Disputed.** Medtronic does not dispute that pending claim 1 originally recited "an external power source… thereby generating a current associated with said |

[1] Pursuant to the amendment to L.R. 56-3 that became effective June 1, 2023, Axonics provides its Responses to Medtronic's Statement of Genuine Disputes.

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| power source." This limitation was replaced by amendment to overcome prior art with "thereby generating a current through said internal power source."<br><br>*Evidence*: **Ex. 45**, July 6, 2008, and August 6, 2008, Amendment, 069 Patent File History at MDT-00000408, MDT-00000426. | internal power source." Exhibit 1, to the Declaration of Brian Nisbet ("Nisbet Decl."), (MDT-00000001, at MDT-00000057). Medtronic does not dispute that the applicant amended the limitation "thereby generating a current associated with said internal power source" to "thereby generating a current through said internal power source." Nisbet Decl., Ex. 1 (MDT-00000408). Medtronic asserts that this amendment was made to overcome a reference cited by the examiner in which alignment is reported based on a current in the **external charger**. Nisbet Decl., Ex. 1 (MDT-00000426). |
| 2. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that the original claims stated "thereby generating a current associated with said internal power source." Medtronic also does not dispute that the claims were amended to replace the preceding quote with "thereby generating a current through said internal power source." Medtronic also does not dispute that the amendment was made to overcome prior art, i.e., as Medtronic describes it, "a reference cited by the examiner." | |
| 3. On July 8, 2008, Medtronic told the Patent Office that the "[i]ndependent claims have been amended solely to clarify the language of the current rather than being 'associated with' the internal power source to the more definite 'through' the internal power source."<br><br>*Evidence*: **Ex. 45**, July 6, 2008 Amendment, 069 Patent File History at MDT-00000412. | **Undisputed.** |

| **Axonics' Undisputed Facts and Supporting Evidence** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
|---|---|
| 4. On August 6, 2008, Medtronic told the Patent Office that: "Claims 1 and 21 have been amended to clarify the claims by reciting that the current of which the alignment is a function is the current that passes through the internal power source."<br><br>*Evidence*: **Ex. 45**, July 6, 2008 and August 6, 2008, Amendment, 069 Patent File History at MDT-00000430. | **Undisputed.** |
| 5. On January 7, 2009, Medtronic amended the claims to overcome the same prior art with the measuring limitation: "measuring said current and reporting said alignment based on said current." Medtronic relied on these amendments to overcome the prior art: "Wang et al '693 does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting alignment based on current through the internal power source."<br><br>*Evidence*: **Ex. 45**, Jan. 7, 2009, Amendment, 069 Patent File History at MDT-00000452, 454, 456-457. | **Disputed.** Medtronic does not dispute that on January 7, 2009, pending independent claims 1 and 21 were amended to recite "measuring said current and reporting said alignment based on said current." Nisbet Decl., Ex. 1 (MDT-00000452, 454). Medtronic does not dispute that the applicant included the statement "Wang et al '693 does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting alignment based on current through the internal power source. Instead, Wang et al '693 specifically discloses measuring the current through the external power source." Nisbet Decl., Ex. 1 (MDT-00000456). Medtronic disputes the other attorney arguments in Axonics statement regarding "amendments to overcome the prior art" and refers to its response in Medtronic's Opposition to Axonics Motion for Summary Judgment. |
| 5. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| Medtronic does not dispute that on January 7, 2009, the independent claims were amended to state "measuring said current and reporting said alignment based on said current." Medtronic does not dispute that the applicant stated "Wang et al '693 does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting alignment based on current through the internal power source." Medtronic states that it disputes the language that there were "amendments to overcome the prior art," but the quotes that Medtronic does not dispute confirm that there were "amendments to overcome the prior art." There is also no dispute that the Wang referenced in SUF 5 is the same as that referenced in SUF 2. | |
| 6. Medtronic accuses Axonics' [REDACTED] of meeting this limitation of the 069 Patent under the doctrine of equivalents. Medtronic's expert Dr. Mihran contends that [REDACTED] This is the same thing Medtronic accused of literally infringing the "value associated with said current" claim limitation of the 148 patent (alleging infringement of 148 Patent "value associated with said current passing through said internal battery" by [REDACTED] | **Disputed.** Material facts have been omitted from Axonics' statement. Medtronic does not dispute the language directly quoted from Dr. Mihran's expert report, but disputes attorney argument outside the quotes. Medtronic argues that [REDACTED] Medtronic does not dispute that that it contends that the claim language "measuring said current" in claim element 5[c] of the '069 patent is infringed by Axonics under the doctrine of equivalents. Medtronic does not dispute that Dr. Mihran contends that the [REDACTED] infringes this claim language under the doctrine of equivalents [REDACTED] Medtronic does not dispute that Axonics |



| **Axonics' Undisputed Facts and Supporting Evidence** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
| --- | --- |
| ). *Evidence*: **Ex. 9**, Mihran Rpt. ¶¶ 43, 589, 606, 1097, 1103-05, p. 240. | literally infringes the "value associated with said current" limitation of the '148 patent |
| 6. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that Medtronic's expert said and that infringement of the previously asserted 148 Patent "value associated with said current passing through said internal battery" limitation was alleged battery ." Medtronic does not dispute that the claim limitation described in this fact is 069 Patent element 5[c]: "measuring said current." Medtronic does not dispute that Medtronic accuses Axonics of infringement of this limitation under the doctrine of equivalents. Medtronic alleges that material facts have been omitted, but that is not the case, and there is no fact that Medtronic identifies that would create a dispute of the fact as stated. Medtronic's assertion that the (emphasis added) admits that there is no dispute that the accused technology is not " ." Medtronic fails to raise a genuine dispute as to any material fact. | |
| 7. Medtronic's infringement theory is premised on the being associated with the battery. Medtronic's infringement expert said in deposition: "Q. A. Yes." *Evidence*: **Ex. 13**, Mihran Dep. at 339:14- | **Undisputed** that one the reasons Axonics infringes is Medtronic does not dispute the quoted language from Dr. Mihran's deposition. |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 16, 305:12-14. | |
| 7. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. Axonics does not agree that it infringes for the reasons stated, but the fact relates only to Medtronic's theory of infringement. Medtronic does not dispute the fact as to its infringement theory, and has confirmed it. While Medtronic includes additional language confirming portions of the text of this fact, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic also does not dispute the quote from Dr. Mihran's deposition: "Q. [REDACTED] A. Yes." | |
| 8. Medtronic has identified no reason why Prosecution History Estoppel should not apply. *Evidence*: **Ex. 44**, Irazoqui Rebuttal Rpt. ¶¶ 461-473; **Ex. 9**, Mihran Rpt. ¶¶ 1097-1123. | **Disputed.** Axonics has never raised prosecution history estoppel as a non-infringement argument or as a claim construction argument during fact discovery. The first time Axonics raised this argument is in its rebuttal expert report on non-infringement. *See* Nisbet Decl., Ex. 8 (Rebuttal Expert Report of Dr. Pedro Irazoqui (December 18, 2022) at ¶¶ 461–473. Medtronic disputes that prosecution history estoppel applies in the manner Axonics belatedly argues as part of its motion for summary judgment. |
| 8. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic alleges that the first time Axonics raised prosecution history estoppel was in its rebuttal expert report on non-infringement. Medtronic's first basis for dispute is simply not true, is untimely raised, and is not a fact that precludes summary judgement.<br><br>Axonics provided contentions related to prosecution history estoppel in an interrogatory response that Medtronic did not address. **Ex. 74, at 72-73, 76-80, 83-86, 90, 95-97**. The dates on that interrogatory response confirm that it was initially served and supplemented during fact discovery. Axonics directed Medtronic to this interrogatory response in Axonics' original reply to its summary judgment motion, filed in February 2023. Dkt. 251-1 at 1 n.2. Medtronic does not address Axonics interrogatory response, and Axonics' interrogatory response confirms Medtronic's allegations are not true. There is no basis to deny summary judgment based on | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| Medtronic's incorrect and unsupported allegations.<br>Moreover, Medtronic's argument is untimely. Medtronic admits that it has had Axonics' expert report that also addresses prosecution history estoppel since December 2022. Medtronic never sought to strike the opinions of Axonics' expert as being untimely. Medtronic has no basis to now oppose summary judgment on this basis, and summary judgment cannot be denied on this basis.<br>While Medtronic asserts that it disputes that prosecution history estoppel applies in the manner Axonics argues, it provides no factual basis for that allegation, nor even an explanation of it. Medtronic provides no basis to deny summary judgment. | |
| 9. Medtronic only alleges infringement of the remaining asserted claim 7 from the 069 Patent under the doctrine of equivalents, and Medtronic's expert Dr. Mihran relies on the doctrine of equivalents for the limitation "measuring said current," "said current" being the current through the battery ("current through said internal power source").<br>*Evidence*: **Ex. 9** Mihran Rpt., ¶¶ 43, 1103, p. 454. | **Undisputed.** |
| 10. The literal language of 069 Patent claim 5, as incorporated in claim 7, requires measuring the current through the implant battery.<br>*Evidence*: **Ex. 43** (069 Patent), Claims 5-7. | **Undisputed.** |
| 11. Medtronic argued the prior art "does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting alignment | **Undisputed** that the applicant included the statement "Wang et al '693 does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting |

| **Axonics' Undisputed Facts and Supporting Evidence** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
|---|---|
| based on current <u>through the internal power source</u>."<br>*Evidence*: **Ex. 45**, Jan. 7, 2009, Amendment, 069 Patent File History at MDT-00000451-461 at 452, 454, 456. | alignment based on current through the internal power source. Instead, Wang et al '693 specifically discloses measuring the current through the external power source." Nisbet Decl., Ex. 1 (MDT-00000456). |

11. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. While Medtronic includes additional language confirming portions of the text of this fact, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic does not dispute that the Wang prior art states "does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils by measuring and reporting alignment based on current <u>through the internal power source</u>." The additional language that Medtronic included does not create a genuine dispute of material fact that precludes summary judgment.

| **Axonics' Undisputed Facts and Supporting Evidence** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
|---|---|
| 12. [Intentionally Omitted] | [Intentionally Omitted] |
| 13. [Intentionally Omitted] | [Intentionally Omitted] |
| 14. [Intentionally Omitted] | [Intentionally Omitted] |
| 15. [Intentionally Omitted] | [Intentionally Omitted] |
| 16. [Intentionally Omitted] | [Intentionally Omitted] |
| 17. [Intentionally Omitted] | [Intentionally Omitted] |
| 18. [Intentionally Omitted] | [Intentionally Omitted] |
| 19. [Intentionally Omitted] | [Intentionally Omitted] |
| 20. [Intentionally Omitted] | [Intentionally Omitted] |
| 21. [Intentionally Omitted] | [Intentionally Omitted] |

**Claim for Relief No. 2: Axonics Is Entitled to Summary Judgment on Non-Infringement of the 069 Patent Claim 7 "wherein said predetermined current in said internal power source declines as said voltage of said internal power source increases during a charging cycle"**

| Axonics' Undisputed Facts and Supporting Evidence[2] | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 22. [redacted] *Evidence*: **Ex. 9**, Mihran Rpt., ¶ 1213; **Ex. 46**, AX0000030 (Orion SRS CD) at AX0000041-42. | **Undisputed.** |
| 23. [redacted]. *Evidence*: **Ex. 9**, Mihran Rpt., ¶¶ 83-84, 95-98; **Ex. 47** AX0048868 ("Texas Instruments bq2404x data sheet"); **Ex. 48**, AX0000439 (Schematic, IPG, Main PCBA). | **Disputed.** While the battery charging chip BQ24040 data sheet describes that the chip can have a constant current (current regulation) phase and a constant voltage (voltage regulation) phase, the battery charging chip BQ24040 [redacted] |
| 23. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic makes a new, untimely, and incorrect attorney argument being raised for the first time in summary judgment briefing that finds no support in the record, cannot be presented to the jury at trial, and is contradicted by the very evidence Medtronic attempts to rely upon. Medtronic's expert's own testing shows [redacted] | |

[2] Axonics treats as true for purposes of only this motion the facts on which Medtronic relies. Axonics reserves its rights to dispute at trial the facts, theories, methodologies, and conclusions relied upon by Medtronic and its expert.



| **Axonics' Undisputed Facts and Supporting Evidence[2]** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
|---|---|
| [redacted] **DAF 69-72.** [redacted] *Id.* <br><br> Medtronic cannot present this new theory at trial because its expert has no opinions on it, it is based on confidential Axonics information that cannot be presented by Medtronic witnesses, and no Axonics expert or fact witness is going to inaccurately describe the Axonics products. *Id.* Medtronic improperly attempts to create a genuine dispute of material fact without actual evidence, and no evidence is cited in its response to raise a genuine dispute of material fact. | |
| 24. When the implant is [redacted] <br><br> *Evidence*: **Ex. 9**, Mihran Rpt., ¶ 1214. | **Undisputed.** |
| 25. The charger may [redacted] <br><br> *Evidence*: **Ex. 9**, Mihran Rpt., ¶¶ 1215-18, | **Undisputed** that during charging, the [redacted] One example of this is illustrated inside the red box in the figure to the left. <br><br> *See, e.g.*, Dkt. 360-6 (Expert Report of Richard T. Mihran, ¶¶ 917–20, 929–31, 1215–18, 1227–29)[1] |

| Axonics' Undisputed Facts and Supporting Evidence[2] | Medtronic's Response to Cited Fact and Supporting Evidence |
| --- | --- |
| 1227-29. | |
| 25. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. While Medtronic includes additional language in its response, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic raises no dispute with the statement [REDACTED]. Medtronic makes the further assertion that [REDACTED]." Medtronic's theory of infringement is not consistent with the Special Master's claim construction and not supported by the evidence cited. *See* **DAF 77-84.** Medtronic provides no explanation of its assertion, nor does Medtronic identify any support in the evidence for it. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 26. Medtronic's expert's test results showed the following: [REDACTED] *Evidence*: **Ex. 9**, Mihran Rpt., ¶¶ 1226-27, 1230. | **Undisputed** that this is part of the evidence that shows infringement of the "declines" limitation present in claims 2, 6, 10 of the '758 patent and claim 7 of the '069 patent. |
| 26. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. Medtronic has stated that it is undisputed that Medtronic provided the referenced test results. While Medtronic includes additional language in its response, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic raises no dispute regarding whether the image shown is Medtronic's expert's testing results. Medtronic makes the further assertion that this "shows infringement of the 'declines' limitation." Medtronic's theory of infringement is not consistent with the Special Master's claim construction and not supported by the evidence cited. *See* **DAF 77-84.** Medtronic provides no | |

| Axonics' Undisputed Facts and Supporting Evidence[2] | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| explanation of its assertion, nor does Medtronic identify any support in the evidence for it. Medtronic raises no genuine dispute of material fact that precludes summary judgment.<br>Medtronic includes in its response the 758 Patent, which has been dismissed from this case with prejudice and should not be further addressed here. | |
| 27. An Axonics document shows that [REDACTED] [REDACTED], as shown in the following example.<br>GB3504, 97,Charge current 3.95V, 40.3,mA ,P,0, 35, 45<br>GB3505, 98,Charge current 4.00V, 40.3,mA ,P,0, 0, 45<br>GB3506, 99,Charge current 4.05V, 11.8,mA ,P,0, 0, 45<br>*Evidence*: **Ex. 9**, Mihran Rpt., ¶¶ 1231-35; *e.g.*, **Ex. 49**, AX0001516 at 1518; **Ex. 57**, AX0001676 at 79; **Ex. 50**, AX0001653 at 1656. | **Undisputed** that this is part of the evidence that shows infringement of the "declines" limitation present in claims 2, 6, 10 of the '758 patent and claim 7 of the '069 patent. |
| 27. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic admits that this fact is undisputed. While Medtronic includes additional language in its response, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic raises no dispute regarding what is stated in the fact. Medtronic makes the further assertion that this "shows infringement of the 'declines' limitation." Medtronic's theory of infringement is not consistent with the Special Master's claim construction and not supported by the evidence cited. *See* **DAF 77-84.** Medtronic provides no explanation of its assertion, nor does Medtronic identify any support in the evidence for it. Medtronic raises no genuine dispute of material fact that precludes summary judgment.<br>Medtronic includes in its response the 758 Patent, which has been dismissed from this case with prejudice and should not be further addressed here. | |

**Claim for Relief No. 3: Axonics Is Entitled to Summary Judgment on Non-Infringement of the Asserted Claims of the 112 Patent Based on the "programmability" Limitations**

