1  Nimalka Wickramasekera (SBN: 268518)
   NWickramasekera@winston.com
2  WINSTON & STRAWN LLP
   333 S. Grand Avenue
3  Los Angeles, CA 90071-1543
   Telephone: (213) 615-1700
4  Facsimile:  (213) 615-1750

5  George C. Lombardi (*pro hac vice*)
   GLombardi@winston.com
6  Brian Nisbet (*pro hac vice*)
   BNisbet@winston.com
7  J.R. McNair (*pro hac vice*)
   JMcNair@winston.com
8  WINSTON & STRAWN LLP
   35 W. Wacker Drive
9  Chicago, IL 60601-9703
   Telephone: (312) 558-5600
10 Facsimile:  (312) 558-5700

11 Attorneys for Plaintiffs
   MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.;
12 MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC.

13

14                    **UNITED STATES DISTRICT COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16

17 MEDTRONIC, INC.; MEDTRONIC          **Case No.  8:19-cv-02115-DOC-JDE**
   PUERTO RICO OPERATIONS
18 CO.; MEDTRONIC LOGISTICS,
   LLC; MEDTRONIC USA, INC.,          **PLAINTIFFS' MEMORANDUM OF**
19                                     **CONTENTIONS OF FACT AND LAW**
              Plaintiffs,              **[L.R. 16-4]**
20
        v.                             Trial: September 3, 2024
21                                     Time: 8:30 A.M.
   AXONICS MOUDLATION                  Place: Courtroom 10A
22 TECHNOLOGIES, INC.,                 Judge: Hon. David O. Carter

23            Defendant.

24

25

26

27

28

# **TABLE OF CONTENTS**

UNITED STATES DISTRICT COURT .................................................................I

PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW [L.R. 16-4] ..........................................................................................................I

I.      BACKGROUND ......................................................................................1

II.     MEDTRONIC'S CLAIMS [L.R. 16-4.1(A)-(C)] ...................................1

    A.      Direct Infringement ..............................................................................1

        1.      Summary of Claim ...........................................................1
        2.      Elements Required ...........................................................2
        3.      Summary of Key Evidence ..............................................3

    B.      Indirect Infringement ...........................................................................9

        1.      Summary of Claim ...........................................................9
        2.      Elements Required ...........................................................9
        3.      Summary of Key Evidence ............................................11

    C.      Willful Infringement ..........................................................................14

        1.      Summary of Claim .........................................................14
        2.      Elements Required .........................................................14
        3.      Summary of Key Evidence ............................................14

    D.      Damages ..............................................................................................15

        1.      Summary of Claim .........................................................15
        2.      Elements Required .........................................................16
        3.      Summary of Key Evidence ............................................18

    E.      Injunction or Other Equitable Relief ..................................................19

        1.      Summary of Claim .........................................................19
        2.      Elements Required .........................................................19
        3.      Summary of Key Evidence ............................................20

    F.      Exceptional Case ................................................................................21

        1.      Summary of Claim .........................................................21
        2.      Elements Required .........................................................21
        3.      Summary of Key Evidence ............................................21

III.    AXONICS' DEFENSES [L.R.16-4.1(D)-(F)] ........................................21

    A.      Non-Infringement................................................................................21

        1.      Summary of Defense.......................................................22
        2.      Elements Required .........................................................22

i

|   |   | 3. | Summary of Key Evidence in Opposition | 23 |
|   | B. | Prosecution History Estoppel/Prosecution Disclaimer | | 23 |
|   |   | 1. | Summary of Defense | 23 |
|   |   | 2. | Elements Required | 23 |
|   |   | 3. | Summary of Key Evidence in Opposition | 23 |
|   | C. | Waiver/Estoppel | | 24 |
|   |   | 1. | Summary of Defense | 24 |
|   |   | 2. | Elements Required | 24 |
|   |   | 3. | Summary of Key Evidence in Opposition | 25 |
|   | D. | Invalidity | | 25 |
|   |   | 1. | Summary of Defense | 25 |
|   |   | 2. | Elements Required | 25 |
|   |   | 3. | Summary of Key Evidence in Opposition | 28 |
|   | E. | Limitation on Damages | | 29 |
|   |   | 1. | Summary of Defense | 29 |
|   |   | 2. | Elements Required | 29 |
|   |   | 3. | Summary of Key Evidence in Opposition | 30 |
|   | F. | Limitation on Recovery of Costs | | 30 |
|   |   | 1. | Summary of Defense | 30 |
|   |   | 2. | Elements Required | 30 |
|   |   | 3. | Summary of Key Evidence in Opposition | 31 |
| IV. | ANTICIPATED EVIDENTIARY ISSUES [L.R. 16-4(H)] | | | 31 |
| V. | IDENTIFICATION OF ISSUES OF LAW [L.R. 16-4(I)] | | | 32 |
| VI. | BIFURCATION OF ISSUES [L.R. 16-4.3] | | | 32 |
| VII. | JURY TRIAL [L.R. 16-4.4] | | | 32 |
| VIII. | ATTORNEYS' FEES [L.R. 16-4.5] | | | 33 |
| IX. | ABANDONMENT OF ISSUES [L.R. 16-4.5] | | | 33 |

Pursuant to Local Rule 16-4, Plaintiffs Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC; and Medtronic USA, Inc. (collectively, "Medtronic") submit these Contentions of Law and Fact.  Medtronic reserves all rights to amend or supplement the assertions contained in these Contentions, including supplementing, editing, or withdrawing any or all of the content below in response to the Memorandum of Contentions of Fact and Law submitted by Defendant Axonics Modulation Technologies, Inc. ("Axonics") or to address any issues that arise during pretrial proceedings for this case.  The Contentions do not specifically reference all the facts or law that Medtronic will present at trial.  The Contentions below are based on Medtronic's current understanding of the parties' claims in light of the Special Master's Report and Recommendation on Claim Construction, (Dkt. 163-1).   In addition, Medtronic reserves the right to amend or supplement the Contentions in response to resolution of the parties' summary judgment and *Daubert* motions.   Medtronic's inclusion of the Contentions below does not constitute a waiver or concession of any aspect of Medtronic's objections or arguments made in connection with those orders, nor does it constitute a waiver of Medtronic's right to appeal the same.

# I.      BACKGROUND

Medtronic has asserted five patents in this infringement action: U.S. Patent Nos. 8,036,756 ("the '756 patent"), 8,626,314 ("the '314 patent"), 9,463,324 ("the '324 patent"), 9,821,112 ("the '112 patent"), and 7,774,069 ("the '069 patent") (collectively, the "Asserted Patents").  Dkt. No. 28.  These patents generally and collectively relate to implantable medical device systems that use electrical energy, including for nerve stimulation.

# II.     MEDTRONIC'S CLAIMS [L.R. 16-4.1(A)-(C)]

## A.      Direct Infringement

### 1.      Summary of Claim

Medtronic asserts that Axonics and/or its customers has committed, and continues to commit, acts of direct infringement of claims 14 and 18 of the '756 patent;

1

claims 18–21 and 24 of the '314 patent; claims 1, 2, 4, 6–12, 14, 16, 17, 20, and 22–24 of the '324 patent; claims 1, 4–7, 16, 17, and 22 of the '112 patent; and claim 7 of the '069 patent (collectively "the Asserted Claims") under 35 U.S.C. § 271(a).  Medtronic asserts that Axonics infringes the Asserted Claims by literal infringement and/or under the doctrine of equivalents.

