1  Matthew D. Powers (Bar No. 104795)
   matthew.powers@tensegritylawgroup.com
2  TENSEGRITY LAW GROUP, LLP
   555 Twin Dolphin Drive, Suite 650
3  Redwood Shores, CA 94065
   Telephone:  (650) 802-6000
4  Facsimile:   (650) 802-6001

5  David M. Stein (Bar No. 198256)
   dstein@olsonstein.com
6  OLSON STEIN LLP
   240 Nice Lane # 301
7  Newport Beach, CA  92663
   Telephone:  (949) 887-4600

8
9  *Attorneys for Defendant* AXONICS, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., | Case No. 8:19-cv-02115-DOC-JDE |
| Plaintiff, | **DEFENDANT AXONICS, INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW [L.R. 16-4]** |
| v. | Pretrial Conf.: July 15, 2024 |
| AXONICS MODULATION TECHNOLOGIES, INC., | Time:   8:30 a.m.<br>Ctrm:   10A<br>Judge:  Hon. David O. Carter |
| Defendant. | **HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY** |

## TABLE OF CONTENTS

I.    BACKGROUND .................................................................................. 1

II.   MEDTRONIC'S CLAIMS (L.R. 16-4.1(a)-(c)) ........................................... 3

      A.    Summary of Medtronic's Claims (L.R. 16-4.1(a)) ............................ 3

      B.    Elements Required to Establish Medtronic's Claims (L.R. 16-
            4.1(b)) ........................................................................................ 4

            1.    Direct Infringement (Counts I-IV and VII) ............................. 4

            2.    Indirect Infringement (Counts I-IV and VII) ........................... 6

            3.    Willful Infringement (Counts I-IV and VII) .......................... 11

            4.    Damages Pursuant to 35 U.S.C. § 284 .................................. 12

            5.    Injunction or Other Equitable Relief .................................... 20

            6.    Exceptional Case and Award of Attorney Fees Pursuant to 35
                  U.S.C. § 285 .................................................................... 21

      C.    Brief Description of the Key Evidence in Opposition to
            Medtronic's Claims (L.R. 16-4.1(c)) ........................................... 22

            1.    No Direct Infringement of the Asserted Claims ..................... 22

                  a.    Lead Fixation Patents ............................................... 22

                  b.    Temperature Sensor Patents ....................................... 24

                  c.    Battery Current Patent .............................................. 29

            2.    No Indirect Infringement of the Asserted Claims .................. 33

            3.    No Willful Infringement of the Asserted Claims ................... 35

            4.    Damages .............................................................................. 37

            5.    Medtronic Is Not Entitled to Injunction or Other Equitable
                  Relief .................................................................................. 44

            6.    Medtronic Is Not Entitled to a Declaration That This Case is
                  Exceptional ........................................................................ 46

III.   AXONICS' DEFENSES (L.R. 16-4.1(d)-(f)) ............................................ 47

    A.   Summary of Axonics' Affirmative Defenses (L.R. 16-4.1(d)) ......... 47

    B.   Elements Required to Establish Axonics' Affirmative Defenses (L.R. 16-4.1(e)) ............................................................................. 48

        1.   Affirmative Defense 1 Elements: Non-Infringement ............. 48

        2.   Affirmative Defense 2 Elements: Prosecution History Estoppel/Prosecution Disclaimer ............................................ 48

        3.   Affirmative Defense 3 Elements: Waiver/Estoppel ............... 50

        4.   Affirmative Defense 4 Elements: Invalidity ........................... 51

        5.   Affirmative Defense 5 Elements: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a) ...................... 58

        6.   Affirmative Defense 6 Elements: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928 ......................................................... 58

        7.   Exceptional Case, Fees, And Costs Elements ........................ 59

    C.   Brief Description of the Key Evidence in Support of Axonics' Affirmative Defenses (L.R. 16-4.1(f)) ............................................ 59

        1.   Affirmative Defense 1: Non-Infringement .............................. 59

        2.   Affirmative Defense 2: Prosecution History Estoppel/Prosecution Disclaimer ............................................ 59

        3.   Affirmative Defense 3: Waiver/Estoppel ............................... 60

        4.   Affirmative Defense 4: Invalidity ........................................... 62

            a.   Lead Fixation Patents ................................................... 62

            b.   Temperature Sensor Patents ......................................... 64

            c.   Battery Current Patent .................................................. 68

        5.   Affirmative Defense 5: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a) ........................................... 70

6.  Affirmative Defense 6: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928 ............................................................................... 71

7.  Exceptional Case, Fees, And Costs ........................................ 72

IV.  ANTICIPATED EVIDENTIARY ISSUES (L.R. 16-4.1(H)) .................... 72

V.  ISSUES OF LAW (L.R. 16-4.1(I)) ............................................... 73

VI.  BIFURCATION OF ISSUES (L.R. 16-4.3) ................................... 73

VII.  JURY TRIAL (L.R. 16-4.4) ...................................................... 73

VIII.  ATTORNEY'S FEES (L.R. 16-4.5) ........................................... 74

IX.  ABANDONMENT OF ISSUES (L.R. 16-4.6) ............................... 74

Pursuant to Local Rule 16-4, Defendant Axonics, Inc. ("Axonics," formerly known as Axonics Modulation Technologies, Inc.) submits this Memorandum of Contentions of Fact and Law ("Memorandum") addressing the contentions of the parties in advance of the trial scheduled to commence on September 3, 2024. By agreement of the parties and order of the Court, this Memorandum will also serve as Axonics' Trial Brief. Dkt. No. 365, p.1.

## I.    BACKGROUND

It is Axonics' understanding that Medtronic continues to assert the following claims. Medtronic asserts that Axonics has literally infringed Claims 1–2, 4, 6–10, 12, 14, 16, 17, 20, 22–24 of U.S. Patent No. 9,463,324 ("324 Patent") and Claims 1, 4–7, 16–17, 22 of U.S. Patent No. 9,821,112 ("112 Patent"). Medtronic also asserts that Axonics has infringed Claim 7 of U.S. Patent No. 7,774,069 ("069 Patent") under the doctrine of equivalents only. Medtronic also claims that Axonics has infringed Claims 14 and 18 of U.S. Patent No. 8,036,756 ("756 Patent") and Claims 18-21 and 24 of U.S. Patent No. 8,626,314 ("314 Patent"), literally or under the doctrine of equivalents. The PTAB found that asserted claims 1, 2, 10–12, 22, and 23 of the '314 Patent were unpatentable. IPR2020-00679, Paper 94, p. 50 (March 21, 2024). Axonics has appealed the finding of patentability by a split panel of PTAB judges of the still-asserted patents of the 314 Patent, and Medtronic has appealed the finding of unpatentability of claims 1, 2, 10–12, 22, and 23. Medtronic alleges direct and indirect infringement with respect to certain claims. Medtronic also asserts that Axonics' infringement is willful. Medtronic seeks damages, enhanced damages, costs, and pre- and post-judgment interest under 35 U.S.C. § 284. Medtronic also seeks a finding of exceptionality under 35 U.S.C. § 285 and an award of reasonable attorney fees. Medtronic also seeks an injunction based on alleged infringement of claim 7 of the 069 Patent under the doctrine of equivalents. Medtronic's Counts V and VI of the Amended Complaint regarding claims 6, 12, 18 of U.S. Patent No. 8,738,148 and claims 1, 2, 4–6, 8–10, 12 of U.S. Patent No. 8,457,758 have been dismissed with

prejudice. Dkt. No. 341.

Axonics disputes all of Medtronic's claims. Axonics does not assume any burden of proof for rebutting these claims, and it further contends that—even without an affirmative showing of evidence by Axonics—any evidence to be submitted by Medtronic cannot satisfy Medtronic's burden of proof. Axonics does not infringe any of the asserted claims directly, indirectly, literally, under the doctrine of equivalents, or willfully. Medtronic's patents are also invalid over the prior art and under 35 U.S.C. § 112. Axonics disputes Medtronic's calculation of damages, and Medtronic's damages claim are barred in whole or in part by 35 U.S.C. § 287(a), 35 U.S.C. § 288, and/or 28 U.S.C. § 1928. Medtronic is also not entitled to the injunction it seeks based on claim 7 of the 069 Patent that would prevent patient access to medical devices. The 756, 314, 324, and 112 Patents have expired, and no injunction or prospective relief is permitted on those patents. Medtronic's claims or requested relief are also barred by Axonics' affirmative defenses of prosecution history estoppel, equitable estoppel, and unclean hands.

Axonics refers to the 756 and 314 Patents as "Lead Fixation Patents,"[1] the 324 and 112 Patents as "Temperature Sensor Patents," and the 069 Patent as "Battery Current Patent." Collectively, these patents are referred to as the "Asserted Patents."[2]

---

[1] The PTAB found that asserted claims 1, 2, 10–12, 22, and 23 of the 314 Patent were unpatentable. IPR2020-00679, Paper 94, p. 50 (March 21, 2024).

[2] Axonics may amend or supplement the assertions contained herein, including supplementing, editing, or withdrawing any of the contentions below in response to the Memorandum of Contentions of Fact and Law (L.R. 16-4) submitted by Plaintiffs or to address any issues that arise during pretrial proceedings for this case or during trial. The contentions herein are based on Axonics' current understanding of the parties' claims, including in light of the Special Master's Report and Recommendation on Claim Construction (Dkt. No. 163-1). Axonics may amend or supplement the Contentions in response to resolution of the parties' objections to the Special Master's Report and Recommendation on Claim Construction, Summary Judgment Motions, *Daubert* Motions, and motions *in limine*—all of which are presently pending or will be

## II.   MEDTRONIC'S CLAIMS (L.R. 16-4.1(a)-(c))

### A.   Summary of Medtronic's Claims (L.R. 16-4.1(a))

Axonics understands that Medtronic will pursue the following claims at trial.

1.   Counts I-IV and VII: Medtronic alleges direct infringement of Claims 14 and 18 of the 756 Patent (Count I); Claims 18-21 and 24 of the 314 Patent[3] (Count II); Claims 1, 2, 4, 6–10, 12, 14, 16, 17, 20, and 22–24 of the 324 Patent (Count III); Claims 1, 4–7, 16, 17, and 22 of the 112 Patent (Count IV); and Claim 7 of the 069 Patent (Count VII) (collectively "the Asserted Claims") under 35 U.S.C. § 271(a). Medtronic asserts that Axonics infringes the Asserted Claims by literal infringement and/or under the doctrine of equivalents.

2.   Counts I-IV and VII: Medtronic alleges indirect infringement of the Asserted Claims through induced infringement by inducing users to directly infringe either literally or under the doctrine of equivalents under 35 U.S.C. § 271(b). Medtronic also claims to allege indirect infringement of the Asserted Claims through contributory infringement under 35 U.S.C. § 271(c) and induced infringement under 35 U.S.C. § 271(f)(1).

3.   Counts I-IV and VII: Medtronic alleges willful infringement of the Asserted Claims by deliberately or intentionally engaging in acts of infringement.

---

filed or refiled shortly. Axonics' inclusion of the contentions below does not constitute a waiver or concession of any aspect of Axonics' objections or arguments made in connection with any issues pending resolution by the Court or Special Master, nor does it constitute a waiver of Axonics' right to appeal the same. Axonics reserves the rights to rely on any contentions included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly. Axonics also reserves the rights to object to Medtronic's identified evidence and file Motions *in Limine* and makes no admission regarding the admissibility or relevance at trial of any Medtronic evidence or argument by addressing it here.

[3] Medtronic appears to be attempting to preserve the right to resurrect previously asserted claims 1, 2, 10–12, and 23 of the 314 Patent, which the PTAB recently invalidated if the trial is postponed.  Axonics objects to this approach.

Should the jury find infringement of a valid patent claim, Medtronic seeks damages pursuant to 35 U.S.C. § 284, pre- and post-judgment interest and costs pursuant to 35 U.S.C. § 284, enhanced damages for alleged willful infringement pursuant to 35 U.S.C. § 284, a permanent injunction based on Claim 7 of the 069 Patent, and a declaration that this case is exceptional and award of attorney fees pursuant to 35 U.S.C. § 285.

## B. Elements Required to Establish Medtronic's Claims (L.R. 16-4.1(b))

### 1. Direct Infringement (Counts I-IV and VII)

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic claims that Axonics has literally directly infringed Claims 1–2, 4, 6–10, 12, 14, 16, 17, 20, 22–24 of the 324 Patent and Claims 1, 4–7, 16–17, 22 of the 112 Patent. Medtronic also claims that Axonics has infringed Claim 7 of the 069 Patent under the doctrine of equivalents. Medtronic also claims that Axonics has directly infringed Claims 14 and 18 of U.S. Patent No. 8,036,756 and Claims 18-21 and 24 of U.S. Patent No. 8,626,314, literally or under the doctrine of equivalents.

To prove its direct literal infringement allegations against Axonics, Medtronic must prove by a preponderance of the evidence separately for each asserted claim that Axonics, (a) without authorization, (b) made, used, offered to sell, sold within the United States, or imported into the United States, accused products or processes that practice each and every limitation of the asserted claims while the patent was in force, and (c) that Medtronic has the right to sue for infringement of the Asserted Patents. Fed. Cir. Bar Association ("FCBA") Model Jury Instructions at 18 (B.3, 3.1a) (2020); 35 U.S.C. § 271(a); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1309-11 (Fed. Cir. 2005) (finding no direct infringement where the accused infringer made a product that did not practice at least one of the claim limitations and noting "To prove direct infringement, the plaintiff must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or

under the doctrine of equivalents.").[4]

To prove literal infringement, Medtronic must prove for each Asserted Claim that each and every limitation of that claim is found identically in the accused Axonics products or processes. FCBA Model Jury Instructions at 18 (B.3, 3.1a); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1310 (Fed. Cir. 2005) ("Literal infringement requires that each and every limitation set forth in a claim appear in an accused product.").

A dependent claim includes all of the limitations of any of the claims to which it refers, plus its additional limitations. FCBA Model Jury Instructions at 18 (B.3, 3.1a). If a claim to which a dependent claim refers is not found infringed, there cannot be infringement of the dependent claim. *Id.* If an independent claim is found to be infringed, Medtronic must prove separately that the additional requirements of the dependent claims have also been infringed. *Id.*

Axonics cannot directly infringe a system claim if itself did not make an apparatus with all of the limitations claimed. *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 ("However, if anyone makes the claimed apparatus, it is the surgeons, who are, as far as we can tell, not agents of Medtronic. Because Medtronic does not itself make an apparatus with the 'interface' portion in contact with bone, Medtronic does not directly infringe."). Axonics cannot directly infringe a method claim if it does not itself perform all of the steps of the method. *Limelight Networks, Inc. v. Akamai Techs., Inc.,* 572 U.S. 915, 923-924 (2014) ("a method patent is not directly infringed—and the patentee's interest is thus not violated—unless a single actor can be held responsible for the performance of all steps of the patent.").