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 28. The independent claims of the 112 Patent require "a control circuit configured to compare the measured temperature to a programmable limit" and "a memory configured to store the programmable limit" or "obtaining a programmable limit from a memory" and "comparing, via a control circuit, the temperature to the programmable limit."<br>*Evidence*: **Ex. 51**, 112 Patent, Claims 1, 8. | **Disputed** in that Axonics' statement mixes claim language from two different independent claims of the '112 patent. Independent claim 1 of the '112 patent requires "a control circuit configured to compare the measured temperature to a programmable limit…" and "a memory configured to store the programmable limit." Independent claim 8 of the '112 patent requires "obtaining a programmable limit from a memory" and "comparing, via a control circuit, the temperature to the programmable limit."<br>Dkt. 28-4 ('112 patent), cl. 1, 8. |
| 28. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that 112 Patent independent Claim 1 states "a control circuit configured to compare the measured temperature to a programmable limit" and "a memory configured to store the programmable limit." Medtronic does not dispute that 112 Patent independent Claim 8 states "obtaining a programmable limit from a memory" and "comparing, via a control circuit, the temperature to the programmable limit." These were the two independent claims cited in the fact. | |
| 29. Axonics' charger can be [redacted]<br>*Evidence*: **Ex. 9**, Mihran Rpt., ¶ 531; **Ex. 52**, Abdeen Dep. at 77:1-78:12, 82:19-83:5, 84:20-85:6, 86:8-22. | Material facts have been omitted from Axonics' statement. Axonics' charger includes a programmable microcontroller with software, including a software-defined programmable temperature limit, that can be updated after its initial setting using tools available to Axonics.<br>*See, e.g.,* Nisbet Decl., Ex. 10, Deposition Transcript of Faizal Abdeen ("Abdeen Dep. Tr.") at 78:9–12, 82:19–83:5, 84:20– |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 85:6, 86:8–22; Dkt. 360-6 (Expert Report of Richard T. Mihran, ¶¶ 482-506, 528–532). |
| 29. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic fails to respond and this fact is therefore undisputed. Medtronic alleges that material facts have been omitted, but that is not the case, and there is no fact that Medtronic identifies that would create a dispute of the fact as stated. Medtronic describes additional hardware, but that does not create a genuine dispute of material fact for purposes of summary judgment. While Medtronic includes additional language in its response, Medtronic raises no dispute with any portion of this fact, and so it is undisputed. Medtronic raises no dispute with the statement "Axonics' charger can be [REDACTED]." Medtronic makes the further assertion that "Axonics' charger includes a programmable microcontroller with software, including a software-defined programmable temperature limit, that can be updated after its initial setting using tools available to Axonics." Medtronic's theory of infringement is not consistent with the Special Master's claim construction and not supported by the evidence cited. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 30. If Axonics' charger code is replaced, it would be a new device and would no longer be the FDA approved device, and such a device would need to go through revalidation and resubmission to the FDA.<br><br>*Evidence*: **Ex. 52**, Abdeen Dep. at 78:13-23, 81:2-14, 83:6-85:10, 85:21-86:5. | **Disputed.** Updating the software on Axonics' charger does not make it a new device. Axonics has provided no evidence to show that any update to the software on the Axonics charger would render the charger "no longer [an] FDA approved device" as Axonics claims. *See* Nisbet Decl., Ex. 10 (Deposition Transcript of Faizal Abdeen ("Abdeen Dep. Tr.")) at 78:13–23, 81:2–14, 83:6–85:10, 85:21–86:5. |
| 30. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic provides no explanation of its assertions, and none of the evidence that Medtronic cites supports its assertions. Medtronic identifies no evidence showing and provides no explanation for asserting that a charger that has new software is not a new device. Additionally, finding this fact is not necessary to granting Axonics' motion. Medtronic asserts that Axonics did not provide evidence to show that updating | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| software on the Axonics charger would render it "no longer [an] FDA approved device." Medtronic is incorrect as Axonics identified supporting deposition testimony. It is Medtronic that has identified no supporting evidence to dispute that the charger would no longer be FDA approved. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 31. After being asked "I am asking any change of [REDACTED] after shipping. Do you have any evidence that that's ever been done by anyone anywhere" Medtronic's expert testified that "I don't have any firsthand knowledge of whether it's been done with a shipped device. . . ."<br><br>*Evidence*: **Ex. 13**, Mihran Dep., 282:22-283:4; *see also id.*, 275:9-21, 276:3-7. | Material facts have been omitted from Axonics' statement. Dr. Mihran's testified as follows: "Q: … I am asking any change of [REDACTED] after shipping. Do you have any evidence that that's ever been done by anyone anywhere? **A. I don't have any firsthand knowledge of whether it's been done with a shipped device. I know it's been done, obviously, with devices in development.** Q. … Have you pointed in your report to any evidence that anyone in the world is even allowed to do what you are talking about, that anyone allowed --is allowed by Axonics or allowed by the regulatory agencies to alter [REDACTED] Can you point to any evidence that that's even permissible? **A. I don't point to evidence that it's permissible; I point to evidence that it is capable."** Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 282:22–283:16. |
| 31. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic fails to respond and this fact is therefore undisputed. Medtronic alleges that material facts have been omitted, but that is not the case, and there is no fact that Medtronic identifies that would create a dispute of the fact as stated. Medtronic does not dispute that its expert was asked "I am asking [REDACTED] after shipping. Do you have any evidence that that's ever been done by anyone anywhere," and Medtronic does not dispute that its expert testified that "I don't have any firsthand knowledge of whether it's been done with a shipped device. . . ." The additional deposition testimony that Medtronic quotes | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| does not create a genuine dispute of material fact. | |
| 32. [REDACTED]. *Evidence*: **Ex. 9**, Mihran Rpt., ¶¶ 19, 197-204; **Ex. 52**, Abdeen Dep. at 51:10-14. | **Disputed** in that Axonics has not shown that [REDACTED] is only used internally. In addition, material facts have been omitted from Axonics' statement. According to Axonics documents, [REDACTED] *See, e.g.*, Dkt. 360-6 (Expert Report of Richard T. Mihran, ¶¶ 19, 197–204, 505–506); Nisbet Decl., Ex. 22 (AX0138739 at 745); Nisbet Decl., Ex. 12 (AX1172714 at 715, 718–9, 777–780); Ex. 13 (AX1091356 at 358, 360, 387–8). |

32. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic asserts that Axonics did not provide evidence to show that [REDACTED] is only used internally. Medtronic is incorrect as Axonics identified supporting expert and fact witness testimony. Additional supporting evidence was also provided in **DAF 90-92**. It is Medtronic that has identified no supporting evidence to dispute that [REDACTED]. Contrary to Medtronic's initial assertion, Medtronic confirms that [REDACTED] While Axonics does not agree with all of Medtronic's characterizations, [REDACTED], and Medtronic identifies nothing showing that [REDACTED] and it is not. Medtronic raises no genuine dispute of material fact that precludes summary judgment.

There is no genuine dispute of material fact. Medtronic alleges that material facts have been omitted, but that is not the case, and there is no fact that Medtronic identifies that would create a dispute of the fact as stated. Medtronic makes assertions about [REDACTED] functionality, which is not the subject of the fact and does not create a genuine dispute of material fact.

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| Axonics also objects to Medtronic's reliance on any evidence related to [REDACTED] to allege infringement because such contentions are untimely. It is not in Medtronic's infringement contentions or expert report, and Axonics objected when Medtronic questioned Axonics' expert about this previously undisclosed theory. **DAF 103, 144**. Medtronic's suggestion that it is allowed to add whole new theories of infringement now when it was provided [REDACTED] discovery during fact discovery is not plausible and a plain violation of Rule 26 and this Court's Scheduling Orders. Opp. at 12. Medtronic knew about [REDACTED] in time to have its expert opine about how Medtronic now claims it supposedly infringes because the same expert in the same report relied upon [REDACTED] extensively, just ***not for that***. *Id.* Medtronic's expert had access to operable [REDACTED] and a charging device. While Medtronic now argues about the conditions of the inspection (Opp. at 12), Medtronic identifies nothing it could not do during the inspection to explore the relevant functionality. *Id.* Axonics identified the document Medtronic now relies upon (**Ex. 53 (AX1172714), DAF 93**) by number in an August 30, 2022 email about [REDACTED], over a month before Medtronic's final infringement contentions and over two months before Medtronic's expert report in which Medtronic's expert cited the document for a different purpose. **DAF 103, 144**. Despite this discovery, Medtronic's expert never once said that [REDACTED] renders any temperature limit programmable. **DAF 103, 144**.<br><br>Axonics objects under FRE 402, 403, 37. | |

**Claim for Relief No. 4: Axonics Is Entitled to Summary Judgment on Non-Infringement of the Asserted Claims of the 112 Patent Based on the Limitation "a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device"**

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 33. Temperature is a property measured in degrees.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 71:22-73:2, *see also, e.g., id.* at 21:1-8, 219:2-220:2. | **Disputed** in that material facts have been omitted from Axonics' statement. Axonics statement refers to a patent claim term – "temperature" – in the asserted '112 and '324 patents without citing any support in the intrinsic record of the patents for its statements. Medtronic does not dispute |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| | that a temperature can be measured in degrees, but Medtronic disputes that a temperature must be measured in degrees.<br><br>Dkt No. 163 (SM R&R re Claim Construction) at 38–39. |
| 33. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic identifies no evidence in the asserted patents or anywhere else to support its argument—contrary to elementary scientific knowledge—that temperature may be measured in something other than degrees. Medtronic identifies no other unit in which temperature is measured, and Medtronic's own expert described temperature in degrees, as is shown in the deposition testimony Axonics cites. Medtronic identifies no evidence showing and provides no explanation for asserting that temperature can be measured in any unit other than degrees. Additionally, finding this fact is not necessary to granting Axonics' motion. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 34. Heat is measured in joules of energy.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 70:21-71:2; 71:22-73:2. | **Disputed** in that material facts have been omitted from Axonics' statement. Axonics statement refers to a patent claim term – "heat" – in the asserted '112 patent without citing any support in the intrinsic record of the patent for its statements. In general, Medtronic does not dispute that heat can be measured in joules of energy, but Medtronic disputes that a heat must be measured in joules of energy.<br><br>*See, e.g.*, Nisbet Decl., Ex. 5 (Mihran Dep. Tr., 89:17–90:21). |
| 34. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic identifies no evidence in the asserted patents or anywhere else to support its argument—contrary to elementary scientific knowledge—that heat may be measured in something other than joules. Medtronic identifies no other unit in which heat is measured, and Medtronic's own expert described heat in joules, as is shown in the deposition testimony Axonics cites. Medtronic identifies no evidence showing and provides no explanation for asserting that heat can be measured in any unit other than joules. Additionally, finding this fact is not necessary to granting Axonics' motion. | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 35. Temperature and heat are not the same thing.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 70:21-71:2; 71:22-73:2. | **Disputed.** Material facts have been omitted from Axonics' statement. Axonics statement refers to a patent claim terms – "temperature" and "heat" – in the asserted '112 patent without citing any support in the intrinsic record of the patent for its statements. Temperature and heat are related. A measured temperature can be indicative of heat and heat can result in temperature changes.<br><br>*See, e.g.*, Dkt. 28-4 ('112 patent specification); Nisbet Decl., Ex. 5 Mihran Dep. Tr., 89:17–90:21; Dkt. 360-6 (Expert Report of Richard T. Mihran, ¶¶ 367, 448–481). |
| 35. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic identifies no evidence in the asserted patents or anywhere else to support its argument—contrary to elementary scientific knowledge—that heat may be measured in something other than joules. Medtronic identifies no other unit in which heat is measured, and Medtronic's own expert described heat in joules, as is shown in the deposition testimony Axonics cites. Medtronic identifies no evidence showing and provides no explanation for asserting that heat can be measured in any unit other than joules. Additionally, finding this fact is not necessary to granting Axonics' motion. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 36. Temperature at a point in time does not account for heat dissipation and the interaction of the device with the environment and does not indicate how much heat has been generated by the charging process.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 68:12-69:17, 71:22-74:5. | **Disputed.** Axonics' charger infringes the asserted claims of the '112 patent because [redacted]<br><br>*See, e.g.*, Dkt. 360-6 (Expert Report of |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Richard T. Mihran, ¶¶ 367, 448–481). |
| 36. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic's statements are non-responsive to the fact. Medtronic does not dispute that "[t]emperature at a point in time does not account for heat dissipation and the interaction of the device with the environment and does not indicate how much heat has been generated by the charging process." Medtronic makes a different point regarding its theory of infringement. Medtronic's theory of infringement is not supported by the evidence cited. Medtronic's assertion does not state its basis for disputing the fact. Additionally, finding this fact is not necessary to granting Axonics' motion. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |
| 37. Medtronic's expert was asked "What else would you need to know and use in order for temperature to provide an indication of heat resulting from the charging process?" and he responded that one needs to account for at least the thermal mass of the material being measured, the rate of heat (energy production), the dissipation of heat from different portions of the device (which may vary depending on the environment), and initial conditions.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 83:23-85:16. | **Disputed** in that Axonics' statement imprecisely paraphrases Dr. Mihran's response and it mischaracterizes Dr. Mihran's testimony in this passage which was not about the patent claims or the accused products but was about how one could theoretically ***quantify*** the joules of thermal energy produced in a hypothetical scenario.<br><br>*See, e.g.*, Nisbet Decl., Ex. 5 (Mihran Dep. Tr. at 84:10–85:7; 86:1–90:21). |
| 37. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that the question quoted in the fact was accurate. The testimony of Dr. Mihran that is described supports Axonics: | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| [redacted]." **Ex. 13**, Mihran Dep. at 84:12-85:7. Medtronic does not identify anything imprecise about Axonics' characterizations. Medtronic's assertions to attempt to limit its expert's testimony are contradicted by Medtronic's own expert's testimony. Medtronic's expert testified about what one would [redacted]" *Id.* Medtronic argues this testimony relates to a hypothetical scenario, but even if that is true, it is the relevant scenario with a charger. This does not support Medtronic's assertions or create a genuine dispute of material fact. | |
| 38. In order to gain information on charging from temperature (e.g., whether a temperature is caused by external conditions or charging), that would require not one temperature datapoint, but data showing how temperature is changing over time as a function of the operating conditions of the device.<br><br>*Evidence*: **Ex. 13**, Mihran Dep. at 92:6-93:16, 98:18-100:11. | **Disputed** in that Axonics' statement imprecisely paraphrases Dr. Mihran's response and it mischaracterizes Dr. Mihran's testimony in this passage which was not about the patent claims or the accused products but was about how one could theoretically ***quantify*** the joules of thermal energy produced in a hypothetical scenario. [redacted]<br><br>*See, e.g.*, Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 84:10–85:7; 86:1–90:21; 93:17–98:17; Dkt. 360-6 (Expert Report of Richard T. Mihran, ¶¶ 367, 448–481). |
| 38. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. The testimony of Dr. Mihran that is described supports Axonics:<br><br>[redacted] | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| ." **Ex. 13**, Mihran Dep. at 92:6-93:16.<br><br>Medtronic does not identify anything imprecise about Axonics' characterizations. Medtronic's assertions to attempt to limit its expert's testimony are contradicted by Medtronic's own expert's testimony. Medtronic's expert testified about what "you wouldn't" be able to do with one datapoint but "could" through continuous monitoring. *Id.* Medtronic argues this testimony relates to a hypothetical scenario, but even if that is true, it is the relevant scenario with a charger. Medtronic makes the further assertion related to its infringement allegations related to Axonics' charging device. Medtronic's theory of infringement is not supported by the evidence cited. Nor does Medtronic provide any basis or explanation for how Medtronic's unexplained infringement theory is a basis to dispute the facts that Medtronic's expert admitted. This does not support Medtronic's assertions or create a genuine dispute of material fact. | |
| 39. In the Axonics accused charger, | **Disputed.** Axonics has not established |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| [redacted]. *Evidence*: **Ex. 13**, Mihran Dep. at 106:8-107:7. | this. Dr. Mihran testified as follows: "Q. [redacted] A. [redacted] Q. Right. So just to take two scenarios. [redacted] A. [redacted] Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 106:8–107:7. |
| 39. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic quotes its expert's testimony, which confirms that he i [redacted]. | |

| **Axonics' Undisputed Facts and Supporting Evidence** | **Medtronic's Response to Cited Fact and Supporting Evidence** |
| --- | --- |
| Medtronic does not dispute the expert testimony it quotes, and provides no explanation of how any such testimony would create a dispute. To the contrary, the testimony that Medtronic admits supports Axonics' stated fact. | |
| 40. [redacted]<br><br>*Evidence*: **Ex. 63**, AX1091356 at AX1091359 (Exhibit 8 to the deposition of Dr. Irazoqui). | **Disputed** in that Axonics has not shown that [redacted].<br>In addition, material facts have been omitted from Axonics' statement. According to Axonics documents, [redacted]<br><br>*See, e.g.*, Dkt. 360-6 (Expert Report of Richard T. Mihran) at ¶¶ 19, 197–204, 505–506; Nisbet Decl., Ex. 22 (AX0138739) at 745; Nisbet Decl., Ex. 12 (AX1172714) at 715, 718–9, 777–780; Nisbet Decl., Ex. 13 (AX1091356 at 358, 360, 387–8). |
| 40. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic asserts that Axonics did not provide evidence to show that [redacted] [redacted]sonnel. But Medtronic does not dispute that Axonics accurately quotes the document cited. Additional supporting evidence was also provided in **DAF 90-92**. It is Medtronic that has identified no supporting evidence to dispute that [redacted]. Contrary to Medtronic's initial assertion, Medtronic confirms that [redacted] While Axonics does not agree with all of Medtronic's characterizations, [redacted], and Medtronic identifies nothing showing that [redacted], and it is not. Medtronic raises no genuine dispute of material fact that precludes summary judgment. | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| There is no genuine dispute of material fact. Medtronic alleges that material facts have been omitted, but that is not the case, and there is no fact that Medtronic identifies that would create a dispute of the fact as stated. Medtronic makes assertions about [REDACTED] functionality, which is not the subject of the fact and does not create a genuine dispute of material fact.<br><br>Axonics also objects to Medtronic's reliance on any evidence related to [REDACTED] to allege infringement because such contentions are untimely. It is not in Medtronic's infringement contentions or expert report, and Axonics objected when Medtronic questioned Axonics' expert about this previously undisclosed theory. **DAF 103, 144**. Medtronic's suggestion that it is allowed to add whole new theories of infringement now when it was provided [REDACTED] discovery during fact discovery is not plausible and a plain violation of Rule 26 and this Court's Scheduling Orders. Opp. at 12. Medtronic knew about [REDACTED] in time to have its expert opine about how Medtronic now claims it supposedly infringes because the same expert in the same report relied upon [REDACTED] extensively, just ***not for that***. *Id.* Medtronic's expert had access to operable [REDACTED] and a charging device. While Medtronic now argues about the conditions of the inspection (Opp. at 12), Medtronic identifies nothing it could not do during the inspection to explore the relevant functionality. *Id.* Axonics identified the document Medtronic now relies upon (**Ex. 53 (AX1172714), DAF 93**) by number in an August 30, 2022 email about [REDACTED], over a month before Medtronic's final infringement contentions and over two months before Medtronic's expert report in which Medtronic's expert cited the document for a different purpose. **DAF 103, 144**. Despite this discovery, Medtronic's expert never once said that [REDACTED] renders any temperature limit programmable. **DAF 103, 144**.<br><br>Axonics objects under FRE 402, 403, 37. | |

**Claim for Relief No. 5: Axonics Is Entitled to Summary Judgment That the Asserted Claims of the 314 and 756 Patents Are Indefinite**