### 2.    Elements Required

To prove liability for direct infringement by literal infringement, Medtronic must prove by a preponderance of the evidence that (1) Medtronic has the right to sue for infringement of the Asserted Patents; (2) Axonics made, used, sold, or offered for sale in the United States, or imported into the United States, a product or process meeting all the requirements of an Asserted Claim; and (3) Axonics did so without Medtronic's authorization during the time the relevant patent was in force.  35 U.S.C. § 271(a).

To prove liability for direct infringement by the doctrine of equivalents, Medtronic must prove that while a limitation of the claim is not identically practiced by or present in an accused product or method, the limitation may be deemed present due to the presence of an equivalent structure or step.  *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). A structure or step is deemed equivalent when there is only an insubstantial difference between the structure or step and the claimed structure or step. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Courts also approach this inquiry through the "function-way-result" test, thereby analyzing whether the claimed invention and an accused device perform substantially the same function, in substantially the same way, to achieve substantially the same result. *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007). The equivalence between the accused product or method and the claimed element must be analyzed at the time of infringement. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997).

### 3.   Summary of Key Evidence

In support of its direct infringement claim, Medtronic will present at trial, among other evidence, evidence showing that Medtronic owns and has the right to sue for infringement of the seven Asserted Patents relating to implantable medical device systems, including those relating to a tined lead that facilitates minimally invasive implantation and fixation of the lead for sacral neuromodulation and those relating to control of the transcutaneous transfer of energy to the implantable medical device. Infringement evidence will show that Axonics has infringed and continues to infringe the '756 and '314 patents (collectively, the "Tined Lead Patents"), which relate to a method and apparatus for stimulation of the sacral nerves with an implantable medical electrical lead including "a fixation mechanism for providing chronic stability of the stimulation electrode and lead" by "anchoring" the "medical electrical lead electrodes in operative relation to a selected sacral nerve." Dkt. 28-1 at 1:18–28. Furthermore, the invention of the '756 and '314 patents "recognizes and provides a solution to the problems associated with implanting and maintaining electrical leads in body tissue … through minimally invasive implantation techniques." *Id.* at 5:33–38.  This will include evidence that Axonics infringes the Tined Lead Patents by making, selling, and using its Tined Lead Kit Models 1201 and 2201, Surgical Tool Kit Model 1801, and Model 1101 Neurostimulator (collectively, "Axonics' tined lead products").

Medtronic will present evidence that Axonics indirectly infringes method claims 18–21 and 24 of the '314 patent and claims 14 and 18 of the '756 patent by making, using, marketing and selling Axonics' tined lead products that when implanted by doctors satisfy all the requirement of those claims, including for example:

> percutaneously introducing an introducer comprising an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to a stimulation site;
> disposing an implantable medical lead within the introducer

> lumen, wherein the implantable medical lead comprises … a plurality of tine elements attached to the lead body along a second segment of the lead body between the first segment of the lead body and the lead proximal end, each tine element comprising a plurality of flexible tines that are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen and adapted to deploy outward to engage body tissue when the introducer is withdrawn …
>
> withdrawing the introducer toward the lead proximal end from the plurality of tine elements to release the plurality of tines.

*See* '756 patent, claim 14.

Thus, Medtronic will prove direct infringement of these claims by doctors using Axonics tined lead products. These claims present the same dispute discussed above regarding "plurality of tine elements," which Medtronic will prove is present in Axonics tined lead products either literally or under the doctrine of equivalents.

As to infringement of the '314 and '756 patents, Medtronic expects to present evidence that may include testimony from witnesses Dr. Toby Chai, Dr. George Mamo, Dr. Karen Noblett, John Woock, Prabodh Mathur, Henry Lee, Guangqiang Jiang, Rinda Sama, and Raymond Cohen, among others. Additionally, Medtronic will present documents and other evidence of infringement, including the Tined Lead Patents and their file histories, which include provisional applications leading to the Asserted Patents, the claim constructions, Axonics' correspondence, technical, and regulatory documents showing the design, structure, function, operation, manufacture, testing, and use of the Axonics r-SNM System, physical samples and pictures of the accused Axonics r-SNM System; instructions and advertising for the Axonics r-SNM System; discovery responses; and all evidence, documents, tests, and testimony cited in Medtronic's expert reports. To the extent Axonics offers testimony from other witnesses, Medtronic may also rely on or offer testimony from those witnesses.

Medtronic will also present evidence that Axonics infringes the '324 and '112

patents (collectively, the "Temperature Control Patents"), which relate to using an external device to transcutaneously charge an implanted medical device with the aid of a temperature sensor to limit the temperature of the external device to which a patient is exposed to ensure patient safety. Dkt. 163-1 at 5. This will include evidence that Axonics, makes, uses, sells, and offers to sell its r-SNM System, which includes Model 1101 Neurostimulator and Model 1401 charging system that includes a temperature sensor, which meet, for example:

> an external charging device configured to transcutaneously transfer energy to the implantable medical device comprising: *a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device; a control circuit configured to compare the measured temperature to a programmable limit and to control the transfer of energy based on the comparison*; and *a memory configured to store the programmable limit*.

and:

> an external device comprising: … *a temperature sensor adapted to provide an output indicative of a temperature of the side of the housing*; and *control circuitry adapted to control the transfer of energy to the implantable medical device based on the output of the temperature sensor to limit a temperature to which a patient is exposed during the transfer of energy to the implantable medical device*.

*See* '112 patent, claim 1; '324 patent, claim 1.

With respect to claim 1 of each of the Temperature Control Patents, Medtronic understands that the disputed limitations in Axonics' accused products are the "sensor," "control circuit…," "a memory configured to store the programmable limit" ('112 patent); "temperature sensor…" and "control circuitry…" ('324 patent) (bold and italicized in above claim language). Medtronic will present evidence that Axonics' IPG and CD literally meet these limitations under the Special Master's claim construction of "indicative of" as "serving as a sign of." Dkt. No. 163-1 at 41. Medtronic will prove that Axonics' CD (the external device) contains (1) a temperature sensor, such as the

CD Patient Temperature Sensor, adapted to provide an output that serves as a sign of the temperature of the side of the CD housing, and (2) a control circuitry, circuitry including a microcontroller, adapted to control the transfer of energy between the CD and IPG based on the output of the temperature sensor to limit a temperature to which a patient is exposed during the transfer of energy to the implantable medical device. For example, the CD will enter a thermal shut off behavior when CD Patient Temperature Sensor reports greater than 41C°.

Similarly, Medtronic will also prove for the '112 patent claim 1 that Axonics CD is an external device that has (1) multiple temperature sensors, including the CD Patient Temperature sensor, configured to measure a temperature that serves as a sign of heat resulting from the transcutaneous transfer of energy to the implantable medical device; and (2) a control circuit, including the microcontroller, configured to compare the measured temperature to a programmable limit (which has been construed to mean "a limit that can be programmed during or after manufacture") and to control the transfer of energy based on the comparison; and a memory, such as flash memory, configured to store the programmable limit.

The evidence Medtronic will present regarding infringement of the '324 and '112 patents may include testimony from witnesses Dr. Richard T. Mihran, Faizal Abdeen, Prabodh Mathur, Rinda Sama, Dr. Jiang, and Raymond Cohen, among others. Additionally, Medtronic will present documents and other evidence of infringement, including the Temperature Control Patents and their filing histories, which include provisional applications leading to the Asserted Patents, the claim constructions, Axonics' correspondence, technical and regulatory documents, source code, and testing data showing the design, structure, function, operation, manufacture, testing, and use of the Axonics r-SNM System; physical samples and pictures of the accused Axonics r-SNM System; instructions and advertising for the Axonics r-SNM System; and discovery responses.  To the extent Axonics offers testimony from other witnesses, Medtronic may also rely on or offer testimony from those witnesses.