If there is no literal infringement, to prove infringement under the doctrine of equivalents, the essential inquiry is whether "the accused product or process contain[s]

---

[4] Emphasis added and internal quotation marks and citations omitted unless noted.

elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); FCBA Model Jury Instructions at 21 (B.3, 3.1c). Establishing doctrine of equivalents infringement requires that any differences between the accused devices or methods and the patent claim are "insubstantial," meaning that the structure or action in the accused product or process (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim. *Warner-Jenkinson*, 520 U.S. at 38-40; FCBA Model Jury Instructions at 21 (B.3, 3.1c). Medtronic must prove the equivalency of the structure or action in the accused product or process to the claim element by a preponderance of the evidence. FCBA Model Jury Instructions at 21 (B.3, 3.1c). If any of the function, way, or result are not substantially the same, there is no infringement. *Warner-Jenkinson*, 520 U.S. at 38-40 A court may not apply the doctrine of equivalents where so doing would effectively eliminate a claim element in its entirety. *Id.* at 29 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."). Medtronic's doctrine of equivalents case is limited to the "plurality of tine elements" claim limitation of the asserted claims of the 314 and 756 Patents, and Claim 7 of the 069 Patent.

## 2. Indirect Infringement (Counts I-IV and VII)

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic asserts induced infringement of the Asserted Claims under 35 U.S.C. § 271(b). Medtronic also claims to assert contributory infringement of the Asserted Claims under 35 U.S.C. § 271(c) and induced infringement of the Asserted Claims under 35 U.S.C. § 271(f)(1).

To prove indirect infringement by inducement under 35 U.S.C. § 271(b),

Medtronic must prove by a preponderance of the evidence: (1) that the acts are actually carried out by third parties that directly infringe each and every limitation of an Asserted Claim; (2) that Axonics took action during the time the relevant patent was in force that was intended to cause and led to the infringing acts by third parties; (3) that Axonics was aware of the Asserted Patent at the relevant time; and (4) Axonics knew that the acts, if taken, would constitute infringement of that Asserted Patent or Axonics subjectively believed that there was a high probability that the acts constituted infringement and took deliberate actions to avoid learning of the infringement. *See* 35 U.S.C. § 271(b); FCBA Model Jury Instructions at 24 (B.3, 3.2); *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement"); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118-19 (Fed. Cir. 2022) (reversing denial of JMOL of no inducement based on a findings regarding the accused infringer's "subjective belief that it wasn't infringing or inducing infringement"). Even if Axonics was aware of an Asserted Patent, but believed that the acts it encouraged did not infringe that patent, Axonics cannot be liable for inducement. FCBA Model Jury Instructions at 24 (B.3, 3.2); *Roche Diagnostics*, 30 F.4th at 1118-19; *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009) (finding that defendant's belief that it was practicing the prior art could support a jury finding that the intent required for induced infringement was lacking). To find inducement, the jury must find either that Axonics specifically intended a third party to infringe an Asserted Patent or that Axonics believed there was a high probability that a third party would infringe the Asserted Patent, but deliberately avoided learning the infringing nature of the third party's acts. FCBA Model Jury Instructions at 24 (B.3, 3.2). The mere fact, if found, that Axonics knew or should have known that there was a substantial risk that a third party's acts would infringe an Asserted Patent would not be sufficient to support a finding of active inducement of infringement. *Id.* Axonics can only be liable for induced infringement if

it took "certain affirmative acts to bring about the commission by others of acts of infringement and had knowledge that the induced acts constitute patent infringement." *Roche*, 30 F.4th at 1117-18. Thus, the intent element of inducement rests on the subjective intent of Axonics. *Id.* at 1119. If Axonics subjectively believed that it was not infringing or inducing infringement, then Axonics could not have acted with knowledge that the acts it brought about constituted patent infringement and could not have taken deliberate actions to avoid confirming a high probability of wrongdoing as required for willful blindness. *Roche*, 30 F.4th at 1119. "Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Inducement requires that the alleged infringer "possessed specific intent to encourage another's infringement." *Id.*; *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1364 (Fed. Cir. 2017) ("[S]pecific intent and action to induce infringement must be proven." (citing *DSU*, 471 F.3d at 1305). "[T]he inducement must involve the taking of affirmative steps to bring about the desired result*." Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011).

To prove indirect infringement by contributory infringement, Medtronic must prove by a preponderance of the evidence that: (1) Axonics sells, offers to sell, or imports within the United States a component of a product, material, or apparatus for use in a process, during the time the relevant patent is in force; (2) the component, material, or apparatus is not a staple article or commodity of commerce suitable for substantial non-infringing use; (3) the component, material, or apparatus constitutes a material part of the invention as claimed; (4) Axonics is aware of the patent and knows that the component, material, or apparatus is especially made or adapted for use as an infringement of the claim; and (5) third parties use the component, material, or apparatus to directly infringe, and the third parties directly infringe each and every limitation of an Asserted Claim. 35 U.S.C. § 271(c); FCBA Model Jury Instructions at

26 (B.3, 3.3); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1374 (Fed. Cir. 2003). To establish contributory infringement, Medtronic must prove that it is more likely than not that Axonics had knowledge of both the patent and direct infringement of that patent. AIPLA's Model Patent Jury Instructions at 20 (3.10) (2024). Thus, even if Axonics was aware of an Asserted Patent, but Axonics establishes that it believed the components or apparatus it sold did not infringe that patent, Axonics cannot be liable for contributory infringement. Rather, in order to prove contributory infringement, Medtronic must prove that Axonics made or adapted the component or apparatus to practice the infringing method, and a showing by Axonics to the contrary would thus preclude a finding of contributory infringement. *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 642 (2015) ("And the *Global-Tech* rationale is sound. Qualifying or limiting its holding, as the Government and Commil seek to do, would lead to the conclusion, both in inducement and contributory infringement cases, that a person, or entity, could be liable even though he did not know the acts were infringing. In other words, even if the defendant reads the patent's claims differently from the plaintiff, and that reading is reasonable, he would still be liable because he knew the acts might infringe. *Global-Tech* requires more. It requires proof the defendant knew the acts were infringing. And the Court's opinion was clear in rejecting any lesser mental state as the standard."); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 523 (Fed. Cir. 2016) ("Zoll argues that its good faith belief in non-infringement negates the knowledge requirement, pointing to its arguments against the direct infringement verdicts discussed *supra* at 20-29. For the claims of the '454 waveform patent and the '905 waveform patent, we find that Zoll's belief in non-infringement, based on its reasonable claim construction argument, does negate the knowledge requirement of contributory infringement. The Supreme Court has explained that if an accused infringer 'reads the patent's claims differently from the plaintiff,' and if 'that reading is reasonable,' then the accused infringer should not be liable for indirect infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928, 191 L. Ed. 2d 883 (2015). While we ultimately

concluded that Zoll's claim construction argument against the jury's direct infringement verdict for the waveform claims was incorrect, *see supra* at 21-23, that argument was based on a reasonable interpretation of the claims in light of the specification and the prosecution history. Because this belief in non-infringement was reasonable, it is a sufficient basis on which to ground the jury's implicit finding of insufficient knowledge for contributory infringement."). To show direct infringement by third parties, Medtronic must prove by a preponderance of the evidence that end users perform all steps of an asserted claim, as described above.

To prove indirect infringement by inducement under 35 U.S.C. § 271(f)(1), Medtronic must prove by a preponderance of the evidence that: (1) Axonics supplies or causes to be supplied components from the United States to a place outside the United States, which make up all or a substantial portion of the invention of a claim of the patent; (2) Axonics takes action intentionally to cause third parties to assemble the components outside of the United States; (3) Axonics knows of the patent, and knows that the encouraged acts constitute infringement of that patent; and (4) the encouraged acts would constitute direct infringement of the claim if they had been carried out in the United States. 35 U.S.C. § 271(f)(1); FCBA Model Jury Instructions at 27 (B.3, 3.4). The product, as it was intended to be assembled outside the United States, included or would have included all elements of at least one of the Asserted Claims. AIPLA's Model Patent Jury Instructions at 19 (3.9) (2024). Axonics cannot be liable for inducement if it believed that the acts it encouraged would not constitute infringement of the patent if carried out in the United States, even if it was aware of the patent. FCBA Model Jury Instructions at 27 (B.3, 3.4). For Medtronic to establish inducement of infringement, it must prove that Axonics specifically intended for third parties to infringe the patent. *Id.*

Not obtaining the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the

infringer intended to induce infringement of the patent. 35 U.S.C. § 298.

### 3.     Willful Infringement (Counts I-IV and VII)

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic further claims that the alleged acts of infringement have been willful. To show that Axonics' infringement is willful, Medtronic must prove by a preponderance of the evidence that: (1) Axonics knew of the asserted patent; (2) Axonics had a specific intent to infringe at the time of the challenged conduct; and (3) Axonics' conduct was willful, wanton, malicious, bad faith, deliberate, consciously wrongful, or flagrant. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04, 106 (2016) ("The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." and "[N]one of this is to say that enhanced damages must follow a finding of egregious misconduct."); *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) ("Even accepting this evidence as true and weighing all inferences in SRI's favor, we conclude that the record is insufficient to establish that Cisco's conduct rose to the level of ***wanton, malicious, and bad-faith behavior required for willful infringement***."); *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 987-88 (Fed. Cir. 2021) ("Even when accepting Bayer's evidence as true and weighing all inferences in Bayer's favor, we conclude that the record is insufficient to establish that Baxalta's 'conduct rose to the level of wanton, malicious, and bad-faith behavior required for willful infringement.'" (citing *SRI Int'l*, 930 F.3d at 1309; *Halo*, 579 U.S. at 103-04)).

Infringement is not willful just because there is a finding that Axonics was aware of the patent and infringed it. *Bayer HealthCare*, 989 F.3d at 998. To establish willfulness, Medtronic must show that Axonics "had a specific intent to infringe at the time of the challenged conduct." *Id.* at 987. While "[k]nowledge of the asserted patent and evidence of infringement is necessary," they are "not sufficient[] for a finding of

willfulness," which requires "deliberate or intentional infringement." *Id.* at 988. Factors for consideration in establishing willful infringement include:

1) Whether or not the alleged infringer acted consistently with the standards of behavior for its industry;

2) Whether or not the alleged infringer intentionally copied a product of the patent holder that is covered by the patent;

3) Whether or not the alleged infringer reasonably believed it did not infringe or that the patent was invalid;

4) Whether or not the alleged infringer made a good-faith effort to avoid infringing the patent, for example, whether the alleged infringer attempted to design around the patent; and

5) Whether or not the alleged infringer tried to cover up its infringement.

FCBA Model Jury Instructions at 35 (B.3, 3.10). Not obtaining the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent. 35 U.S.C. § 298.

### 4.     Damages Pursuant to 35 U.S.C. § 284

Medtronic claims that it is entitled to damages sufficient to compensate it for the alleged infringement, pre-judgement and post-judgment interest and costs, and enhanced damages for alleged willful infringement. If the jury finds that any asserted claim is infringed and not invalid, Medtronic must prove each element of its damages, including the amount of damages, by a preponderance of the evidence under 35 U.S.C. § 284. AIPLA's Model Patent Jury Instructions at 56 (10.0) (2024); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 107 (2016).

Medtronic seeks lost profits on some sales of Axonics accused products and a reasonable royalty for the sales of Axonics accused products for which it does not seek lost profits. In the alternative, it seeks a reasonable royalty on Axonics accused sales

starting in December 2019. If Medtronic proves infringement, it may receive a reasonable royalty or lost profits, but not both for the same allegedly infringing units. *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). Medtronic must prove the amount of damages to a reasonable degree of certainty; damages may not be awarded if they are speculative, only possible, or based on guesswork. FCBA Model Jury Instructions at 55 (B.5, 5.1). A reasonable royalty analysis requires a court to hypothesize, not to speculate. *ResQNet.com, Inc. v. Lansa, Inc*, 594 F.3d 860, 869 (Fed. Cir. 2010). And regardless of the type of damages Medtronic seeks, the court must be careful to ensure that award is no more than the value of the patented invention. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021) ("a patentee must take care to seek only those damages attributable to the infringing features"). Thus, the court must carefully tie proof of damages to the claimed invention's footprint in the market place. *See, e.g., ResQNet.com*, 594 F.3d at 869; *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.").

To recover lost profits (as opposed to reasonable royalties), Medtronic must show a causal relationship between the infringement and Medtronic's loss of profit. FCBA Model Jury Instructions at 57 (B.5, 5.2). In other words, Medtronic must show that, but for the infringement, there is a reasonable probability that Medtronic would have earned higher profits. *Id.*; *Grain Processing*, 185 F.3d at 1349 ("To recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits."); *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) ("The *Panduit* test, however, operates under an inherent assumption, not appropriate in this case, that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment. If the patentee's and the infringer's products are not substitutes in a

competitive market, *Panduit's* first two factors do not meet the 'but for' test -- a prerequisite for lost profits. . . . Windsurfing and BIC sold different types of sailboards at different prices to different customers. As noted, their sailboards differed significantly in terms of price, product characteristics, and marketing channels. On the facts of this case, Windsurfing did not show 'but for' causation under a correct application of *Panduit* or otherwise."); *Sunoco Partners & Mktg. Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1180 (Fed. Cir. 2022). To show this, Medtronic must provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture" and that, if there had been no infringement, it would have made the sales or some portion of the sales that Axonics made of the accused products for which Medtronic seeks lost profits. *Grain Processing Corp.*, 185 F.3d at 1349; FCBA Model Jury Instructions at 57 (B.5, 5.2). To prove lost profits, Medtronic must prove each of the following by a preponderance of the evidence:

1) That there was demand for the patented product or method;

2) That there were no available, acceptable, noninfringing substitute products;

3) That Medtronic had the manufacturing and marketing capacity to make any infringing sales actually made by Axonics and for which Medtronic seeks an award of lost profits—in other words, that Medtronic was capable of satisfying the demand; and

4) The amount of profit that Medtronic would have made if Axonics had not infringed.