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 41. Every asserted claim of U.S. Patent Nos. 8,626,314 and 8,036,756 (the 314 and 756 Patents) recites the term a "plurality of tine elements."<br><br>*Evidence*: **Ex. 5** (314 Patent) at Claims 1, | **Undisputed.** |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| 2, 10–12, and 18–24; **Ex. 55** (756 Patent) at Claims 14, 18. | |
| 42. During claim construction briefing and at the claim construction hearing, Medtronic contended that "element" and "portion" were synonyms, and would mean "part of a whole" to a person of ordinary skill in the art.<br>*Evidence*: Dkt. No. 115 at 6, n.5; **Ex. 1** (Medtronic Claim Construction Hearing slides) at 14. | **Disputed.** Medtronic cited and relied upon the dictionary definitions of "element" and "portion," and their definitions as supporting that the "disputed term [plurality of tine elements] does not require separate structures." Dkt. No. 115 at 6. These dictionary definitions were relied upon in the context of the argument that "'Element' does not indicate separate structure…" Dkt. 358-1 (Medtronic Claim Construction Hearing slides) at 14. |
| 42. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that it contended these terms to be both synonymous and mean "part of a whole" to a person of ordinary skill. Medtronic cited and relied upon the dictionary definitions of "element" and "portion" for this exact purpose. Dkt. No. 115 at 6, n.5 ("Contemporaneous dictionaries define 'element' as 'a part of a whole,' which as used in the context of the tined lead patents is synonymous with 'portion.'"). That Medtronic did so with the intent to support its argument during claim construction does not change that it made these contentions or place that fact into dispute. | |
| 43. At the claim construction hearing, Medtronic told the Special Master that, with respect to "element" and "portion," "[t]here's no indication that anything other than the ordinary use of the term would be relevant here."<br>*Evidence*: **Ex. 2** (Claim Construction Hearing Transcript) at 42:18-20. | **Disputed** to the extent that the quote is incomplete and was made in the context of the parties' claim construction dispute and Medtronic's argument that "there is no reference to 'structure'…" Nisbet Decl., Ex. 4 (9/7/22 Claim Construction Hr'g Tr.) at 42:20–24. |
| 43. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. Medtronic does not dispute that it made these contentions to the Special Master at the claim construction hearing. That Medtronic did so within the context of its argument | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| during claim construction does not change that it made these contentions or placed that fact into dispute. The additional context Medtronic cites, in which their counsel stated "there is no reference to 'structure' there" (**Ex. 2** (Claim Construction Hearing Transcript) at 42:23), affirms that Medtronic argued to the Court that only the "ordinary use" of the term "element" was relevant and denied that its proposed construction requires a particular structure, a position which it now contradicts by asserting a tine element must encircle the lead. There is no dispute of this fact. | |
| 44. One of ordinary skill in the art applying the meaning of "portion" and "element" advanced by Medtronic and adopted by the Special Master in his construction of a "plurality of tine elements" to the Axonics helical tine structure could reasonably come to different conclusions concerning the number of "tine elements" it had, including that it has sixteen tine elements, each comprising one tine.<br>*Evidence*: **Ex. 4** (1/8/23 Chai Depo.) at 170:5-24; *id.* at 195:11-23. | **Disputed.** Dr. Chai testified based on his analysis that "there would not be 16 portions or parts," expressly disagreeing with "another person [who] could look at it and say there would be 16 tined elements." Nisbet Decl., Ex. 19, (1/8/2023 Chai Dep. Tr. at 170:5-24; see also id. 195:11–199:2 ("I see three elements based on my analysis.")) Dr. Chai rejected Axonics' counsel's presumption "that different persons of ordinary skill might come up with different answers in applying the Special Master's construction" stating that he "believe[s] that everybody who gets asked with these set of definitions would come up with a similar analysis." Id. at 198:6–18. |
| 44. Axonics Response: Medtronic fails to raise a genuine dispute as to this fact. The testimony Medtronic has identified by its expert does not dispute that one of ordinary skill in the art could reasonably come to different conclusions concerning the number of tine elements in the Axonics helical tine structure. While the parties' experts disagree regarding the number of "tine elements" present in the Axonics helical tine structure, Dr. Chai's testimony regarding his opinion on this issue does not dispute that another POSITA could reasonably come to a different conclusion. Medtronic's expert may believe there are three tine elements, but this does not mean another POSITA could not reasonably conclude otherwise. Nor did he reject that different persons of ordinary skill could reach a different conclusion on the number of "tine elements." Medtronic's expert has explicitly agreed that another person could reach a different conclusion based on the Special Master's construction. **Ex. 4** (1/8/23 Chai Depo.) at 170:5-24 ("My analysis is there would not be 16 portions or parts. But I guess another | |

| Axonics' Undisputed Facts and Supporting Evidence | Medtronic's Response to Cited Fact and Supporting Evidence |
|---|---|
| person could look at it and say there would be 16 tined elements."). In response to a question about whether he believed this admission affected his opinion, Dr. Chai stated that he believes others "would come up with a similar analysis." **Ex. 70,** at 198:6–18. That is neither a retraction of his earlier admission nor a conclusion that another POSITA could not reasonably disagree with his analysis. This fact is not disputed. | |
| 45. Each asserted claim of the 314 and 756 Patents requires that each tine element of the plurality of tine elements possess two or more tines.<br>*Evidence*: **Ex. 5** (314 Patent) at Claims 1, 2, 10–12, and 18–24; **Ex. 55** (756 Patent) at Claims 14, 18. | **Undisputed.** |
| 46. The Special Master's construction of "plurality of tine elements" is "two or more ***parts or portions*** (each of which includes one or more tines) that are positioned along the length of the lead body and that may be formed as a single structure or as multiple structures".<br>*Evidence*: Dkt. No. 163-1 ("R&R") at 27. | **Undisputed.** |

## RESPONSE TO MEDTRONIC STATEMENT OF ADDITIONAL MATERIAL FACTS

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| 47. Claim 1 of the '069 Patent originally recited "an external power source… generating a current associated with said internal power source" and "an alignment indicator, operatively coupled to said internal power source, reporting said alignment as a function of said current." Thus, as originally filed, the alignment was reported as a function of the "current associated with said internal power source."<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000057). | Undisputed that the Claim 1 of the 069 Patent originally contained the language quoted. This does not support Medtronic's position; this supports Axonics' position. The more complete language of the limitations of Claim 1 of the 069 Patent is "an external power source having a primary coil, said external power source providing energy to said implantable medical device when said primary coil of said external power source is placed in proximity of said secondary coil of said implantable medical device and thereby generating a current associated with said internal power source" and "an alignment indicator, operatively coupled to said internal power source, reporting said alignment as a function of said current." MDT Ex. 1 (MDT-00000001, at MDT-00000057).<br><br>Medtronic's assertion, which is lawyer argument, "Thus, as originally filed, the alignment was reported as a function of the 'current associated with said internal power source,'" does not create a genuine dispute of material fact because Medtronic's characterization is factually unsupported. It is undisputed that original Claim 1 of the 069 Patent described an alignment indicator reporting alignment as a function of the "current associated with said internal power source." This does not support Medtronic's position; this supports Axonics' position. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | |
| 48. The examiner rejected claims 1–31 based on U.S. Patent No. 5,690,693 ("Wang") disclosing an alignment indicator 40 within external TET device 50 (i.e., the external charger) and coupled to the primary coil 9, rather than within implanted medical device 14 and coupled to battery 13.<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000375–376); Nisbet Decl., Ex. 2 (U.S. Patent No. 5,690,693 ("Wang"), Fig. 2). | Undisputed that the Examiner rejected Claims 1-31 based on U.S. Patent No. 5,690,693 ("Wang"). Medtronic's characterization of the examiner's rejection based on Wang is not accurate and not a material fact. The Examiner stated that "[t]he IMD has an internal power source 13 (i.e., a rechargeable battery) and a secondary coil 10 coupled to the power source," adding that "Wang discloses an alignment indicator that is operatively coupled to the internal power source, which reports proper alignment based on the input current." MDT Ex. 1 at MDT-00000375-376. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. |
| 49. The applicant argued that "Wang et al '693 explicitly discloses that the alignment indicator utilizes a measurement of the magnitude of the input current to the primary coil" and therefore failed to "show, disclose or suggest, and in fact teaches away from, the alignment indicator being operatively coupled to the internal power source."<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000390). | Undisputed that the applicant made the quoted statements as part of the applicant's arguments during prosecution.<br><br>This is not a material fact to summary judgment. Nor does this raise a genuine dispute of fact. Medtronic's selection of these quotations does not support narrowing the scope of disclaimer during prosecution or narrowing the scope of subject matter foreclosed by prosecution history estoppel. |
| 50. Because Wang measures current in the external charger, the applicant argued that "Wang '693 specifically discloses measuring the current associated with the external power source" and fails to disclose "an alignment indicator, | Undisputed that the applicant made the quoted statements as part of the applicant's arguments during prosecution.<br><br>This is not a material fact to summary judgment. Nor does this raise a genuine |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| operatively coupled to said internal power source, reporting said alignment as a function of said current."<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000390, MDT-00000386). | dispute of fact. Medtronic's characterization of the examiner's rejection based on Wang is not accurate and not a material fact. Medtronic's selection of these quotations does not support narrowing the scope of disclaimer during prosecution or narrowing the scope of subject matter foreclosed by prosecution history estoppel. |
| 51. The examiner argued that, because "Wang discloses that the alignment is reported based on the input DC current, which depends on the power draw of the internal power source" and "[s]ince power is calculated by the known equation P=VI," "the current of the internal power source directly affects the operation of the alignment indicator" located in the external charger of Wang. In other words, the examiner took the position that the current measured by Wang's alignment indicator in the external charger is "associated with" the internal battery.<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000403). | Undisputed that the Examiner made the following statement:<br><br>"Wang discloses that the alignment is reported based on the input DC current, which depends on the power draw of the internal power source" and "[s]ince power is calculated by the known equation P=VI, the current of the internal power source directly affects the operation of the alignment indicator."<br><br>Medtronic's characterization using "other words" about the examiner's position, and specifically the alleged conclusion that the current measured in Wang's alignment indicator is "associated with" the internal battery is not a fact, not material, and not supported by sufficient evidence to raise a genuine dispute of fact. |
| 52. In response, the applicant amended the limitation "thereby generating a current associated with said internal power source" to "thereby generating a current through said internal power source."<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000386, MDT-00000408). | Undisputed that the applicant amended the claim language as noted. This does not support Medtronic's position; this supports Axonics' position. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | |
| 53. This amendment foreclosed using the current in the external charger as "said current" for alignment reporting.<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000408). | Undisputed that one approach foreclosed by the amendment was using current in the external charger. Medtronic's characterization about the import of the amendment and the scope of the disclaimed subject matter is not a material fact, it is a legal conclusion, it is factually unsupported, and does not create a genuine dispute of fact. |
| 54. The applicant stated, "claims 1 and 21, as amended, recite that the alignment indicator reports alignment as a function of a current through the internal power source. Wang et al '693 teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source."<br><br>Nisbet Decl., Ex. 1, (MDT-00000001, at MDT-00000413); see also Nisbet Decl., Ex. 1, at MDT-00000431) ("Thus, Wang et al '693 does not show, disclose or suggest, and in fact teaches away from reporting the alignment of the primary and secondary coils as a function of the current <u>through the internal power source</u>. Instead, Wang et al '693 specifically discloses measuring the current associated with the <u>external power source</u>."). | Not a genuine dispute of material fact. Medtronic's quotation of this record document is incomplete leaving out important additional language that shows why there is no genuine dispute of material fact and supporting Axonics' position. The actual, complete quotation is not genuinely disputed and supports Axonics. Medtronic's statement is not supported by evidence sufficient to create a genuine dispute of fact. This does not support Medtronic's position; this support Axonics' position.<br><br>Medtronic actually said during prosecution "claims 1 and 21, as amended, recite that the alignment indicator reports alignment as a function of a current <u>through the internal power source</u>. As noted above, not only does Wang et al '693 not show, disclose or suggest this subject matter, Wang et al '693 teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source." MDT Ex. 1, (MDT- |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | 00000001, at MDT-00000413). Medtronic omits important language from the quotation: "As noted above, not only does Wang et al '693 not show, disclose or suggest this subject matter, . . . ." The applicant emphasized "through the internal power source," and this was omitted from the quote in the statement. *Id.*<br><br>It is undisputed that the parenthetical quote from MDT-00000431 is accurate.<br><br>This language supports Axonics, not Medtronic, and shows there is no genuine dispute that Medtronic distinguished the art based on "current through the internal power source," and that other currents were disclaimed by argument or amendment. |
| 55. The examiner stated, "the applicant argues that Wang does not teach measuring a current generated in the internal power source and then using the internal current to report alignment. However, the claims never require that the internal current, or any current for that matter, to be measured."<br><br>Nisbet Decl., Ex. 1 (MDT-00000001, at MDT-00000441). | Undisputed that the examiner made the quoted statements. This statement by the examiner is supportive of Axonics' motion and helps to show the absence of a genuine dispute of material fact. Specifically, this statement is supportive of Axonics' position with respect to the proper scope of disclaimer for purposes of application of the doctrine of equivalents. In any event, this statement does not support a genuine dispute of fact in support of Medtronic. |
| 56. In response, the applicant amended the claims to include the limitation at issue, "measuring said current." | Undisputed that the applicant made the quoted amendment. This is an undisputed material fact in support of Axonics' motion for summary judgment as it |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Nisbet Decl., Ex. 1 (MDT-00000001, at MDT-00000452). | supports Axonics' position with respect to the proper scope of disclaimer for purposes of application of the doctrine of equivalents. In any event, this statement does not support a genuine dispute of fact in support of Medtronic. |
| 57. The applicant continued to argue that the distinction between the Wang reference and the amended claims was that Wang "teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source."<br><br>Nisbet Decl., Ex. 1 (MDT-00000001, at MDT-00000457). | Undisputed that the applicant made the quoted statement as part of the applicant's arguments during prosecution. Medtronic's characterization of this portion of the prosecution history is not a material fact and does not create a genuine dispute of facts. Moreover, the statement is supportive of Axonics' motion and helps to show the absence of a genuine dispute of material fact. Specifically, this statement is supportive of Axonics' position with respect to the proper scope of disclaimer for purposes of application of the doctrine of equivalents. In any event, this statement does not support a genuine dispute of fact in support of Medtronic. |
| 58. Wang does not disclose the accused equivalent – measuring a current in the implant as a proxy for the actual current through the battery.<br><br>Nisbet Decl., Ex. 2 (Wang, Fig. 2); Nisbet Decl., Ex. 1 (MDT-00000001, at MDT-00000403). | Undisputed that the operation described for Wang and the operation of Axonics product alleged to be equivalent are not identical. Medtronic's characterization is not a material fact, nor is the fact in question material to the scope of the disclaimer because for the reasons Axonics has explained Medtronic cannot carry its burden of showing that the reason for the amendment was tangential to the alleged equivalent.<br><br>Axonics incorporates as if stated in full herein its response to DAF 59. As shown |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | in DAF 59, Wang describes a system that does not disclose the use of a measured current through the internal power source. The alleged equivalent also does not use a measured current through the internal power source. |
| 59. The scope of surrender based on the objectively apparent reasons for the amendment is limited to "measuring the current through the external power source."<br><br>Nisbet Decl., Ex. 1 (MDT-00000001, at MDT-00000456) | Not a statement of fact supported by evidence but an erroneous lawyer argument and legal conclusion insufficient to create a genuine dispute of material fact. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. This is also not a material fact to summary judgment, and Medtronic's characterizations of this are not a material fact. This improperly includes legal conclusions and assumptions contrary to the law, which is addressed in Axonics' Reply.<br><br>The scope of the surrender includes currents other than "current through the internal power source." The scope of the surrender is not "measuring the current through the external power source." Medtronic's statement is not supported by the facts and raises no genuine dispute of fact. The scope of the surrender includes currents other than "current through the internal power source."<br><br>The applicant made two relevant amendments to claims of the 069 Patent, as described in SUF 2-4, which Axonics incorporates as if stated in full herein. Medtronic confirmed that the narrowing of "current ***associated with***" to "current ***through***" was to "clarify" by using the |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | "more definite 'through'" and by requiring use of "the current that ***passes through*** the internal power source." SUF 2-5; Ex. 45 at MDT-00000408, 412, 426, 430, 451-461. In particular, the applicant said "Independent claims have been amended solely to clarify the language of the current rather than being 'associated with' the internal power source to the more definite 'through' the internal power source. This amendment will present the claims in better form for appeal." *Id.* at MDT-00000412. The applicant also said "Claims 1 and 21 have been amended to clarify the claims by reciting that the current of which the alignment is a function is the current that passes through the internal power source." *Id.* at MDT-00000412, 430.<br><br>Medtronic included as a basis for distinguishing the prior art that it did not use "current through the internal power source." For example, the applicant said "Claims 1 and 21, as amended, recite that the alignment indicator reports alignment as a function of a current through the internal power source. As noted above, not only does Wang et al '693 not show, disclose or suggest this subject matter, Wang et al '693 teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source." MDT Ex. 1/ Ex. 45 (MDT-00000001, at MDT-00000413). The applicant emphasized "through the internal power source," confirming its relevance. *Id.* |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Medtronic argued during prosecution following the second amendment, "claims 1 and 21, as amended, recite that the alignment indicator reports alignment by ***measuring and reporting*** alignment based on ***current . . . through the internal power source*** . . . . As noted above, ***not only*** does Wang et al '693 not show, disclose or suggest ***this subject matter***, Wang et al '693 teaches away from basing the alignment indicator on the current through the internal power source by teaching the use of current associated with the external power source." MDT Ex. 1/ Ex. 45 at MDT-00000456-457.<br><br>This prosecution history supports Axonics. The applicant distinguished the art based on its failure to disclose "current through the internal power source." That alone is sufficient to show that the scope of the surrender includes the currents other than the "current through the internal power source." Moreover, the applicant specifically argued separately as evidenced by the "not only" language that the prior art relied on the external device and did not disclose the use of current through the internal power source.<br><br>The second amendment that requires measuring further confirms the that the surrender included "current through the internal power source." Following the first amendment, the examiner said that "***the claims never require that the internal current*** . . . be measured." MDT Ex. 1 (MDT-00000001, at MDT-00000441). |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | The claims were amended to add the "measuring" requirement. As the above argument during prosecution shows, Medtronic argued the prior art lacked measuring not just any internal current but the current through the internal power source, and the amendments narrowed the claims to just the measured current through the internal power source, excluding all other currents. |
| 60. [Intentionally Omitted] | [Intentionally Omitted] |
| 61. [Intentionally Omitted] | [Intentionally Omitted] |
| 62. [Intentionally Omitted] | [Intentionally Omitted] |
| 63. [Intentionally Omitted] | [Intentionally Omitted] |
| 64. [Intentionally Omitted] | [Intentionally Omitted] |
| 65. [Intentionally Omitted] | [Intentionally Omitted] |
| 66. [Intentionally Omitted] | [Intentionally Omitted] |
| 67. [Intentionally Omitted] | [Intentionally Omitted] |
| 68. [Intentionally Omitted] | [Intentionally Omitted] |
| 69. Axonics [redacted]<br><br>*Compare* Dkt 198-47 (AX0048868) *with* the following: Dkt. 360-6 (Expert Report | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization of this is not a material fact. Medtronic identifies no way that its argument may be presented at trial. It was not offered by Medtronic's expert. It is not supported by the documents. It is not supported by Axonics' expert.<br><br>The paragraphs Medtronic cites from its |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| of Richard T. Mihran) ¶¶ 641, 762-767, 927-928, 933-937; Nisbet Decl., Ex. 6 (AX0002900, at AX0002902); Nisbet Decl., Ex. 7 (AX0000439 at AX0000439); Nisbet Decl., Ex. 8 (Rebuttal Expert Report of Pedro Irazoqui (December 18, 2022) at ¶ 278). | expert's report neither show the absence of [REDACTED] nor support the incorrect interpretation of the [REDACTED] that Medtronic's attorneys propose for the first time here. In fact, much of what Medtronic cites from Dr. Mihran highlights that there is [REDACTED] Medtronic cites paragraphs of Dr. Mihran's report that do not even relate to the relevant claim term.<br><br>Mihran paragraph 641 describes how [REDACTED] Dkt. 360-6 , [REDACTED]. This paragraph appears not in a discussion of the relevant claim term, but in a discussion related to 148 Patent "Claim 6[d] wherein said external power source automatically varies its power source output based on a measured voltage associated with said current passing through said internal battery." *Id.* at p. 266.<br><br>Mihran paragraphs 762-767 describe [REDACTED] |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted]. These paragraphs appear not in a discussion of the relevant claim term, but in a discussion related to 758 Patent "Claim 1[c]: wherein said external power source automatically varies its power output based on a value associated with said current passing through said internal power source." *Id.* at p. 313.<br><br>Mihran paragraphs 927-928 describe [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | This supports Axonics' argument and says nothing about either or to refute that this is . To the contrary, this proves that Medtronic's attorneys' arguments about are incorrect and there is a <br><br> Mihran paragraphs 933-937 show the opposite of what Medtronic argues, and beyond that is an inaccurate description of |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | the document relied upon and the system. First,  |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Ex. 9 [Mihran Rpt.], ¶ 933 (highlighting added).<br><br>The above data thus confirms He in fact offered no such opinion. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | The rest of the evidence cited by Medtronic similarly does not support finding there is [REDACTED] *Id.*<br><br>[REDACTED]<br><br>[REDACTED] |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | |

AXONICS' REPLY TO MEDTRONIC'S STATEMENT OF ADDITIONAL FACTS 45 Case No. 8:19-cv-02115-DOC-JDE

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Medtronic's Exhibit 7 is |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | This is consistent with the data in Dr. Mihran's own report that shows [redacted]<br><br>Axonics' expert Dr. Irazoqui provides no support for Medtronic's statement. Instead, the paragraph of Dr. Irazoqui's report cited by Medtronic says exactly the opposite: [redacted]" MDT Ex. 8, ¶ 278.<br><br>This statement is inaccurate and unsupported by any evidence. Moreover, there is no way for this argument to be introduced at trial. Medtronic's expert did not offer this opinion. No Medtronic witness can provide testimony about the confidential aspects of operation of Axonics' system. Axonics' expert offered no such opinion, nor will he as it is an inaccurate description of the system operation. Medtronic asked no Axonics witness about this, and no Axonics witness would inaccurately describe the operation of their own system as Medtronic has. |
| 70. The data sheet for the battery charging chip (BQ24040) (AX0048868) states that the voltage regulation phase of the battery charging chip only begins if the battery voltage (VO(REG)) reaches the "regulation voltage," which is set to 4.20 volts.<br><br>Dkt 198-47 (AX0048868) at 871, 874, | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization of this is not a material fact. Medtronic identifies no |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| 879 ("*Once the cell has charged to the regulation voltage* the voltage loop takes control and holds the battery at the regulation voltage until the current tapers to the termination threshold."). | way that its argument may be presented at trial. It was not offered by Medtronic's expert. It is not supported by the documents. It is not supported by Axonics' expert. This is an inaccurate description of the document. Axonics incorporates as if stated in full herein its response to DAF 69. |
| 71. Axonics' Dkt 198-47 (AX0048868); Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 641, 762–767, 927–928, 933–937; Nisbet Decl., Ex. 6 (AX0002900, at AX0002902); Nisbet Decl., Ex. 7 (AX0000439 at AX0000439); Nisbet Decl., Ex. 8 (Rebuttal Expert Report of Pedro Irazoqui (December 18, 2022) at ¶ 278). | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization of this is not a material fact. Medtronic identifies no way that its argument may be presented at trial. It was not offered by Medtronic's expert. It is not supported by the documents. It is not supported by Axonics' expert. Medtronic's statement is an inaccurate description that no reasonable juror could |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | find for Medtronic based on the evidence upon which Medtronic purports to rely. Axonics incorporates as if stated in full herein its response to DAF 69. [redacted] |
| 72. Medtronic's expert identifies [redacted]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 927–928. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact.<br><br>Axonics incorporates as if stated in full herein its response to DAF 69. As described in DAF 69, Axonics' products have [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted] |
| 73. Dr. Mihran's includes graphs in his expert report that show [redacted] | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
|  Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 917–20, 929–31, 1215–18, 1227–29. | lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
|  |  |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted] Ex. 44, ¶¶ 394-96. |
| 74. Dr. Mihran's includes graphs in his expert report that show tha [redacted] Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 917–20, 929–31, 1215–18, 1227–29. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization is factually unsupported and does not create a genuine dispute of fact. Axonics incorporates as if stated in full herein its response to DAF 70.<br><br>As stated in DAF 70, no reasonable juror could find that [redacted] |
| 75. The fact that [redacted] | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion |

| **Medtronic Additional Material Fact** | **Axonics' Response** |
|---|---|
| [redacted]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 917–20, 929–31, 1215–18, 1227–29. | that is not supported by the evidence on which Medtronic purports to rely. Contrary to the claim construction. *See* DAF 74.<br><br>Medtronic misstates that data and assumes facts. Axonics' expert, Dr. Irazoqui, zoomed in on Dr. Mihran's data and confirmed [redacted] *See* DAF 73. [redacted] Ex. 44, ¶ 398.<br><br>Also, Medtronic's argument that "this [redacted] does not bring Axonics' system within the Special Master's claim construction. The Special Master rejected a construction that would include "an inverse relationship between voltage and current 'at any instance.'" Dkt. No. 163-1("R&R") at 83. Whether or not "instantaneous," [redacted] |
| 76. A current declining while the battery voltage continues to increase is within the scope of the Special Master's construction.<br><br>Dkt. No. 163-1 ("R&R") at 75–86. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Medtronic's assertion is not an accurate recitation of the Special Master's construction and Medtronic's attempts to show infringement by applying its incomplete and therefore inaccurate gloss on the Special Master's construction cannot give rise to a genuine dispute of material fact.<br><br>The Special Master construed the term "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle" to mean "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle, ***which does not include instances in which said current passing through said internal power source declines only after the voltage of said internal power source increases during a charging cycle, and which does not include a two-phase charging cycle with a constant current phase followed by a roughly constant voltage phase***." Dkt. No. 163-1 ("R&R") at 85 (emphasis added). |
| 77. Dr. Mihran shows in his report the following plot which | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's expert's opinion that "the following plot which ,''" is |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 928–31, 1226–29. | factually unsupported and does not create a genuine dispute of fact. *See* DAF 69. For purposes of this motion, it is not disputed that "" This does not support Medtronic's position; this support Axonics' position.<br><br>Mihran paragraphs 927-928 describe |
| 78. Baumann shows battery voltage (U) at a constant maximum (UG) while battery current reduces in steps. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Not a material fact to summary judgment. To |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| <br>Dkt. No. 163-1 ("R&R") at 79 (citing IPR2020-00680 – Dkt. 111, Ex. 28, December 22, 2020 Patent Owner's Response at 27–28). | the extent that Medtronic fails to recite that the constant voltage phase is a roughly constant voltage Medtronic misstates the record and its statement is unsupported and cannot give rise to a genuine dispute of fact. Moreover, an accurate account of the disclosure of Baumann supports Axonics' motion for summary judgment.<br><br>The Special Master's claim construction order stated, "Medtronic thus stated that Baumann's disclosure of 'a constant current phase and a "roughly constant" voltage phase' did not disclose the 'declines as' limitation. Regardless of whether the PTAB adopted or relied upon these statements, Medtronic's statements amount to a clear and unmistakable disclaimer of a constant current phase followed by a roughly constant voltage phase." Dkt. No. 163-1 ("R&R") at 84.<br><br>The Special Master construed the term "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle" to mean "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle, which does not include instances in which said current passing through said internal power source declines only after the voltage of said internal power source increases during a charging cycle, and ***which does not include a two-phase charging cycle with a constant current*** |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | ***phase followed by a roughly constant voltage phase***." Dkt. No. 163-1 ("R&R") at 85 (emphasis added).<br><br>Medtronic fails to raise a genuine dispute of fact or explain how it can meet the Special Master's construction given that [REDACTED] present in the disclaimed Baumann reference and that were excluded from the Special Master's construction. |
| 79. The following plot [REDACTED]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 928–31, 1226–29. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's expert's opinion regarding the "following plot [REDACTED] is factually unsupported and does not create a genuine dispute of fact.<br><br>Axonics' expert, Dr. Irazoqui, found that this data [REDACTED]." Ex. 44, ¶ 398. Thus, [REDACTED] Dkt. No. 163-1 ("R&R") at 85. Medtronic argues there is a dispute regarding whether Axonics has a [REDACTED] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted] Medtronic appears to argue there may be [redacted] but no evidence supports that and Medtronic fails to raise a genuine dispute based on it. |
| 80. Medtronic and Dr. Mihran dispute Axonics' contention that [redacted].<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 928–31, 1226–29. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely.<br><br>As stated in DAF 79, Axonics' expert, Dr. Irazoqui, found that this data [redacted]" Ex. 44, ¶ 398. Thus, [redacted] the term "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle." Dkt. No. 163-1 ("R&R") at 85. |
| 81. The following plot illustrating the [redacted] | Undisputed that Dr. Mihran's data shows that [redacted]." This does not support Medtronic's position; this support Axonics' position. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 928–31, 1226–29. | Axonics incorporates as if stated in full herein its response to DAF 79. As described in DAF 79, |
| 82. As Axonics recognizes, <br><br> Dkt. 357-1 at 16. | Undisputed that <br><br> Otherwise, disputed, but this is not supported by evidence sufficient to create a genuine dispute of fact. This does not support Medtronic's position; this support Axonics' position. <br><br> Axonics stated in its Motion, taking Medtronic's allegations as true, |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted] The [redacted] is an unsupported assertion by Medtronic. |
| 83. Axonics [redacted] Nisbet Decl., Ex. 9 (AX0042175 at AX0042177). | Undisputed that during a test "[redacted]." Not a material fact to summary judgment. |
| 84. [redacted] | Undisputed that [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| [redacted] Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 928–36, 1226–35. | [redacted] his does not support Medtronic's position; this support Axonics. [redacted] he term "wherein said current passing through said internal power source declines as said voltage of said internal power source increases during a charging cycle." Dkt. No. 163-1 ("R&R") at 85.<br><br>Otherwise, not supported by evidence sufficient to create a genuine dispute of fact, specifically, [redacted] Axonics incorporates as if stated in full herein its response to DAF 82. |
| 85. Asserted claim 1 of the '112 patent recites: "a control circuit configured to compare the measured temperature to a programmable limit and to control the transfer of energy based on the comparison" and "a memory configured to store the programmable limit."<br><br>Dkt. 28-4 ('112 patent), cl. 1. | Undisputed that the quoted language includes two of the limitations of claim 1 of the 112 Patent. This is not a material fact. Nor does it raise a genuine dispute of fact. |
| 86. Claim 8 of the '112 patent (from which asserted claims 16 and 17 depend) recites "obtaining a programmable limit from a memory" and "comparing, via a control circuit, the temperature to the programmable limit." | Undisputed that the quoted language includes two of the limitations of claim 8 of the 112 Patent. This is not a material fact. Nor does it raise a genuine dispute of facts. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Dkt. 28-4 ('112 patent), cl. 8. | |
| 87. During claim construction, the parties disputed the meaning of the term "programmable limit" and the Special Master construed it to mean "a limit that can be programmed during or after manufacture.<br><br>Dkt. No. 163-1 ("R&R") at 63. | Undisputed that the Special Master construed the limitation "programmable limit" to mean "a limit that can be programmed during or after manufacture." However, Medtronic omits key reasoning of the Special Master stating that if the limit can only be programmed during manufacture then this does not constitute a programmable limit. Medtronic cannot create a genuine dispute of material fact based on its misinterpretation of the Special Master's construction that excludes the Special Master's reasoning and explanation. |
| 88. Dr. Mihran provides ample evidence that [REDACTED]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 197–198, 482–506 and 526–532. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. The characterization of Medtronic's own expert's opinions is not a material fact. Nor does it create a genuine dispute of facts. Further, Medtronic's expert's opinions are factually unsupported and do not create a genuine dispute of fact. Dr. Mihran does not provide evidence on which a reasonable juror could find that Medtronic's assertion is correct.<br><br>Medtronic ignores the Special Master's construction by arguing that the ability to be programmed ***during*** manufacture is enough. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | The Special Master expressly stated, "to whatever extent Medtronic is proposing that the 'programmable limit' term could be met by a limit that is programmable by the manufacturer at the time of production or shipping but that cannot subsequently be modified, such an interpretation would read out the word 'programmable.' To whatever extent this is disputed, all of the evidence discussed above supports finding that 'programmable limit' requires that the relevant limit in the completed apparatus must be programmable after the apparatus is shipped to distributors or customers for use." Dkt. No. 163-1 ("R&R") at 59-60.<br><br>Medtronic's suggestion that programmability during manufacture meets the Special Master's construction disregards the language of the R&R.<br><br>***All*** the functionality Medtronic points to for its claim that the temperature limits are programmable ***after shipment***, on the undisputed record, is only available to be used pre-shipment in Axonics' testing and development environment or would, even if it ever could be used after shipment, which Medtronic has no evidence to support, constitute wholesale replacement of the code, not programmable parameters. |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted]<br><br>To the extent Dr. Mihran argues there is programmability after shipment, the only evidence points to the fact that [redacted] DAF 90. This is not "programmed to be programmable" as required by the Special Master's construction. Medtronic raises no genuine dispute of material fact. Medtronic accuses nothing other than wholesale replacement of code with commodity functionality in the chip itself common to all computers. Axonics incorporates as if stated in full herein its responses to DAF 90 and 92.<br>Axonics objects under FRE 402, 403, 37. |
| 89. Dr. Mihran explains that that [redacted] | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. The |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 197–198, 482–506 and 526–532. | characterization of Medtronic's own expert's opinions is not a material fact. Nor does it create a genuine dispute of facts. Further, Medtronic's expert's opinions are factually unsupported and do not create a genuine dispute of fact. Dr. Mihran does not provide evidence on which a reasonable juror could find that Medtronic's assertion is correct.<br><br>Medtronic ignores the Special Master's construction by arguing that the ability to be programmed ***during*** manufacture is enough.<br><br>The Special Master expressly stated, "to whatever extent Medtronic is proposing that the 'programmable limit' term could be met by a limit that is programmable by the manufacturer at the time of production or shipping but that cannot subsequently be modified, such an interpretation would read out the word 'programmable.' To whatever extent this is disputed, all of the evidence discussed above supports finding that 'programmable limit' requires that the relevant limit in the completed apparatus must be programmable after the apparatus is shipped to distributors or customers for use." Dkt. 163-1 ("R&R")at 59-60.<br><br>Medtronic's suggestion that programmability during manufacture meets the Special Master's construction disregards the language of the R&R.<br><br>***All*** the functionality Medtronic points to for its claim that the temperature limits are programmable ***after shipment***, on the |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | undisputed record, is only available to be used pre-shipment in Axonics' testing and development environment or would, even if it ever could be used after shipment, which Medtronic has no evidence to support, constitute wholesale replacement of the code, not programmable parameters.<br><br>[REDACTED]<br><br>To the extent Dr. Mihran argues there is programmability after shipment, the only evidence points to the fact that [REDACTED] DAF 90. This is not "programmed to be programmable" as required by the Special Master's construction. Medtronic raises no genuine dispute of material fact. Medtronic accuses nothing other than |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | wholesale replacement of code with commodity functionality in the chip itself common to all computers. Axonics incorporates as if stated in full herein its responses to DAF 90 and 92. Axonics objects under FRE 402, 403, 37. |
| 90. Axonics corporate witness, Faizal Abdeen, admitted that [redacted] Nisbet Decl., Ex. 10 (Deposition Transcript of Faizal Abdeen ("Abdeen Dep. Tr.")) at 78:9–12, 82:19–83:5, 84:20–85:6, 86:8–22. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted]<br><br>Ex. 44 ¶ 223 includes in full Mr. Abdeen's testimony at 76:12-81:24.<br><br>This is not "programmed to be programmable" as required by the Special Master's construction. Medtronic raises no genuine dispute of material fact. Medtronic accuses nothing other than wholesale replacement of code with commodity functionality in the chip itself common to all computers. |
| 91. Axonics documents describe the [redacted]<br><br>Nisbet Decl., Ex. 11 (AX0000416, at AX0000417) [redacted] | Undisputed as to the text of the document, but Medtronic's characterization of the document is not a material fact, nor does it raise a genuine dispute of facts. Such documents include factory programming, which is excluded from the Special Master's construction. |
| 92. Axonics documents also identify that [redacted]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 197–198, 205–206 (*citing* Nisbet Decl., Ex. 12 (AX1172714)) | Undisputed as to the text of the document, is not supported by evidence sufficient to create a genuine dispute of fact. [redacted]<br><br>[redacted]. Ex. 9, Mihran Rpt., ¶¶ 19, 197-204; Ex. 52, Abdeen Dep. at |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | 51:10-14; Ex. 63, AX1091356 at AX1091359. SUF 32, 40.<br><br>[redacted]<br><br>Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 93. Axonics' document shows that [redacted]<br><br>Nisbet Decl., Ex. 12 (AX1172714, at AX1172777 [redacted] AX1172718 [redacted] | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization of the [redacted]<br>Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 94. Axonics' [redacted] | Undisputed as to the quote for the document. Not a statement of fact supported by evidence sufficient to create |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Nisbet Decl., Ex. 13 (AX1091356, at AX1091356–8, AX1091387) | a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. This does not support Medtronic's position; this supports Axonics' position.<br>Axonics objects to Medtronic's reliance on any evidence related to to allege infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 95. In addition to citing<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 197–198, 205–206, 482–532. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. The characterization of the import of Medtronic's own expert's opinions is not a material fact. Nor does it create a genuine dispute of facts. Further, Medtronic's expert's opinions are factually unsupported and do not create a genuine dispute of facts. *See* DAF 90.<br><br>Medtronic's expert, Dr. Mihran, relied entirely on testimony that the |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [REDACTED]. This is not "programmed to be programmable" as required by the Special Master's construction. In short, Medtronic raises no genuine dispute of material fact. Medtronic accuses nothing other than [REDACTED]. This is precisely what the claim construction does not allow.<br><br>Axonics objects to Medtronic's reliance on any evidence related to [REDACTED] to allege infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 96. But the claim term is "programmable limit" and the Special Master's construction only requires a limit that "can be" programmed during or after manufacture, and not a limit that has been re-programmed after shipping. Thus, to show infringement, Medtronic need only show that this limit can be programmed, not that it has been re-programmed after shipping.<br><br>Dkt. No. 163-1 ("R&R") at 63. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. This is not a material fact to summary judgment. This is legal argument and does not raise a genuine dispute of facts. The Special Master's claim construction is under review by the Court.<br><br>Medtronic ignores the Special Master's construction by arguing that the ability to be programmed ***during*** manufacture is enough. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | The Special Master expressly stated, "to whatever extent Medtronic is proposing that the 'programmable limit' term could be met by a limit that is programmable by the manufacturer at the time of production or shipping but that cannot subsequently be modified, such an interpretation would read out the word 'programmable.' To whatever extent this is disputed, all of the evidence discussed above supports finding that 'programmable limit' requires that the relevant limit in the completed apparatus must be programmable after the apparatus is shipped to distributors or customers for use." Dkt. No. 163-1 ("R&R") at 59-60.<br><br>Medtronic's suggestion that programmability during manufacture meets the Special Master's construction disregards the language of the R&R.<br><br>***All*** the functionality Medtronic points to for its claim that the temperature limits are [redacted] |
| 97. Axonics' own characterization of "programmable" as referring to a "limit that is able to be changed."<br><br>Dkt. No. 163-1 ("R&R") at 50. | Undisputed that Axonics proposed a construction for "programmable limit" that included "limit that is able to be changed": "a variable temperature limit that is able to be changed during use, excluding limits that are pre-determined |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | or preselected or manufacturer presets." Dkt. No. 163-1 ("R&R") at 50. This is not a material fact to summary judgment. This does not support Medtronic's position; this supports Axonics' position. As Axonics' construction and the Special Master's construction confirm, the device must be programmable after shipment. |
| 98. During claim construction, Axonics agreed that "programmable" means "capable of being programmed," but contended that such a capability is limited to happening "during use, excluding limits that are predetermined or preselected or manufacturer presents."<br><br>Dkt. 138 ("Axonics Responsive Claim Construction Brief") at 19. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization of Axonics' claim construction is not a material fact. This does not support Medtronic's position; this supports Axonics' position.<br><br>The terms "capable of being programmed" was language from Medtronic's construction, and Axonics addressed how even the language of Medtronic's construction supported Axonics. Axonics does not dispute that its construction contained the language "during use, excluding limits that are predetermined or preselected or manufacturer presents": "a variable temperature limit that is able to be changed during use, excluding limits that are pre-determined or preselected or manufacturer presets." Dkt. No. 163-1 ("R&R") at 50.<br><br>Axonics addressed how even the cases that Medtronic cited supported Axonics' |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | approach at claim construction, including that devices need to be programable after manufacture. For example, Axonics stated, "in *Info-Hold, Inc. v. Muzak Holdings LLC*, No. 1:11-cv-283, 2012 U.S. Dist. LEXIS 128424, at *12 (S.D. Ohio Sep. 10, 2012), the district court properly rejected defendant's proposed construction of 'programmable' as 'programmed' (meaning already programmed), but that is consistent with Axonics' proposed construction, which would similarly exclude 'already programmed' limits and require the present ability to be changed." Dkt. No. 138 at 16-17. |
| 99. In its IPR petition, Axonics contended as part of its proposed construction that a "programmable limit" is a "variable temperature limit stored on a memory that is able to be changed or modified by a user or software…."<br><br>Nisbet Decl., Ex. 14 ("Axonics' Petition for IPR of U.S. Patent 9,821,112) at 7 | Undisputed that Axonics included this language as quoted in its IPR Petition but disputed in that Medtronic fails to quote Axonics' entire construction and leaves out critical language. Medtronic's characterization of the import of this contention is factually unsupported, does not raise a genuine dispute of fact, and does not support Medtronic's position; it supports Axonics' position.<br><br>Axonics contended in its IPR petition, as part of its proposed construction, that a programmable limit is a "variable temperature limit stored on a memory that is able to be changed or modified by a user or software, ***excluding pre-determined, manufacturer presets.***" Axonics' Petition for IPR of U.S. Patent 9,821,112 at 7. This was a proposed construction by Axonics in an IPR petition, and is not binding here. It is also consistent with the Special Master's |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | construction which expressly stated that the evidence "supports finding that 'programmable limit' requires that the relevant limit in the completed apparatus must be programmable ***after the apparatus is shipped*** to distributors or customers for use." Dkt. No. 163-1 ("R&R") at 60. |
| 100. Axonics' experts have not provided the opinion that modifying the [REDACTED] would effectively destroy the FDA approved product as an operable medical device.<br><br>Nisbet Decl., Ex. 8 (Rebuttal Expert Report of Pedro Irazoqui at ¶¶ 215–227) | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. Medtronic's characterization of this is not a material fact. Axonics incorporates by reference its response to DAF 101.<br><br>Medtronic attempts to criticize Axonics' undisputed factual showing that it would not be permissible to alter the temperature limits without going through a new regulatory process but cites no contrary fact and no evidence to place that fact in genuine dispute. |
| 101. Mr. Abdeen's deposition testimony did not state that modifying a [REDACTED] would affect the operability of the accused product as an FDA approved product.<br><br>Nisbet Decl., Ex. 10 (Deposition Transcript of Faizal Abdeen ("Abdeen Dep. Tr.")) at 78:9–12, 82:19–83:5, | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| 84:20–85:6, 86:8–22. | Medtronic's characterization of this is not a material fact.<br><br>Mr. Abdeen testified "If we replace it with new code, it has to be brought back to the factory and the code be re-uploaded that way. And then I have to say that the new code that you replace will mostly make it a new product, and then it has to go through – depending on the kind of change that you made, it will have to go through revalidation and resubmission to the FDA." Axonics' expert Dr. Irazoqui quoted Mr. Abdeen's testimony in full. Ex. 44, ¶¶ 222-226. |
| 102. Axonics' expert opined<br><br>Nisbet Decl., Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 7; Nisbet Decl., Ex. 16 (Irazoqui 112 Invalidity Precision Chart) at 8. | Undisputed, but this is not a material fact to summary judgment. Medtronic identifies nothing inconsistent with Dr. Irazoqui's opinions on invalidity and non-infringement. |
| 103. .<br><br>Dkt. 360-6 (Expert Report of Richard T. | |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| Mihran) ¶¶ 19–20, 204, Fn. 18, Fn. 22, Fn. 23, Fn. 25; Nisbet Decl., Ex. 5 Deposition Transcript of Richard Mihran ("Mihran Dep. Tr.") at 110:13–121:7; Nisbet Decl., Ex. 8 (Rebuttal Expert Report of Pedro Irazoqui) at ¶¶ 97–99, 288–307. | Axonics did produce<br><br>Medtronic identifies no |



| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted] Axonics making [redacted] available to its [redacted] Axonics also identified the document that Medtronic now relies upon (AX1172714, DAF 93) specifically by number in an August 30, 2022 email about [redacted], over a month before Medtronic's final infringement contentions and over two months before Medtronic's expert report in which Medtronic's expert cited the document for |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | a different purpose. DAF 103; Ex. 80; Ex. 81; Ex. 9, ¶¶ 197-98, 350, 505.<br><br>Medtronic did not address [REDACTED] in its infringement contentions (Ex. 78) or expert report. Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Medtronic knew about [REDACTED] in time to have its expert opine about how it supposedly infringes because the same expert in the same report relied upon [REDACTED] extensively but for an entirely different purpose. Opp at 15. Medtronic's expert had access to operable [REDACTED] software and a charging device. Medtronic identifies nothing it could not do during the inspection to explore the relevant functionality; it simply chose not to.<br><br>Despite this discovery, Medtronic's expert never once said that [REDACTED] renders any temperature limit programmable supports infringement of the programmability limitation.<br>Axonics objects under FRE 402, 403, 37. |
| 104. Dr. Mihran cited [REDACTED] documentation and test results throughout his report, including discussions regarding the capability [REDACTED]<br><br>*See, e.g.*, (without limitation) Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 66, 166, 197–204, 349–352, 355, 357, 505–506, 508–512, 514, 518, 587, 610. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization regarding Dr. Mihran's infringement contentions purportedly about is factually unsupported and does not create a genuine dispute of fact. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Medtronic mischaracterizes disparate opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [redacted] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [redacted] Dr. Mihran admits that this theory of infringement is not expressly disclosed in his report.<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [redacted]. Ex. 13 [Mihran Dep.] at 274:21-281:18. Medtronic did not address [redacted] in its infringement contentions (Ex. 78). Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely. Axonics objects under FRE 402, 403, 37. |
| 105. Dr. Mihran explained that [redacted] | Undisputed that Dr. Mihran's stated the language as quoted in his expert report. Medtronic's expert's opinion regarding the programmability of the CD is factually unsupported and does not create a genuine dispute of material fact. Axonics incorporates by references its responses to the surrounding DAFs. This does not disclose any theory of infringement related to [redacted]. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶ 482. | Axonics objects under FRE 402, 403, 37. |
| 106. Dr. Mihran identifies the [REDACTED]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 482–504. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's expert's opinion regarding the programmability of the CD is factually unsupported and does not create a genuine dispute of fact. Medtronic's characterization about this is factually unsupported and does not create a genuine dispute of fact. Axonics incorporates by references its responses to the surrounding DAFs. This does not disclose any theory of infringement related to [REDACTED]. |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | |
| 107. Dr. Mihran [redacted]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 505–506. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization regarding [redacted] is factually unsupported and does not create a genuine dispute of fact.<br><br>Medtronic mischaracterizes disparate opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [redacted] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [redacted] Dr. Mihran admits that this theory of infringement is not expressly disclosed in his report.<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [redacted] Ex. 13 [Mihran Dep.] at 274:21- |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | 281:18.<br><br>[REDACTED]. SUF 32, 40; DAF 92. Medtronic has shown no evidence that the Axonics charger temperature limits are programmed to be programmable or that [REDACTED]<br><br>Axonics objects to Medtronic's reliance on any evidence related to [REDACTED] to allege infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 108. Dr. Mihran also discusses the [REDACTED]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 528–532. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic's characterization regarding [REDACTED] and Mr. Abdeen's testimony are factually unsupported and do not create a genuine dispute of fact.<br><br>Medtronic mischaracterizes disparate opinions in its expert's report that on their |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | face never disclose a theory of infringement of the programmability limitation based on [REDACTED] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [REDACTED] Dr. Mihran admits that this theory of infringement is not expressly disclosed in his report.<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [REDACTED]. Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Axonics objects to Medtronic's reliance on any evidence related to [REDACTED] to show infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 109. Dr. Mihran testified as follows in response to questions from Axonics' counsel: [REDACTED] | Undisputed that Dr. Mihran testified as quoted. Medtronic's expert's opinion regarding [REDACTED] is factually unsupported and does not create a genuine dispute of fact. Dr. Mihran did not have factual support for his assertion that he had such an infringement opinion at all. Additionally, this does not support Medtronic's position; this supports Axonics.<br><br>Medtronic mischaracterizes disparate |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| [redacted]<br><br>Nisbet Decl., Ex. 5 Deposition Transcript of Richard Mihran ("Mihran Dep. Tr.") at 273:14–24. | opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [redacted] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [redacted] Dr. Mihran admits that this theory of infringement is not expressly disclosed in his report.<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [redacted]. Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Axonics objects to Medtronic's reliance on any evidence related to [redacted] to show infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 110. Dr. Mihran testified as follows in response to questions from Axonics' counsel: "Q. … [redacted]<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 274:25–275:8. | Undisputed that Dr. Mihran testified as quoted and this testimony supports Axonics' motion, not Medtronic's opposition. Medtronic's expert's opinion regarding [redacted] is factually unsupported and does not create a genuine dispute of fact. Dr. Mihran did not have factual support for his assertion that he had such an infringement opinion at all. Additionally, this does not support Medtronic's position; this supports |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Axonics.<br><br>Medtronic mischaracterizes disparate opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [REDACTED] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [REDACTED] Dr. Mihran admits that this theory of infringement is not expressly disclosed in his report.<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [REDACTED]. Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Additionally, [REDACTED]. SUF 32, 40; DAF 92. Medtronic has shown no evidence that the Axonics charger temperature limits are programmed to be programmable or that [REDACTED] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Axonics objects to Medtronic's reliance on any evidence related to [redacted] to show infringement because such contentions are untimely. Axonics objects under FRE 402, 403, 37. |
| 111. Mihran testified as follows in response to questions from Axonics' counsel: [redacted]<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 276:3–15. | Undisputed that Dr. Mihran testified as quoted. Medtronic's expert's opinion regarding [redacted] is factually unsupported and does not create a genuine dispute of fact. Dr. Mihran did not have factual support for his assertion that he had such an infringement opinion at all. Additionally, this does not support Medtronic's position; this supports Axonics.<br><br>Medtronic mischaracterizes disparate opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [redacted] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [redacted]<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted] Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Additionally, [redacted]. SUF 32, 40; DAF 92. Medtronic has shown no evidence that the Axonics charger temperature limits are programmed to be programmable or that [redacted]<br><br>Axonics objects to Medtronic's reliance on any evidence related to [redacted] to show infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 112. Dr. Mihran testified as follows in response to questions from Axonics' counsel: [redacted]<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at | Undisputed that Dr. Mihran testified as quoted. Medtronic's expert's opinion regarding [redacted] is factually unsupported and does not create a genuine dispute of fact. Dr. Mihran did not have factual support for his assertion that he had such an infringement opinion at all. Additionally, this does not support Medtronic's position; this supports Axonics.<br><br>Medtronic mischaracterizes disparate |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| 279:19–280:1. | opinions in its expert's report that on their face never disclose a theory of infringement of the programmability limitation based on [REDACTED] and similarly attempts to rely on the testimony of Axonics' witness that never mentions [REDACTED]<br><br>Medtronic also improperly relies on its attempt to expand its expert's opinions during deposition (Opp. at 13-14), which should not be countenanced as Axonics was given no notice of such opinions prior to his deposition, and Medtronic's expert could not identify anywhere in his report where he said that the "programmable limit" limitation was satisfied by [REDACTED]. Ex. 13 [Mihran Dep.] at 274:21-281:18.<br><br>Additionally, [REDACTED]. SUF 32, 40; DAF 92. Medtronic has shown no evidence that the Axonics charger temperature limits are programmed to be programmable or that [REDACTED]<br><br>Axonics objects to Medtronic's reliance on any evidence related to [REDACTED] to |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | show infringement because such contentions are untimely.<br>Axonics objects under FRE 402, 403, 37. |
| 113. Asserted claim 1 of the '112 patent recites: "a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device."<br><br>Dkt. 28-4 ('112 patent), cl. 1. | Undisputed. This does not raise a genuine dispute of material fact. |
| 114. Claim 8 of the '112 patent (from which asserted claims 16 and 17 depend) recites "sensing, via a sensor, a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device."<br><br>Dkt. 28-4 ('112 patent), cl. 8 | Undisputed. This does not raise a genuine dispute of material fact.<br><br>Medtronic's reliance on Claims 8, 16, and 17 of the 112 Patent does not support infringement of the asserted claims in this case. These claims involved sensing temperature on an implant not a charger. Medtronic does not make a showing that such temperature could not be indicative of heat from transcutaneous transfer of energy. Moreover, Axonics' positions in the IPR proceedings with respect to the claims cited in Medtronic's statement are not material as the claims are different, the limitations involve implant temperature measurement, Medtronic survived the IPR based on the distinction between temperature sensors being in the implant versus in the charger, and the asserted claims with the charger temperature sensor were not invalidated during IPR and positions taken by Axonics that did not prevail in the IPR are not binding in this proceeding. DAF 121-24. |
| 115. The Special Master noted that | Undisputed that the Special Master's |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Axonics did not "persuasively demonstrate that ["indicative of"] should be limited to a particular type of indication."<br><br>Dkt. No. 163-1 ("R&R") at 38. | language is quoted correctly. Medtronic's characterization of the relevance of this statement however is factually unsupported and does not create a genuine dispute of fact.<br><br>Medtronic attempts to rely on the Special Master's disputed construction of "indicative of" in a different patent (324 Patent) and different term, "output indicative of the temperature of the side of the housing," which does not dictate the meaning of the term with different elements in the 112 Patent. The term "indicative of" has not been construed in the 112 Patent. |
| 116. The Special Master construed the term "indicative of" to mean "serving as a sign of," explaining that "'indicative of' is a broad term that can potentially incorporate many different concepts, and '[t]he patentee is free to choose a broad term and expect to obtain the full scope of its plan and ordinary meaning…."<br><br>Dkt. No. 163-1 ("R&R") at 40. | Undisputed that the Special Master's language is quoted correctly. Medtronic's characterization of the relevance of this statement is factually unsupported and does not create a genuine dispute of fact.<br><br>Medtronic attempts to rely on the Special Master's disputed construction of "indicative of" in a different patent (324 Patent) and different term, "output indicative of the temperature of the side of the housing," which does not dictate the meaning of the term with different elements in the 112 Patent. The term "indicative of" has not been construed in the 112 Patent. |
| 117. During his deposition, Dr. Irazoqui was unable to find support in the intrinsic record for his interpretation of the claim limitation "a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device" as | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. This is |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| requiring "a temperature sensor that distinguishes between heat caused by the transfer of energy and other sources of heat, as well as converts from heat to temperature."<br><br>Nisbet Decl., Ex. 20 Deposition Transcript of Pedro Irazoqui ("Irazoqui Dep. Tr.") at 210:16-222:5) | not a material fact to summary judgment. Moreover, Medtronic is alleging based on this that Dr. Irazoqui and Axonics offered a new and untimely claim construction: "Axonics' untimely new claim construction fares no better for the same reasons. In fact, Axonics' expert found no support in the intrinsic record for it." Opp. at 15. Medtronic's characterizations in and regarding this statement are factually unsupported, do not create a genuine dispute of fact, and are not a material fact to summary judgment.<br><br>The question Medtronic quotes from Dr. Irazoqui's deposition, "So your opinion is that these claims require a temperature sensor that distinguishes between heat caused by the transfer of energy and other sources of heat, as well as converts from heat to temperature, fair?" was part of a longer set of related and misleading questions in which Dr. Irazoqui was asked to "apply ***the construction*** that -- or the interpretation of the claims that we just talked about, the requirements that you're imposing on the claim for the purposes of infringement. Is there anything in the '112 patent that describes a temperature sensor that will differentiate between heat generated from the transfer of energy and other sources of heat, and calculates the conversion between heat and temperature?" Ex. 77 [Irazoqui Dep.], 210:16-212:19. The questions and answers were not directed merely to the subject matter the statement identifies. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Dr. Irazoqui offered no claim construction on this term and confirmed that in deposition. Dr. Irazoqui did offer opinions in his report, which were consistent with Axonics' earlier contentions, regarding whether the limitation "temperature indicative of heat resulting from the transcutaneous transfer of energy" was infringed, and there is nothing untimely about these contentions. Dr. Irazoqui also described the teachings of the 112 Patent, including in the testimony quoted by Medtronic and additional testimony Medtronic omits from its citation.<br><br>Medtronic omits from its citation that Dr. Irazoqui identified in the specification of the 112 Patent the issue raised by Medtronic's question: "So I think we're actually getting to the heart of it, right? And this is where I think a lot of the contention comes from, is when a person of ordinary skill in the art -- when I read this patent and I read the claim and I see a word like 'indicative' -- right? -- I pull the patent up on Google because -- Google patents, because I can search it there. Right? ***And I search for the word "indicative." And if I remember correctly, it doesn't occur a single time anywhere in the specification***." Ex. 77 [Irazoqui Dep.], 222:7-224:7.<br><br>Dr. Irazoqui offered no construction of this term, as his report confirms. Ex. 44, ¶¶ 201-14.<br><br>Axonics' expert Dr. Irazoqui clarified more than once that he was not offering a |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | construction of this term in the 112 Patent in his deposition. Dr. Irazoqui testified: "I ***don't see that I have taken a construction of 'indicative' in the '112 patent***." Ex. 77 [Irazoqui Dep.], 237:3-18. Dr. Irazoqui continued by confirming in looking back at the "claim construction document that was filed on July 1st" that he did not "discuss the '112 patent there", and "***[f]or the claims not interpreted by the court*** or the Special Master, ***I have used the plain meaning that one of ordinary skill*** in the art would have understood at the time of the alleged invention." *Id.*, 237:19-238:7.<br><br>Dr. Irazoqui also testified, "***I don't see where I make a statement about a construction regarding the word 'heat'*** unless you're referring to the first sentence where I say, 'Another reason why the output of the temperature is not indicative of heat generated by the transcutaneous transfer.'" *Id.*, 240:19-242:5. Dr. Irazoqui continued, "But that statement does not limit what 'indicative' means. It only means that whatever you take 'indicative' to mean, whether you take a broad definition or a narrow definition -- whatever you take 'indicative' to mean, you need to know whether or not the thing you're measuring is going to that or not. So the question is not heat. The question is heat from transcutaneous transfer. And for that, you need to be able to separate it out, irrespective of your definition of 'indicative.'" *Id.*<br><br>Medtronic's lawyer repeatedly asked |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Dr. Irazoqui questions falsely premised on the Special Master already having construed the claim term. For example, Dr. Irazoqui was asked, "And does this sensor meet the limitation 'a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device' ***under the Special Master's construction***?" *Id.*, 234:9-14. Dr. Irazoqui was also asked, "And under your -- based off your understanding of the -- ***like the Special Master's construction*** of 'indicative of,' this would not satisfy 'indicative of?" *Id.*, 231:19-22. Dr. Irazoqui was also asked, "So does the disclosure of the device in column 6, lines 5 through 10, satisfy the limitation 'a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device' ***under the Special Master's construction***?" *Id.*, 233:7-13.<br><br>Even in the questions preceding those Medtronic quotes in its briefing, Medtronic asked about a construction by asking Dr. Irazoqui to "***apply the construction*** that -- or the interpretation of the claims that we just talked about, the requirements that you're imposing on the claim for the purposes of infringement." *Id.*, 211:20-212:18. Dr. Irazoqui said "***I'm not sure that I have provided a claim construction at all*** in our conversation so far, and certainly not one that is different from the one that I provide in my report." *Id.* |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Axonics and Dr. Irazoqui timely disclosed their theories. Throughout fact discovery, the only disclosure Medtronic provided of its contentions for this limitation were the following sentences and a series of unexplained document quotations: "For example, [redacted] ." Ex. 78, at 16-17. These sentences appeared in the paragraph: [redacted] . Discovery is ongoing and Axonics' technical productions are highly deficient (including Axonics' refusal to date to produce samples of the Accused Products, |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | source code, and complete technical documents). Medtronic reserves the right to revise these contentions once Axonics satisfies its discovery obligations." *Id.* at 16-17. Medtronic entirely failed to address the language of this limitation.<br><br>Axonics expressly disputed this limitation was met in its rebuttal contentions: "Medtronic's infringement contentions have not pointed to [redacted]." Ex. 79, at 179-186. Axonics argued that [redacted]" *Id.* Axonics explained that [redacted] *Id.*<br><br>Medtronic addressed the meaning of heat from the transcutaneous transfer of energy for the first time in its expert report: [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Ex. 9, ¶ 450.<br><br>Dr. Irazoqui then explained in his expert report on non-infringement that .'' *Id.* There was nothing untimely about Axonics' or Dr. Irazoqui's theories. |
| 118. Dependent claim 16 recites that one way to measure a "temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device" is to sense "a temperature of the external charging device during the transcutaneous transfer of energy to the implantable medical device."<br><br>Dkt. 28-4 ('112 patent), cl. 16. | Undisputed that the quotations are accurate. Medtronic's characterization of this is not a material fact and is factually unsupported and does not create a genuine dispute of fact.<br><br>While these "comprising" claims show that measuring a surface temperature may be within the scope of the claims, they do not show that it is sufficient or necessary. Axonics' expert specifically confirmed that there is such an embodiment in the patent with a "temperature sensor . . . [in] thermally conductive contact with the patient-facing side of the antenna," but that there "may be other[]" embodiments. Ex. 77 [Irazoqui Dep.], 252:8-253:10. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Showing merely [redacted] (Opp. at 15) is not sufficient to meet this limitation. This is not supported by the language of the claims themselves. Even in Medtronic's initial contentions, Medtronic did not allege that merely measuring the temperature of a charging device was sufficient to meet this claim limitation. Throughout fact discovery, Medtronic's contentions for this limitation were the following sentences and a series of unexplained document quotations: "For example, [redacted]." Ex. 78, at 16-17. Axonics incorporates as if stated in full herein its response to DAF 114. |
| 119. Dependent claim 17 recites that one way to measure a "temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device" is to sense "a temperature of a surface of the external device during the transcutaneous transfer of charging energy to the implantable medical device."<br><br>Dkt. 28-4 ('112 patent), cl. 17. | Undisputed that the quotations are accurate. Medtronic's characterization of this is not a material fact, is factually unsupported, and does not create a genuine dispute of fact. Axonics incorporates as if stated in full herein its response to DAF 114 and DAF 118. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | |
| 120. Dr. Mihran shows infringement of the '112 patent "indicative of" limitation by, among other things, pointing to [redacted]<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 448–481, 545, 549, 550. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. *See* DAF 128.<br><br>Dr. Irazoqui states, [redacted] *Id.*, at ¶¶ 203-204. [redacted] *Id.*, at ¶ 205. |