Additionally, Medtronic will present evidence that Axonics infringes the '069 patent (the "Charge Control Patent"). The '069 patent relates to a system for transcutaneous energy transfer that includes that the current in the battery of the implantable medical device declines as the voltage of the battery increases during a charging cycle. Dkt. 28-7 at 23:22–39. The evidence will show that Axonics infringes the Charge Control Patent by making, using, selling, and offering to sell its r-SNM System, which includes Model 1101 Neurostimulator and Model 1401 charging system.

For the '069 patent, Medtronic understands that Axonics disputes the following limitations, including primarily the bolded:

> (claim 5) "an alignment indicator, operatively coupled to said internal power source, measuring said current and reporting an alignment between said primary coil and said secondary coil based on said current"
>
> (claim 5) "wherein said external power source automatically varies its power output in order to generate a predetermined current in said internal power source"
>
> (claim 6) "The system as in claim 5 wherein said predetermined current in said internal power source varies as a function of a voltage of said internal power source"
>
> (claim 7) "The system as in claim 6 ***wherein said predetermined current in said internal power source declines as said voltage of said internal power source increases during a charging cycle***"

Medtronic will present evidence that Axonics' IPG and CD meet the bolded limitation under the Special Master's claim construction of claim 7 as "wherein said predetermined current in said internal power source declines as said voltage of said internal power source increases during a charging cycle, which does not include instances in which said predetermined current in said internal power source declines only after the voltage of the internal power source increases during a charging cycle, and which does not include a two-phase charging cycle with a constant current phase followed by a roughly constant voltage phase." Dkt. 163-1 at 86.

7

Medtronic will prove, among other things, that the accused r-SNM system infringes "an alignment indicator … measuring said current and reporting an alignment between said primary coil and said secondary coil based on said current" in claim 5 under the doctrine of equivalents because the device output is equivalent to "said current"—the "current through said internal power source" generated through the induced field. Medtronic will also prove literally or under the doctrine of equivalents that the Axonics' CD automatically varies its power output to generate a predetermined current in the IPG battery (as recited in claim 5). Furthermore, Medtronic will prove that the accused r-SNM system also meets claim 6 (wherein said predetermined current in said internal power source varies as a function of a voltage of said internal power source). For claim 7, Medtronic will prove the accused system meets the limitation of "wherein said predetermined current in said internal power source declines as said voltage of said internal power source increases during a charging cycle".

This evidence may include testimony from witnesses Dr. Richard T. Mihran, Faizal Abdeen, Prabodh Mathur, Rinda Sama, and Raymond Cohen, among others. Additionally, Medtronic will present documents and other evidence of infringement, including the Charge Control Patents and their filing histories, which include provisional applications leading to the Asserted Patents, the claim constructions, Axonics' correspondence, technical and regulatory documents, source code, and testing data showing the design, structure, function, operation, manufacture, testing, and use of the Axonics r-SNM System; physical samples and pictures of the accused Axonics r-SNM System; instructions and advertising for the Axonics r-SNM System; and discovery responses.  To the extent Axonics offers testimony from other witnesses, Medtronic may also rely on or offer testimony from those witnesses.

Medtronic reserves the right to amend its summary and list of evidence, including adding to or removing from it.  In particular, Medtronic reserves the right to supplement, edit, and withdraw evidence from this list in response to Axonics' Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial

1  proceedings for this case.

2      **B.**    **Indirect Infringement**

3          **1.**    **Summary of Claim**

4      Medtronic asserts that Axonics has actively induced infringement, and continues

5  to actively induce infringement, of the Asserted Claims under 35 U.S.C. § 271(b) by

6  inducing users to directly infringe either literally or under the doctrine of equivalents.

7  Medtronic also asserts that Axonics has contributorily infringed the Asserted Claims

8  under 35 U.S.C. § 271(c) by knowingly offering for sale and selling the Axonics r-SNM

9  System, which has no substantial non-infringing uses and which when used causes the

10  direct infringement of the Asserted Claims. Medtronic also asserts that Axonics has

11  induced infringement of the Asserted Claims under 35 U.S.C. § 271(f)(1) by, without

12  authority, supplying the Axonics r-SNM System or by causing the Axonics r-SNM

13  System to be supplied from the United States to be used in a manner infringing the

14  Asserted Claims.

15          **2.**    **Elements Required**

16      Axonics is liable for induced infringement if Medtronic proves by a

17  preponderance of the evidence that Axonics induced another to directly infringe an

18  asserted claim either literally or under the doctrine of equivalents. *See* 35 U.S.C.

19  § 271(b); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed.

20  Cir. 2002).

21      To prove liability for induced infringement, Medtronic must prove by a

22  preponderance of the evidence that (1) the acts carried about by Axonics' end users of

23  the accused products directly infringe an asserted claim; (2) Axonics took action that

24  was intended to cause the infringing acts by Axonics' end users; and (3) Axonics was

25  aware of the asserted patent and knew that the acts, if taken, would constitute

26  infringement of the asserted patent or that Axonics believed there was a high probability

27  that the acts by its end users would infringe the asserted patent and took deliberate steps

28  to avoid learning of that infringement. *See* Fed. Cir. Bar Association Model Jury

9

1  Instructions at 24 (B.3.2.) (2020); *3M v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed.

2  Cir. 2002); *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed.

3  Cir. 2017).

4       To show direct infringement by Axonics' end users, Medtronic must prove by a

5  preponderance of the evidence that end users perform all steps of an asserted claim. *See*

6  Fed. Cir. Bar Association Model Jury Instructions at 18 (B.3.1a); *Exergen Corp. v. Wal-*

7  *Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009); *Advanced Cardiovascular Sys.,*

8  *Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001).

9       Even if the actions of Axonics' end users do not literally meet all the elements of

10  a claim, Medtronic can show direct infringement of a claim under the doctrine of

11  equivalents. Under the doctrine of equivalents, Axonics' end users directly infringe a

12  claim if the end users perform steps that literally meet or are equivalent to every element

13  of the claim. *See* Fed. Cir. Bar Association Model Jury Instructions at 21 (B.3.1c); *Ottah*

14  *v. Bracewell LLP*, No. 2022-1876, 2022 WL 16754378, at *2 (Fed. Cir. Nov. 8, 2022).

15  A step is equivalent to a claim element that is not met literally if a person having

16  ordinary skill in the field of technology of the patent would have considered the

17  differences between them to more likely than not be "insubstantial" or would have

18  found that the action: (1) performs substantially the same function (2) in substantially

19  the same way (3) to achieve substantially the same result as the claim element. *See* Fed.

20  Cir. Bar Association Model Jury Instructions at 21 (B.3.1c); *Mylan Inst. LLC v.*

21  *Aurobindo Pharma Ltd.*, 857 F.3d 858, 866–67 (Fed. Cir. 2017); *Huang v. Auto-Shade,*

22  *Inc.*, 945 F. Supp. 1307, 1311 (C.D. Cal. 1996).

23       To prove Axonics is liable for contributory infringement, Medtronic must prove

24  that Axonics offered for sale or sold the Axonics r-SNM System and (1) that Axonics

25  had knowledge of the Asserted Patents, (2) that Axonics had knowledge of patent

26  infringement, and (3) that the Axonics r-SNM System is not a staple article or

27  commodity of commerce suitable for a substantial noninfringing use. *Bio-Rad Labs.,*

28  *Inc. v. ITC*, 998 F.3d 1320, 1335 (Fed. Cir. 2021). Medtronic must only prove Axonics'

knowledge of the Asserted Patents and knowledge of infringement. Medtronic is not required to prove Axonics' intent. *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1356 (Fed. Cir. 2018).