AIPLA's Model Patent Jury Instructions at 47 (10.2.1.2) (2024); FCBA Model Jury Instructions at 57 (B.5, 5.2); *Sunoco*, 32 F.4th at 1180 (Fed. Cir. 2022) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978)). For factor two, the acceptable substitute must have been available during the damages period, but need not have actually been sold at that time. AIPLA's Model Patent Jury Instructions at 48 (10.2.1.4) (2024); *Grain Processing Corp.*, 185 F.3d at 1349. If an acceptable substitute ***was not sold*** during the damages period, a competitor or Axonics must have

had the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable substitute. AIPLA's Model Patent Jury Instructions at 48 (10.2.1.4) (2024); *Grain Processing Corp.*, 185 F.3d at 1350-51, 1354. If some of Axonics' customers would just as likely have purchased an acceptable non-infringing substitute, then Medtronic has not shown it lost those sales but for Axonics' infringing sales. AIPLA's Model Patent Jury Instructions at 48 (10.2.1.4) (2024). When reconstructing the "but for" market, "a fair and accurate reconstruction" includes "alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." *Grain Processing Corp.*, 185 F.3d at 1350-51. An acceptable substitute may be a product or method that involved a modification of the infringing product or method to avoid infringement or the removal of at least one feature of the invention from the product or method. AIPLA's Model Patent Jury Instructions at 48 (10.2.1.4) (2024).

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Medtronic and Axonics. AIPLA's Model Patent Jury Instructions at 51 (10.2.5.2) (2024). The necessary assumption in the hypothetical negotiation is that the asserted patents are infringed and valid although the defendant is challenging both. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). The hypothetical negotiation date is the date of first infringement, here June 2016, which is around the date of Axonics' European regulatory approval for the accused products and when Axonics had actually made rechargeable sacral neuromodulation products in the United States. *Georgia-Pacific Corp.*, 318 F. Supp. at 1123 (the date of the hypothetical coincided with the first manufacture); *LaserDynamics*, 694 F.3d at 76 (finding the hypothetical negotiation date was not the date of first liability, but the earlier date of first direct infringement). The following *Georgia-Pacific* factors can be considered to inform the hypothetical negotiations:

1) The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2) The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3) The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4) The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5) The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.

6) The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7) The duration of the patent and the term of the license.

8) The established profitability of the product made under the patent; its commercial success; and its current popularity.

9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10)   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11)   The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12)   The portion of the profit or of the selling price that may be customary in the

particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13)   The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14)   The opinion testimony of qualified experts.

15)   The amount that a licensor (such as the patentee) and a licensee (such  as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120.

In making the required showing as to its claim for reasonable royalty, Medtronic must establish first, the amount of damages that is attributable to Axonics' alleged infringement to a reasonable degree of certainty. *LaserDynamics, Inc.*, 694 F.3d at 67 (explaining that reasonable royalty damages are "'reasonable' in light of the technology at issue," and "the trial court must carefully tie proof of damages to the claimed invention's footprint in the market place."). Medtronic must also show the amount of money that Medtronic and Axonics would have agreed upon as a fee for using the invention at a hypothetical negotiation taking place at a time just prior to when infringement first began. *Id.* at 76.

Any damages amount must be based on the incremental value attributable to the patented technology, as distinct from other, unpatented features of the accused product (including those patented by Axonics or licensed by Axonics from third parties and including Axonics' own investments in technological advancements and Axonics' own

know-how), or other factors such as marketing or advertising, or Axonics' size or market position. AIPLA's Model Patent Jury Instructions at 53-54 (10.2.5.4) (2024); FCBA Model Jury Instructions at 66 (B.5, 5.8(2)). In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base (i.e., the total royalty) must reflect the value attributable to the patented technology. AIPLA's Model Patent Jury Instructions at 53-54 (10.2.5.4) (2024). In multi-component products with both infringing and non-infringing components, royalties should be based not on the entire product, but instead on the "smallest salable unit" that practices the patent and has close relation to the claimed invention. *Id.* at 54 (10.2.5.5) (2024); *LaserDynamics, Inc.* 694 F.3d at 67. Under the entire market value rule, in order to recover damages as a percentage of revenues or profits attributable to the entire product, Medtronic must establish that it is more likely than not that the patented feature is the sole driver of customer demand for an entire multi-component product such that it creates the basis for customer demand or substantially creates the value of the product. AIPLA's Model Patent Jury Instructions at 54 (10.2.5.6 (2024); *LaserDynamics, Inc.*, 694 F.3d at 67. The entire market value rule ensures that the royalty damages being sought by the patentee under 35 U.S.C. § 284 are reasonable in light of the technology at issue, meaning the damages theory must be based on sound economic and factual predicates. *LaserDynamics, Inc.*, 694 F.3d at 67 ("The entire market value rule is derived from Supreme Court precedent requiring that 'the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative'"). In determining a reasonable royalty, evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention may be considered. AIPLA's Model Patent Jury Instructions at 55 (10.2.5.8) (2024).

If Medtronic proves that Axonics' infringement was willful, the Court may

award increased damages of up to three times the amount of damages found or assessed, but enhanced damages are not required by a finding of egregious misconduct. 35 U.S.C. § 284. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016). The Court has discretion in deciding whether to award enhanced damages and in what amount, but enhanced damages are "not to be meted out in a typical infringement case," are "a 'punitive' or 'vindictive' sanction for egregious infringement behavior," and are "generally reserved for egregious cases of culpable behavior." *Halo*, 579 U.S. at 103-04. Conduct warranting enhanced damages has been described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate." *Id.* Awards of enhanced damages are limited to "egregious cases of misconduct beyond typical infringement." *Id.*, at 110. The Read factors provide guidance in determining whether and in what amount damages should be enhanced. These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).

If Medtronic proves Axonics' infringement of a valid claim, the Court may provide Medtronic interest and costs as fixed by the Court. 35 U.S.C. §284. However, the Court has "some discretion in awarding prejudgment interest," and prejudgment interest is not required whenever infringement is found. *GM Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983). For example, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* Prejudgment interest is

meant to be compensatory and not punitive. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996). Interest on projected future damages has not been permitted. *Id.*

### 5.    Injunction or Other Equitable Relief

Medtronic requests a permanent injunction. The Court should decline to grant injunctive relief, and in the absence of injunctive relief, Medtronic claims it is entitled to other prospective equitable relief, including an ongoing running royalty for the life of the allegedly infringed patents. If the jury finds that the one asserted claim of the 069 Patent is infringed and not invalid, to obtain an injunction, Medtronic must also prove: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 558, 561 (D. Del. 2008) (denying a motion for a permanent injunction, finding that a cross-license showed the adequacy of money damages, there was a "strong public interest in maintaining diversity in the coronary stent market," and evidence showed physician preference for the accused infringer's [Medtronic's] products as a public interest weighing against injunction).

An ongoing royalty is not an automatic remedy: "awarding an ongoing royalty where 'necessary' to effectuate a remedy, be it for antitrust violations or patent infringement, does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed." *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).

Since Medtronic seeks equitable relief, it is appropriate for the Court to consider equitable defenses, such as the defense of lack of clean hands, in addition to Axonics' other defenses. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945). Another reason why permanent injunction or other equitable relief

is improper if Medtronic's conduct gives it unclean hands. *Id.* at 814 (acknowledging that the maxim "he who comes into equity must come with clean hands" "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."). A party may not seek an injunction based on a record the party itself wrongfully influenced. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). Before Medtronic receives equitable relief from the Court, it must demonstrate that it is worthy of such relief and that it has conducted its dealings in an equitable manner. *Clean Energy v. Applied LNG Techs., USA, LLC*, No. SA CV 08-746 AHS (RNBx), 2008 U.S. Dist. LEXIS 78917, at *21 (C.D. Cal. Sep. 3, 2008). Axonics incorporates its equitable defenses below from Section III, including unclean hands.

### 6.    Exceptional Case and Award of Attorney Fees Pursuant to 35 U.S.C. § 285

Medtronic requests a declaration that this case is exceptional along with a corresponding award of attorney fees pursuant to 35 U.S.C. § 285.

Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits. In addition, even a finding of willful infringement does not mandate an attorney fee award. *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020).

On the other hand, Medtronic's requirement that Axonics mount a defense of this matter by filing and prosecuting the present lawsuit is exceptional under 35 U.S.C. § 285.

To prove this case is exceptional, Medtronic must prove the following: that this case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 557 (2014); *Sionyx LLC v. Hamamatsu*

*Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020). Medtronic must prove that the case is exceptional by a preponderance of the evidence, and the district court makes the exceptional-case determination on a case-by-case basis considering the totality of the circumstances. *Octane*, 572 U.S. at 554, 557-58. The court may weigh such factors as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6.

### C. Brief Description of the Key Evidence in Opposition to Medtronic's Claims (L.R. 16-4.1(c))

#### 1. No Direct Infringement of the Asserted Claims

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful.

##### a. Lead Fixation Patents

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For lack of direct infringement, Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claims of the 314 and 756 Patents, including at least the limitations that recite, or otherwise depend on, a "plurality of tine elements." For example, Axonics will present evidence that this limitation is not met by any of the accused Axonics products, including the accused Tined Lead Kit Models 1201 and 2201, Surgical Tool Kit Model 1801, and Model 1101 Neurostimulator identified by Medtronic (collectively, the "Tined Lead Accused Products"). Axonics will present evidence that the helical anchor in the relevant Tined Lead Accused Products does not include "two or more parts or portions (each of which includes one or more tines) that are positioned along the length of the lead body and that may be formed as a single structure or multiple structures" as the Special Master's construction states. Axonics will present evidence that the Axonics helical anchor

includes a single "portion" with tines, running along the length of the lead, meaning it is *one* tine element under the Special Master's recommended construction, not a plurality of tine elements. If either Axonics' proposed construction or Medtronic's proposed construction is adopted by the Court, Axonics will present evidence that its helical anchor does not infringe under those constructions, and it reserves its rights to show it does not infringe under any other construction that may be adopted by the Court.

If the Court does not strike Medtronic's doctrine of equivalents allegations, Axonics will also present evidence that Axonics' Tined Lead Accused Products do not infringe under the doctrine of equivalents. Axonics' helical anchor is not insubstantially different from the claimed "plurality of tine elements," and Axonics' helical anchor does not perform substantially the same function, work in substantially the same way, or achieve substantially the same result as the claimed "plurality of tine elements." Axonics will also present evidence that reliance on the doctrine of equivalents is barred by prosecution history estoppel. Axonics incorporates below Section III(C)(2) by reference here.

This evidence may include: the 314 and 756 Patents, the file histories of the 314 and 756 Patents, patents and applications related to the 314 and 756 Patents, and the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products; technical design, design-related, manufacturing, and regulatory documents pertaining to the Tined Lead Accused Products evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged infringement; other documents and communications (including emails); test results; discovery responses; testimony from fact witnesses, including deposition designations of relevant deponents, including from Mr. Lee, Mr. Swoyer, Dr. Chai, Mr. Gerber, and Dr. Mamo; expert testimony, including from Mr. Pless; and all evidence, documents, tests, and testimony cited in

Axonics' expert reports. Axonics may also rely on or offer testimony from Dr. Noblett, Dr. Woock, Mr. Mathur, Dr. Jiang, Mr. Sama, Mr. Cohen, or others, including if Medtronic relies on testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### b. Temperature Sensor Patents

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For lack of direct infringement, Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claims of the 324 Patent, including at least the limitations that recite, or otherwise depend on,

- "a temperature sensor adapted to provide an output indicative of a temperature of the side of the housing;" "providing, via a temperature sensor of the external device, output indicative of a temperature of the side of the housing;" "a temperature sensor adapted to provide an output indicative of a temperature of a side of the housing;"

- "control circuitry adapted to control the transfer of energy to the implantable medical device based on the output of the temperature sensor to limit a temperature to which a patient is exposed during the transfer of energy to the implantable medical device;" "controlling the transfer of energy from the primary coil to the secondary coil based on the output indicative of the temperature of the side of the housing to limit a temperature to which a patient is exposed during the transfer of energy to the implantable medical device;"

- "wherein the control circuitry is adapted to limit the transfer of energy

between the external device and the secondary coil"

- "wherein the external device is adapted to limit at least one of a temperature of the side and a temperature of a surface of the patient to no higher than a respective predetermined temperature"

- "wherein the control circuit is adapted to limit a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;" "limiting a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to limit a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to switch the energy transfer on and off based on the output indicative of a temperature of the side of the housing;" "switching the energy transfer on and off based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to limit a current driving the primary coil;" "wherein the control circuit is adapted to limit a current driving the primary coil;"

- "wherein the external device further comprises a circuit adapted to monitor recharging of a rechargeable power source of the implantable medical device;"

- "wherein the circuit adapted to monitor recharging is adapted to provide status of the recharging to a user;"

- "wherein at least a portion of the side is thermally conductive;" and

- "limiting at least one of a temperature of the side and a temperature of a surface of the patient to no higher than a respective predetermined

temperature."

For lack of direct infringement, Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claims of the 112 Patent, including at least the limitations that recite, or otherwise depend on,

- "a sensor configured to measure a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device;" "sensing, via a sensor, a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device;"
- "a control circuit configured to compare the measured temperature to a programmable limit and to control the transfer of energy based on the comparison;" "comparing, via a control circuit, the temperature to the programmable limit;"
- "a memory configured to store the programmable limit;" "obtaining a programmable limit from a memory;"
- "wherein the control circuit is configured to adjust a rate at which energy is transferred to the implantable medical device;"
- "a primary coil, and wherein the control circuit is configured to limit the current driving the primary coil;"
- "the control circuit is configured to limit the time during which energy is transferred to the implantable medical device;"
- "wherein the control circuit is configured to alternate between initiating the transcutaneous transfer of energy to the implantable medical device and terminating the transcutaneous transfer of energy to the implantable medical device;"
- "wherein sensing, via a sensor, a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device comprises sensing, via a sensor, a temperature of the external charging

device during the transcutaneous transfer of energy to the implantable medical device;"

- "wherein sensing, via a sensor, a temperature indicative of heat resulting from the transcutaneous transfer of energy to the implantable medical device comprises sensing, via a sensor, a temperature of a surface of the external device during the transcutaneous transfer of charging energy to the implantable medical device;" and

- "wherein the programmable limit is under software control."