| 121. In its '112 patent IPR petition, Axonics argued that the temperature sensor described in the patent specification provides support for the "indicative of" limitation.<br><br>Nisbet Decl., Ex. 14 ('112 IPR Petition) at 11-12; Nisbet Decl., Ex. 17 (Colvin | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Axonics offered no construction of the term "temperature indicative of heat |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| Decl. Ex. 1003) at 35. | resulting from the transcutaneous transfer of energy" in the IPR. Medtronic relies upon descriptions provided for a means plus function term "means for measuring a temperature indicative of heat resulting from the transcutaneous transfer of charging energy to the implantable medical device" that is part of Claim 18 that is asserted, was not invalidated by the Board, and the construction of which was not adopted by the Board. MDT Ex. 21 [112 FWD] at 13, 53. This has no relevance to the present proceeding.<br><br>Axonics' in the IPR merely cited the only temperature sensor structure in the 112 Patent for purposes of the means plus function limitation. Axonics stated: "Apart from the reference to 'temperature sensor' noted above, there appears no alternative structure for measuring parameters correlated to temperature." MDT Ex. 14 at 12.<br><br>Axonics quoted the 112 Patent: "The external device comprises an alternating current (AC) coil configured for transcutaneously conveying the energy to the implantable medical device, a sensor configured for measuring a parameter correlated to a temperature generated by the external device during the transcutaneous conveyance of the energy to the implantable medical device, and a memory configured for storing a programmable limit." MDT Ex. 14 at 11 (quoting 112 Patent at 6:38-45). Axonics also cited the claim language, that the "structure of a 'temperature sensor' is |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | referenced throughout the application." *Id.* at 12 (describing 112 Patent at 20:6-67) Axonics also showed Figure 14. *Id.* Axonics' expert relied on portions of these same disclosures. MDT Ex. 17 at 35 of 216. |
| 122. To facilitate controlling the transfer of energy to the implantable medical device, the temperature sensor described in the '112 patent specification is not required to indicate how much heat has been created by the transcutaneous energy transfer process.<br><br>*See generally* Dkt. 28-4 ('112 patent). | Undisputed but immaterial. There are numerous non-infringing alternative ways of controlling the transfer of energy to the implantable medical device and numerous ways of operation that do not require a temperature sensor that indicates how much heat has been created by the transcutaneous energy transfer process. Axonics' transfer of energy to the implantable medical device does not involve a temperature sensor that indicates how much heat has been created by the transcutaneous energy transfer process. However, the claims of the 112 Patent require a "temperature indicative of heat resulting from the transcutaneous transfer of energy." Medtronic fails to identify any way that the temperature sensor described in the 112 Patent specification could meet this limitation and not indicate how much heat has been created by the transcutaneous energy transfer process. |
| 123. In arguing for invalidity in IPR and this litigation, Axonics did not argue that the claimed temperature sensor must measure "something [that] actually indicates how much heat has been created by the transcutaneous energy transfer process."<br><br>Nisbet Decl., Ex. 14 ('112 IPR Petition) | Undisputed but immaterial. Axonics did not use the quoted language in the IPR proceeding. Axonics incorporates as if stated in full herein its response to DAF 122.<br><br>Other than the means plus function claim addressed above, Medtronic cites portions of the IPR proceeding for claims for |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| at 11–12, 28–29, 49–50, 65–67, 77–78; Nisbet Decl., Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 18–20; Nisbet Decl., Ex. 16 (Irazoqui 112 Invalidity Precision Chart), 24–46. | which Medtronic filed a disclaimer (Claim 8) and claims that were not found unpatentable (Claim 1). MDT Ex. 21 [112 FWD] at 2, 53; MDT Ex. 14 at 28–29 (Claim 1), 49–50 (Claim 8), 65–67 (Claim 1), 77–78 (Claim 8).<br><br>For the disclaimed claim, and its dependents that were found unpatentable in the 112 patent IPR proceeding, ***did not require*** the temperature sensor to be in the ***external device*** at all. The prior art at issue had a temperature sensor in the implant. MDT Ex. 21 [112 FWD] at 35 (confirming limitation was met by "thermistor 80 in implanted receiver 14 to regulate the charging of rechargeable power source 44 to restrict temperature rise"), 53; MDT Ex. 14 at 77. And Medtronic points to nothing in the record suggesting that a temperature reading in the ***implant*** would not be indicative of heat generated from transcutaneous energy transfer.<br><br>For claims not found unpatentable, there was a requirement for the temperature sensor to be in the external charging device. This limitation was how Medtronic escaped invalidity of the asserted claims. MDT Ex. 21 [112 FWD] at 18-19, 24-30. Axonics' positions in attempting to invalidate those claims in the IPRs are not controlling in this proceeding. MDT Ex. 21 [112 FWD] at 24-30, 53.<br><br>Axonics' invalidity arguments in the present case are not relevant as Axonics' |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | expert offered his invalidity opinions under "Medtronic's own apparent interpretation of the claims." MDT Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 1; MDT Ex. 16 (Irazoqui 112 Invalidity Precision Chart), 1. |
| 124. In arguing for invalidity in IPR and this litigation, Axonics alleges that a temperature sensor on an external device that ensured that the temperature of the surface of the external device did not exceed a certain temperature limit would satisfy the '112 patent "indicative of" claim requirement.<br><br>Nisbet Decl., Ex. 14 ('112 IPR Petition) at 28–29, 49–50, 65–67, 77–78; Nisbet Decl., Ex. 17 (Colvin Decl. Ex. 1003, Ex. B) at 49, 73–74, 144; Nisbet Decl., Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 18-20; Nisbet Decl., Ex. 16 (Irazoqui 112 Invalidity Precision Chart), 24–46. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Immaterial. Axonics did not allege merely that a temperature sensor on an external device that ensured that the temperature of the surface of the external device did not exceed a certain temperature limit met the limitation. For example, Axonics contended:<br><br>"A POSITA would have known the external device was subject to UL 544 such that it would have been obvious to include a temperature sensor on the external device of Torgerson to measure a temperature of the device ***applied to the patient*** during charging to ensure compliance with mandatory safety requirements. *See* Ex. 1003, ¶ 123. This temperature would have been indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device. *Id*." MDT Ex. 14 at 29.<br><br>"As discussed, it would have been obvious to incorporate the temperature sensor of Taylor into the external |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | transmitter of Barreras '313 to ensure compliance with EN60601. In light of Taylors's disclosure of (1) applicable safety standards, (2) temperature sensor in external transmitter, and (3) concern to limit overheating of skin by the transmitter feet for patient comfort and safe charging, a POSITA would have strong motivation as a medical device manufacturer to modify Barreras '313 based on Taylor to include a temperature sensor in the transmitter to ***determine the temperature of the surface applied to the patient*** during recharging met applicable safety standards. Ex. 1003, ¶ 201." *Id.* at 66-67.<br><br>Axonics also relied on an implant temperature sensor for Claim 8, as described in the preceding statement. "Torgerson discloses transcutaneous coupling of implantable medical device (14) with a primary coil, and external charging device (30, 35) with a secondary coil, to transfer energy to the implantable medical device, as well as a temperature sensor (520) and control circuitry (525) adapted to control energy transfer to the implantable medical device based on temperature output in order to limit temperature rise during recharge to prevent unsafe conditions for the patient. Ex. 1005 at 9:21-23; 10:19-23; Claim 36. Thus, Torgerson teaches a recharge management system that includes a temperature sensor for monitoring the temperature of the medical device." *Id.*, 49-50. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | "Barreras '313 teaches a ***thermistor 80 in the implanted device*** (see above in Fig. 6) such that '[t]he temperature is measured by a thermistor 80 which is adhered to the rechargeable power source 44 during manufacturing.' Ex. 1010 at 8:58-60. Further as shown in Figure 6 above, Barreras '313 teaches a control circuit that regulates charging based on a temperature reading of a temperature sensor (80) to restrict temperature rise. See id. at 8:56-9:5." *Id.*, 77.<br><br>Medtronic cites Nisbet Decl., Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 18-20; Nisbet Decl., Ex. 16 (Irazoqui 112 Invalidity Precision Chart), 24–46, but this evidence is unrelated to this statement and does not support it. |
| 125. In arguing for invalidity in IPR and this litigation, Axonics and its expert "offer[ed] no explanation of the nature of heat, how it is distinct from temperature, how to distinguish heat from the transcutaneous transfer of energy as opposed to other sources of heat, or what is required for temperature to indicate heat at all."<br><br>Nisbet Decl., Ex. 14 ('112 IPR Petition) at 11–12, 28-29, 49–50, 65–67, 77–78; Nisbet Decl., Ex. 17 (Colvin Decl. Ex. 1003) at 35; Nisbet Decl., Ex. 15 (Irazoqui 112 Invalidity Bion Chart), 18–20; Nisbet Decl., Ex. 16 (Irazoqui 112 Invalidity Precision Chart), 24–46. | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument contrary to the claim construction and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. *See* DAF 117.<br><br>There can be no dispute that Medtronic knew it needed to address this claim language given that its expert ultimately tried to. Dr. Irazoqui addressed in his rebuttal expert report that there had been "no attempt" to determine "how much heat the charger produces as a result of transcutaneous energy transfer" as opposed to "when there is no transcutaneous energy transfer." *Id.* (citing Ex. 44, ¶ 203). Medtronic ignores |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | this record in suggesting that this is a new issue. It is not.<br><br>Dr. Irazoqui stated, "I have seen no attempt by anyone to actually determine how much heat the charger produces as a result of transcutaneous energy transfer as opposed to heat produced by all the electronics even when there is no transcutaneous energy transfer. The charger components will generate some heat just by turning on the charger, even if the charger is not transferring energy to an implant." Dr. Irazoqui further stated, "Mr. Schulzetenberg describes in his testimony, the charger generates heat even if there is no transcutaneous energy transfer, and there is no temperature sensor that distinguishes between the heat generated without transcutaneous energy transfer and heat generated with transcutaneous energy transfer." Ex. 44, ¶ 203. |
| 126. Claims 9–13 of the '112 patent depend from Claim 8 and incorporate the limitations of claim 8 including the phrase "sensing, via a sensor, a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device."<br><br>Dkt. 28-4 ('112 patent), cl. 8–13. | Undisputed but not material. Axonics incorporates its response to DAF 114 as if fully set forth herein. |
| 127. In IPR, Axonics contended claims 9-13 are invalid, and the PTAB issued a final written decision finding that Axonics had proven unpatentability of claims 9–13 by a preponderance of the evidence.<br><br>Nisbet Decl., Ex. 14 ('112 IPR Petition) | Undisputed but not material. Axonics incorporates its response to DAF 114 as if fully set forth herein. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| at 28–29, 49–50, 65–67, 77–78; Nisbet Decl., Ex. 21 ('112 IPR Final Written Decision) at 3. | |
| 128. Dr. Mihran testified as follows in response to questions from Axonics' counsel: **"A. You said -- in your question, you said 'use temperature as an indication of heat,' and I just want to make sure I understand your question. When you say 'indication of heat,' are you meaning number of joules of thermal energy that had been produced up to that point in time by the device? What do you mean exactly?** Q. I mean is that the right way to think about it? I am asking you that question, too. Is that the right way to think about it, what 'heat' means? **A. As I think we discussed in the prior session, heat can connote different things depending on the context."**<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 86:1–15. | Undisputed that the testimony was as quoted without the emphasis, but immaterial. The relevant testimony related to the claim limitation at issue. Both before and after the testimony Medtronic cites, Medtronic's expert addressed the relevant claim limitation.<br><br>Dr. Mihran was asked "What else would you need to know and use in order for ***temperature to provide an indication of heat resulting from the charging process***?" SUF 37. He responded: "[redacted]." Ex. 13 at 84:1-85:16.<br><br>The expert opined again after the testimony Medtronic quotes that if there was not a measurement of total heat there would need at least to be an analysis of change of temperature over time: "[Y]ou could certainly infer the difference by monitoring temperature and monitoring how that temperature is changing as a |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | function of the operating conditions of the device." Ex. 13 at 92:20-93:16. Medtronic's expert further testified "Q. Okay. How do you do that? A. By monitoring temperature and recording over a period of time." *Id.*<br><br>Medtronic's expert also confirmed that he had no evidence [redacted]: "But generally speaking, [redacted]" Ex. 13 at 106:8-20. |
| 129. Dr. Mihran testified as follows in response to questions from Axonics' counsel: "Q. … So I am asking you in the context of, like, using temperature as an indication of heat that results from charging, does that make sense to you? Does that concept makes sense? And if so, like, what's the right meaning of "heat" to give in that setting? … A: Well, certainly, there is a reflection of how much heat or thermal energy was generated from a temperature measurement under a, you know, set of conditions. So temperature will reflect that, certainly. I understood your question to be more specific in terms of actually trying to quantify the number of thermal joules, if you will, or joules of thermal energy that was produced."<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 86:20–87:12. | Undisputed that the testimony was as quoted, but immaterial. The relevant testimony related to the claim limitation at issue. Both before and after the testimony Medtronic cites, Medtronic's expert addressed the relevant claim limitation.<br><br>Dr. Mihran was asked "What else would you need to know and use in order for ***temperature to provide an indication of heat resulting from the charging process***?" SUF 37. He responded: [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted]." Ex. 13 at 84:1-85:16.<br><br>The expert opined again after the testimony Medtronic quotes that if there was not a measurement of total heat there would need at least to be an analysis of change of temperature over time: "[Y]ou could certainly infer the difference by monitoring temperature and monitoring how that temperature is changing as a function of the operating conditions of the device." Ex. 13 at 92:20-93:16. Medtronic's expert further testified "Q. Okay. How do you do that? A. By monitoring temperature and recording over a period of time." *Id.*<br><br>Medtronic's expert also confirmed that he had no evidence [redacted]: "But generally speaking, [redacted] Ex. 13 at 106:8-20. |
| 130. Dr. Mihran testified as follows in response to questions from Axonics' counsel: "Q. … Like, do you think that 'heat' has a known and understandable meaning in the context of, like, the heat resulting from transcutaneous energy transfer? **A. So you are asking -- I believe – I understand your question to be asking how was 'heat' used in one of the claim limitations of the patents at issue?**<br>Q. I mean, do you have an opinion 1 about how 'heat' -- like, does 'heat' have | Undisputed that the testimony was as quoted without the emphasis, but immaterial. The relevant testimony related to the claim limitation at issue. Both before and after the testimony Medtronic cites, Medtronic's expert addressed the relevant claim limitation.<br><br>Dr. Mihran was asked "What else would you need to know and use in order for ***temperature to provide an indication of heat resulting from the charging process***?" SUF 37. He responded: "[redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| meaning in the context of heat from transcutaneous energy transfer, or not? **A. Of course. Of course it does.** Q. Well, what's that meaning, and have you been applying it? Like, what is that meaning? **A. In general terms, it is the effect of thermal energy that's produced by the process of generating fields for transcutaneous energy transfer that will, of course, result in temperature changes**. Q. All right. And that heat is still joules now or not? **A. I would, in this context, view it as a change in temperature due to the production of thermal energy.** Q. Thermal energy being measured in joules? **A. You can measure it in joules, and you can also measure the effect of that heat production by measuring temperature."**<br><br>Nisbet Decl., Ex. 5 (Mihran Dep. Tr.) at 89:17–90:21. | [redacted]." Ex. 13 at 84:1-85:16.<br><br>The expert opined again after the testimony Medtronic quotes that if there was not a measurement of total heat there would need at least to be an analysis of change of temperature over time: "[Y]ou could certainly infer the difference by monitoring temperature and monitoring how that temperature is changing as a function of the operating conditions of the device." Ex. 13 at 92:20-93:16. Medtronic's expert further testified "Q. Okay. How do you do that? A. By monitoring temperature and recording over a period of time." *Id.*<br><br>Medtronic's expert also confirmed that he had no evidence [redacted]: "But generally speaking, [redacted]." Ex. 13 at 106:8-20. |
| 131. Dr. Irazoqui conceded that the [redacted] | Undisputed that [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
|  Ex. 8 (Rebuttal Expert Report of Pedro Irazoqui) at ¶ 133. | |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted]<br><br>Medtronic's statements are not supported by evidence sufficient to create a genuine dispute of fact. Medtronic takes Dr. Irazoqui's statement out of context.<br><br>[redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | |
| 132. Dr. Mihran argues that the accused products infringe the '112 patent "indicative of" limitation.<br><br>Dkt. 360-6 (Expert Report of Richard T. Mihran) ¶¶ 448–481, 545, 549, 550. | Undisputed that Dr. Mihran argues that the accused products infringe the '112 patent "indicative of" limitation.<br><br>However, this is not a fact that Axonics accused products infringe the '112 patent "indicative of" limitation and thus, does not raise a genuine dispute of fact. |
| 133. Axonics argued during claim construction that "Medtronic's proposed interpretation [of 'plurality of tine elements'] would allow for 'arbitrary line-drawing' or 'arbitrary division' of any structure."<br><br>Dkt. 163-1 at 26. | Undisputed. Axonics' contention is now indisputably true, in view of the admissions of Medtronic's expert that persons of ordinary skill in the art who applied the Special Master's construction could reasonably count different numbers of "tine elements" in the accused Axonics product, including finding three or four tine elements, under which the accused product could infringe, and finding ***sixteen*** tine elements, under which the accused product ***would not infringe.***<br><br>*See* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4**, Chai Dep. at 170:5-24 (testifying "another person could look at it and say there would be 16 tine[] elements"). *See also id.* |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | at 195:11-23 (testifying "***people might construe more than three*** based on the Special Master's language and Medtronic's common language definition."). |
| 134. During the claim construction hearing, the Special Master asked Medtronic to respond to Axonics' concern: "How do you give meaning to the word 'element' such that it's not amorphous?"<br><br>Nisbet Decl., Ex. 4 (9/7/22 Claim Construction Hr'g Tr.) at 43:13–44:3 | Undisputed. |
| 135. Medtronic directly addressed how to give meaning to the word "element" during the claim construction hearing, relying on the intrinsic record:<br>Well, it's read in context of the specification. And I think you said—I believe it was said in the tentative that this is an issue that's more appropriate for factual determinations during infringement. I think that's right. But there is—*there is clearly stated in the specification that the tines are going to be around the lead and along the length of the lead, and that provides plenty of information to a person of skill in* | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic did not directly address the Special Master's question. It responded only indirectly, and with a general assertion that there is "plenty of information" to avoid ambiguity. Medtronic did not argue at claim construction that "tine element" should be limited structurally and functionally, as its expert Dr. Chai did. Specifically, under Dr. Chai's interpretation, any given tine structure was not a "tine element" unless it provided, in one full circle around a medical lead (a structural limitation), what he deemed "sufficient" fixation (a functional limitation). *See* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4** at 194:18-195:3 |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| *the art to come to conclusions about what would be an element and what would not be an element.*<br><br>Nisbet Decl., Ex. 4 (9/7/22 Claim Construction Hr'g Tr.) at 43:13–44:3 | ***). See also id.*** at 107:15-108:11, 128:2-129:3, 135:22-136:11, 124:25-125: , 134:5-7; 109:10-16; 131:9-18 ; ::9; 154:9-19; 132:21-133:17; 127:23-128:1.<br><br>Medtronic never argued for such a narrow interpretation of "element" during claim construction. It argued the opposite. Medtronic insisted during claim construction that the word "element" in "plurality of tine elements" would not have a special meaning to a person of skill in the art, and relied on general-purpose dictionaries to define "element" and "portion" (the word its construction substitutes) as simply "part of a whole." It said so in its briefing (Dkt. No. 115 at 6, n.5), its claim construction slides (Dkt No. 198-1 (**Ex. 1** (Pls.' Hr'g slides)) at 14), and in its argument at the hearing. Dkt. No. 198-2 (**Ex. 2** (Claim Construction Hearing Transcript)) at 42:12-20. In fact, |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | in direct contradiction to its current claim construction opinion, Medtronic's lead counsel told the Special Master and this Court in connection with "element," ***twice,*** "there is ***no reference to 'structure'*** there. There's no reference to 'structure' there." *Id.* at 42:23-24. And |
| 136. Axonics did not dispute during claim construction that each tine element would encircle the lead body.<br><br>Nisbet Decl., Ex. 4 (9/7/22 Claim Construction Hr'g Tr.) at 43:13–50:10 | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Medtronic never made this argument, so it was unnecessary to dispute anything. Axonics' claim construction brief described in passing one "***embodiment***" described in the specification, "***such as***" a "tine mounting band … encircling the lead body." Dkt. No. 111 at 4. But neither Axonics nor the patent specification characterized an "encircling" tine element as anything more than an embodiment that may be "preferred" but is not required. *See* Dkt. No. 198-5, **Ex. 5** (314 Patent) at 10:42-47)("In the depicted ***preferred embodiments***, the tine elements **125**, **130**, **135** and **140** or **125′**, **130′**, **135′** and **140′** ***preferably*** comprise a tine mounting band **175** or **175′** encircling the lead body..."). At claim construction, Medtronic ***never*** contended that "tine elements" should be limited to a preferred embodiment, and in fact contended the opposite, scolding ***Axonics*** for "improper[ly]" seeking to "limit the claims to only certain depicted embodiments." Dkt. No. 115 at 6 (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)("It |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment. . . .”). |