To prove Axonics is liable for induced infringement under 35 U.S.C. § 271(f)(1), Medtronic must show that Axonics supplied or caused to be supplied components of the Axonics r-SNM System, where such components were uncombined in whole or in part, in such a manner as to actively induce the combination of such components outside the United States in such a manner as would infringe within the United States.

### 3.   Summary of Key Evidence

In support of its indirect infringement claims, Medtronic will introduce evidence to show that Axonics directs users of the Axonics r-SNM System, through manuals and instructions, to infringe the Tined Lead Patents by performing an implantation method for "percutaneously introducing an introducer comprising an introducer lumen," "disposing an implantable medical lead within the introducer lumen," "withdrawing the introducer toward the lead proximal end from the plurality of tine elements to release the plurality of tines." *See* '756 patent, claim 14. Medtronic will present evidence that Axonics indirectly infringes these claims by inducing doctors to directly infringe by performing the claimed method steps and contributing to their infringement.  For example, Medtronic will present evidence that doctors practice each method step of these claims when they implant Axonics' tined lead through an introducer, including by following Axonics' instruction manuals.  Medtronic will also present evidence that Axonics and its employees have been aware of Medtronic's Tined Lead Patents long before this litigation, including during the design and development of Axonics' tined lead products.  Medtronic will also present evidence that in spite of Axonics' knowledge of Medtronic's Tined Lead Patents and notice of its infringement at least as of November 4, 2019, Axonics has continued to intentionally instruct doctors to practice the method steps of the Tined Lead Patents through its marketing, promotional, and training materials.  Medtronic will also present evidence that Axonics' tined lead and

introducer are not staple goods, rather they are specifically designed to be used with other components of Axonics system, and have no substantial noninfringing use.

Medtronic will also show that Axonics induces infringement of the Temperature Control Patents by providing the Axonics r-SNM System with instructions and manuals to users such as customers, patients, hospitals, medical centers, clinics, clinicians, doctors, nurse practitioners, care providers, sales representatives, suppliers, distributors, and resellers, who, in turn, use, provision for use, test, offer for sale, or sell the Axonics r-SNM System in a manner that directly infringes the Temperature control patents.  For example, the evidence will show that, on the direction of Axonics, users of the Axonics r-SNM System use:

> an external charging device configured to transcutaneously transfer energy to the implantable medical device comprising; a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device; a control circuit configured to compare the measured temperature to a programmable limit . . .

*See* '112 Patent, Claim 1.

Medtronic will also introduce evidence showing that Axonics indirectly infringes the Charge Control Patent by providing the Axonics r-SNM System with instructions and manuals to users such as customers, patients, hospitals, medical centers, clinics, clinicians, doctors, nurse practitioners, care providers, sales representatives, suppliers, distributors, and resellers, who, in turn, use, provision for use, test, offer for sale, or sell the Axonics r-SNM System in a manner that directly infringes the Charge Control Patent. For example, the evidence will show that, on the direction of Axonics, users of the Axonics r-SNM System use an:

> an external power source having a primary coil, said external power source providing energy to said implantable medical device when said primary coil of said external power source is placed in proximity of said secondary coil of said implantable medical device and thereby generating a current through said internal power source; an alignment indicator, operatively coupled to said internal power source, measuring said current and

12

reporting an alignment between said primary coil and said
secondary coil based on said current; and wherein said external
power source automatically varies its power output in order to
generate a predetermined current in said internal power source.

*See* '069 patent, claim 5.


The above will be supported by evidence referenced above in section II.A. It will
also be supported by evidence showing that Axonics provides user instructions and
manuals accompanying its products for the Axonics r-SNM System as well as other
marketing and promotional materials that instruct, direct, and knowingly and
intentionally induce others to use the Axonics r-SNM System in a matter that infringes
the Asserted Claims. Further, the foregoing evidence will include the accused Axonics
r-SNM System itself, documentary evidence such as Axonics' regulatory filings,
training materials, advertisements, correspondence and design documents; and all
evidence, documents, tests, and testimony cited in Medtronic's expert reports.
Medtronic may also present testimony from witnesses, including at least Dr. Toby Chai,
Dr. Richard T. Mihran, Karen Noblett, John Woock, Prabodh Mathur, Henry Lee,
Guangqiang Jiang, Rinda Sama, Raymond Cohen, and Faizal Abdeen. To the extent
Axonics offers testimony from other witnesses, Medtronic may also rely on or offer
testimony from those witnesses.

Evidence will also show that Axonics had knowledge of the Asserted Patents, as
well as knowledge of patent infringement. This evidence includes Axonics' documents
and statements that Axonics spent significant resources studying the intellectual
property landscape in the sacral neuromodulation space, as well as the statement from
its CEO that he was "very familiar" with the patents that are the subject of the litigation.
*See* Dkt. 28, First Am. Compl. ¶¶ 51, 68, 85, 102; MDT-00003321–3323.

Medtronic will also introduce evidence showing that when used or tested by end
users within the United States and abroad, the accused Axonics r-SNM System contains

parts or steps that are identical or equivalent to each and every element of the asserted claims. That is, the accused r-SNM System performs substantially the same function, in substantially the same way, to achieve substantially the same result as the products covered by the Asserted Patents. This evidence will show that Axonics has supplied or caused to be supplied abroad its Axonics r-SNM System to infringing end users.

Medtronic will also present evidence that Axonics has committed, and continues to commit contributory infringement by, inter alia, knowingly offering for sale and selling the Axonics r-SNM System, which has no substantial non-infringing uses, and which when used in its normal and customary way as desired and intended by Axonics, causes the direct infringement of the Asserted Claims.

The above will include evidence showing that Axonics indirectly infringes the Asserted Claims within the United States and abroad by, for example, designing and selling its Axonics r-SNM System in such a way that requires end users to combine or use the components of the Axonics r-SNM System in an infringing manner and to utilize an implantation mechanism and method covered by the Tined Lead Patents.

### C.   Willful Infringement

#### 1.   Summary of Claim

Medtronic asserts that Axonics has willfully infringed, and continues to willfully infringe, the Asserted Claims by deliberately or intentionally engaging in acts of infringement on an ongoing basis with knowledge of Medtronic's patents.

#### 2.   Elements Required

To show that Axonics' infringement was willful, Medtronic must prove by a preponderance of the evidence that Axonics knew of the Asserted Patents and that Axonics' infringement was deliberate or intentional. See Fed. Cir. Bar Association Model Jury Instructions at 35–36 (B.3.10); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–06 (2016).

#### 3.   Summary of Key Evidence

In support of its willful infringement claim, Medtronic will present at trial, among

1   other evidence, evidence showing that Axonics had knowledge of the Asserted Patents.

2   As discussed above, this evidence includes documents, correspondence, and statements

3   from Axonics' employees acknowledging that Axonics was familiar with the Asserted

4   Patents and the Accused Products. Additional evidence includes discovery documents

5   such as Axonics' responses to Medtronic's RFAs and Interrogatories, Medtronic's

6   response to Axonics' RFAs and Interrogatories, and the file histories of the asserted

7   patents including the inter partes review histories.  Medtronic incorporates by reference

8   the evidence and witnesses listed with respect to section II.B above.

9       Evidence will also show that Axonics intentionally provides the Axonics r-SNM

10  System to others, such as customers, patients, hospitals, medical centers, clinics,

11  clinicians, doctors, nurse practitioners, care providers, sales representatives, suppliers,

12  distributors, and resellers, who, in turn, use, provision for use, test, offer for sale, or sell

13  the Axonics r-SNM System in a manner that directly infringes the Asserted Claims.