For example, Axonics will present evidence that these limitations of the 324 and 112 Patents are not met by any of the accused Axonics products, including the accused Model 1101 Neurostimulator and Model 1401 charging device identified by Medtronic (collectively, the "Recharge Accused Products"). Regarding the 324 Patent, for example, Axonics will present evidence that shows ███████████████████████████████████████████████████████████████████████████████████████████████████████. Axonics will similarly present evidence that there is ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Regarding the "indicative of" limitations of the 324 Patent, Axonics will present evidence that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. If either Axonics' proposed construction or Medtronic's proposed construction is adopted by the Court, Axonics will present evidence that its temperature sensors and firmware do not infringe under those constructions, and it reserves its rights to show its temperature sensors and firmware do not infringe under any other construction that may be adopted by the Court. Regarding dependent claims of the 324 Patent, Axonics will also present

additional evidence, for example, that the Recharger Accused Products do not limit a time during which energy is transferred and do not have a charging device with at least a portion of the side that is thermally conductive. Axonics understands from Medtronic's Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 403-1) that 324 Patent Claim 11 is not asserted. Dkt. 403-1 at 27, No. 109 ("The use of a 'thermally conductive' housing material is separately claimed in **unasserted** dependent claim 11."). As stated, Axonics' products do not have a charging device with a thermally conductive side, and Medtronic's asserted claims of the 324 and 112 Patents are not enabled without a limitation to a thermally conductive side.

Regarding the 112 Patent, for example, Axonics will present evidence that ███████ resulting from the transcutaneous transfer of energy to the implanted medical device, including for the reasons above for the 324 Patent, ████████████ ████████████████████████████████████████████████████████ Additionally, Axonics will present evidence that there is no temperature sensor that measures heat specifically from the transcutaneous transfer of energy. Axonics will also present evidence that its products ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ that is "a limit that can be programmed during or after manufacture" as the Special Master's construction states. If either Axonics' proposed construction or Medtronic's proposed construction is adopted by the Court, Axonics will present evidence that its firmware does not infringe under those constructions, and it reserves its rights to show it does not infringe under any other construction that may be adopted by the Court. Regarding dependent claims of the 112 Patent, Axonics will also present additional evidence that the Recharger Accused Products do not limit a time during which energy is transferred and do not

have a programmable limit under software control.

Additionally, Axonics' redesigned charger has been on sale since September 2023, and it does not infringe the 324 and 112 Patents, and Medtronic does not claim otherwise.

This evidence may include: the 324 and 112 Patents, the file histories of the 324 and 112 Patents, patents and applications related to the 324 and 112 Patents, and the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products and Axonics' redesigned charger; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and redesigned charger evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged inducement; other documents and communications (including emails); test results; source code; discovery responses; testimony from fact witnesses, including deposition designations of relevant deponents, including from witnesses Mr. Abdeen, Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, and Mr. Schulzetenberg; expert testimony, including from Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics may also rely on or offer testimony from Dr. Mihran, Mr. Mathur, Mr. Sama, Mr. Cohen, or others, including if Medtronic relies on testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### c.  Battery Current Patent

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations.

For lack of direct infringement, Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claim of the 069 Patent, including at least the limitations that recite, or otherwise depend on,

- "thereby generating a current through said internal power source";
- "an alignment indicator, operatively coupled to said internal power source, measuring said current and reporting an alignment between said primary coil and said secondary coil based on said current;"
- "wherein said external power source automatically varies its power output in order to generate a predetermined current in said internal power source;"
- "wherein said predetermined current in said internal power source varies as a function of a voltage of said internal power source;" and
- "wherein said predetermined current in said internal power source declines as said voltage of said internal power source increases during a charging cycle."

For example, Axonics will present evidence that these limitations of the 069 Patent are not met by any of the accused Axonics products, including the Recharge Accused Products. For example, the Asserted Claim of the 069 Patent requires, inter alia, that a current passing through the implant battery declines as the voltage of the implant battery increases during a charging cycle. Axonics will present evidence that the Recharge Accused Products ███████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████. Axonics will present evidence that nothing Medtronic identifies meets this limitation of the claim. Axonics will present evidence that the Recharge Accused Products do not infringe under the Special Master's construction of these limitations: "wherein said [predetermined] current [passing through/in] said internal power source declines as said voltage of said internal power source increases during a charging cycle, which does not include instances in which said [predetermined] current [passing through/in] said internal power source declines only after the voltage of [said/the] internal power

source increases during a charging cycle, and which does not include a two-phase charging cycle with a constant current phase followed by a roughly constant voltage phase." The charging in the Recharge Accused Products is specifically excluded from the scope of the claims by the Special Master's construction. If either Axonics' proposed construction or Medtronic's proposed construction is adopted by the Court, Axonics will present evidence that the Recharge Accused Products do not infringe under those constructions, and it reserves its rights to show the Recharge Accused Products do not infringe under any other construction that may be adopted by the Court.

For example, the one Asserted Claims of the 069 Patent requires, inter alia, an alignment indicator, measuring the current through the implant battery, and reporting an alignment between charger and implant coils based on that current. Axonics will present evidence that it does not have ███████████████████████████████████████████████████████████████████████████████████████████████. Medtronic alleges infringement only under the doctrine of equivalents. Axonics will present the evidence that the Recharge Accused Products do not ██████████████████████████████████████████████████████ and that Axonics' Recharge Accused Products do not infringe this limitation under the doctrine of equivalents. Axonics' Recharge Accused Products ███████████████████████████████████████████. Axonics will present evidence that its Recharge Accused Products do not perform substantially the same function, work in substantially the same way, or achieve substantially the same result as a system that ███████████████. Axonics will also present evidence that reliance on the doctrine of equivalents is barred by prosecution history estoppel. Axonics incorporates below Section III(C)(2) by reference here.

For example, the one Asserted Claim of the 069 Patent requires, inter alia, that

the external power source automatically varies its power output in order to generate a predetermined current in the implant battery and that the predetermined current varies as a function of voltage. Axonics will provide evidence that . Additionally, Medtronic relies on functionality that

Additionally, Axonics' redesigned charger has been on sale since September 2023, and it does not infringe the 069 Patent.

This evidence may include: the 069 Patent, its file history, related patents and applications, and the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products and Axonics' redesigned charger; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and redesigned charger evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged inducement; other documents and communications (including emails); test results; source code; discovery responses; testimony from fact witnesses, including deposition designations of relevant deponents, including from the witnesses Mr. Abdeen, Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, and Mr. Schulzetenberg; expert testimony, including from Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics may also rely on or offer testimony from Dr. Mihran, Mr. Mathur, Mr. Sama, Mr. Cohen, or others, including if Medtronic relies on testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's

Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 2.      No Indirect Infringement of the Asserted Claims

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful.

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For indirect infringement, Axonics will provide evidence, for example, that no act by a third party directly infringes an Asserted Claim of any of the Asserted Patents. Axonics incorporates by reference Section II(C)(1) above identifying evidence Axonics will provide that there is no direct infringement by or using Axonics' Tined Lead Accused Products or Recharge Accused Products.

For example, regarding induced infringement under 35 U.S.C. § 271(b) or (f), Axonics also will provide evidence that it does not induce allegedly infringing acts, does not know that any end-user is infringing any asserted claim, does not believe that any end-user is infringing any asserted claim, does not specifically intend any end-user to infringe any asserted claim, does not take any action intended to cause and lead to infringing acts by third parties, does not know that third party actions if taken would constitute infringement, and does not subjectively believe that there is a high probability that any third party acts constitute infringement and took deliberate actions to avoid learning of the infringement. Regarding contributory infringement (35 U.S.C. § 271(c)), Axonics also will provide evidence that it does not know that any end-user is infringing any Asserted Claim, has not especially made or adapted any component for use in an infringing instrumentality or to practice an infringing method, includes components that are staple articles or commodities of commerce that are suitable for substantial non-infringing use.

As additional examples for lack of indirect infringement, Axonics will provide

evidence that it believes that its products and the methods used with them do not infringe Medtronic's Asserted Patents when used by third parties and that it does not induce infringement of any Asserted Patent. Axonics will provide evidence that it has designed or redesigned its products to ensure it does not infringe. For example, Axonics set out ████████████████████████████████ and designed its helical anchor and obtained patent protection for it. █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Additionally, for the Temperature Sensor Patents and Battery Current Patent, instructions Axonics provides discourage uses that could result in the use of the functionality that Medtronic alleges infringes the Temperature Sensor Patents and Battery Current Patent. The evidence will show that Medtronic has failed to identify specific components sufficient to establish contributory infringement or inducing acts by Axonics, failed to identify acts of inducement that will result in allegedly infringing acts (as opposed to acts that are not accused of infringing), and Medtronic has failed to establish that the Recharge Accused Products lack substantial non-infringing modes of operation. Medtronic has also failed to establish that Axonics was aware of any allegations that it infringed the Asserted Patents until Medtronic filed the Complaints in this case. The evidence will also show that Medtronic's allegations of copying by Axonics are baseless. Axonics will provide evidence of its original design for its helical anchor and its design and release of a recharger for a sacral neuromodulation implant before Medtronic's release of such a device and that the design of Axonics' recharger was original and different from other commercial implant rechargers.

This evidence will include the evidence identified in Section II(C)(1) above, which is incorporated by reference here. Additionally, this evidence may include internal documents and statements to others confirming Axonics' belief that it does not infringe or induce infringement, documents showing the design or redesign of its products ████████████████████████, and analyst reports and communications

demonstrating Axonics' reasonable belief that its products did not infringe and it did not induce infringement, evidence of what was known in the art at the time of the alleged inducement (including prior art patents and publications, prior art patent applications and prior art products), and testimony from fact witnesses, including deposition designations of relevant deponents, including Mr. Lee, Mr. Swoyer, Dr. Chai, Mr. Gerber, Dr. Mamo, Mr. Hultgren, Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, Mr. Monacelli, Ms. Bibb, Mr. Albrecht, Mr. Bombeck, Mr. Schulzetenberg, and Ms. Burman; expert testimony, including Mr. Pless and Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics has identified witnesses that it will call or may call at trial, and these include Mr. Cohen, Mr. Abdeen, Mr. Dearen, and Dr. Woock who Axonics may call to testify regarding the foregoing. Axonics may also rely on or offer testimony from Dr. Mihran, Dr. Noblett, Dr. Woock, Mr. Mathur, Mr. Sama, Dr. Jiang, Mr. Sama, Mr. Cohen, or others, including if Medtronic relies on testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 3.   No Willful Infringement of the Asserted Claims

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful.

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For willful infringement, for example, Axonics will provide evidence that it does not willfully infringe (directly or indirectly). Axonics will provide evidence, for example, that neither Axonics nor a third party directly infringes an Asserted Claim of any of the

Asserted Patents. Axonics incorporates by reference Sections II(C)(1) and (2) above identifying evidence Axonics will provide that there is no infringement.

For example, Axonics will provide evidence that it did not intentionally infringe or cause others to infringe the Asserted Patents, it did not specifically intend to infringe, it acted consistently with the standards of behavior for its industry, it did not copy any patented product features, it reasonably believed it did not infringe and that the patents were invalid, and it made a good faith effort to avoid infringement (including in ███████████████████████████), and Axonics has not attempted to cover up any of its actions. Axonics will also provide evidence that, even if it is found to infringe, that infringement was not willful, wanton, malicious, bad faith, deliberate, intentional, consciously wrongful, or flagrant. Axonics will provide evidence that it believes that its products and the methods used with them do not infringe Medtronic's Asserted Patents and that Medtronic's Asserted Patents were invalid. Axonics will provide evidence that it has designed or redesigned its products ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. The evidence will show that Medtronic has failed to establish that Axonics was aware of any allegations that it infringed the Asserted Patents until Medtronic filed the Complaints in this case. The evidence will also show that Medtronic's allegations of copying by Axonics are baseless. Axonics will provide evidence of its original design for its helical anchor and its design and release of a recharger for a sacral neuromodulation implant before Medtronic's release of such a device and that the design of Axonics' recharger was original and different from other commercial implant rechargers.

This evidence will include the evidence identified Sections II(C)(1) and (2) above, which is incorporated by reference here. Additionally, this evidence may include internal documents and statements to others confirming Axonics' belief that it

does not infringe or induce infringement; internal documents and statements to others confirming Axonics' belief that the Asserted Patents are invalid; Axonics' good faith IPR petitions for which the Patent Office found a reasonable likelihood that Axonics would prevail at Institution (to the extent admitted); documents showing the design or redesign of its products ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and analyst reports and communications demonstrating Axonics' reasonable belief that its products did not infringe, it did not induce infringement, and the Asserted Patents are invalid; communications between Axonics and Medtronic; evidence of what was known in the art at the time of the alleged inducement (including prior art patents and publications, prior art patent applications and prior art products), and testimony from fact witnesses, including deposition designations of relevant deponents, including Mr. Lee, Mr. Swoyer, Dr. Chai, Mr. Gerber, Dr. Mamo, Mr. Hultgren, Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, Mr. Monacelli, Ms. Bibb, Mr. Albrecht, Mr. Bombeck, Mr. Schulzetenberg, and Ms. Burman; expert testimony, including Mr. Pless and Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics has identified witnesses that it will call or may call at trial, and these include Mr. Cohen, Mr. Abdeen, Mr. Dearen, and Dr. Woock who Axonics may call to testify regarding the foregoing. Axonics may also rely on or offer testimony from Dr. Mihran, Dr. Noblett, Mr. Mathur, Mr. Sama, Dr. Jiang, Mr. Sama, or others, including if Medtronic relies on testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 4.    Damages

Plaintiff bears the burden of proving damages, and Axonics relies on Medtronic's inability to show that it meets the requirements to obtain the damages that it seeks. Axonics additionally will rely on evidence to refute Medtronic's allegations.

If an asserted claim is not infringed or invalid, Medtronic may not receive damages based on that claim.

Axonics contends that Medtronic is not entitled to lost profits. Therefore, the appropriate measure of damages in this matter, if any, is a reasonable royalty. Damages, if any, should be calculated using running royalty rates for the Lead Fixation Patents, Temperature Sensor Patents, and Battery Current Patent far lower than what Medtronic seeks, with the result that any damages award would be a small fraction of what Medtronic seeks. These rates are applied to the worldwide net sales of the accused products during the damages period starting on December 1, 2019, in the event that one or more of those patents are found infringed and not invalid. Axonics also incorporates by reference the discussion of its affirmative defenses directed to Medtronic's damages claims from Section III below.