| 137. Axonics' claim construction brief argued that according to the specification, a “tine element” “encircl[es] the lead body”: “The embodiments described in the specification, and their accompanying figures, show that a tine element is a structure, such as ‘a tine mounting band 175 or 175 ‘encircling the lead body,’ which also ‘comprises at least one flexible, pliant, tine.’”<br><br>Dkt. 111 at 8 | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely.<br><br>Axonics' claim construction brief described in passing one “***embodiment”*** described in the specification, “***such as***” a “tine mounting band … encircling the lead body.” Dkt. No. 111 at 4. But neither Axonics nor the patent specification characterized an “encircling” tine element as anything more than an embodiment that may be “preferred,” but is not required. *See* Dkt. No. 198-5, **Ex. 5** (314 Patent) at 10:42-47)(“In the depicted ***preferred embodiments***, the tine elements **125**, **130**, **135** and **140** or **125′**, **130′**, **135′** and **140′** ***preferably*** comprise a tine mounting band **175** or **175′** encircling the lead body...”). At claim construction, Medtronic ***never*** contended that “tine elements” should be limited to a preferred embodiment, and in fact contended the opposite, scolding ***Axonics*** for “improper[ly]” seeking to “limit the claims to only certain depicted embodiments.” Dkt. No. 115 at 6 (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)(“It is improper to read limitations from a preferred embodiment described in the specification—even if it is the only |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | embodiment. . . ."). |
| 138. Medtronic's surgeon-expert, Dr. Chai, explained in his claim construction declaration that: "[A] POSITA with experience in sacral neuromodulation"—qualifications which the PTAB adopted but Axonics' expert indisputably lacks (Dkt. 139 at 11)—"would understand the important aspects of the plurality of tine elements is that there *are multiple sets of tines formed around the lead body to provide fixation sufficient to engage the subcutaneous muscle tissue* along a length of the lead body, (see e.g., 756 patent, 6:4-9, 6:26-30, 6:44-48, 9:61-10:6, 10:2434, 11:65-12:2, 12:8-32), and that those multiple sets of tines are positioned proximal to the electrode array to engage with the subcutaneous muscle tissue that keeps the distal electrodes in a specific and fixed relationship to the sacral 3rd nerve (see e.g., 756 patent, 5:50-57, 7:20-35, 9:61-10:6, 11:55-12:4)."<br><br>Dkt. 139-7 at 12 | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely.<br><br>Medtronic now contends it argued at claim construction that "tine element" should be limited structurally and functionally, as its expert Dr. Chai did. Specifically, under Dr. Chai's interpretation, any given tine structure was not a "tine element" unless it provided, in one full circle around a medical lead (a structural limitation), what he deemed "sufficient" fixation (a functional limitation). *See* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4** at 194:18-195:3 ***). See also id.*** at 107:15-108:11, 128:2-129:3, 135:22-136:11, 124:25-125 , 134:5-7; 109:10-16; 131:9-18 |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted] ; 140:21-142:8; 154:9-19; 132:21-133:17; 127:23-128:1.<br><br>Medtronic never argued for such a narrow interpretation of "element" during claim construction. It argued the opposite. Medtronic insisted during claim construction that the word "element" in "plurality of tine elements" would not have a special meaning to a person of skill in the art, and relied on general-purpose dictionaries to define "element" and "portion" (the word its construction substitutes) as simply "part of a whole." It said so in its briefing (Dkt. No. 115 at 6, n.5), its claim construction slides (Dkt No. 198-1 (**Ex. 1** (Pls.' Hr'g slides)) at 14), and in its argument at the hearing. Dkt. No. 198-2 (**Ex. 2** (Claim Construction Hearing Transcript)) at 42:16-23. In fact, in direct contradiction to its current claim construction opinion, Medtronic's lead counsel told the Special Master and this Court in connection with "element," ***twice,*** "there is ***no reference to 'structure'*** there. There's no reference to 'structure' there." *Id.* at 42:23-24. And Medtronic ***never*** contended that "tine elements" should be limited to a preferred embodiment, and in fact contended the opposite, scolding ***Axonics*** for "improper[ly]" seeking to "limit the claims to only certain depicted embodiments." Dkt. No. 115 at 6 (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("It |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment. . . .").<br><br>To the extent that Medtronic contends Dr. Chai has any relevant expertise, Dr. Chai is a physician who has never designed or developed an implantable medical lead for commercial use (Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4** (1/8/2023 Chai Tr.) at 31:9-36:14), and could not answer basic questions related to lead design and development (*id.* at 59:1-69:15, 75:14-82:10).<br><br>Immaterial to the resolution of Axonics' motion to the extent Medtronic contends Axonics' expert lacks expertise.<br><br>Undisputed that Medtronic's expert offered his opinions under an understanding that a POSITA would have "experience in sacral neuromodulation." Dr. Chai quoted the PTAB's POSITA qualifications: "With these considerations, we find a POSITA would have had at least the following qualifications: (1) a bachelor's degree, or coursework equivalent, in biomedical engineering, electrical engineering, or mechanical engineering, or a medical degree, and (2) at least two years of experience researching and developing medical leads for sacral neuromodulation." Dkt. 139-7, ¶ 22. Dr. Chai then confirmed that this was the level of ordinary skill he applied: "I agree that this is the appropriate level of skill in the art and have applied this definition." *Id.* Medtronic's statement of |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | fact admits that this was the level of ordinary skill applied by Medtronic's expert.<br><br>When offering the opinion Medtronic quotes, Dr. Chai confirmed that the POSITA definition he applied required knowledge of sacral neuromodulation: "Rather, a POSITA with experience in sacral neuromodulation would understand that whether the tine elements are formed separately or as a single structure is not what is important to the invention. Rather, a POSITA would understand the important aspects of the plurality of tine elements is that there are multiple sets of tines formed around the lead body to provide fixation sufficient to engage the subcutaneous muscle tissue along a length of the lead body, (see e.g., 756 patent, 6:4-9, 6:26-30, 6:44-48, 9:61-10:6, 10:24-34, 11:65-12:2, 12:8-32), and that those multiple sets of tines are positioned proximal to the electrode array to engage with the subcutaneous muscle tissue that keeps the distal electrodes in a specific and fixed relationship to the sacral 3rd nerve (see e.g., 756 patent, 5:50-57, 7:20-35, 9:61-10:6, 11:55-12:4). Dr. Irazoqui does not discuss these fixation considerations that are specific to the sacral anatomy, which a POSITA would understand were important." Dkt. 139-7, ¶ 24.<br><br>The Court of Appeals for the Federal Circuit rejected this POSITA definition for the 756 and 314 Patents, and explicitly adopted a view of the art that does ***not*** |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | require knowledge specific to sacral neuromodulation. *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 958-59 (Fed. Cir. 2023) ("[T]he Board erred in its definition of 'the relevant art' as limited to medical leads for sacral-nerve stimulation."). As the CAFC determined, the Board adopted an incorrect definition of the relevant art, which Dr. Chai adopted. |
| 139. Special Master found Axonics' indefiniteness argument "unpersuasive because the claim language at issue is reasonably clear" and this "pertains to factual disputes regarding infringement rather than any legal question for claim construction."<br><br>Dkt. 163-1 at 26–27. | Disputed to the extent Medtronic contends there remain factual issues that could prevent summary judgment of indefiniteness. Whatever factual disputes remained at the time of the Special Master's finding have been resolved by the admissions of Medtronic's expert that persons of ordinary skill in the art could reasonably count different numbers of "tine elements" in the accused Axonics product, including finding three or four tine elements, under which the accused product could infringe, and finding ***sixteen*** tine elements, under which the accused product ***would not infringe***.<br><br>*See* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4**, Chai Dep. at 170:5-24 (testifying "another person could look at it and say there would be 16 tine[] elements"). *See also id.* at 195:11-23 (testifying "***people might construe more than three*** based on the Special Master's language and Medtronic's common language definition."). |
| 140. "The Special Master's construction does not specifically construe a single 'tine element," because the parties | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| disputed only whether a "plurality of tine elements" may be "a single structure or [] multiple structures," not what constituted a single tine element, which both parties understood "encircles" or is "formed around the lead body."<br><br>Nisbet Decl., Ex. 18 (12/16/22 Pless Rept.) ¶87; Dkt. 163-1 at 27; Dkt. 111 (Axonics' Opening Claim Construction Brief) at 2–8; Dkt. 122 (Medtronic's Corrected Opening Claim Construction Brief) at 5–7. | lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely.<br><br>During claim construction, the parties disputed what a "tine element" is, in particular whether it must be a separate "structure" from any other tine element. Axonics contended that a "plurality of tine elements" required two or more ***structures*** (*see, e.g.,* Dkt. No. 111 at 3). Medtronic disagreed, specifically insisting that "element" meant "part of a whole" and connoted no structure at all, in direct contradiction to the structural and functional interpretation it has now adopted to try to save the claims from invalidity. Dkt. No. 198-2 (**Ex. 2** (Claim Construction Hearing Transcript)) at 42:18-24. Medtronic's argument that the parties did not address the meaning of "tine element" in the singular, and the Special Master did not construe "tine element," rests on the false premise that the meaning of "tine element" is different in connection with ***one*** "tine element" than it is in connection with a plurality of "tine elements." That position defies common sense. Reciting "two or more apples" does not change what an apple is; it is the same thing each time, whether there is one, or more than one. It is also contrary to law. *See, e.g., Dayco Prods. v. Total Containment, Inc.,* 258 F.3d 1317, 1327-28 (Fed. Cir. 2001)(plurality, "when used in a claim, ***refers to two or more items***. . ."); *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | 1568, 1575 (Fed. Cir. 1996) ("The term means, simply, 'the state of being plural.'"). |
| 141. Axonics' expert, Mr. Pless, opined that an [REDACTED]<br><br>Nisbet Decl., Ex. 18 (12/16/22 Pless Rept.) ¶¶ 87–90, 93. | Not a statement of fact sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely.<br><br>Mr. Pless opined that the tine assembly of Axonics' product [REDACTED] " in reliance on overwhelming evidence to that effect, including but not limited to an "unwrapped" view of the Axonics helical anchor.<br><br>Nisbet Decl., Ex. 18 (12/16/22 Pless Rept.) ¶¶ 87–93. |
| 142. In contrast, Medtronic's surgeon-expert, Dr. Chai, explained, based on the actual structure of the Axonics device and not an "unwrapped" drawing, and his extensive experience with the function and implantation of sacral neuromodulation devices and the relevant anatomy, how the Special Master's construction applies to Axonics' product: [REDACTED]<br><br>Dkt. 202-1, Expert Report of Toby Chai Report ("Chai Expert Report")2 ⁋⁋ 206, | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument and advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely, including to the extent that Medtronic contends this: 1) accurately describes Dr. Chai's analysis; 2) shows Dr. Chai did not contradict the Special Master's recommended construction of "plurality of tine elements"; and 3) raises a genuine dispute of fact over indefiniteness.<br><br>Dr. Chai admitted that he disregarded the Special Master's construction, which he |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| 208, 286, 288 (applied to Axonics' product, [redacted] Nisbet Decl., Ex. 19, 1/8/2023 Chai Dep. Tr. at 105:23–106:7 | regarded as "just one sentence" that did not restrict him because there "***there are other important things to analyze.***" (Dkt. No. 360-2/Dkt. No. 395-1 (**Ex. 4** at 194:18-195:3). In finding three tine elements in the accused Axonics product, he discarded the Special Master's construction of a tine "element" as "a part of a whole" in favor of "the way ***I defined it***" (*id.* at 128:2-129:3) which he "thought was ***more appropriate***" *(id.* at 110:11-19) than the claim construction.<br><br>Dr. Chai confirmed he did not believe that the Special Master's construction of "plurality of tine elements" restricted his understanding of a single "tine element" in any way, because the Special Master was "talking about [a] plurality of tine elements. I'm talking about a single tine element, not a plurality, a single tine element is ***around***. But a plurality of tine elements is ***along***." Ex. 70, at 110:11-111:16. *See also id.* at 130:12-14 ("The plurality of tine elements is in the Special Master's construction. But tine elements is not."). That is wrong—Medtronic told the Special Master an "element" is simply a "part of a whole." Reciting "two or more apples" does not change what an apple is; it is the same thing each time, whether there is one, or more than one. Dr. Chai's and functional limits on "tine element" that Medtronic had previously insisted were not required. Specifically, under Dr. Chai's interpretation, any given tine structure was not a "tine element" unless it provided, in one full circle around a medical lead (a structural limitation), what |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | he deemed "sufficient" fixation (a functional limitation). *See id.* at 194:18-195:3 [REDACTED] ***). See also id.*** at 107:15-108:11, 128:2-129:3, 135:22-136:11, 124:25-125:2 [REDACTED], 134:5-7; 109:10-16; 131:8-18 [REDACTED]; 140:21-142:8; 154:9-19; 132:21-133:17; 127:23-128:1.<br><br>Dr. Chai was not simply explaining how a POSITA would understand the claim construction (Opp. at 8) or how it "should be applied to the facts of the case" (Opp. at 3-5), as Medtronic proposes. Dr. Chai departed from and ***contradicted*** the claim construction, rejecting any "part or portion" of a tine assembly he was presented with as meeting "tine element" unless it met both his structural criterion of encircling the lead and his functional criterion of providing sufficient fixation around that full circle. Tine assemblies |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | that lacked these features were not "tine elements" under Dr. Chai's special claim construction, even if they were a "part or portion" which included "one or more tines" and was positioned along the length of the lead body—all that the actual claim construction required. *See, e.g.,* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4** at 140:21-142:8 (rejecting groups of tines as a "tine element" unless they provided "sufficient" fixation ***around*** the lead), 127:23-128:1 [REDACTED]<br><br>Medtronic's alleged facts are also immaterial, in view of the admissions of Medtronic's expert that persons of ordinary skill in the art who applied the Special Master's construction could reasonably count different numbers of "tine elements" in the accused Axonics product, including finding three or four tine elements, under which the accused product could infringe, and finding ***sixteen*** tine elements, under which the accused product ***would not infringe.***<br><br>*See* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4**, Chai Dep. at 170:5-24 (testifying "another person could look at it and say there would be 16 tine[] elements"). *See also id.* at 195:11-23 (testifying "***people might construe more than three*** based on the Special Master's language and Medtronic's common language definition."). |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Further disputed to the extent that Medtronic contends Dr. Chai has any relevant expertise. Dr. Chai is a physician who has never designed or developed an implantable medical lead for commercial use (*id.* at 31:9-36:14) and could not answer basic questions related to lead design and development (*id.* at 59:1-69:15, 75:14-82:10). |
| 143. In performing his analysis, Dr. Chai did not "impermissibly depart[] from the Special Master's construction," but rather "appl[ied] it in the most appropriate fashion."<br><br>Nisbet Decl., Ex. 19 1/8/2023 Chai Dep. Tr. at 138:3–139:4, 98:21–99:3, 101:6–10, 104:7–22, 105:23–106:13, 107:3–14; Dkt. 202-1, Chai Expert Report ¶¶70, 205–06, 285–86 ("My analysis is based on [the Special Master's] construction.") | Not a statement of fact supported by evidence sufficient to create a genuine dispute of material fact; rather this is a lawyer argument advancing a conclusion that is not supported by the evidence on which Medtronic purports to rely. Dr. Chai admitted that he disregarded the Special Master's construction, which he regarded as "just one sentence" that did not restrict him because there "***there are other important things to analyze.***" Dkt. No. 360-2/Dkt. No. 395-1 (**Ex. 4** at 194:18-195:3). In finding three tine elements in the accused Axonics product, he discarded the Special Master's construction of a tine "element" as "a part of a whole" in favor of "the way ***I defined it***" (*id.* at 128:2-129:3) which he "thought was ***more appropriate***" *(id.* at 110:11-19) than the claim construction.<br><br>Dr. Chai confirmed he did not believe that the Special Master's construction of "plurality of tine elements" restricted his understanding of a single "tine element" in any way, because the Special Master was "talking about [a] plurality of tine elements. I'm talking about a single tine |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | element, not a plurality, a single tine element is ***around***. But a plurality of tine elements is ***along***." Ex. 70, at 110:11-111:16. *See also id.* at 130:12-14 ("The plurality of tine elements is in the Special Master's construction. But tine elements is not."). That is wrong—Medtronic told the Special Master an "element" is simply a "part of a whole." Reciting "two or more apples" does not change what an apple is; it is the same thing each time, whether there is one, or more than one. Dr. Chai's interpretation is also contrary to law. *See, e.g., Dayco Prods. v. Total Containment, Inc.,* 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) (plurality, "when used in a claim, ***refers to two or more items***. . .")<br><br>Dr. Chai's "more appropriate" interpretation of the claim language imported structural and functional limits on "tine element" that Medtronic had previously insisted were not required. Specifically, under Dr. Chai's interpretation, any given tine structure was not a "tine element" unless it provided, in one full circle around a medical lead (a structural limitation), what he deemed "sufficient" fixation (a functional limitation). *See* Ex. 70 at 194:18-195:3 [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted]). *See also id.* at 107:15-108:11, 128:2-129:3, 135:22-136:11, 124:25-125:2 [redacted], 134:5-7; 109:10-16; 131:8-18 [redacted] 140:21-142:8; 154:9-19; 132:21-133:17; 127:23-128:1.<br><br>Dr. Chai was not simply explaining how a POSITA would understand the claim construction (Opp. at 8) or how it "should be applied to the facts of the case" (Opp. at 7-8), as Medtronic proposes. Dr. Chai departed from and ***contradicted*** the claim construction, rejecting any "part or portion" of a tine assembly he was presented with as meeting "tine element" unless it met both his structural criterion of encircling the lead and his functional criterion of providing sufficient fixation around that full circle. Tine assemblies that lacked these features were not "tine elements" under Dr. Chai's special claim construction, even if they were a "part or portion" which included "one or more tines" and was positioned along the length of the lead body—all that the actual claim construction required. *See, e.g.,* Dkt. No. 360-2/Dkt. No. 395-1, **Ex. 4** at 140:21-142:8 (rejecting groups of tines as a "tine element" unless they provided "sufficient" fixation ***around*** the lead), 127:23-128:1 |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [REDACTED]<br><br>Medtronic relies on statements from its expert that he faithfully applied the Special Master's recommended construction, but the question is not what Medtronic's expert says he did, but whether he actually applied the construction that Medtronic obtained. As the record demonstrates, he did not, instead limiting "tine elements" to include only tine assemblies that include the specific structural and functional requirements he thought relevant, and which Medtronic previously insisted had no relevance, as discussed above. |
| 144. Dr. Irazoqui testified as follows: [REDACTED]<br><br>Nisbet Decl., Ex. 20 (Irazoqui Dep. Tr.) at 162:19–164:15. | Undisputed that Dr. Irazoqui made the quoted statement, but it does not create a genuine dispute of material fact. Medtronic takes this quote out of context. Axonics objects to Medtronic's reliance on any evidence related to [REDACTED] to allege infringement because such contentions are untimely.<br><br>[REDACTED]<br><br>Medtronic takes Dr. Irazoqui's opinions out of context and fails to accurately present Dr. Irazoqui's opinions. Dr. |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | Irazoqui confirmed that his opinion was [REDACTED] "[REDACTED]" Ex. 77 (Irazoqui Dep. Tr.) at 156:18-157:9. "[REDACTED] |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | [redacted]" *Id.* at 159:20-160:17. "[ [redacted] |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted] *Id.* at 160:22-162:22.<br><br>Axonics objected during Dr. Irazoqui's deposition to Medtronic's question as untimely contentions: "I'm going to object to all of this, the introduction of this exhibit and this questioning, because this is not a basis of any infringement allegations that Medtronic has ever raised. We object to this attempt to do an end-run around your discovery obligations, and we are going to be seeking to exclude any such theory from trial.<br>And Medtronic's expert never relied on this in his report, doesn't show infringement of -- . . . . We can confer -- -- on this, but I'm telling you we're going to be seeking to exclude all of this." *Id.* at 169:18-170:15.<br><br>Medtronic attempts to offer entirely new theories that Axonics' expert has not had the full opportunity to address. Medtronic |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | is attempting to entirely change its theory of alleged infringement to ambush Axonics at trial. Medtronic did not comply with its discovery obligations either during fact discovery or during expert discovery. Medtronic was required to disclose the [REDACTED] theory it now relies on to attempt to defeat this motion.<br><br>Dr. Irazoqui also confirmed that Dr. Mihran had not offered opinions related to anything other than wholesale replacement of code:<br><br>"[REDACTED]." *Id.* at 162:19- |