14  Although Axonics claims it reasonably believed it did not infringe the asserted patents,

15  it did not perform any investigations, such as conducting freedom to operate

16  investigations to assess whether it infringed the asserted patents.

17      Evidence will also show that Axonics provides user instructions and manuals

18  accompanying its products for the Axonics r-SNM System, as well as other marketing

19  and promotional materials that instruct, direct, and intentionally induce others to use the

20  Axonics r-SNM System in a manner that directly infringes the Asserted Claims.

21  Medtronic will present additional evidence that Axonics has hired a U.S. sales team that

22  has been involved with and continues to be involved with the distribution of marketing

23  promotional, and training materials, which instructs Axonics' customers regarding the

24  use of the Axonics r-SNM System in a manner that directly infringes the Asserted

25  Patents.

26  **D.   Damages**

27      **1.   Summary of Claim**

28  Medtronic seeks to recover damages from Axonics pursuant to 35 U.S.C. § 284

15

adequate to compensate it for Axonics' infringement, but in no event less than a reasonable royalty for Axonics' unauthorized infringement of the Asserted Claims.

Medtronic also seeks to recover pre-judgement and post-judgment interest and costs pursuant to 35 U.S.C. § 284. Medtronic seeks to recover enhanced damages for Medtronic's willful infringement pursuant to 35 U.S.C. § 284.

## 2.     Elements Required

Medtronic is entitled to damages to compensate for Axonics' infringement of one or more of the Asserted Claims, but "in no event less than a reasonable royalty." 35 U.S.C. § 284.   Medtronic seeks damages in the form of both lost profits and a reasonable royalty. Medtronic must establish the amount of its damages by a preponderance of the evidence. *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017). Medtronic is not required to prove the amount of its damages with mathematical precision, it must only prove them with reasonable certainty. *See* Fed. Cir. Bar Association Model Jury Instructions at 55 (B.5.1); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1374 (Fed. Cir. 1991).

To recover lost profits, Medtronic "must show that 'but for' infringement it reasonably would have made the additional profits enjoyed by the infringer." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). "Once the patentee establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id.* The four-factor *Panduit* test is an accepted and useful way for a patentee to prove entitlement to lost profits damages. *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)). "The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." *Id.* "A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's *prima*

*facie* case with respect to 'but for' causation.  A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement.  When the patentee establishes the reasonableness of this inference, *e.g.*, by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales.  The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales." *Id.* (cleaned up).

Medtronic is entitled to at least a reasonably royalty. "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). *See* Fed. Cir. Bar Association Model Jury Instructions at 64 (B.5.6).  As a general matter, the reasonable royalty analysis considers the relevant facts and circumstances concerning the parties as of the time of the hypothetical negotiation, but the analysis is flexible—the fact-finder may also look to "events and facts that occurred thereafter and that could not have been known or predicted by the hypothesized negotiators" under the so called "Book of Wisdom." *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575–76 (Fed. Cir. 1988), *overruled on other grounds by Knorr Bremse Sys. Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004). Courts consider a variety of factors in determining the reasonable royalty that the parties would have agreed to in the "hypothetical negotiation," including the *Georgia-Pacific* factors. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

If Medtronic proves that Axonics' infringement was willful, the Court may award increased damages of up to three times the amount of damages found or assessed. 35 U.S.C. § 284; *Halo Elecs.*, 579 U.S. at 93.

If Medtronic is the prevailing party in this case, then Medtronic is entitled to interest and costs as fixed by the Court. *See* 35 U.S.C. § 284.

### 3.     Summary of Key Evidence

In support of its damages claim, Medtronic will present evidence showing that, among other things, Axonics specifically targeted Medtronic's customers to convert them to Axonics. Medtronic will present evidence that Axonics has taken a significant market share from Medtronic.

In support of its lost profits damages claims, Medtronic will present evidence, including testimony by Medtronic's fact and expert witnesses, regarding the *Panduit* factors.  Medtronic will present evidence that it has marketed and continues to market competing products that practice an Asserted Claim of each Asserted Patent.  Medtronic will present evidence that sales of the accused products and sales of the Medtronic's competing products establish demand for the patented products.  Medtronic will present evidence that there are no available or acceptable non-infringing substitutes to the asserted patents or Medtronic's competing products. Medtronic will present evidence that there were no FDA approved, available or acceptable noninfringing alternatives on the market at the time of infringement.  And Axonics will be unable to meet its burden in showing that an alternative not on the market is available. Indeed, the undisputed evidence establishes that the finned lead, Axonics' redesign, and Axonics' F15 product (before April 2022) were not available during the damages period. Medtronic will present evidence that it had capacity in its various manufacturing facilities and sufficient sales and marketing resources to meet additional demand.  Medtronic will also present evidence of its lost profits due to Axonics' infringement, through expert analysis that determines the amount of lost sales that Medtronic would have captured in the but for world, and the expected profits that would have come from those sales.  Medtronic will also present evidence that Axonics redesign continues to infringe and is therefore not available, including documentary evidence from Axonics and the FDA, and expert testimony of Dr. Mihran and all supporting documents.  Medtronic will also present evidence that the redesign presents an unacceptable risk to patients, including the testimony of Dr. Mihran and Axonics and FDA documents.

In support of its reasonable royalty damages claims, Medtronic will present evidence, including testimony by Medtronic's fact witnesses and experts, regarding the hypothetical negotiation between Medtronic and Axonics to license the Asserted Patents in exchange for a reasonable royalty. Medtronic will present evidence related to the *Georgia-Pacific* factors, which will include, among other quantitative and qualitative analyses, identification of the smallest saleable patent practicing unit, an analysis of the revenue, costs, and profits associated with those units, the technological and economic similarities and dissimilarities of potentially relevant license agreements, the history of Medtronic and Axonics and the competitive relationship between Medtronic and Axonics, and additional methods to apportion value to the asserted patents including through patent citation analysis.

In support of its claims for enhanced damages, Medtronic will present at trial, among other evidence, evidence showing that Axonics willfully infringed the Asserted Patents.

The jury will be asked to determine Medtronic's damages up to and including May 31, 2024, the last date for which Axonics provided sales data for the accused products. Medtronic will prove and seek supplemental damages from June 1, 2024, through the date of the verdict, as well as ongoing post-verdict damages.

The evidence will include, without limitation, technical, regulatory, financial, and marketing documents from Axonics and Medtronic and other communications, discovery responses, testimony from fact witnesses and testimony from expert witnesses, including Linnea Burman, Raj Thomas, Dr. Chai, Dr. Mihran, Dr. Berger, and Mr. McDuff, including materials cited in Medtronic's expert reports.

### E.      Injunction or Other Equitable Relief

#### 1.      Summary of Claim

Following a trial on the merits, and upon a finding of infringement, Medtronic seeks a permanent injunction against future, ongoing infringement.

#### 2.      Elements Required

To obtain an injunction, Medtronic must prove infringement of at least one asserted claim and further prove that: (1) it has suffered an irreparable harm injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006). If the Court declines to grant injunctive relief, it may exercise its equitable authority to award other prospective relief, including an ongoing running royalty for the life of the infringed patents. 35 U.S.C. § 283; *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 733 F.3d 1369, 1375, 1379 (Fed. Cir. 2013).