On May 24, 2024, Axonics filed a motion to exclude certain portions of Medtronic's damages expert's opinions. The motion currently is scheduled for a hearing on June 24, 2024.

Axonics will rely on evidence establishing that Medtronic is not entitled to all or some of the lost profits that it seeks. For example, Axonics will provide evidence that the products Medtronic relies upon do not practice Asserted Patents and Medtronic has not shown the demand for the patented product, including based on non-patented features and sales of non-patented products. Axonics will show that Medtronic has failed to show the absence of acceptable, non-infringing alternatives, including the ones it itself has argued exist and the ones that Medtronic itself believed would be commercially successful. Axonics will also provide evidence that there are acceptable and available non-infringing alternatives. Such alternatives include finned leads, Axonics' F15 non-rechargeable neurostimulation product, and Axonics' redesigned charging device. Axonics will show that two of the key non-infringing alternatives, F15 and Axonics' redesigned charging device, have been made commercially available during the damages period. Moreover, even if alternatives were not on the market,

they were available. Axonics will provide evidence that the redesigned charging device complies with the relevant standards, is safe, the related PMA has been approved by the FDA, and it has been shipping commercially since September 2023. Given the design of the redesigned charging device, its commercial sales also undermine Medtronic's alleged value of the patented inventions.  In addition, Medtronic has not shown that its manufacturing and marketing capacity would be sufficient in the "but for" world. Axonics will provide evidence that Medtronic's lost profits calculations are speculative and flawed, including because they do not adequately consider or address that patients would choose alternative third-line therapies or not to pursue therapies, the timing of allegedly lost sales, or the timing of the release of Medtronic's rechargeable product in the "but for" world. Medtronic has not shown and cannot show a causal relationship between the alleged infringement and alleged lost profits, including based on market dynamics and growth, differences between Axonics' and Medtronic's products, and Medtronic's inability to show it would have obtained additional sales in the "but for" world without Axonics' products.

For the date of the hypothetical negotiation, Axonics will provide evidence that the hypothetical negotiation for a license to the patents-in-suit would have occurred on or around June 2016, including based on Axonics' R15 product receiving its CE Mark on June 6, 2016, when Axonics had made rechargeable sacral neuromodulation products in the United States.  Medtronic's expert's analysis is based on a flawed date of the hypothetical negotiation, but Axonics' expert has opined that her opinions do not change if a Q2 2017 date of the hypothetical negotiation is considered.

For a reasonable royalty, assuming liability (which Axonics denies), Axonics will provide  evidence that damages for the patents-in-suit would be calculated using running royalty rates for the Lead Fixation Patents, Temperature Sensor Patents, and Battery Current Patent far lower than those Medtronic seeks, with the result that any

damages award would be a small fraction of what Medtronic seeks.[5] For example,
Axonics will provide evidence of the appropriate royalty rates (if any damages are
awarded) based on actual royalty rate in a license it has from a third party, the relative
value of patents in that license that are technologically comparable to the patents-in-
suit, the lack of importance of the accused technologies to the accused products, the
importance of technologies (whether covered by other patents or not) to the accused
products other than the claimed inventions in the asserted patents, and the greater
importance of technologies covered by the patents licensed by Axonics to Axonics
accused products than the comparatively minor contribution of the asserted patents
(even assuming invalidity and infringement for the purposes of the damages analysis),
and non-infringing alternatives. Axonics will provide additional evidence under the
*Georgia-Pacific* factors, including for example, (i) the terms of any agreements or
negotiations that involved the patents-in-suit, as well as other agreements entered into
by Medtronic; (ii) an Axonics' license agreement from a third party and related
amendments;   (iii) the nature and scope of the license from the hypothetical
negotiation; (iv) the lack of an established licensing policy or marketing program by
Medtronic related to the licensing of its patents and Medtronic's willingness to license;
(v) the complex relationship between Medtronic and Axonics, including Axonics'
release of a product providing significant advancements over existing technologies and
Axonics growing the market; (vi) the lack of effect of selling the patented technology
in promoting sales of other products; (vii) the duration of the patents and term of the
license; (viii) lack of importance of Medtronic's patented technology to Axonics or its
customers or to the success of the accused products, including as shown by the success

---

[5] Per Special Master Order No. SM-29, Axonics served updated financial information
on June 6, 2024 so that the parties may update their damages calculations. Dkt. No.
372, p. 19. Medtronic may serve a supplemental expert report on June 17, 2024, and
Axonics intends to serve a supplemental expert report on June 20, 2024. *Id.*

in the market of non-infringing products; (ix) the nature of the alleged invention in the patents-in-suit is that they are not foundational technology and are not an improvement over the prior art; (x) the patented technology is of limited value, including as shown by the unimportance of the accused aspects of the accused products, sales of non-infringing products, including the sales of the redesigned charger and the cost of developing it, and patent citation analysis; (xii) the lack of a customary portion of profits or the selling price; (xi) apportionment and the value of the invention as distinguished from non-patented elements, manufacturing, business risk, or improvements added by Axonics; (xii) the testimony of experts, including particularly Ms. Davis, Mr. Mooney, Dr. Irazoqui, Mr. Pless, Dr. Butrick; and (xiii) the amount of the license from the hypothetical negotiation, including the royalty structure, base, and rate. Additionally, Axonics will provide evidence, for example, that Medtronic failed to bring innovations to the field of sacral neuromodulation to the detriment of patients and that Medtronic knew (and clinicians pointed out) that its product had shortcomings. Axonics will provide evidence, for example, that in the hypothetical negotiation the parties would have recognized the benefits of having Axonics on the market in securing a significant expansion of the market and in spearheading and accelerating innovation that otherwise would not have occurred. Additionally, Axonics will provide evidence, for example, that (i) Medtronic actually stood to make more money in this market with Axonics in the market, and Medtronic encouraged Axonics to enter the market; and (ii) Medtronic further benefited from seeing and learning about Axonics' technology.

Medtronic has stated repeatedly that it is not seeking prefiling damages, and its expert calculated damages starting in December 2019.  The damages on Lead Fixation Patents, if awarded, would run through their expiration dates, which are November 9, 2021, and February 18, 2022. The damages on Temperature Sensor Patents, if awarded, would run through their expiration date, which is April 30, 2024.

Even if Medtronic proves that Axonics' infringement was willful, which

Axonics disputes as explained above, Axonics will provide evidence that the Court should not enhance damages. Axonics incorporates by reference above Section II(C)(3) here. For example, Axonics will provide evidence that this is a typical case that does not involve behavior that is egregious, culpable, willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate. No punitive or vindictive sanction is warranted. Axonics will provide evidence that (i) it did not deliberately copy Medtronic or any other entity; (ii) Axonics formed a good-faith belief that the Asserted Patents were invalid and/or not infringed; (iii) Axonics' behavior as a party to the litigation is appropriate; (iv) Axonics is far smaller with fewer financial resources than Medtronic; (v) if Axonics is found to willfully infringe (which it disputes), it will be a close case, which weighs against enhancement; (vi) Axonics engaged in no misconduct and no misconduct of any significant duration; (vii) Axonics took remedial action by designing around the Asserted Patents; (viii) Axonics has no motivation for harm; and (ix) Axonics has not committed misconduct nor attempted to conceal it.

Axonics will provide evidence that prejudgment interest is not warranted. For example, Axonics will provide evidence that Medtronic, misled Axonics to reasonably believe that Medtronic did not intend to attempt to enforce its patents against Axonics; Axonics relied on Medtronic's conduct; and Axonics undertook the tremendous additional expense of launching its product before Medtronic sued. Axonics incorporates by reference below Section III(C)(3) here. If any prejudgment interest is awarded, it should only be compensatory, not punitive.

This evidence may include: the Asserted Patents, related patents, and their prosecution histories; the Court's claim constructions; physical samples and pictures of the accused products; technical design, design-related, manufacturing, and regulatory documents pertaining to the accused products, non-infringing alternatives, and allegedly embodying products evidencing their design, structure, function, and operation; documents showing the design, structure, function, and operation of other

third-line therapies other than sacral neuromodulation; documents regarding the cost of non-infringing alternatives; financial information; market information, including evidence of market growth; licenses and related documents, communications, and patents; patents practiced by the Accused Products or allegedly embodying products; evidence of Medtronic's failure to innovate, its recognition, and its effects; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising; evidence regarding Axonics obtaining a CE Mark in June 2016 and making of products for a subsequent clinical study in Europe; the parties' communications before Medtronic sued Axonics, including in particular Medtronic's communications praising Axonics' achievements; the evidence regarding and communications about the parties' meetings; Medtronic's review of Axonics' confidential information about Axonics' accused products; Medtronic's own internal communications and presentations regarding Axonics; the decisions in IPRs and Medtronic's own contentions and admissions made in the course of the IPRs; internal documents and statements to others confirming Axonics' belief that the Asserted Patents are invalid and not infringed; documents showing ████████████████ ████████████████████████████████████; analyst reports and communications demonstrating Axonics' reasonable belief that its products did not infringe, it did not induce infringement, and the Asserted Patents are invalid; communications between Axonics and Medtronic; evidence of what was known in the art at the time of the alleged inducement (including prior art patents and publications, prior art patent applications and prior art products); evidence of what was known in the art; other documents and communications (including emails); test results; source code; discovery responses; testimony from fact witnesses, including deposition designations of relevant deponents, including from the witnesses Mr. Lee, Dr. Mamo, Dr. Chai, Mr. Lee, Mr. Harper, Mr. Olson, Mr. Schmeling, Mr. Schulzetenberg, Mr. Monacelli, Mr. Albrecht, Mr. Swoyer, Mr. Gerber, Mr. Hultgren, Mr. Gaddam, Mr. Bombeck, Ms. Bibb, and Ms. Burman; expert testimony, including from Ms. Davis, Mr. Mooney, Mr.

Pless, Dr. Irazoqui, and Dr. Butrick; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics has identified witnesses that it may call at trial, and these include Mr. Dearen, Mr. Abdeen, Mr. Lee, Mr. Woock, Dr. Noblett, Mr. Cohen, Mr. Sama, who Axonics may call to testify regarding the foregoing. To the extent Medtronic offers testimony from Dr. Chai, Dr. McDuff, Dr. Mihran or others, Axonics may also rely on or offer testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 5. Medtronic Is Not Entitled to Injunction or Other Equitable Relief

Plaintiff bears the burden of proving entitlement to injunctive relief and the equitable relief of an ongoing royalty, and Axonics relies on Medtronic's inability to establish the elements necessary to obtain the relief Medtronic seeks by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. The Lead Fixation Patents or Temperature Sensor Patents are expired, so Medtronic cannot seek an injunction based on these patents.

Axonics will rely on evidence establishing that Medtronic has not suffered an irreparable injury and that remedies at law, including monetary damages, are adequate to compensate Medtronic for any alleged injury (the existence of which is disputed). For example, Axonics will provide evidence that the market has grown since its entry and Medtronic has previously licensed patents to an implant competitor. Also, Medtronic fails to show harm to brand recognition and that other alleged injuries— including to market share or revenue (which are disputed)—are irreparable. Thus, there is no evidence of irreparable injury or one for which money damages are inadequate.

Axonics will rely on evidence establishing that the balance of hardships between the plaintiff and defendant show a remedy in equity is not warranted, and that an

injunction against Axonics would cause serious and likely irreparable harm to Axonics. Axonics will rely on evidence establishing that an injunction against Axonics would be contrary to the public interest.

Ongoing royalties are not available as a matter of course, and Medtronic has merely asserted that it is entitled to an ongoing royalty in the absence of an injunction but has not shown that an ongoing royalty should be awarded in the present case, what amount of ongoing royalty it seeks, or that any royalty it requests should be awarded, including based on the evidence described above and in Section II(C)(4), which is incorporated here.

Axonics will provide evidence that Medtronic's requested equitable recovery are barred by the doctrine of equitable estoppel and unclean hands, and Axonics incorporates by reference herein Section III(C)(3) below.

The evidence may include: the Asserted Patents; the file histories of the Asserted Patents, patents and applications related to the Asserted Patents, the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products; technical design, design-related, manufacturing, and regulatory documents; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged infringement; evidence related to the market; evidence related to Medtronic's conduct in the market; evidence related to Medtronic's history of releasing or not releasing products; Medtronic's license with Boston Scientific and the related communications and documents; evidence of patient and physician preference for Axonics; the parties' communications before Medtronic sued Axonics, including in particular Medtronic's communications praising Axonics' achievements; Medtronic's own internal communications and presentations regarding Axonics and Medtronic's statements about Axonics; documents showing Medtronic's false and misleading statements about Axonics; other documents and communications (including emails); test results; discovery responses; testimony from fact witnesses, including deposition

designations of relevant deponents, including from Mr. Albrecht, Ms. Bibb, Mr. Bombeck, Mr. Hultgren, Mr. Monacelli, Mr. Olson, Mr. Schmeling, Mr. Gaddam, and Ms. Burman; testimony or declarations from the fourteen doctors identified in Axonics' Second Supplemental Initial Disclosures dated October 10, 2022. Axonics may also rely on the testimony of Dr. Noblett, Dr. Woock, Mr. Dearen, Mr. Mathur, Dr. Jiang, Mr. Sama, Mr. Abdeen, Mr. Cohen, or others, including if Medtronic relies on their testimony. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 6.    Medtronic Is Not Entitled to a Declaration That This Case is Exceptional

Plaintiff bears the burden of proving this case is exceptional, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits.

This evidence may include: the evidence used in Axonics' defenses and in response to Medtronic's claims, which also illustrate the nature of Medtronic's claims, and Axonics incorporates by reference the evidence identified in Sections II(C)(1-5) and III(C)(1-6), including Axonics' affirmative defenses to and responses to Medtronic's claims of infringement and willful infringement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and Medtronic's litigation tactics and Axonics' proper litigation conduct; Axonics' good faith IPR petitions for which the Patent Office found a reasonable likelihood that Axonics would prevail at Institution (to the extent admitted).

**III.    AXONICS' DEFENSES (L.R. 16-4.1(d)-(f))**

    **A.    Summary of Axonics' Affirmative Defenses (L.R. 16-4.1(d))**

    Axonics will pursue the following affirmative defenses at trial.

    **Affirmative Defense 1:** To the extent that non-infringement must be asserted as an affirmative defense, Axonics does not directly, indirectly, or willfully infringe of the Asserted Claims under 35 U.S.C. §§ 271(a), 271(b), 271(c), and 271(f), either literally or under the doctrine of equivalents.