| Medtronic Additional Material Fact | Axonics' Response |
|---|---|
| | 163:19. |
| 145. Dr. Irazoqui testified as follows: [redacted] Nisbet Decl., Ex. 20 (Irazoqui Dep. Tr.) at166:11–22. | Undisputed that Dr. Irazoqui made the quoted statement, but it does not create a genuine dispute of material fact. Medtronic takes this quote out of context. Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely.<br><br>Axonics incorporates as if stated in full herein its response to DAF 144. Axonics objects under FRE 402, 403, 37. |
| 146. [redacted] Dkt. 360-39 at AX1091358. | Undisputed as to the quote for the document. But Medtronic's characterization of the [redacted] Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely.<br><br>[redacted] Axonics objects under FRE 402, 403, 37. |
| 147. [redacted] Dkt. 360-39 at AX1091387. | Undisputed as to the quote for the document. But Medtronic's characterization of the document is not supported by evidence sufficient to create a genuine dispute of fact. Axonics objects to Medtronic's reliance on any evidence related to [redacted] to allege infringement because such contentions are untimely. |

| Medtronic Additional Material Fact | Axonics' Response |
| --- | --- |
| | [redacted] Axonics objects under FRE 402, 403, 37. |

Dated: June 10, 2024

Respectfully submitted

*/s/ Matthew D. Powers*

Matthew D. Powers (Bar No. 104795)
William P. Nelson (Bar No. 196091)
Natasha M. Saputo (Bar No. 291151)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:   (650) 802-6000
Facsimile:    (650) 802-6001
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com

Azra M. Hadzimehmedovic (Bar No. 239088)
Aaron M. Nathan (Bar No. 251316)
Samantha A. Jameson (Bar. No. 296411)
Stephen K. Shahida (admitted *Pro Hac Vice*)
Danielle C. Pfifferling (admitted *Pro Hac Vice*)
Nathaniel D. Cook (admitted *Pro Hac Vice*)
TENSEGRITY LAW GROUP, LLP
1676 International Drive, Suite 910
McLean, VA 22102
Telephone:   (703) 940-5033
Facsimile:    (650) 802-6001
azra@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
stephen.shahida@tensegritylawgroup.com
danielle.pfifferling@tensegritylawgroup.com
nathaniel.cook@tensegritylawgroup.com

David M. Stein (Bar No. 198256)
Olson Stein LLP
240 Nice Lane #301
Newport Beach, CA 92663
Telephone: (949) 887-4600
dstein@olsonstein.com

*Attorneys for Defendant Axonics, Inc.*