### 3.   Summary of Key Evidence

In support of its request for a permanent injunction, Medtronic will prove that it can meet the four factors set forth in *eBay*. 547 U.S. at 391 (2006). Medtronic will prove that it has—and continues to—suffer irreparable harm from Axonics' infringement because before the launch of the Accused Products, Medtronic's InterStim products were "the only implantable device approved for SNM therapy." AX0009607–668 at 616; AX0383890–918 at 892; AX0744774–777 at 774. As such, Axonics directly competes with Medtronic in a two-player sacral neuromodulation market. Courts have found that where the accused infringer directly competes with the patentee in the market for the patented technology, the patentee generally has an easier burden in showing irreparable harm. *See, e.g.*, *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1337–38 (Fed. Cir. 2013). Axonics' infringement has also caused past harm to Medtronic's market share, revenue, and brand recognition, which supports the finding of irreparable injury and inadequacy of monetary damages.

Medtronic will also prove that monetary damages are inadequate to compensate for its injury caused by Axonics' infringement, and that equitable relief is warranted considering the balance of hardships to the parties. The public will also not be harmed by an injunction. Medtronic can continue to supply the demands with its InterStim

20

system such that no shortage occurs, and patient needs are met. The public also has an interest in upholding patent rights and that the grant of injunction would strike a proper balance between protecting Medtronic's patent rights (including the right to exclude) and protecting the public from the injunction's adverse effects, if any.

The evidence will include, without limitation, technical, regulatory, financial, and marketing documents from Axonics and Medtronic and other communications, discovery responses, testimony from fact witnesses and testimony from expert witnesses, including Dr. Chai, Dr. Mihran, Dr. Berger, and Mr. McDuff, including materials cited in Medtronic's expert reports.

### F.   Exceptional Case

#### 1.   Summary of Claim

Medtronic seeks a declaration that this case is exceptional along with a corresponding award of attorney fees pursuant to 35 U.S.C. § 285.

#### 2.   Elements Required

An "'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

#### 3.   Summary of Key Evidence

In support of its request for a declaration that this case is exceptional, Medtronic will rely on the same evidence in support of its claims of infringement and willful infringement. Medtronic will also rely on evidence of Axonics' efforts, or lack thereof, to design around the Asserted Patents or otherwise avoid infringement, Axonics' litigation tactics and the consequent burden imposed on Medtronic, and Axonics' parallel proceedings in the PTAB challenging Medtronic's patents.

### III.   AXONICS' DEFENSES [L.R.16-4.1(D)-(F)]

#### A.   Non-Infringement

1

### 1.    Summary of Defense

2     Axonics asserts that it does not infringe claims 14 and 18 of the '756 patent,

3 claims 18-21 and 24 of the '314 patent, claims 1, 2, 4, 6-12, 14, 16, 17 and 20, 22-24 of

4 the '324 patent, claims 1, 4-7, 16-17 and 22 of the 112 patent, and claim 7 of the '069

5 patent under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(b), either literally or under the

6 doctrine of equivalents.

7

### 2.    Elements Required

8     To prove direct infringement by literal infringement, Medtronic must show that

9 the Axonics r-SNM System contains every limitation claimed in the Asserted Patents.

10 To prove noninfringement, Axonics must establish that the accused product does not

11 meet a limitation of the Asserted Claims. *See Riles v. Shell Expl. & Prod. Co.*, 298 F.3d

12 1302, 1308 (Fed. Cir. 2002).

13     In order to prove liability for direct infringement by the doctrine of equivalents,

14 Medtronic must show that while a limitation of the claim is not identically practiced by

15 or present in an accused product or method, the limitation may be deemed present due

16 to the presence of a substantially equivalent structure or step. *Mylan Institutional LLC*

17 *v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). Axonics may attempt

18 to show insubstantiality by proving that the accused Axonics r-SNM System does not

19 perform substantially the same function in substantially the same way to obtain

20 substantially the same result as the products covered by the Asserted Claims. *Catalina*

21 *Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 813 (Fed. Cir. 2002).

22     To prove liability for indirect infringement, Medtronic must show that Axonics

23 knowingly, or with willful blindness, committed acts that led to direct infringement.

24 *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir.

25 2019). Axonics may establish that it does not indirectly infringe the Asserted Claims by

26 either showing that the end users of its product do not directly infringe the Asserted

27 Claims or that Axonics did not know of, and was not willfully blind to, the direct

28 infringement by the end users of its products. *See Unwired Planet, LLC v. Apple Inc.*,

22

829 F.3d 1353, 1364 (Fed. Cir. 2016); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004).

### 3. Summary of Key Evidence in Opposition

As discussed above with respect to section II.A, as key evidence in opposition of Axonics' noninfringement defense, Medtronic will present at trial, among other evidence, manuals, instructions, and marketing materials for use of the Axonics r-SNM System, testimony from fact and expert witnesses; the Tined Lead Patents, Temperature Control Patents, and Charge Control Patents and their filing histories; patents covering the accused products, the Axonics r-SNM System itself, documentary evidence such as Axonics' regulatory filings, training materials, and technical design and development documents showing the design, structure, function, and operation of the Axonics r-SNM System.

### B. Prosecution History Estoppel/Prosecution Disclaimer

#### 1. Summary of Defense

In defense against Medtronic's claims of infringement under the doctrine of equivalents, Axonics asserts that it is entitled to summary judgment of noninfringement of the '314, '756, and '069 patents under the doctrine of equivalents due to prosecution history estoppel / prosecution disclaimer on all of the Asserted Patents. Axonics argues that the claim limitations that Medtronic accuses it of infringing are within the subject matter that Medtronic surrendered and disclaimed during prosecution to overcome prior art.

#### 2. Elements Required

To support its prosecution history estoppel and prosecution disclaimer defenses, Axonics must show that Medtronic, during patent prosecution, made a clear and unmistakable surrender of the subject matter covered by the Asserted Claims. *See Amgen Inc. v. Coherus BioSciences, Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 828 (Fed. Cir. 1999).

#### 3. Summary of Key Evidence in Opposition

As key evidence in opposition to Axonics' defenses, Medtronic will present, among other evidence, the asserted patents, file histories (which include the inter partes review histories) of the asserted patents and related patents, claim constructions, and testimony from Medtronic's expert and fact witnesses.

### C.     Waiver/Estoppel

#### 1.     Summary of Defense

Axonics asserts that any claim for equitable relief relating to the Tined Lead Patents is barred by the doctrine of unclean hands and equitable estoppel. Axonics further asserts that the doctrine of waiver and equitable estoppel bars any claim for equitable relief related to the Temperature Control Patents and Charge Control Patents.

#### 2.     Elements Required

The doctrine of unclean hands prevents a court from awarding equitable relief to a plaintiff. To establish unclean hands, Axonics must demonstrate (1) inequitable conduct by Medtronic; (2) that Medtronic's conduct directly relates to the claim Medtronic has asserted against Axonics; and (3) Medtronic's conduct injured Axonics. Bad intent is the essence of the defense of unclean hands. *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1101 (C.D. Cal. 2019).

To bar Medtronic's suit under the equitable estoppel doctrine, Axonics must show (1) that Medtronic, through misleading conduct or silence, led Axonics to reasonably infer that Medtronic did not intend to enforce its patent against Axonics; (2) that Axonics relied on Medtronic's representation, and (3) that Axonics will be materially prejudiced if Medtronic is allowed to proceed with its claim. *Radio Sys. Corp. v. Tom Lalor & Bumper Boy, Inc.*, 709 F.3d 1124, 1130 (Fed. Cir. 2013).

To establish a waiver defense, Axonics must prove by clear and convincing evidence that Medtronic, with full knowledge of the material facts, intentionally relinquished its rights to enforce the Asserted Claims or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1028

24

(Fed. Cir. 2008).