    **Affirmative Defense 2:** Prosecution History Estoppel/Prosecution Disclaimer

    **Affirmative Defense 3:** Waiver/Estoppel

    **Affirmative Defense 4:** Invalidity of the Asserted Claims under 35 U.S.C. §§ 102, 103, and/or 112.

    **Affirmative Defense 5:** Medtronic's claims for damages are limited under 35 U.S.C. § 287(a).

    **Affirmative Defense 6:** Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928.

    **Exceptional Case, Fees, And Costs:** A finding of exceptionality under 35 U.S.C. § 285 and an award of reasonable attorney fees.

    The relief that Axonics seeks is:

    1.    That the Court find that Medtronic shall take nothing by this action, including that Medtronic's request for an injunction be denied;

    2.    That the Court find that the claims of the Asserted Patents are invalid;

    3.    That the Court find that Axonics does not infringe any claim of any Asserted Patent, directly or indirectly, willfully, literally or under the doctrine of equivalents;

    4.    The Court declare that this is an exceptional case and award Axonics reasonable attorneys' fees under 35 U.S.C. § 285;

    5.    That Axonics be awarded its costs, disbursements (including expert fees), and reasonable attorney fees incurred in this action; and

6.     That Axonics be granted any other and further relief as the Court deems just and proper.

**B.     Elements Required to Establish Axonics' Affirmative Defenses (L.R. 16-4.1(e))**

### 1.     Affirmative Defense 1 Elements: Non-Infringement

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful.[6] To the extent that non-infringement is an affirmative defense, Axonics prevails on this defense if Medtronic fails to prove infringement (either based on its own failure to meet its burden or based on Axonics' contrary showing) under the relevant elements described above in Sections II(B)(1-3) responding to Medtronic's Claims of direct infringement, indirect infringement, and willful infringement, which Axonics incorporates by reference here.

### 2.     Affirmative Defense 2 Elements: Prosecution History Estoppel/Prosecution Disclaimer

The doctrine of prosecution history estoppel or prosecution disclaimer "precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022). "Questions related to the application and scope of prosecution history estoppel fall within the exclusive province of the court." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003). The doctrine of prosecution history estoppel bars a patentee from construing its claims for the purpose of the doctrine of equivalents, in a way that would capture subject matter previously surrendered during prosecution of the patent application. Prosecution history estoppel "applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered

---

[6] Willful infringement is Medtronic's burden to prove and accordingly is not an affirmative defense nor is it Axonics' burden to disprove willful infringement.

from the literal scope of a claim during prosecution." *Amgen Inc. v. Coherus BioSciences, Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019).  Prosecution history estoppel can occur by the patent applicant either (1) making a narrowing amendment to the claim; or (2) surrendering claim scope during argument to the patent examiner. *Id.* at 1159. "[T]he Supreme Court has recognized that a patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019). The presumption may be overcome if the patentee can show: "(1) the equivalent was unforeseeable at the time of the application; (2) the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or (3) there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* "The tangential relation exception is very narrow," and Medtronic has not rebutted the presumption. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1358 (Fed. Cir. 2013). Narrowing amendments exclude equivalents besides the subject matter of the prior art reference at issue, and such other equivalents are not only tangentially related: "[A]n amendment made to avoid prior art that contains the equivalent in question is not tangential. ***It does not follow, however***, that equivalents not within the prior art must be tangential to the amendment." *Integrated*, 734 F.3d at 1358. For estoppel based on argument, "the prosecution history must evince a clear and unmistakable surrender of subject matter." *Id.* The Federal Circuit has explained that "[c]lear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel." *Id.* Thus, Axonics prevails on its defense if it shows that, during prosecution of the Asserted Patents, or a patent in the same family, Medtronic clearly and unmistakably disavowed a certain meaning to obtain the patent, and now seeks, through its literal and doctrine of equivalents infringement case, to include that disavowed meaning within the scope of the claim.

### 3.      Affirmative Defense 3 Elements: Waiver/Estoppel

Equitable estoppel is "addressed to the sound discretion of the trial court" and must be proven by Axonics by a preponderance of the evidence. *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (en banc). The doctrine of equitable estoppel bars assertion of a claim if, "(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016).

The doctrine of unclean hands demands that a plaintiff act fairly in the matter for which he seeks a remedy. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945). Unclean hands "necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 814-15. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim. *Id.* To prove unclean hands, Axonics must show "inequitable conduct by the plaintiff and that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant." *Intamin, Ltd. v. Magnetar Techs. Corp*, 623 F. Supp. 2d 1055, 1075 (C.D. Cal. 2009). Axonics need not additionally demonstrate that it was somehow injured or prejudiced by Medtronic's conduct as such requirement is inconsistent with controlling Supreme Court, Federal Circuit and Ninth Circuit authority. *Id.* A party may not seek an injunction based on a record the party itself wrongfully influenced. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).   Alternatively, misconduct supporting the unclean hands defense will not be permitted if there is a direct relationship between that conduct and the party's allegations. *Id.* at 245-46 (courts "close their doors" "only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication");

*Precision*, 324 U.S. at 814 (acknowledging that the maxim "he who comes into equity must come with clean hands" "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").

To prove waiver, Axonics must show by clear and convincing evidence either that (1) Medtronic, with full knowledge of the material facts, intentionally relinquished its rights to enforce the Asserted Patents; or (2) that Medtronic's conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008).

### 4.     Affirmative Defense 4 Elements: Invalidity

Axonics must prove invalidity on a claim-by-claim basis by clear and convincing evidence. AIPLA's Model Patent Jury Instructions at 22 (4) (2024).

Prior art includes any of the following items received into evidence during trial:

1.     any product or method that was publicly known or used by others in the United States before the alleged invention claimed in an Asserted Patent;

2.     any product or method that was in public use or on sale in the United States more than one year before the effective filing date of the Asserted Patent;

3.     any patents that issued before the alleged invention claimed in an Asserted Patent or more than one year prior to the effective filing date of the application for the patent; and

4.     any publications having dates of public accessibility before alleged invention claimed in an Asserted Patent or more than one year prior to the effective filing date of the application for the patent.

AIPLA's Model Patent Jury Instructions at 23 (5.0.1) (2024). Additionally, the prior art includes applicant admitted prior art. "A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation

and obviousness." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569-70 (Fed. Cir. 1988). "[A] statement by an applicant . . . in the application . . . that certain matter is 'prior art' to him, is an admission that that matter is prior art for all purposes, whether or not a basis in § 102 can be found for its use as prior art." *In re Nomiya*, 509 F.2d 566, 571 n.5 (C.C.P.A. 1975) (followed in *Constant*, 848 F.2d at 1570). An admission of "actual knowledge" of an invention "constitutes an admission that it is prior art." *In re Fout*, 675 F.2d 297, 300-01 (C.C.P.A. 1982).

If an earlier-filed parent application does not fully support claims in a later-filed continuation, the claims cannot receive an effective filing date earlier than the date of the continuation application. *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009) ("This court is mindful that continuing applications, such as Affymetrix's application here, can only receive the benefit of an earlier-filed parent application if that parent fully supports the claims. If not supported in the parent application, fundamental fairness requires that claims to new matter receive, at best, the filing date of the continuing application."); *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1335-41 & n.2 (Fed. Cir. 2010) (concluding that broadened claims were not "adequately described" in the priority application, and the claims were "not entitled" to the filing date of the priority application).

To establish that an Asserted Claim is invalid as anticipated (35 U.S.C. § 102), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that all the requirements of each asserted claim are present in a single piece of prior art— either expressly or inherently. *See* FCBA Model Patent Jury Instructions B.4.3b-1 (2020). To establish that the asserted claims are invalid as obvious (35 U.S.C. § 103), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the original application was filed or at the time of the alleged invention claimed. *See* AIPLA's Model Patent Jury Instructions at 37 (7.0) (2024); FCBA Model Patent Jury Instructions B.4.3c (2020); *Dystar Textilfarben GmbH v. C.H. Patrick Co.*,

464 F.3d 1356, 1360, 1372 (Fed. Cir. 2006). Obviousness may be shown by considering one or more than one item of prior art. AIPLA's Model Patent Jury Instructions at 37 (7.0) (2024). The following factors must be evaluated to determine whether Axonics has established that the claimed invention is obvious: (1) the scope and content of the prior art relied upon by Axonics; (2) the differences, if any, between each claimed invention Axonics contends is obvious and the prior art; (3) the level of ordinary skill in the art; and (4) additional considerations (or secondary considerations), if any, that indicate that the invention was obvious or not obvious. *Id.*; *Dystar*, 464 F.3d at 1360. A claim is obvious if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention or the date of the alleged invention. 35 U.S.C. § 103. This showing can be made by, for example, establishing that a person having ordinary skill in the art would have been motivated to combine the teachings of prior art references to achieve the claimed invention and would have had a reasonable expectation success in doing so. *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014); *Dystar*, 464 F.3d at 1360. The additional considerations (such as commercial success, if any) are relevant only if there is a connection, or nexus, between the factor and the alleged invention covered by the patent claim. AIPLA's Model Patent Jury Instructions at 42 (7.4) (2024). While additional considerations must be taken into account, the "do not necessarily control the obviousness determination." *Bristol-Myers Squibb*, 752 F.3d at 977. Even if additional considerations are established, those factors should be considered along with all the other evidence in the case in determining whether Axonics has proven that the claimed invention would have been obvious. *Id.*, at 973. "Obviousness is a question of law with underlying factual findings." *Id.*, at 972.

The petitioner in an *Inter Partes* Review ("IPR") of a claim in a patent that results in a final written decision may not assert in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during

the IPR. 35 U.S.C. § 315(e). A petitioner in an IPR may only request to cancel claims of a patent on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications. 35 U.S.C. § 311(b). The other categories of prior art identified above, including systems and grounds based on applicant admitted prior art, and invalidity allegations under other statutory provisions such as § 112 cannot be the basis of an IPR proceeding and thus are not estopped. 35 U.S.C. §§ 311(b), 315(e); *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1374 (Fed. Cir. 2022) ("[T]he 'patents or printed publications' that form the 'basis' of a ground for *inter partes* review must themselves be prior art to the challenged patent. That conclusion excludes any descriptions of the prior art contained in the challenged patent."). *See also Spex Techs. v. Kingston Tech. Corp.*, No. SACV 16-01790 JVS (AGRx), 2020 WL 4342254, at 16 (C.D. Cal. June 16, 2020) (finding IPR estoppel does not apply to combination of system art with other grounds based on patents or printed publications).

To establish that the asserted claims are invalid due to incorrect inventorship under 35 U.S.C. § 102(f) or other applicable statutory provisions or case law, Axonics must show by clear and convincing evidence that the claim was invented by a third party before the patentee invented the alleged invention, or that the named inventors did not themselves invent the subject matter sought to be patented. 35 U.S.C. §§ 101, 102(a), 102(f), 102(g); AIPLA's Model Patent Jury Instructions at 33-34 (6.6) (2024); *Teva Pharm. Indus. v. AstraZeneca Pharms. LP*, 661 F.3d 1378, 1383 (Fed. Cir. 2011); *In re Verhoef*, 888 F.3d 1362, 1368 (Fed. Cir. 2018). To be an inventor, one must make a significant contribution to the conception of at least one of the claims of the patent even if that claim has not been alleged to be infringed. FCBA Model Patent Jury Instructions B.4.3d at 54. Persons may be inventors even if they do not make the same type or amount of contribution, and even if they do not contribute to the subject matter of each claim of the patent. *Id.*

"Indefiniteness is a question of law" but may involve underlying questions of

fact. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). To establish that the asserted claims are invalid as indefinite (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that Asserted Claims, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). One way to establish such indefiniteness is to show that a person of ordinary skill in the field of the invention cannot determine, with reasonable certainty, what the claims cover and what they do not cover. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) ("A claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not."); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373-74 (Fed. Cir. 2014) (claims found indefinite when the specification used "e.g." instead of "i.e." and left those of ordinary skill "to wonder" what else was included). "[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015). Claims are indefinite if they fail to "provide objective boundaries for those of skill in the art." *Interval*, 766 F.3d at 1371 (citing *Nautilus*).

To establish that the asserted claims are invalid as lacking enablement (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence that the patent specification teaches those of skill in the art how to make and use the full scope of the claimed invention without undue experimentation as of the effective filing date of the patent. 35 U.S.C. § 112; *Amgen Inc. v. Sanofi,* 143 S. Ct. 1243, 1251-1258; *Trs. Of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1361-62 (Fed. Cir. 2018); *Idenix*

*Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1165 (Fed. Cir. 2019); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007) (concluding that a claim term was construed to include both mechanical and electronic sensors, but "the specification did not enable the full scope of the invention because it did not enable electronic side impact sensors"); *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-46 (Fed. Cir. 2005) (explaining that the "quid pro quo of the patent bargain" requires the "specification must enable one of ordinary skill in the art to practice the full scope of the claimed invention," and  concluding that "creat[ing] a particular fuel-efficient automobile engine" "would not necessarily support a broad claim to every possible type of fuel-efficient engine, no matter how different in structure or operation from the inventor's engine," one seamless DWT method "does not entitle the inventor . . . to claim any and all means for achieving that objective"). The Supreme Court in *Amgen* confirmed that "the specification must enable the ***full scope of the invention*** as defined by its claims. ***The more one claims, the more one must enable***." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023). Providing an example in the specification "***may*** suffice" "if the specification also discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose." *Id*. at 611. A specification may only "call for a reasonable amount of experimentation." *Id.* at 612. Claims are particularly problematic when they seek "to monopolize an entire class of things defined by their function." *See id.* at 613. The "*Wands* factors" may be considered in determining whether undue experimentation is required to make and use the full scope of the claimed invention include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). "Conducting the Wands analysis has routinely involved concrete identification of at least some embodiment or

embodiments asserted not to be enabled—including what particular products or processes are or may be within the claim, so that breadth is shown concretely and not just as an abstract possibility, and how much experimentation a skilled artisan would have to undertake to make and use those products or processes." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020). "If an inventor attempts but fails to enable his invention in a commercial product that purports to be an embodiment of the patented invention, that is strong evidence that the patent specification lacks enablement." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007). "[T]he enablement requirement is a question of law based on underlying factual findings." *McRO*, 959 F.3d at 1096.