### 3. Summary of Key Evidence in Opposition

As key evidence in opposition to Axonics' waiver/estoppel defense, Medtronic will present, among other evidence, such as the testimony of Linnea Burman and Andrew Schmeling, the testimony of Medtronic's expert witnesses, Axonics' fact witnesses, such as Raymond Cohen, and experts, the file histories (which include the inter partes review histories) of the Asserted Patents and related patents, the prior art identified and relied upon by Axonics, the correspondences and communications, documents including regulatory, technical, marketing, presentations and financial documents.

### D. Invalidity

#### 1. Summary of Defense

Axonics asserts as invalid under either 35 U.S.C. §§ 102, 103 and/or 122, in whole or in part, claims 14 and 18 of the '756 patent; claims 18-21 and 24 of the '314 patent; claims 1, 2, 4, 6-12, 14, 16, 17, 20, and 22-24 of the '324 patent; claims 1, 4-7, 16-17, and 22 of the '112 patent; and claim 7 of the '069 patent.

#### 2. Elements Required

The Asserted Claims are presumed to be valid, and Axonics has the burden of proving invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

To establish that any of the Asserted Claims are invalid as anticipated under 35 U.S.C. § 102. Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that all the requirements of each claim are present in a single piece of prior art before the claim's priority date. *See* Fed. Cir. Bar Association Model Jury Instructions at 48 (B.4.3b-1); *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1343 (Fed. Cir. 2018).

To establish that any of the Asserted Claims are invalid due to incorrect inventorship under 35 U.S.C. § 102(f), Axonics must prove by clear and convincing

evidence that the named inventors did not themselves invent the subject matter sought to be patented. *In re Verhoef*, 888 F.3d 1362, 1367 (Fed. Cir. 2018); *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997).

To establish that any of the Asserted Claims are invalid as obvious under 35 U.S.C. § 103, Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the original application was filed. *See* Fed. Cir. Bar Association Model Jury Instructions at 50 (B.4.3c); *In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir. 2018). A claim is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention." 35 U.S.C. § 103; *see also Genzyme Corp. v. Dr. Reddy's Labs., Ltd*., 716 F. App'x 1006, 1008 (Fed. Cir. 2017). This requires showing that a person having ordinary skill in the art would have been motivated to combine the teachings of prior art references to achieve the claimed invention and would have had a reasonable expectation success in doing so. *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd*., 821 F.3d 1359, 1367–78 (Fed. Cir. 2016). Objective indicia of non-obviousness, such as commercial success of the invention, long felt and unresolved need, failure of others, skepticism by experts, industry praise, teaching away, and copying, may be evidence that the invention is non-obvious. *In re Kavanagh*, 851 F. App'x 1028, 1033 (Fed. Cir. 2021).

The petitioner in an *Inter Partes* Review ("IPR") of a claim in a patent that results in a final written decision may not assert in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the IPR. 35 U.S.C. § 315(e); *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022) ("estoppel applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which reasonably could have been asserted against the claims included in the petition"). Although in general IPR estoppel does not apply to system or device art, "if a patent

1    challenge is simply swapping labels for what is otherwise a patent or printed publication

2    invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel." *California*

3    *Inst. of Tech. v. Broadcom Ltd.*, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019),

4    *aff'd*, 25 F.4th 976 (Fed. Cir. 2022).

5         Axonics also asserts that certain claims are in valid under 35 U.S.C. § 112 for

6    being indefinite, lacking written description, and lacking enabling disclosures. Axonics

7    must prove indefiniteness by clear and convincing evidence.  *Biosig Instruments, Inc.*

8    *v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed Cir. 2015). "A claim is indefinite only if,

9    when read in light of the specification and prosecution history, it fail[s] to inform, with

10   reasonable certainty, those skilled in the art about the scope of the invention." *Niazi*

11   *Licensing Corp.*, 30 F.4th at 1346; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S.

12   898, 901 (2014).

13        The test for written description is whether the specification "conveys to those

14   skilled in the art that the inventor had possession of the claimed subject matter as of the

15   filing date." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc*., 665 F.3d 1269, 1285 (Fed.

16   Cir. 2012). "This test requires an 'objective inquiry into the four corners of the

17   specification from the perspective of a person of ordinary skill in the art.'" *id.* There is

18   no requirement that a patent describe the unclaimed features of the infringing product.

19   *See e.g., AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285,

20   1301 (Fed. Cir. 2014).

21        Axonics also "bears the burden, throughout the litigation, of proving lack of

22   enablement by clear and convincing evidence."  *Cephalon, Inc. v. Watson Pharms.,*

23   *Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013).  "[T]o be enabling, the specification of a

24   patent must teach those skilled in the art how to make and use the full scope of the

25   claimed invention without undue experimentation."  *In re Wright,* 999 F.2d 1557, 1561

26   (Fed. Cir. 1993).  "Section 112 requires enablement of only the claimed invention, not

27   matter outside the claims."  *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d

28   1091, 1100 (Fed. Cir. 2020).  "The dispositive question of enablement does not turn on

whether the accused product is enabled." *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306 (Fed. Cir. 2001).

### 3. Summary of Key Evidence in Opposition

As key evidence in opposition to Axonics' invalidity defense, Medtronic will present at trial, among other evidence, the testimony of Medtronic's expert witnesses, Axonics' fact and expert witnesses, the file histories (which include the inter partes review histories) of the Asserted Patents, the prior art identified and relied upon by Axonics, and claim constructions.

With respect to the purported prior art grounds identified by Axonics, Axonics bears the burden of proof, but Medtronic will present evidence that Axonics has not shown that certain references qualify as prior art, including that certain documents were not publicly available or do not describe any particular system that was on sale or offered for sale, that Axonics has not shown that the prior art grounds anticipate or render obvious each and every element of the asserted claims, and that Axonics has not shown that a person of ordinary skill in the art would have been motivated to combine any prior art references with a reasonable expectation of success to arrive at the claimed inventions of the asserted patent claims. Medtronic will present evidence that there were secondary considerations of non-obviousness, for example, long-felt need, praise of others, positive recognition, commercial success, failure of others, and copying. Medtronic will present evidence that the USPTO already considered the alleged prior art Axonics relies upon, including that Axonics is estopped from raising the alleged prior art it relies upon because it was raised or reasonably could have been raised as part of its *inter partes* review petitions. Medtronic may also present evidence of earlier conception, diligence and reduction to practice of its claimed inventions. Medtronic may also present evidence from fact witnesses, such as Dr. Mamo, Mr. Olson (by deposition designation), Mr. Gerber, and Mr. Schmeling, and expert witnesses, such as Dr. Chai, Dr. Mihran, and Dr. Berger, including all evidence, documents, tests, and testimony cited in Medtronic's expert reports.

1        With respect to indefiniteness, Axonics bears the burden of proof, but Medtronic

2   will present evidence that the claim terms are not indefinite based on the asserted

3   patents, file histories (including *inter partes* review proceedings) of the asserted patents

4   and related patents, claim construction, extrinsic evidence, and expert testimony.

5        With respect to Axonics' allegation of new matter, Axonics bears the burden of

6   proof, but Medtronic will present evidence that no new matter was added to the

7   specification of the 112 patent and that the 112 patent is entitled to its earliest asserted

8   priority date as shown by the patent itself, its parent applications, its file histories, and

9   evidence from fact witnesses, such as Mr. Olson (by deposition designation) and Mr.

10  Schmeling, and expert witnesses, such as Dr. Berger, including all evidence,

11  documents, tests, and testimony cited in Medtronic's expert reports.