To establish that the asserted claims are invalid as lacking written description (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence that the disclosure of the application relied upon does not reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE*, 264 F.3d 1111, 1118, 1120 (Fed. Cir. 2001) ("The written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date. When the applicant adds a claim or otherwise amends his specification after the original filing date, as Brandon did in this case, the new claims or other added material must find support in the original specification. . . . Because Brandon did not file a continuation-in-part application, he cannot rely on any alternative filing date for his newly added claim 2. We therefore uphold the district court's ruling that claim 2 is invalid for failing to satisfy the written description requirement."). Written description presents a question of fact for the jury. *Ariad Pharms.*, 598 F.3d at 1355; *ScriptPro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014).

### 5. Affirmative Defense 5 Elements: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a)

"Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1359 (Fed. Cir. 2021) (internal citations omitted). "If a patentee who makes, sells, offers for sale, or imports his patented articles has not 'given notice of his right' by marking his articles pursuant to the marking statute, he is not entitled to damages before the date of actual notice." *Id.* (internal citations omitted). Medtronic bears the burden of pleading and proving it complied with § 287(a)'s marking requirement. *Id.*

To the extent that Plaintiffs have made any patented products or licensed others to do so between the respective issuance date of the asserted patents and the filing of this lawsuit on November 4, 2019, and amendment of the complaint adding additional patents on November 26, 2019, Medtronic has not marked such products or required its licensees to mark such products. Plaintiffs' claims for relief against Axonics and prayer for damages from Axonics may be limited under 35 U.S.C. § 287(a), including Plaintiffs' failure to provide pre-filing notice of alleged infringement to Axonics.

### 6. Affirmative Defense 6 Elements: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928

Should the Court find that one or more claims of one or more Asserted Patents is valid and infringed by Axonics while also correctly finding that one or more other claims in the same patent(s) are invalid, Medtronic shall recover no costs because it failed to disclaim the invalid claims before filing this suit. 35 U.S.C. § 288.

If a judgment is rendered for Medtronic and it appears that Medtronic, in its specifications, claimed to be, but was not, the original and first inventor or discoverer of any material or substantial part of the thing patented, no costs shall be included in such judgment because Medtronic failed to disclaim the invalid claims before filing

this suit. 28 U.S.C. § 1928.

### 7.     Exceptional Case, Fees, And Costs Elements

Finally, Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits. In addition, even a finding of willful infringement does not mandate an attorney fee award. *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020).

On the other hand, Medtronic's requirement that Axonics mount a defense of this matter by filing and prosecuting the present lawsuit is exceptional under 35 U.S.C. § 285.

Axonics provides the relevant elements above in Section II(B)(6) responding to Medtronic's Claims for an exceptionality determination and incorporates that section by reference.

### C.     Brief Description of the Key Evidence in Support of Axonics' Affirmative Defenses (L.R. 16-4.1(f))

### 1.     Affirmative Defense 1: Non-Infringement

Although plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, or willful.[7] To the extent that non-infringement is an affirmative defense, the evidence on which Axonics will rely is provided above in Sections II(C)(1-3) responding to Medtronic's Claims of direct infringement, indirect infringement, and willful infringement, which Axonics incorporates by reference here.

### 2.     Affirmative Defense 2: Prosecution History Estoppel/Prosecution Disclaimer

Axonics will provide evidence that Medtronic surrendered claim scope during

---

[7] Willful infringement is Medtronic's burden to prove and accordingly is not an affirmative defense nor is it Axonics' burden to disprove willful infringement.

prosecution related to at least the claim terms "plurality of tine elements" in the Lead Fixation Patents and "generating a current through said internal power source" and "measuring said current" in the 069 Patent through claim amendment, argument before the Patent office, or both. Medtronic is thus barred from attempting to recapture that subject matter through application of the doctrine of equivalents, but Medtronic has impermissibly alleged infringement under the doctrine of equivalents for those claim terms.

Axonics may rely on the following evidence to establish its allegations with respect to its claim that a finding of infringement is barred by prosecution history disclaimer/prosecution history estoppel: the Asserted Patents, the file histories of the Asserted Patents, patents and applications related to the Asserted Patents, and the file histories of those related patents; the Court's claim constructions; discovery responses of both parties; other documents and communications (including emails); testimony from fact witnesses, including deposition designations of relevant deponents, including from the named inventors (Mr. Gerber, Mr. Olson, Mr. Schmeling, Dr. Mamo, Mr. Swoyer) and other Medtronic witnesses (Dr. Chai, Mr. Gaddam, Mr. Harper, Mr. Schulzetenberg); expert testimony, including from Mr. Pless and Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. To the extent that Medtronic offers the testimony of its experts Dr. Mihran and Dr. Chai or other witnesses, Axonics may also rely on those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 3.    Affirmative Defense 3: Waiver/Estoppel

Axonics will provide evidence that Medtronic's claims and recovery are barred by the doctrine of equitable estoppel. Axonics will provide evidence that Medtronic, through misleading conduct, led Axonics to reasonably believe that Medtronic did not

intend to attempt to enforce its patents against Axonics; Axonics relied on Medtronic's conduct; and due to Axonics' reliance, Axonics would be materially prejudiced if Medtronic were allowed to proceed with its charge of infringement. For example, Axonics will provide evidence that over a period of years Medtronic engaged in a course of conduct and made a series of statements and interactions that led Axonics to reasonably believe that Medtronic not only did not intend to assert patent infringement but rather welcomed Axonics' presence in what was then a dramatically underserved market for sacral neuromodulation. Axonics will provide evidence that, through these interactions, Medtronic learned about Axonics' plans and technology, including Axonics' confidential information. Medtronic said and did nothing for years, suing Axonics after the tremendous additional expense of Axonics launching its product, to Axonics' detriment.

Next, Axonics will provide evidence that Medtronic's false, deceptive, and misleading statements regarding Axonics' products as compared to Medtronic's products, which preclude Medtronic from coming to equity with clean hands to seek injunctive relief—and especially so when Medtronic has specifically attempted to persuade physicians with responsibility for which sacral neuromodulation products they implant with beliefs that are incorrect and based on Medtronic's false, deceptive, and misleading claims.

In addition, Axonics will provide evidence that Medtronic's claims and recovery are barred by the doctrine of unclean hands based on Medtronic's prosecution of the patents in the family of the asserted 324 Patent and the 112 Patent, in particular including Medtronic's introduction of new matter into patent application 13/210,569, filed on August 16, 2011, from which U.S. Patent No. 8,725,262 issued without disclosure of such new matter to the US Patent and Trademark Office.

The evidence may include: the prosecution histories of the applications and the patents that allegedly claim priority to U.S. Patent Application 10/836,318 (abandoned); the Asserted Patents, related patents, and their prosecution histories,

including particularly the asserted 112 Patent and the 324 Patent as well as the 262 Patent and the 547 Patent; the Carbunaru published patent application assigned to Boston Scientific; the Court's claim constructions; Medtronic's discovery responses in this case, including in particular Medtronic's responses to Axonics' Requests for Admission; the parties' communications before Medtronic sued Axonics, including in particular Medtronic's communications praising Axonics' achievements; the evidence regarding and communications about the parties' meetings; Medtronic's review of Axonics' confidential information about Axonics' accused products; Medtronic's own internal communications and presentations regarding Axonics; documents showing Medtronic's false and misleading statements about Axonics; other documents and communications (including emails); testimony of Medtronic's corporate witness, Mr. John Albrecht, and exhibits thereto; and Medtronic's named inventors, Mr. David Olson and Mr. Andrew Schmeling, and exhibits thereto. Axonics has identified witnesses that it may call at trial, and these include Mr. Dearen and Mr. Cohen, who Axonics may call to testify regarding the foregoing. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 4.     Affirmative Defense 4: Invalidity

#### a.     Lead Fixation Patents

Axonics will provide evidence of the invalidity of the Lead Fixation Patents. For example, Axonics will provide evidence that the claims of the Lead Fixation Patents are obvious over the following system in combination with another system or piece of prior art: 2000 Minimally Invasive Method and System in view of one of (a) Medtronic Tined Cardiac Leads, including Models 4011, 6961, 6971, and 6991; (b) ThinLine II Sterox Implantable Pacing Leads, including Models 430-25S, 430-35S, and 432-35S; (c) U.S. Patent No. 5,902,330 ("Ollivier"); or (d) U.S. Patent No.

5,957,966 ("Schroeppel"). Axonics will provide evidence on the scope and content of the prior art, that the difference, if any, between the claims and the prior art are obvious, the motivation to combine the prior art, the level of ordinary skill, the absence of secondary considerations that show obviousness, and the absence of nexus between the secondary considerations and the alleged invention covered by the claim. Regarding secondary considerations and contrary to Medtronic's allegations, Axonics will provide evidence that there was, for example, no long-felt need, praise of others, commercial success, copying, and near simultaneous invention. Medtronic bears the burden of proving estoppel, but Axonics will provide evidence that it is not estopped on any of the art on which it relies, including because the prior art consists of systems, art that otherwise could not reasonably have been raised during an IPR, or combinations that otherwise could not reasonably have been raised during an IPR. Axonics reserves the rights to rely on any combinations included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly.

Axonics will also provide evidence that the "plurality of tines" term is indefinite under the Special Master's construction.

This evidence may include: the 314 and 756 Patents, the file histories of the 314 and 756 Patents, patents and applications related to the 314 and 756 Patents, and the file histories of those related patents; the Court's claim constructions; prior art references and evidence showing the contents of prior art systems listed above and as described in the November 7, 2022 expert report of Mr. Pless; devices, documents, and any other prior art materials identified in Axonics' exhibit list; discovery responses of both parties; other documents and communications (including emails); testimony and evidence establishing a lack of secondary considerations of non-obviousness, including as described in the November 7, 2022 expert report of Mr. Pless; evidence of what was known in the art at the time of the alleged invention or priority date of the Lead Fixation Patents; the decisions in IPRs and Medtronic's own contentions and

admissions made in the course of the IPRs; the Federal Circuit's decision on the Lead Fixation Patents; testimony from fact witnesses, including deposition designations of relevant deponents, including Mr. Lee, Mr. Swoyer, Dr. Chai, Mr. Gerber, and Dr. Mamo; expert testimony, including Mr. Pless; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. To the extent Medtronic offers testimony from other witnesses, Axonics may also rely on or offer testimony from those witnesses. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### b.   Temperature Sensor Patents

Axonics will provide evidence of the invalidity of the Temperature Sensor Patents. For example, Axonics will provide evidence that the claims of the 324 Patent are anticipated by U.S. Patent Application Publication 2004/0098068 ("Carbunaru") or the Advanced Bionics/Boston Scientific Bion system ("Bion"). Axonics will also provide evidence that the claims of the 324 Patent are obvious over the following references:

- Carbunaru alone or in view of one of U.S. Patent No. 6,685,638 ("Taylor"), the standard UL 544 ("UL 544"), or the standard UL 60601-1 ("UL 60601-1"), and optionally further in view of U.S. Patent No. 5,702,431 ("Wang");

- PCT Patent Publication No. WO 01/83029 A1 ("Torgerson") in view of either UL 544 or UL 60601-1 alone or in further combination with Taylor, Wang, Taylor and Wang, U.S. Patent No. 4,082,097 ("Mann"), or Taylor and Mann;

- Bion alone or in view of one of Taylor, UL 544, or UL 60601-1, and optionally further in view of Wang; and

- U.S. Patent No. 5,733,313 ("Barreras") in view of either UL 544 or UL

60601-1 alone or in further combination with Taylor, Wang, Taylor and Wang, or Taylor and U.S. Patent No. 6,516,227 ("Meadows").

Medtronic bears the burden of proving estoppel, but no estoppel applies to the 324 Patent because no IPR was instituted, and so there was no final written decision.

For example, Axonics will provide evidence that the claims of the 112 Patent are anticipated by Bion. Additionally, Axonics will provide evidence that new matter was added to the specification of a parent application to the 112 Patent and that new matter was claimed in the 112 Patent, and so the priority date for the claims of the 112 Patent are August 16, 2011. Based on that priority date, Axonics will also provide evidence that the Advanced Bionics/Boston Scientific Precision system ("Precision") anticipates. Axonics will also provide evidence that the claims of the 112 Patent are obvious over the following references:

- Bion alone or in view of one of UL 60601-1 or applicant admitted prior art; and
- Based on a later August 16, 2011, priority date, the Precision alone or in view of UL 60601-1 or applicant admitted prior art.

Axonics reserves the right to rely on any combinations included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly.

Medtronic bears the burden of proving estoppel, but Axonics will provide evidence that it is not estopped on any of the art on which it relies for the 112 Patent, including because the prior art consists of systems or admitted prior art, art that otherwise could not reasonably have been raised during an IPR, or combinations that otherwise could not reasonably have been raised during an IPR.

Axonics will provide evidence on the scope and content of the prior art, that the difference, if any, between the claims and the prior art are obvious, the motivation to combine the prior art, the level of ordinary skill, the absence of secondary considerations that show obviousness, and the absence of nexus between the secondary

considerations and the alleged invention covered by the claim. Regarding secondary considerations and contrary to Medtronic's allegations, Axonics will provide evidence that there was, for example, no failure of others, commercial success, copying, or positive recognition; and some of the evidence Medtronic has relied upon shows secondary considerations of obviousness.

Axonics will also provide evidence that the Temperature Sensor Patents are invalid for lack of enablement because they did not enable single-enclosure chargers, including without limitation within the range of form factors of the accused product and allegedly embodying Medtronic wireless recharger product, and creating a single-enclosure charger required undue experimentation, as demonstrated by both Axonics' and Medtronic's design efforts. Axonics will also provide evidence that the Temperature Sensor Patents are invalid for lack of enablement also because they did not enable the use of a charger with a temperature sensor with an output indicative of the temperature of the side of the housing or that is configured to measure a temperature indicative of heat resulting from transcutaneous transfer without the side of the housing being conductive, as Medtronic's subsequent design efforts again confirm. Thus, the patents did not teach one of ordinary skill how to make and use the full scope of the claimed invention. Axonics will provide evidence addressing the *Wands* factors for each basis to allege the claims are not enabled. Axonics will additionally provide evidence that the 112 Patent added new matter to the specification and thus was not enabled.  For similar reasons, Axonics will also provide evidence that the Temperature sensor patents lacked written description.