12       With respect to Axonics' allegations of lack of enablement, Axonics bears the

13  burden of proof, but Medtronic will show that the claimed inventions are enabled,

14  including for the reasons set forth in its summary judgment briefing and based on

15  evidence cited therein including the disclosures of the asserted patents.  Medtronic will

16  also present inventor testimony, such as from Mr. Schmeling, and expert testimony,

17  including from Drs. Mihran and Berger, and documentary evidence rebutting the

18  purported challenges identified by Axonics; including all evidence, documents, tests,

19  and testimony cited in Medtronic's expert reports.

20       With respect to Axonics' allegations of incorrect inventorship, Axonics bears the

21  burden of proof, but Medtronic will present rebuttal evidence based on the testimony of

22  fact witnesses, including inventors, and the file histories of the asserted patents.

23       **E.    Limitation on Damages**

24            **1.    Summary of Defense**

25      Axonics argues that Medtronic's claims for damages and costs are limited or

26  barred under 35 U.S.C. § 287(a).

27            **2.    Elements Required**

28      Medtronic is not entitled to recover damages for any infringement of the Asserted

Claims at any time before Axonics was afforded constructive or actual notice of Medtronic's exclusive rights to the subject matter embodying the Asserted Patents. *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062 (Fed. Cir. 1987). Axonics would have been put on constructive notice of the Asserted Patents by Medtronic's marking its covered product with the word "patent" or the abbreviation "pat.," or actual notice with an affirmative communication from Medtronic to Axonics of a specific charge of infringement against the accused product. *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001).

Medtronic is entitled to damages from the time Axonics had actual or constructive notice of its infringement.

### 3. Summary of Key Evidence in Opposition

As set forth above with respect to section II.D, Medtronic will present evidence showing that Medtronic is entitled to damages for Axonics' infringement and, that Axonics knowingly continued its infringing activity despite having actual and constructive notice of its infringement, and that Axonics has failed to meet its burden of proof to show that any of the asserted claims are invalid.

### F. Limitation on Recovery of Costs

#### 1. Summary of Defense

Axonics argues that Medtronic's claims for damages and costs are limited or barred under 35 U.S.C. § 288 or 28 U.S.C. § 1928.

#### 2. Elements Required

If any claim of the Asserted Patents is invalid, Medtronic may maintain an action for infringement of the remaining valid claim(s) but shall recover no costs unless a disclaimer of the invalid claim was entered at the Patent and Trademark Office before the commencement of the suit. If a judgment is rendered for Medtronic on a part of any of the Asserted Patents where it appears in the specifications that Medtronic claimed to be, but was not, the original and first inventor or discoverer of any material or substantial part of the thing patented, no costs shall be included in such judgment unless

the proper disclaimer has been filed in the Patent Office prior to the commencement of this action.

### 3.   Summary of Key Evidence in Opposition

Medtronic is entitled to seek costs.  The 35 U.S.C. § 288 affirmative defense does not apply to any issues in this case.  35 U.S.C. § 288 only applies if a patent claim is found invalid prior to the commencement of the lawsuit.  *See, e.g.*, *Bradford Co. v. Jefferson Smurfit Corp.*, 2001 WL 35738792, at *1, 7 (Fed. Cir. Oct. 31, 2001); *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 690 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019); *Cordance Corp. v. Amazon.com, Inc.*, 631 F.Supp.2d 484, 503 (D. Del. 2009).  A patentee is not required to disclaim a claim under § 288 if it was not found to be invalid prior to the commencement of the lawsuit.  Likewise, the 28 U.S.C. § 1928 affirmative defense does not apply to any facts or issues in this case.  As key evidence in opposition to Axonics' defense of limitation on recovery of costs, to the extent necessary, Medtronic will present at trial, among other evidence, the testimony of expert and fact witnesses, including the inventors, in addition to the file histories of the Asserted Patents.

## IV.   ANTICIPATED EVIDENTIARY ISSUES [L.R. 16-4(H)]

Medtronic has filed a *Daubert* motion to exclude certain opinions of Axonics' experts Ms. Julie Davis, Mr. Benjamin Pless, and Dr. Charles Butrick.  Dkt. 344. Axonics has also filed *Daubert* motions to exclude certain opinions of Medtronic's experts Dr. DeForest McDuff, Dr. Toby Chai, Dr. Richard Mihran, and Dr. Ronald Berger.  Dkt. 348.  Those motions remain pending and are set to be heard on June 25, 2024. Dkt. 445.

The parties will file motions *in limine* on June 21, 2024.  Dkt. 365.  Medtronic incorporates by reference those forthcoming motions and the arguments therein.

The parties have also prepared a joint exhibit list that will be filed the same day as this memorandum. The parties maintain certain objections to exhibits on the joint

exhibit list. As of the filing of this memorandum, the parties continue to meet and confer to resolve any evidentiary objections on the joint exhibit list.

In addition, the parties have exchanged deposition designations and are in the process of exchanging objections thereto and meeting and conferring to address such objections.

Medtronic reserves the right to raise additional disputed evidentiary issues as this action proceeds.

## V.     IDENTIFICATION OF ISSUES OF LAW [L.R. 16-4(I)]

To the extent the parties' motions *in limine* present any issues of law, Medtronic incorporates by reference those motions and arguments herein.

The remaining issues of law have already been decided by the Court at the *Markman* stage or will be decided by the Court at the summary judgment and *Daubert* stages.

Medtronic also reserves its right to update this section based on issues that remain or arise following the parties' meet and confer process, including based on the law cited and described above.

## VI.    BIFURCATION OF ISSUES [L.R. 16-4.3]

Medtronic does not believe any issues should be bifurcated.

## VII.   JURY TRIAL [L.R. 16-4.4]

The following issues are triable to a jury as a matter of right:

- Patent infringement under 35 U.S.C. § 271;
- Willful patent infringement;
- Damages for patent infringement; and
- Validity of the Asserted Patents, but the ultimate question of indefiniteness and enablement are questions of law for the Court.

Non-jury issues to be decided by the Court include:

- Injunctive relief;

1    • Enhanced damages for willful infringement;

2    • Supplemental damages from June 1, 2024, through date of verdict;

3    • Whether Medtronic's case against Axonics is exceptional;

4    • Attorneys' fees and costs;

5    • Pre- and post-judgment interest and costs; and

6    • Whether Medtronic is entitled to an ongoing royalty;

7    • Prosecution History Estoppel/Prosecution Disclaimer; and

8    • Waiver and Estoppel including equitable estoppel and unclean hands.

9  **VIII.  ATTORNEYS' FEES [L.R. 16-4.5]**

10      Medtronic should be awarded attorneys' fees under 35 U.S.C. § 285 because this

11  is an exceptional case.  No attorneys' fees should be awarded to Axonics in this case.

12  **IX.    ABANDONMENT OF ISSUES [L.R. 16-4.5]**

13      None at this time.  Medtronic reserves the right to update this section based on

14  any of the Court's anticipated rulings with respect to Medtronic's motion for summary

15  judgment or Axonics' motion for summary judgment, or based on any affirmative

16  defenses that Axonics abandons in its memorandum of contentions of fact and law or

17  any future narrowing of the case.

18

19

20  Dated:  June 21, 2024              WINSTON & STRAWN LLP

21                                     By: /s/ *Nimalka Wickramasekera*

22                                        Nimalka Wickramasekera
                                          George C. Lombardi
23                                        Brian Nisbet
                                          J.R. McNair

24                                        Attorneys for Plaintiffs
25                                        MEDTRONIC, INC.; MEDTRONIC
                                          PUERTO RICO OPERATIONS CO.;
26                                        MEDTRONIC LOGISTICS, LLC;
                                          MEDTRONIC USA, INC.

27

28