Axonics will also provide evidence that the inventorship of the 112 Patent is incorrect and that additional, unidentified inventors contributed the "programmable limit" limitation, including based on the admissions of the named inventors. Axonics will also provide evidence that the inventorship of the 324 Patent is incorrect because Claim 5 requires an "adjustable assembly," and the evidence will show that the named inventors confirmed that Mr. Forsberg contributed to that alleged invention and was

originally named on the application from which the 324 Patent is a continuation, but was left off of the 324 Patent application.

This evidence may include: the 324 and 112 Patents, the file histories of the 324 and 112 Patents, patents and applications related to the 324 and 112 Patents, and the file histories of those related patents; the Court's claim constructions; prior art references and evidence showing the contents of prior art systems listed above and as described in the expert reports of Mr. Irazoqui; devices, documents, and any other prior art materials identified in Axonics' exhibit list; discovery responses of both parties; other documents and communications (including emails); testimony and evidence establishing a lack of secondary considerations of non-obviousness as described in the expert reports of Mr. Irazoqui; physical samples and pictures of the accused products and Medtronic's allegedly embodying products; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and Medtronic's allegedly embodying products evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged invention or priority date of the Temperature Sensor Patents; testimony from fact witnesses, including deposition designations of relevant deponents, including Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, and Mr. Schulzetenberg; expert testimony, including Mr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics has identified witnesses that it will call or may call at trial, and these include Mr. Abdeen, who Axonics may call to testify regarding the foregoing. To the extent Medtronic offers testimony from other witnesses related to this defense, Axonics may also rely on or offer testimony from those same witnesses that Medtronic relies upon. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of

Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### c.     Battery Current Patent

Axonics will provide evidence of the invalidity of the Battery Current Patent. For example, Axonics will provide evidence that the asserted claim of the Battery Current Patent is anticipated by applicant admitted prior art and the Eon or Genesis System ("Eon"). Axonics will also provide evidence that the claim of the Battery Current Patent is obvious over the following references:

- Precision alone or in view of the admitted prior art or Pacesetter Pacemakers and/or Battery Charge Controller ADP3810/3811, Battery Charger Controller LP3946, or Battery Charger Controller LM3622, Charge Management Controllers MCP73826/MCP73827/MCP73828, Linear Technology Fast Charge Circuits for NiCad Batteries, Bion, Eon, or the transient reductions in current known to occur in prior art systems;
- Eon alone or in view of Precision, the applicant admitted prior art, Pacesetter Pacemakers, or the transient reductions in current known to occur in prior art systems;
- Applicant admitted prior art in view of Precision, Eon, or the transient reductions in current known to occur in prior art systems.

Axonics reserves the right to rely on any combinations included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly.

Medtronic bears the burden of proving estoppel, but Axonics will provide evidence that it is not estopped on any of the art on which it relies for the Battery Current Patent, including because the prior art consists of systems or admitted prior art, art that otherwise could not reasonably have been raised during an IPR, or combinations that otherwise could not reasonably have been raised during an IPR.

Axonics will provide evidence on the scope and content of the prior art, that the

difference, if any, between the claims and the prior art are obvious, the motivation to combine the prior art, the level of ordinary skill, the absence of secondary considerations that show obviousness, and the absence of nexus between the secondary considerations and the alleged invention covered by the claim. Regarding secondary considerations and contrary to Medtronic's allegations, Axonics will provide evidence that there was, for example, no long-felt but unmet need, proof of positive recognition, failure of others, commercial success, or copying; and some of the evidence Medtronic has relied upon shows secondary considerations of obviousness.

Axonics will also provide evidence that the Battery Current Patent is invalid for lack of enablement because it did not enable single-enclosure chargers, including without limitation within the range of form factors of the accused product and allegedly embodying Medtronic wireless recharger product, and creating a single-enclosure charger required undue experimentation, as demonstrated by both Axonics' and Medtronic's design efforts. Thus, the patent does not teach one of ordinary skill how to make and use the full scope of the claimed invention. Axonics will provide evidence addressing the *Wands* factors to allege the claims are not enabled. For similar reasons, Axonics will also provide evidence that the Battery Current Patent lacked written description.

Axonics will also provide evidence that the inventorship of claim of the Battery Current Patent is incorrect and that the named inventors admitted that they did not invent the subject matter claimed, and instead admitted that another group including Mr. Nedungadi invented the subject matter claimed.

This evidence may include: the Battery Current Patent, the file history of the Battery Current Patent, patents and applications related to the Battery Current Patent, and the file histories of those related patents; the Court's claim constructions; prior art references and evidence showing the contents of prior art systems listed above and as described in the expert reports of Mr. Irazoqui; devices, documents, and any other prior art materials identified in Axonics' exhibit list; discovery responses of both

parties; other documents and communications (including emails); testimony and evidence establishing a lack of secondary considerations of non-obviousness as described in the expert reports of Mr. Irazoqui; physical samples and pictures of the accused products and Medtronic's allegedly embodying products; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and Medtronic's allegedly embodying products evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged invention or priority date of the Battery Current Patent; testimony from fact witnesses, including deposition designations of relevant deponents, including Mr. Gaddam, Mr. Harper, Mr. Olson, Mr. Schmeling, and Mr. Schulzetenberg; expert testimony, including Mr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. Axonics has identified witnesses that it will call or may call at trial, and these include Mr. Abdeen, who Axonics may call to testify regarding the foregoing. To the extent Medtronic offers testimony from other witnesses related to this defense, Axonics may also rely on or offer testimony from those same witnesses that Medtronic relies upon. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

### 5.     Affirmative Defense 5: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a)

Even if Medtronic were able to prove that its InterStim and other products may practice the Asserted Patents, Axonics will provide evidence that Medtronic admitted that it has not marked its products and has not required any licensee to mark its products. Medtronic also admitted that it had not given notice of alleged infringement to Axonics before filing its complaint and amended complaint in this case.

However, on the current record, Medtronic is only seeking damages starting in December 2019, so it may not be necessary for Axonics to present evidence on this defense at trial. (Beyond that, Axonics also disputes Medtronic's entitlement to any damages.)

To the extent Axonics must present evidence on this defense, this evidence may include: the Asserted Patents, the file histories of the Asserted Patents, patents and applications related to the Asserted Patents, and the file histories of those related patents; the Court's claim constructions; other documents and communications (including emails); discovery responses, including Medtronic's responses to Requests for Admission; proof of no embodying products; proof of no marking and no notice before filing; testimony from fact witnesses, including deposition designations of relevant deponents, including from Mr. Albrecht; expert testimony, including from Mr. Pless and Dr. Irazoqui; and all evidence, documents, tests, and testimony cited in Axonics' expert reports. To the extent Medtronic offers testimony from other witnesses related to this defense, Axonics may also rely on or offer testimony from those same witnesses that Medtronic relies upon. Axonics reserves the right to amend its summary and list, including adding to or removing from it. In particular, Axonics reserves the right to supplement, edit, and withdraw evidence from this list in response to Medtronic's Memorandum of Contentions of Fact and Law or to address any issues that arise during trial or pretrial proceedings for this case.

> **6.      Affirmative Defense 6: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928**

Should the Court find that one or more claims of one or more Asserted Patents is valid and infringed by Axonics while also correctly finding that one or more other claims in the same patent(s) are invalid, Medtronic shall recover no costs because it failed to disclaim the invalid claims before filing this suit.

### 7.   Exceptional Case, Fees, And Costs

Finally, Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits. On the other hand, Medtronic's requirement that Axonics mount a defense of this matter by filing and prosecuting the present lawsuit is exceptional under 35 U.S.C. § 285.

This evidence may include: the evidence used in Axonics' defenses, which also illustrates the nature of Medtronic's claims, and Axonics incorporates by reference the evidence identified in Sections III(C)(1-6); and Medtronic's litigation tactics and the burden on Axonics.

As described in the incorporated sections, Axonics may also provide evidence that this case is exceptional because over a period of years, Medtronic engaged in a course of conduct and a series of statements and interactions that led Axonics reasonably to believe that Medtronic not only did not intend to assert patent infringement against Axonics but rather welcomed Axonics' presence in what was then a dramatically underserved market for SNM.

## IV.   ANTICIPATED EVIDENTIARY ISSUES (L.R. 16-4.1(H))

Axonics has filed *Daubert* motions to exclude certain opinions of Medtronic's experts DeForest McDuff, Ph.D., Dr. Toby Chai, Richard Mihran, Ph.D., and Dr. Ronald Berger, Ph.D. Dkt. Nos. 392 and 393. Medtronic has also filed a *Daubert* motion to exclude certain opinions of Axonics' experts Ms. Julie Davis, Mr. Benjamin Pless, and Dr. Charles Butrick. Dkt. No. 402. Those motions remain pending and are set to be heard on June 24, 2024.

The parties expect to file motions *in limine* on June 21, 2024. Axonics incorporates by reference those forthcoming motions and the arguments therein.

The parties have also prepared a joint exhibit list that will be filed the same day as this memorandum (by June 21, 2024, pursuant to Dkt. No. 365). The parties maintain certain objections to exhibits on the joint exhibit list. As of the filing of this memorandum, the parties continue to meet and confer to resolve any evidentiary

objections on the joint exhibit list.

In addition, the parties have exchanged deposition designations and objections thereto. The parties are meeting and conferring to address such objections.

Axonics reserves the right to raise additional disputed evidentiary issues as this action proceeds.

## V.   ISSUES OF LAW (L.R. 16-4.1(I))

The Court has not yet issued a claim construction order, and Axonics incorporates its objections to the Special Master's Report and Recommendation (Dkt. No. 165) here. Axonics may supplement the issues of law after the Court issues its order.

Axonics incorporates Axonics' briefing and arguments on both parties' summary judgment motions, *Daubert* motions and motions *in limine* to the extent they present any issues of law.

Axonics also reserves its right to update this section based on issues that remain or arise following the parties' meet and confer process, including based on the law cited and described above.

## VI.   BIFURCATION OF ISSUES (L.R. 16-4.3)

Axonics does not believe any issues should be bifurcated.

## VII.   JURY TRIAL (L.R. 16-4.4)

Both parties timely demanded trial by jury.

The following issues are triable to a jury as a matter of right:

- Patent infringement under 35 U.S.C. § 271;
- Willful patent infringement;
- Damages for patent infringement;
- Validity of the Asserted Patents, but the ultimate question of indefiniteness, enablement, and obviousness are questions of law for the Court with underlying facts that may be resolved by the jury;

Non-jury issues to be decided by the Court include:

- Medtronic's request for injunctive relief;
- Medtronic's request for enhanced damages if the jury finds willful infringement;
- Whether Medtronic's claims for damages are limited under 35 U.S.C. § 287(a);
- Whether Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928;
- Whether Medtronic's case against Axonics is exceptional;
- Whether Medtronic's prosecution of its case against Axonics is exceptional;
- Medtronic's request for attorneys' fees and costs;
- Axonics' request for costs, disbursements (including expert fees), and reasonable attorneys' fees incurred in this action;
- Medtronic's pre- and post-judgment interest and costs;
- Prosecution History Estoppel/Prosecution Disclaimer;
- Waiver and Estoppel including equitable estoppel and unclean hands.

## VIII.  ATTORNEY'S FEES (L.R. 16-4.5)

No attorneys' fee should be awarded to Medtronic in this case. Axonics should be awarded attorneys' fees under 35 U.S.C. § 285 because this is an exceptional case as explained above in Sections III(B)(7) and III(C)(7).

## IX.  ABANDONMENT OF ISSUES (L.R. 16-4.6)

Medtronic's Counts V and VI of the Amended Complaint regarding claims 6, 12, 18 of U.S. Patent No. 8,738,148 and claims 1, 2, 4–6, 8–10, 12 of U.S. Patent No. 8,457,758 have been dismissed with prejudice. Dkt. No. 341.

Axonics reserves the right to update this section based on any of the Court's anticipated rulings with respect to Axonics' motion for summary judgment or Medtronic's motion for summary judgment. Axonics also reserves its right to update this section based on any issues Medtronic abandons in its memorandum of contentions of fact and law, or any future narrowing of the case.

Dated: June 14, 2024

Respectfully submitted,

*/s/    Samantha Jameson*
Matthew D. Powers (Bar No. 104795)
William P. Nelson (Bar No. 196091)
Natasha M. Saputo (Bar No. 291151)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Facsimile:   (650) 802-6001
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com

Azra M. Hadzimehmedovic (Bar No. 239088)
Aaron M. Nathan (Bar No. 251316)
Samantha A. Jameson (Bar. No. 296411)
Stephen K. Shahida (admitted *Pro Hac Vice*)
Danielle C. Pfifferling (admitted *Pro Hac Vice*)
Nathaniel D. Cook (admitted *Pro Hac Vice*)
TENSEGRITY LAW GROUP, LLP
1676 International Drive, Suite 910
McLean, VA 22102
Telephone:  (703) 940-5033
Facsimile:   (650) 802-6001
azra@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
stephen.shahida@tensegritylawgroup.com
danielle.pfifferling@tensegritylawgroup.com
nathaniel.Cook@tensegritylawgroup.com

David M. Stein (Bar No. 198256)
Olson Stein LLP
240 Nice Lane #301,
Newport Beach, CA 92663
Telephone:  (949) 887-4600
dstein@olsonstein.com

*Attorneys for Defendant Axonics, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 14, 2024, copies of the foregoing were served upon the following parties as indicated below:

| | |
|---|---|
| Nimalka Wickramasekera<br>Joe S. Netikosol<br>WINSTON & STRAWN LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071-1543<br>Telephone: (213) 615-1700<br>Facsimile: (213) 615-1750 | **Via E-mail**<br><br>NWickramasekera@winston.com<br>JNetikosol@winston.com |
| George C. Lombardi<br>Samantha M. Lerner<br>J.R. McNair<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, IL 60601-9703<br>Tel: (312) 558-5600 | GLombard@winston.com<br>SLerner@winston.com<br>JMcNair@winston.com<br>RKang@winston.com<br>winston-medtronic-axonics@winston.com |
| Robert Nai-Shu King<br>WINSTON & STRAWN LLP<br>101 California St., Floor 34<br>San Francisco, CA 94111-5812<br>Telephone: (415) 591-1400 | |
| Robert T. Vlasis III<br>Brian E. Ferguson<br>WINSTON & STRAWN LLP<br>1901 L. Street NW<br>Washington, DC 20036<br><br>***Counsel for Plaintiffs Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC.; Medtronic USA, Inc.,*** | BEFerguson@winston.com<br>RVlasis@winston.com |

*/s/ Nicole High*
Nicole High