Nimalka Wickramasekera (SBN: 268518)
NWickramasekera@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

George C. Lombardi (*pro hac vice*)
GLombard@winston.com
Brian Nisbet (*pro hac vice*)
BNisbet@winston.com
J.R. McNair (*pro hac vice*)
JMcNair@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   (312) 558-5600
Facsimile:    (312) 558-5700

Attorneys for Plaintiffs
MEDTRONIC, INC.; MEDTRONIC
PUERTO RICO OPERATIONS CO.;
MEDTRONIC LOGISTICS, LLC;
MEDTRONIC USA, INC.

Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
William P. Nelson (Bar No. 196091)
william.nelson@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Tel./Fax: (650) 802-6000 / (650) 802-6001

Azra Hadzimehmedovic (Bar No. 239088)
azra@tensegritylawgroup.com
Aaron M. Nathan (Bar No. 251316)
aaron.nathan@tensegritylawgroup.com
Samantha A. Jameson (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
1676 International Drive, Suite 910
McLean, VA 22102
Tel./Fax: (703) 940-5031 / (650) 802-6001

David M. Stein (Bar No. 198256)
dstein@olsonstein.com
OLSON STEIN LLP
240 Nice Lane # 301
Newport Beach, CA  92663
Telephone: (949) 887-4600

Attorneys for Defendant Axonics, Inc.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> AXONICS MODULATION TECHNOLOGIES, INC., <br><br> Defendant. | Case No. **8:19-cv-02115-DOC-JDE** <br><br> **[PROPOSED] JOINT FINAL PRETRIAL CONFERENCE ORDER** <br><br> Judge David O. Carter <br><br> Date: September 3, 2024 <br> Time: 8:30am <br> Courtroom: 10A |

**TO THE COURT:**

PLEASE TAKE NOTICE that the parties hereby lodge the attached

[PROPOSED] FINAL PRETRIAL CONFERENCE ORDER and related Exhibits.

Dated: July 12, 2024

Nimalka Wickramasekera (SBN: 268518)
NWickramasekera@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:   (213) 615-1750

George C. Lombardi (*pro hac vice*)
GLombard@winston.com
Brian Nisbet (*pro hac vice*)
BNisbet@winston.com
J.R. McNair (*pro hac vice*)
JMcNair@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   (312) 558-5600
Facsimile:   (312) 558-5700

*Attorneys for Plaintiffs*
MEDTRONIC, INC.; MEDTRONIC
PUERTO RICO OPERATIONS CO.;
MEDTRONIC LOGISTICS, LLC;
MEDTRONIC USA, INC.

The signatory above attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Matthew D. Powers (Bar No. 104795)
William P. Nelson (Bar No. 196091)
Natasha M. Saputo (Bar No. 291151)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:   (650) 802-6000
Facsimile:    (650) 802-6001
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com

Azra M. Hadzimehmedovic (Bar No. 239088)
Aaron M. Nathan (Bar No. 251316)
Samantha A. Jameson (Bar. No. 296411)
Stephen K. Shahida (*pro hac vice*)
Danielle C. Pfifferling (*pro hac vice*)
Nathaniel D. Cook (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
1676 International Drive, Suite 910
McLean, VA 22102
Telephone:   (703) 940-5033
Facsimile:    (650) 802-6001
azra@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
stephen.shahida@tensegritylawgroup.com
danielle.pfifferling@tensegritylawgroup.com
nathaniel.cook@tensegritylawgroup.com

David M. Stein (Bar No. 198256)
OLSON STEIN LLP
240 Nice Lane # 301
Newport Beach, CA  92663
Telephone: (949) 887-4600
dstein@olsonstein.com

*Attorneys for Defendant Axonics, Inc.*

Following pretrial proceedings, pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16, IT IS ORDERED:

1. The parties are:

    a. Plaintiffs Medtronic, Inc.; Medtronic Puerto Rico Operations Co.; Medtronic Logistics, LLC; Medtronic USA, Inc. (collectively, "Medtronic");

    b. Defendant Axonics, Inc. ("Axonics," previously Axonics Modulation Technologies, Inc. (Dkt. 95, Notice of Name Change).)

Axonics has been served and has appeared. There are no other parties named in the pleadings.

The pleadings which raise the issues are:

    a. Medtronic's First Amended Complaint (Dkt. 28); and

    b. Axonics' Answer to First Amended Complaint (Dkt. 34).

2. Federal jurisdiction and venue are invoked upon the grounds:

    a. Medtronic asserts claims arising under the patent laws of the United States, 35 U.S.C. § 271, et seq. related to U.S. Patent Nos. 8,036,756 ("the '756 patent"), 8,626,314 ("the '314 patent"), and 9,463,324 ("the '324 patent").[1] The Court has federal jurisdiction over such claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). Federal jurisdiction is not disputed.

---

[1] Medtronic's Counts V and VI of the Amended Complaint regarding claims 6, 12, 18 of U.S. Patent No. 8,738,148 and claims 1, 2, 4–6, 8–10, 12 of U.S. Patent No. 8,457,758 have been dismissed with prejudice. Dkt. No. 341. On July 11, 2024, Judge Carter granted Axonics' motion for summary judgment of non-infringement of U.S. Patent No. 9,821,112 as to the asserted claims, namely Claims 1, 4–7, 16–17, and 22 (Dkt. No. 497 at 55) and granted Axonics' motion for summary judgment of non-infringement of Claim 7 of U.S. Patent No. 7,774,069 (*id.* at 49). Medtronic reserves all rights, including on appeal.

b. Medtronic asserts venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b) and 1400(b) because Axonics maintains regular and established places of business and Medtronic alleges that Axonics engaged in acts of patent infringement that were committed within this judicial district. Venue is not disputed.

3. The trial is estimated to take seven trial days with 20 hours per side. This 20 hours is inclusive of opening statements and closing statements, but not jury selection.

4. The trial is to be a jury trial, although some of the issues and remedies are equitable and for determination by the Court.

At least seven (7) days prior to the trial date (i.e., by August 27, 2024, pursuant to Dkt. No. 365) the parties shall file and serve by email or personal delivery: (a) proposed jury instructions as required by L.R. 51-1 and (b) any special questions requested to be asked on voir dire.

5. The following facts are admitted and require no proof: none.[2]

6. The following facts, though stipulated, shall be without prejudice to any evidentiary objection: none.

7. The following claims and defenses will be presented at trial:

**Plaintiff (Medtronic):**

(a) Medtronic plans to pursue the following claims against Axonics:

Claim 1: Direct Infringement of claims 14 and 18 of the '756 patent; claims 18-

---

[2] The parties are diligently meeting and conferring on the scope of the proposed stipulated facts that should be included to help streamline the trial. The parties will submit the list of stipulated facts to the Court on Monday morning before the Final Pretrial Conference, and if any disagreement remains, the parties will be prepared to discuss those disagreements at the Pretrial Conference.

21 and 24 of the '314 patent[3]; claims 1, 2, 4, 6-10, 12, 14, 16, 17, 20, 22-24 of the '324 patent.

Claim 2: Induced Infringement, in the United States and Through the Supply of Components from the United States, of claims 14 and 18 of the '756 patent; claims 18-21 and 24 of the '314 patent; claims 1, 2, 4, 6-10, 12, 14, 16, 17, 20, 22-24 of the '324 patent.

Claim 3: Contributory Infringement of claims 14 and 18 of the '756 patent, and claims 18-21 and 24 of the '314 patent.

Claim 4: Willful infringement of claims 14 and 18 of the '756 patent; claims 18-21 and 24 of the '314 patent; Direct Infringement of claims 1, 2, 4, 6-10, 12, 14, 16, 17, 20, 22-24 of the '324 patent.

Claim 5: Damages. Medtronic seeks to recover damages from Axonics pursuant to 35 U.S.C. § 284 adequate to compensate it for Axonics' infringement, but in no event not less than a reasonable royalty for Axonics' infringement of the Asserted Claims.  The jury will be asked to determine Medtronic's damages up to and including April 30, 2024, the last date of expiration for any asserted patent. Medtronic will prove and seek supplemental damages as appropriate.

Medtronic also seeks to recover pre-judgment and post-judgment interest and costs pursuant to 35 U.S.C. § 284. Medtronic seeks to recover enhanced damages for Axonics' willful infringement pursuant to 35 U.S.C. § 284.

Claim 6: A finding of exceptionality under 35 U.S.C. § 285 and an award of reasonable attorney fees.

(b)     The elements required to establish Medtronic's claims are:

Claim 1 Elements:

---

[3] Medtronic will not assert claims 1, 2, 10-12, and 22-23 of the '314 patent at the September 3, 2024 trial.  Medtronic reserves the right to re-assert these claims should the current trial date be continued.

**Medtronic's Position**

Medtronic alleges that Axonics directly infringes claims 14 and 18 of the '756 patent; claims 18-21 and 24 of the '314 patent; claims 1, 2, 4, 6-10, 12, 14, 16, 17, 20, 22-24 of the '324 patent. The '314 and '756 patents are referred to as the "Tined Lead Patents."[4] The '324 patent is referred to as the "Temperature Control Patent."

Axonics has never challenged Medtronic's ownership of the Asserted Patents, yet Axonics now refuses to stipulate at trial that Medtronic owns the Asserted Patents. There is no reason for Axonics's refusal other than to prolong the trial, waste time, and force Medtronic to present needless evidence of undisputed ownership.

Axonics is liable for direct infringement by literal infringement if Medtronic proves by a preponderance of the evidence that (1) Medtronic owns the Asserted Patents and has the right to sue for their infringement; (2) Axonics made, used, sold, or offered for sale in the United States, or imported into the United States, a product meeting all the requirements of at least one Asserted Claim; and (3) Axonics did so without Medtronic's authorization during the time the Asserted Patents were in force. 35 U.S.C. § 271(a). *See* Federal Circuit Bar Association Model Jury Instructions, last edited May 2020 ("FCBA"), No. B.3.1a.

Axonics is liable for direct infringement under the doctrine of equivalents if Medtronic proves by a preponderance of the evidence that Axonics made, used, sold, offered for sale in the United States, or imported into the United States, a product that does not literally meet all of the elements of an Asserted Claim but that performs steps that literally meet or are equivalent to each and every element of an Asserted Claim. A step or element is equivalent to a claim element if it is insubstantially

---

[4] Medtronic objects to Axonics's new label of "Lead Fixation Patents" to refer to the '314 and '756 patents as incomplete as to the nature of the claims and therefore misleading. The '314 and '756 patents have been referred to as the Tined Lead Patents throughout this litigation.

different than the claim element or if it (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim.

### Axonics' Position

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic claims that Axonics has literally directly infringed Claims 1–2, 4, 6–10, 12, 14, 16, 17, 20, 22–24 of the 324 Patent. Medtronic also claims that Axonics has directly infringed Claims 14 and 18 of U.S. Patent No. 8,036,756 and Claims 18-21 and 24 of U.S. Patent No. 8,626,314[5], literally or under the doctrine of equivalents only. Collectively these claims are referred to as the "Asserted Claims" and these patents are referred to as the "Asserted Patents." The 756 and 314 Patents are referred to as the "Lead Fixation" Patents.[6] The 324 Patent is referred to as the "Temperature Sensor Patent."

The products accused under the 756 and 314 Patents are referred to as the "Lead Fixation Accused Products." The products accused under the 324 Patent is referred to as the "Recharge Accused Products."

To prove its direct literal infringement allegations against Axonics, Medtronic must prove by a preponderance of the evidence separately for each asserted claim that Axonics, (a) without authorization, (b) made, used, offered to sell, sold within the United States, or imported into the United States, accused products or processes that

---

[5] Medtronic appears to be attempting to preserve the right to resurrect previously asserted claims 1, 2, 10–12, and 23 of the 314 Patent, which the PTAB recently invalidated if the trial is postponed.  Axonics objects to this approach.

[6] The PTAB found that asserted Claims 1, 2, 10–12, 22, and 23 of the '314 Patent were unpatentable. IPR2020-00679, Paper 94, p. 50 (March 21, 2024). Axonics has appealed the finding of patentability by a split panel of PTAB judges of the still-asserted patents of the 314 Patent, and Medtronic has appealed the finding of unpatentability of claims 1, 2, 10-12, 22, and 23.

practice each and every limitation of the asserted claims while the patent was in force, and (c) that Medtronic has the right to sue for infringement of the Asserted Patents. FCBA at 18 (B.3, 3.1a) (2020); 35 U.S.C. § 271(a); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1309-11 (Fed. Cir. 2005).  The only remaining asserted claims of the Lead Fixation Patents not invalidated by the PTAB are method claims (Claims 14 and 18 of U.S. Patent No. 8,036,756 and Claims 18-21 and 24 of U.S. Patent No. 8,626,314). Accordingly, to establish that Axonics has directly infringed these claims, Medtronic must show that Axonics has performed each and every step of the claimed methods.  *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 773 (Fed.Cir.1993) (holding that "[t]he sale of [an apparatus capable of performing a claimed process is] not a direct infringement because a method or process claim is directly infringed only when the process is performed"). To prove literal infringement, Medtronic must prove for each Asserted Claim that each and every limitation of that claim is found identically in the accused Axonics products or processes, or performed identically using the accused Axonics products. FCBA at 18 (B.3, 3.1a); *Cross Med. Prods.*, 424 F.3d at 1310.

If there is no literal infringement, to prove infringement under the doctrine of equivalents, the essential inquiry is whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); FCBA at 21 (B.3, 3.1c). Establishing doctrine of equivalents infringement requires that any differences between the accused devices or methods and the patent claim are "insubstantial," meaning that the structure or action in the accused product or process (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim. *Warner-Jenkinson*, 520 U.S.  at 38-40; FCBA at 21 (B.3, 3.1c). Medtronic's doctrine of equivalents case is limited to the "plurality of tine elements" claim limitation of the

asserted claims of the Lead Fixation Patents.

Claim 2 Elements:

**Medtronic's Position**

Axonics is liable for induced infringement if Medtronic proves by a preponderance of the evidence that Axonics induced another to directly infringe an Asserted Claim either literally or under the doctrine of equivalents. To prove that Axonics is liable for inducing infringement, Medtronic must prove by a preponderance of the evidence that (1) Medtronic owns the Asserted Patents and has the right to sue for their infringement; (2) acts carried about by Axonics' end users of the accused products directly infringe an asserted claim; (3) Axonics took action that was intended to cause and led to the infringing acts by Axonics' end users, and (4) Axonics was aware of the Asserted Patents and knew that the acts, if taken, would constitute infringement of the Asserted Patent, or that Axonics believed there was a high probability that the acts by its end users would infringe an Asserted Patent and took deliberate steps to avoid learning of that infringement. To show direct infringement by Axonics' end users, Medtronic must prove by a preponderance of the evidence that end users perform all steps of an Asserted Claim.

For the alleged underlying act of direct infringement by Axonics' end users, Medtronic must prove by a preponderance of the evidence that (1) Medtronic owns the Asserted Patent and has the right to sue for their infringement; (2) customers used Axonics' products in the specific way that Axonics directs, and such use practices each and every limitation of each Asserted Claim; (3) said end users' use of Axonics' products in the infringing manner was done without Medtronic's authorization during the time the Asserted Patent was in force. For any aspect of underlying infringement alleged under the doctrine of equivalents, Axonics' end users directly infringe a claim if the end users perform steps that literally meet or are equivalent to each and every element of the claim. A step is equivalent to a claim element if it is

7

insubstantially different that the claim element or if it (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim.

Axonics is also liable for induced infringement through the supply of components from the United States for combination abroad if Medtronic proves by a preponderance of the evidence that (1) Medtronic owns the Asserted Patents and has the right to sue for their infringement; (2) Axonics supplied or caused to be supplied components from the United States to a place outside the United States, which make up all or a substantial portion of the invention of a claim of the Asserted Patents; (3) Axonics takes action intentionally to cause end users to assemble the components outside the United States; (4) Axonics knows of the Asserted Patents, and knows that the encouraged acts constitute infringement of that patent; and (5) the encouraged acts would constitute direct infringement of the claim if they had been carried out in the United States. 35 U.S.C. § 271(f)(1).

### Axonics' Position

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic asserts induced infringement of the Asserted Claims under 35 U.S.C. § 271(b) and induced infringement of the Asserted Claims under 35 U.S.C. § 271(f)(1).

To prove indirect infringement by inducement under 35 U.S.C. § 271(b), Medtronic must prove by a preponderance of the evidence: (1) that the acts are actually carried out by third parties that directly infringe each and every limitation of an Asserted Claim; (2) that Axonics took action during the time the relevant patent was in force that was intended to cause and led to the infringing acts by third parties; and (3) that Axonics was aware of the Asserted Patent at the relevant time and (4) Axonics knew that the acts, if taken, would constitute infringement of that Asserted Patent or Axonics subjectively believed that there was a high probability that the acts constituted

infringement and took deliberate actions to avoid learning of the infringement. *See* 35 U.S.C. § 271(b); FCBA at 24 (B.3, 3.2); *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118-19 (Fed. Cir. 2022). Even if Axonics was aware of an Asserted Patent, but believed that the acts it encouraged did not infringe that patent, Axonics cannot be liable for inducement. FCBA at 24 (B.3, 3.2); *Roche Diagnostics*, 30 F.4th at 1118-19; *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009).

To prove indirect infringement by inducement under 35 U.S.C. § 271(f)(1), Medtronic must prove by a preponderance of the evidence that: (1) Axonics supplies or causes to be supplied components from the United States to a place outside the United States, which make up all or a substantial portion of the invention of a claim of the patent; (2) Axonics takes action intentionally to cause third parties to assemble the components outside of the United States; (3) Axonics knows of the patent, and knows that the encouraged acts constitute infringement of that patent; and (4) the encouraged acts would constitute direct infringement of the claim if they had been carried out in the United States. 35 U.S.C. § 271(f)(1); FCBA at 27 (B.3, 3.4).

Claim 3 Elements:

**Medtronic's Position**

Axonics is liable for contributory infringement of a claim if Medtronic proves by a preponderance of the evidence that (1) Medtronic owns the Asserted Patents and has the right to sue for their infringement; (2) Axonics sold, offered to sell, or imported within the United States a component of a product, material, or apparatus for use in a process, during the time the Asserted Patents were in force; (3) the component, material, or apparatus is not a staple article or commodity of commerce suitable for substantial noninfringing use; (4) the component, material, or apparatus constitutes a material part of the invention; (5) Axonics was aware of the Asserted

Patents and knew that the component, material, or apparatus was especially made or adapted for use as an infringement of the claim; and (6) the end users used the component, material, or apparatus to directly infringe the claim.

### Axonics' Position

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. Medtronic asserts contributory infringement of the Asserted Claims under 35 U.S.C. § 271(c).

To prove indirect infringement by contributory infringement under 35 U.S.C. § 271(c), Medtronic must prove by a preponderance of the evidence that: (1) Axonics sells, offers to sell, or imports within the United States a component of a product, material, or apparatus for use in a process, during the time the relevant patent is in force; (2) the component, material, or apparatus is not a staple article or commodity of commerce suitable for substantial non-infringing use; (3) the component, material, or apparatus constitutes a material part of the invention as claimed; (4) Axonics is aware of the patent and knows that the component, material, or apparatus is especially made or adapted for use as an infringement of the claim; and (5) third parties use the component, material, or apparatus to directly infringe, and the third parties directly infringe each and every limitation of an Asserted Claim. 35 U.S.C. § 271(c); FCBA at 26 (B.3, 3.3); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1374 (Fed. Cir. 2003).

Claim 4 Elements:

### Medtronic's Position

To show that Axonics' infringement is willful, Medtronic must prove by a preponderance of the evidence that Axonics knew of the Asserted Patents and that Axonics' infringement was intentional and deliberate. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 104 (2016).

### Axonics' Position

Plaintiff bears the burden of proving infringement, including direct, indirect,

literal, under the doctrine of equivalents, and willful. Medtronic further claims that the alleged acts of infringement have been willful.

To show that Axonics' infringement is willful, Medtronic must prove by a preponderance of the evidence that: (1) Axonics knew of the asserted patent; (2) Axonics had a specific intent to infringe at the time of the challenged conduct; and (3) Axonics' conduct was willful, wanton, malicious, bad faith, deliberate, consciously wrongful, or flagrant. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04, 106 (2016); *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019); *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 987-88 (Fed. Cir. 2021).

Factors for consideration in establishing willful infringement include:

1) Whether or not the alleged infringer acted consistently with the standards of behavior for its industry;

2) Whether or not the alleged infringer intentionally copied a product of the patent holder that is covered by the patent;

3) Whether or not the alleged infringer reasonably believed it did not infringe or that the patent was invalid;

4) Whether or not the alleged infringer made a good-faith effort to avoid infringing the patent, for example, whether the alleged infringer attempted to design around the patent; and

5) Whether or not the alleged infringer tried to cover up its infringement.

FCBA at 35 (B.3, 3.10).

  Claim 5 Elements:

**Medtronic's Position**

Medtronic must establish the amount of its damages by a preponderance of the evidence.

Medtronic seeks lost profit damages for Axonics' infringement. To recover lost profits, Medtronic "must show that 'but for' infringement it reasonably would

have made the additional profits enjoyed by the infringer." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). One non-exclusive way to do that is by establishing the four factors set out in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).  "Once the patentee establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id.*

Medtronic seeks a reasonable royalty, which has been defined as the amount of money that Medtronic and Axonics would have agreed to in a hypothetical negotiation taking place at a time just prior to when infringement first began.[7]  Courts

_____

[7] **Medtronic's position:** The Court granted as modified Medtronic's motion to exclude Ms. Davis's damages opinions based on the application of the incorrect date of hypothetical negotiation.  Dkt. 497.  Ms. Davis has no disclosed opinion on reasonable royalty damages applying the Court ordered Q2 2017 date of hypothetical negotiation. Therefore, Ms. Davis should not be allowed to testify concerning reasonable royalty damages.  Axonics attempts to save her opinion by citing a conclusory footnote included in a supplemental report that only resulted from Axonics's sanctionable discovery conduct, and was limited by the Special Master to exclusively concern the availability and acceptability of Axonics's redesigned charger.  This footnote is non-substantive, irrelevant, not timely disclosed, not included in her initial report related to her reasonable royalty opinion, and not tied to that opinion in any way.  Any reliance on it only furthers the prejudice Medtronic suffered from Axonics's discovery misconduct.  Axonics chose to have Ms. Davis use a date of hypothetical negotiation that was contrary to its own discovery responses to bolster its case for available noninfringing alternatives.  The Court has now ruled against Axonics on those issues. Axonics does not get a redo on the eve of trial.  Medtronic will oppose any supplementation of Ms. Davis's report. **Axonics position:** Contrary to Medtronic's position that "Ms. Davis has no disclosed opinion on reasonable royalty damages applying the Court ordered Q2 2017 date of hypothetical negotiation," Ms. Davis expressly opined "to the extent that the hypothetical negotiation were to occur later than June 2016, as described in my Rebuttal Report, the parties approach to the hypothetical negotiation would remain the same, and in my opinion, the outcome would be unchanged." Ex. F to Axonics' Opp. to Medtronic's Daubert Motion (1/5/2023 Davis Rpt.) at 18 n.124. If the Court does not allow Ms. Davis to render a reasonable royalty opinion based on the Court's Daubert Order, then Axonics will seek

consider a variety of factors in determining the reasonable royalty that the parties would have agreed to in the "hypothetical negotiation," including the *Georgia-Pacific* factors. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

If Medtronic proves that Axonics' infringement was willful, the Court may increase the amount of damages of up to three times the amount of damages awarded by the jury. If Medtronic is the prevailing party in this case, then Medtronic is entitled to interest and costs as fixed by the Court.

Medtronic seeks to recover damages from Axonics pursuant to 35 U.S.C. § 284 adequate to compensate it for Axonics' infringement, but in no event not less than a reasonable royalty for Axonics' infringement of the Asserted Claims.  The jury will be asked to determine Medtronic's damages up to and including April 30, 2024, the last date of expiration for any asserted patent. Medtronic will prove and seek supplemental damages as appropriate.

**Axonics' Position**

Medtronic claims that it is entitled to damages sufficient to compensate it for the alleged infringement, pre-judgement and post-judgment interest and costs, and enhanced damages for alleged willful infringement. If the jury finds that any asserted claim is infringed and not invalid, Medtronic must prove each element of its damages, including the amount of damages, by a preponderance of the evidence under 35

---

leave to supplement Ms. Davis's opinions by this coming Wednesday, July 17, 2024, to confirm that her opinion does not change under the date of the hypothetical, which is Q2 2017 according to the Court's July 11, 2024 Order. (Axonics notes for the record again that both parties' experts relied on the dates of the hypothetical negotiation that the party did not disclose in its discovery responses. Axonics does not agree with Medtronic's other arguments, and will be happy to address them at the Final Pretrial Conference if that Court desires.)

U.S.C. § 284. AIPLA's Model Patent Jury Instructions at 56 (10.0) (2024); *Halo Elecs., Inc. v. Pulse Elecs.*, *Inc.*, 579 U.S. 93, 107 (2016).

If Medtronic proves infringement, it may receive a reasonable royalty or lost profits, but not both for the same allegedly infringing units. *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). Damages may not be awarded if they are speculative, only possible, or based on guesswork. FCBA Model JIs at 55 (B.5, 5.1).

To recover lost profits (as opposed to reasonable royalties), Medtronic must show a causal relationship between the infringement and Medtronic's loss of profit. FCBA at 57 (B.5, 5.2). In other words, Medtronic must show that, but for the infringement, there is a reasonable probability that Medtronic would have earned higher profits. *Id.*; *Grain Processing*, 185 F.3d at 1349; *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218-19 (Fed. Cir. 1993); *Sunoco Partners & Mktg. Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1180 (Fed. Cir. 2022). To show this, Medtronic must provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture" and that, if there had been no infringement, it would have made the sales that Axonics made of the accused products for which Medtronic seeks lost profits. *Grain Processing Corp.*, 185 F.3d at 1349; FCBA 57 (B.5, 5.2)*. To prove lost profits, Medtronic must prove each of the following by a preponderance of the evidence:

1.     That there was demand for the patented product or method;

2.     That there were no available, acceptable, noninfringing substitute products;

3.     That Medtronic had the manufacturing and marketing capacity to make any infringing sales actually made by Axonics and for which Medtronic seeks an award of lost profits—in other words, that Medtronic was capable of satisfying the demand; and

4.     The amount of profit that Medtronic would have made if Axonics had not

14

infringed.

AIPLA's Model Patent Jury Instructions at 47 (10.2.1.2) (2024); FCBA at 57 (B.5, 5.2); *Sunoco*, 32 F.4th at 1180 (Fed. Cir. 2022) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978)). For factor two, the acceptable substitute must have been available during the damages period, but need not have actually been sold at that time. AIPLA's Model Patent Jury Instructions at 48 (10.2.1.4) (2024); *Grain Processing Corp.*, 185 F.3d at 1349.

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Medtronic and Axonics. AIPLA's Model Patent Jury Instructions at 51 (10.2.5.2) (2024).[8] The hypothetical negotiation date is the date of first infringement. *Georgia-Pacific Corp.*, 318 F. Supp. at 1123; *LaserDynamics*, 694 F.3d at 76. The following *Georgia-Pacific* factors can be considered to inform the hypothetical negotiations:

1.    The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.    The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.    The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the

---

[8] **Axonics's Position:** The Court granted Axonics' *Daubert* motion on Medtronic expert's McDuff's forward patent citation analysis, which was a critical step in his analysis and calculation of a reasonable royalty. Dr. McDuff has no disclosed opinion on reasonable royalty damages without that analysis, and therefore Dr. McDuff should not be allowed to testify at trial concerning reasonable royalty damages. **Medtronic's Position:** Medtronic disagrees that Dr. McDuff has no disclosed opinion on reasonable royalty damages without the forward patent citation analysis, and Medtronic reserves the right to present that testimony at trial. And, if Medtronic establishes infringement of a valid patent claim, Medtronic is entitled to at least reasonable royalty damages as compensation under the law.

manufactured product may be sold.

4.    The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.    The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.

6.    The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7.    The duration of the patent and the term of the license.

8.    The established profitability of the product made under the patent; its commercial success; and its current popularity.

9.    The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.    The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion testimony of qualified experts.

15.     The amount that a licensor (such as the patentee) and a licensee (such  as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120.

In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base (i.e., the total royalty) must reflect the value attributable to the patented technology. AIPLA's Model Patent Jury Instructions at 53-54 (10.2.5.4) (2024).

If Medtronic proves that Axonics' infringement was willful, the Court may award increased damages of up to three times the amount of damages found or assessed, but enhanced damages are not required by a finding of egregious misconduct. 35 U.S.C. § 284. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, at 106. Conduct warranting enhanced damages has been described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* Awards of enhanced damages are limited to "egregious cases of misconduct beyond typical infringement." *Id.*, at 110. The Read factors provide guidance in determining whether and in what amount damages should be enhanced. These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial

condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).

If Medtronic proves Axonics' infringement of a valid claim, the Court may provide Medtronic interest and costs as fixed by the Court. 35 U.S.C. §284. However, the Court has "some discretion in awarding prejudgment interest," and prejudgment interest is not required whenever infringement is found. *GM Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983). For example, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.*

Claim 6 Elements:

### Medtronic's Position

To prove entitlement to a declaration that this is an exceptional case and a corresponding award of attorneys' fees, Medtronic, as a prevailing party, must prove by a preponderance of the evidence that (1) this case is one that stands out from others with respect to substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. *Octane Fitness v. ICON Health & Fitness*, 134 S. Ct. 1749, 1756, 1758 (2014).

### Axonics' Position

Medtronic requests a declaration that this case is exceptional along with a corresponding award of attorney fees pursuant to 35 U.S.C. § 285.

Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits. In addition, even a finding of willful infringement does not mandate an attorney fee award. *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020).

18

On the other hand, Medtronic's requirement that Axonics mount a defense of this matter by filing and prosecuting the present lawsuit is exceptional under 35 U.S.C. § 285.

To prove this case is exceptional, Medtronic must prove the following: that this case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 557 (2014); *Sionyx*, 981 F.3d at 1355. Medtronic must prove that the case is exceptional by a preponderance of the evidence, and the district court makes the exceptional-case determination on a case-by-case basis considering the totality of the circumstances. *Octane*, 572 U.S. at 554, 557-58. The court may weigh such factors as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6.

   (c)   In brief, the key evidence Medtronic relies on for each claim is:

Claim 1 Evidence:

- Evidence showing that the accused Axonics r-SNM System, literally or under the doctrine of equivalents, meets the asserted claim limitations of the '756 and '314 patents (collectively, the "Tined Lead Patents"), including, for example, that Axonics' tined leads have "a plurality of tine elements," as construed by the Special Master, and that Axonics instructs that its tined lead be used in an infringing method.

- Evidence showing that the accused Axonics r-SNM System, literally or under the doctrine of equivalents, meets the asserted claim limitations of the '324 Patent (the "Temperature Control Patent"), including, for

example, the "sensor," "control circuit…,"  "temperature sensor…" and "control circuitry…" ('324 patent) limitations under the claim construction of "indicative of", and that Axonics instructs its product be used in an infringing method.

- The above evidence will include testimony from fact and expert witnesses; the Tined Lead Patents and Temperature Control Patent, and their file histories; the Axonics r-SNM System itself; Axonics' regulatory applications and documents; instructions and advertising for the Axonics r-SNM System; technical design and development documents showing the structure, function, and operation of the Axonics r-SNM System; Axonics communications and presentations; and discovery documents.

Claim 2 Evidence:

- Evidence listed above supporting Claim 1 showing that the accused products meet the Asserted Claim limitations of the Tined Lead Patents and Temperature Control Patent.

- Evidence listed above supporting Claim 1 showing that Axonics knowingly and intentionally induces infringement of the Tined Lead Patents and Temperature Control Patent and showing that users of the Axonics r-SNM System use methods that infringe the Asserted Patents.

- Evidence showing that Axonics indirectly infringes the Tined Lead Patents by directing users of the Axonics r-SNM System to practice each method step of the Asserted Claims of the Tined Lead Patents when they implant Axonics' tined lead through an introducer, including by following Axonics' instruction manuals, and users perform those steps.

- Evidence showing that Axonics and its employees have been aware of Medtronic's Tined Lead Patents long before this litigation, including

20

during the design and development of Axonics' tined lead products.

- Evidence showing that Axonics has continued to intentionally instruct doctors to practice the method steps of the Tined Lead Patents through its marketing, promotional, and training materials despite Axonics' knowledge of Medtronic's Tined Lead Patents and notice of its infringement at least as of November 4, 2019, and that users perform those steps.

- Evidence showing that Axonics indirectly infringes the Temperature Control Patent by providing the Axonics r-SNM System with instructions and manuals to users such as customers, patients, hospitals, medical centers, clinics, clinicians, doctors, nurse practitioners, care providers, sales representatives, suppliers, distributors, and resellers, who, in turn, use, provision for use, test, offer for sale, or sell the Axonics r-SNM System in a manner that directly infringes the Temperature Control Patent, and users perform those steps.

- Evidence showing that Axonics had knowledge of the Temperature Control Patent, as well as knowledge of patent infringement.  This evidence includes Axonics' documents and statements from its employees acknowledging that Axonics was familiar with the Asserted Patents.

- Additional evidence includes discovery documents such as Axonics' responses to Medtronic's RFAs and Interrogatories and Medtronic's response to Axonics' RFAs and Interrogatories, and the file histories of the asserted patents including the inter partes review histories.

- Evidence showing that Axonics has hired a U.S. sales team that has been involved with and continues to be involved with the distribution of marketing promotional, and training materials, which instructs Axonics'

customers regarding the use of the Axonics r-SNM System in a manner that directly infringes the Asserted Patents.

- Evidence showing that Axonics indirectly infringes the Asserted Claims within the United States and abroad by, for example, designing and selling its Axonics r-SNM System in such a way that requires end users to combine or use the components of the Axonics r-SNM System in an infringing manner and to utilize an implantation mechanism and method covered by the Tined Lead Patents.

- Evidence showing that when used or tested by end users within the United States and abroad, the accused Axonics r-SNM System contains parts or steps that are identical or equivalent to each and every element of the asserted claims. That is, the accused r-SNM System performs substantially the same function, in substantially the same way, to achieve substantially the same result as the products covered by the Asserted Patents. This evidence will show that Axonics has supplied or caused to be supplied abroad the Axonics r-SNM System to infringing end users.

- The above evidence will also include manuals, instructions, and marketing materials for use of the Axonics r-SNM System, testimony from fact and expert witnesses; the Tined Lead Patents, Temperature Control Patent and their file histories; the Axonics r-SNM System itself; documentary evidence such as Axonics' regulatory filings, training materials, and technical design and development documents showing the structure, function, and operation of the Axonics r-SNM System; Axonics communications and presentations; and discovery documents.

Claim 3 Evidence:

- Evidence listed above supporting Claims 1 and 2 showing that Axonics

knowingly and intentionally induces infringement of the Tined Lead Patents  and showing that users of the Axonics r-SNM System use methods that infringe the Asserted Patents.

- Evidence showing that Axonics committed and continues to commit contributory infringement by knowingly offering for sale and selling the Axonics r-SNM System, which has no substantial noninfringing uses, and which when used in its normal and customary way as desired and intended by Axonics, causes the direct infringement of the Asserted Claims.

- The above evidence will include manuals, instructions, and marketing materials for use of the Axonics r-SNM System; testimony from fact and expert witnesses; the Tined Lead Patents and their file histories; the Axonics r-SNM System itself; and documentary evidence such as Axonics' regulatory filings, training materials, and technical design development documents showing the structure, function, and operation of the Axonics r-SNM System; Axonics communications and presentations; and discovery documents.

Claim 4 Evidence:

- Evidence supporting Claims 1, 2, and 3 showing that Axonics intentionally provides the Axonics r-SNM System to others, such as customers, patients, hospitals, medical centers, clinics, clinicians, doctors, nurse practitioners, care providers, sales representatives, suppliers, distributors, and resellers, who, in turn, use, provision for use, test, offer for sale, or sell the Axonics r-SNM System in a manner that directly infringes the Asserted Claims.

- Evidence supporting claims 1, 2, and 3 showing that Axonics provides user instructions and manuals accompanying its products for the

23

Axonics r-SNM System, as well as other marketing and promotional materials that instruct, direct, and intentionally induce others to use the Axonics r-SNM System in a manner that directly infringes the Asserted Claims.

- Evidence showing that Axonics has hired a U.S. sales team that has been involved with and continues to be involved with the distribution of marketing promotional, and training materials, which instructs Axonics' customers regarding the use of the Axonics r-SNM System in a manner that directly infringes the Asserted Patents.

- Evidence showing that Axonics had knowledge of the Asserted Patents prior to and during Axonics' infringement of the Asserted Patents.

- Evidence showing Axonics relied on Medtronic's patented technology in developing the accused products.

- Evidence showing Axonics relied on Medtronic's products to obtain regulatory approval.

- Evidence showing Axonics sold its product by marketing its similarity to Medtronic's products.

- This evidence includes Axonics' documents and statements from its employees acknowledging that Axonics was familiar with the Asserted Patents. Additional evidence includes discovery documents such as Axonics' responses to Medtronic's RFAs and Interrogatories and Medtronic's response to Axonics' RFAs and Interrogatories, and the file histories of the asserted patents including the inter partes review histories.

Claim 5 Evidence:

- Evidence showing Medtronic's lost profits due to Axonics' infringement, through expert analysis that determines the amount of lost

24

sales that Medtronic would have captured in the but-for world, and the expected profits that would have come from those sales. This includes evidence regarding the *Panduit* factors.

- Evidence regarding the hypothetical license negotiation between Medtronic and Axonics to license the Asserted Patents in exchange for a reasonable royalty at the time of first infringement, including evidence related to the *Georgia-Pacific* factors.

- Evidence that it has marketed and continues to market competing products that practice an Asserted Claim of each Asserted Patent.

- Evidence that that there are no available or acceptable non-infringing substitutes to the asserted patents or Medtronic's competing products; evidence that there were no FDA approved, available or acceptable noninfringing alternatives on the market at the time of infringement.

- Evidence showing, to support enhanced damages, that Axonics willfully infringed the Asserted Patents, including evidence that once Axonics failed to be acquired and was forced to market the accused products, Axonics specifically gathered information about Medtronic's sales force, hired former Medtronic sales representatives, identified Medtronic's top 1,000 customers, specifically targeted those Medtronic customers to convert them to Axonics', and built its entire business around converting those customers to Axonics and stealing market share from Medtronic.

- The above evidence will also include testimony from witnesses and experts; documents reflecting Axonics' sales, revenues, and expected profits of the accused products; and Axonics' communications, correspondence, and presentations; technical, regulatory, financial, and marketing documents from Axonics and Medtronic and other

communications and discovery responses; Axonics' efforts, or lack thereof, to avoid infringement; and Axonics' litigation tactics and the consequent burden imposed on Medtronic.

Claim 6 Evidence:

- Evidence listed above supporting claims 1-5 showing that Axonics has knowingly and intentionally infringed the Asserted Patents directly, indirectly in the United States and abroad.

- Evidence of Axonics' efforts, or lack thereof, to design around the Asserted Patents or otherwise avoid infringement.

- Evidence of Axonics' litigation tactics and the consequent burden on Medtronic.

- Axonics' parallel proceedings in the PTAB challenging Medtronic's patents.

**Defendant (Axonics)**[9]

(a)      Axonics plans to pursue the following affirmative defenses:

Affirmative Defense 1: To the extent that non-infringement must be asserted as an affirmative defense, Axonics does not directly, indirectly, or willfully infringe of the Asserted Claims under 35 U.S.C. §§ 271(a), 271(b), 271(c), and 271(f), either literally or under the doctrine of equivalents.

Affirmative Defense 2: Prosecution History Estoppel/Prosecution Disclaimer

Affirmative Defense 3: Waiver/Estoppel

Affirmative Defense 4: Invalidity of the Asserted Claims under 35 U.S.C. §§ 102, 103, and/or 112.

---

[9] The brief description of the key evidence Axonics relies follows Axonics' statement of affirmative defenses and elements required to establish Defendant's affirmative defenses.

<u>Affirmative Defense 5:</u> Medtronic's claims for damages are limited under 35 U.S.C. § 287(a).

<u>Affirmative Defense 6:</u> Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928.

<u>Exceptional Case, Fees, And Costs:</u> A finding of exceptionality under 35 U.S.C. § 285 and an award of reasonable attorney fees.

(b)    The elements required to establish Defendant's affirmative defenses are:

<u>Affirmative Defense 1 Elements: Non-Infringement</u>

**Axonics' Position**

Plaintiff bears the burden of proving infringement, including direct, indirect, literal, under the doctrine of equivalents, and willful. To the extent that non-infringement is an affirmative defense, Axonics prevails on this defense if Medtronic fails to prove infringement (either based on its own failure to meet its burden or based on Axonics' contrary showing) under the elements described above. Axonics incorporates by reference the elements described in Axonics' Position under Section 7(b) for Medtronic's Claims 1-3 above related to direct infringement, induced infringement, contributory infringement, and willful infringement. [10]

**Medtronic's Position**

***Direct Infringement***

To prove liability for direct infringement by literal infringement, Medtronic must prove by a preponderance of the evidence that (1) Medtronic has the right to sue for infringement of the Asserted Patents; (2) Axonics made, used, sold, or offered for sale in the United States, or imported into the United States, a product meeting all the requirements of an Asserted Claim; and (3) Axonics did so without Medtronic's

---

[10] Willful infringement is Medtronic's burden to prove and accordingly is not an affirmative defense nor is it Axonics' burden to disprove willful infringement.

authorization during the time the relevant patent was in force.  35 U.S.C

§ 271(a).

To prove liability for direct infringement by the doctrine of equivalents, Medtronic must prove that while a limitation of the claim is not identically practiced by or present in an accused product or method, the limitation may be deemed present due to the presence of an equivalent structure or step.  *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). A structure or step is deemed equivalent when there is only an insubstantial difference between the structure or step and the claimed structure or step. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Courts also approach this inquiry through the "function-way-result" test, thereby analyzing whether the claimed invention and an accused device perform substantially the same function, in substantially the same way, to achieve substantially the same result. *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007). The equivalence between the accused product or method and the claimed element must be analyzed at the time of infringement. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997).

### Indirect Infringement

To prove liability for induced infringement, Medtronic must prove by a preponderance of the evidence that (1) the acts carried about by Axonics' end users of the accused products directly infringe an asserted claim; (2) Axonics took action that was intended to cause the infringing acts by Axonics' end users; and (3) Axonics was aware of the asserted patent and knew that the acts, if taken, would constitute infringement of the asserted patent or that Axonics believed there was a high probability that the acts by its end users would infringe the asserted patent and took deliberate steps to avoid learning of that infringement. *See* Fed. Cir. Bar Association Model Jury Instructions at 24 (B.3.2.) (2020); *3M v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002); *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d

1357, 1364 (Fed. Cir. 2017).

To show direct infringement by Axonics' end users, Medtronic must prove by a preponderance of the evidence that end users perform all steps of an asserted claim. *See* Fed. Cir. Bar Association Model Jury Instructions at 18 (B.3.1a); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009); *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001).

Even if the actions of Axonics' end users do not literally meet all the elements of a claim, Medtronic can show direct infringement of a claim under the doctrine of equivalents. Under the doctrine of equivalents, Axonics' end users directly infringe a claim if the end users perform steps that literally meet or are equivalent to every element of the claim. *See* Fed. Cir. Bar Association Model Jury Instructions at 21 (B.3.1c); *Ottah v. Bracewell LLP*, No. 2022-1876, 2022 WL 16754378, at *2 (Fed. Cir. Nov. 8, 2022). A step is equivalent to a claim element that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to more likely than not be "insubstantial" or would have found that the action: (1) performs substantially the same function (2) in substantially the same way (3) to achieve substantially the same result as the claim element. *See* Fed. Cir. Bar Association Model Jury Instructions at 21 (B.3.1c); *Mylan Inst. LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866–67 (Fed. Cir. 2017); *Huang v. Auto-Shade, Inc.*, 945 F. Supp. 1307, 1311 (C.D. Cal. 1996).

To prove Axonics is liable for contributory infringement, Medtronic must prove that Axonics offered for sale or sold the Axonics r-SNM System and (1) that Axonics had knowledge of the Asserted Patents, (2) that Axonics had knowledge of patent infringement, and (3) that the Axonics r-SNM System does not have substantial noninfringing uses. *Bio-Rad Labs., Inc. v. ITC*, 998 F.3d 1320, 1335 (Fed. Cir. 2021). Medtronic must only prove Axonics' knowledge of the Asserted Patents and

knowledge of infringement. Medtronic is not required to prove Axonics' intent. *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1356 (Fed. Cir. 2018).

To prove Axonics is liable for induced infringement under 35 U.S.C. § 271(f)(1), Medtronic must show that Axonics supplied or caused to be supplied components of the Axonics r-SNM System, where such components were uncombined in whole or in part, in such a manner as to actively induce the combination of such components outside the United States in such a manner as would infringe within the United States.

### Willful Infringement

To show that Axonics' infringement was willful, Medtronic must prove by a preponderance of the evidence that Axonics knew of the Asserted Patents and that Axonics' infringement was deliberate or intentional. See Fed. Cir. Bar Association Model Jury Instructions at 35–36 (B.3.10); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–06 (2016).

Affirmative Defense 2 Elements: Prosecution History Estoppel/Prosecution Disclaimer

#### Axonics' Position

The doctrine of prosecution history estoppel or prosecution disclaimer "precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022). Prosecution history estoppel "applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." *Amgen Inc. v. Coherus BioSciences, Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019). Prosecution history estoppel can occur by the patent applicant either (1) making a narrowing amendment to the claim; or (2) surrendering claim scope during argument to the patent examiner. *Amgen Inc. v. Coherus BioSciences, Inc.*, 931 F.3d 1154, 1159

(Fed. Cir. 2019). "[T]he Supreme Court has recognized that a patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019). The presumption may be overcome if the patentee can show: "(1) the equivalent was unforeseeable at the time of the application; (2) the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or (3) there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.*

For estoppel based on argument, "the prosecution history must evince a clear and unmistakable surrender of subject matter." *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1358 (Fed. Cir. 2013). Axonics prevails on its defense if it shows that, during prosecution of the Asserted Patents, or a patent in the same family, Medtronic clearly and unmistakably disavowed a certain meaning to obtain the patent, and now seeks, through its literal and doctrine of equivalents infringement case, to include that disavowed meaning within the scope of the claim. *Id.*

### Medtronic's Position

To support its prosecution history estoppel and prosecution disclaimer defenses, Axonics must show that Medtronic, during patent prosecution, made a clear and unmistakable surrender of the subject matter covered by the Asserted Claims. *See Amgen Inc. v. Coherus BioSciences, Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 828 (Fed. Cir. 1999).

In the Federal Circuit, "a narrowing amendment is presumed to be a surrender of all equivalents within 'the territory between the original claim and the amended claim.' [citation omitted]." Medtronic can overcome this presumption if it "can show that one of the following 'exceptions' to prosecution history estoppel applies: (1) the rationale underlying the amendment bears no more than a tangential relation to the

31

equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1364 (Fed. Cir. 2020).

For estoppel based on argument, if a statement made during prosecution is amenable to "multiple reasonable interpretations," then it does not constitute "a clear and unmistakable" surrender. *Tritek Techs., Inc. v. United States*, No. 02-255 C, 2004 U.S. Claims LEXIS 142, at *56 (Fed. Cl. June 4, 2004). For example, where the remarks are "'so ambiguous,' or where the history was clearly inclusive, the Court simply could not determine that they signified surrender." *Id.* (citing *Omega Eng'g Inc.,* 334 F.3d at 1324 (quoting *Northern Telecom Ltd. v. Samsung Electronics Co.,* 215 F.3d 1281, 1293-94 (Fed. Cir. 2000) (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1347 (Fed. Cir.2001)).

<u>Affirmative Defense 3 Elements: Waiver/Estoppel</u>

**Axonics' Position**

Equitable estoppel is "addressed to the sound discretion of the trial court" and must be proven by Axonics by a preponderance of the evidence. *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (en banc). The doctrine of equitable estoppel bars assertion of a claim if, "(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016).

The doctrine of unclean hands demands that a plaintiff act fairly in the matter for which he seeks a remedy. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945). Unclean hands "necessarily gives wide range to the

equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 814-15. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim. *Id.* A party may not seek an injunction based on a record the party itself wrongfully influenced. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). Alternatively, misconduct supporting the unclean hands defense will not be permitted if there is a direct relationship between that conduct and the party's allegations. *Id.* at 245-46; *Precision*, 324 U.S. at 814.

### Medtronic's Position

The doctrine of unclean hands prevents a court from awarding equitable relief to a plaintiff. To establish unclean hands, Axonics must demonstrate (1) inequitable conduct by Medtronic; (2) that Medtronic's conduct directly relates to the claim Medtronic has asserted against Axonics; and (3) Medtronic's conduct injured Axonics. Bad intent is the essence of the defense of unclean hands. *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1101 (C.D. Cal. 2019).

To bar Medtronic's suit under the equitable estoppel doctrine, Axonics must show (1) that Medtronic, through misleading conduct or silence, led Axonics to reasonably infer that Medtronic did not intend to enforce its patent against Axonics; (2) that Axonics relied on Medtronic's representation, and (3) that Axonics will be materially prejudiced if Medtronic is allowed to proceed with its claim. *Radio Sys. Corp. v. Tom Lalor & Bumper Boy, Inc.*, 709 F.3d 1124, 1130 (Fed. Cir. 2013).

To establish a waiver defense, Axonics must prove by clear and convincing evidence that Medtronic, with full knowledge of the material facts, intentionally relinquished its rights to enforce the Asserted Claims or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1028 (Fed. Cir. 2008).

Affirmative Defense 4 Elements: Invalidity

**Axonics' Position**

Axonics must prove invalidity on a claim-by-claim basis by clear and convincing evidence. AIPLA's Model Patent Jury Instructions at 22 (4) (2024). Prior art includes any of the following items received into evidence during trial:

1.     any product or method that was publicly known or used by others in the United States before the alleged invention claimed in an Asserted Patent;

2.     any product or method that was in public use or on sale in the United States more than one year before the priority date of the Asserted Patent;

3.     any patents that issued before the alleged invention claimed in an Asserted Patent; and

4.     any publications having dates of public accessibility before alleged invention claimed in an Asserted Patent.

AIPLA's Model Patent Jury Instructions at 23 (5.0.1) (2024). Additionally, the prior art includes applicant admitted prior art. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569-70 (Fed. Cir. 1988).

To establish that an Asserted Claim is invalid as anticipated (35 U.S.C. § 102), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that all the requirements of each asserted claim are present in a single piece of prior art—either expressly or inherently. *See* FCBA at B.4.3b-1.

To establish that the asserted claims are invalid as obvious (35 U.S.C. § 103), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the original application was filed or at the time of the alleged invention claimed. *See* AIPLA's Model Patent Jury Instructions at 37 (7.0) (2024); *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360, 1372 (Fed. Cir. 2006). Obviousness may be shown by considering one or more than one item of prior art. AIPLA's Model Patent Jury Instructions at 37 (7.0) (2024). The following factors must

be evaluated to determine whether Axonics has established that the claimed invention is obvious: (1) the scope and content of the prior art relied upon by Axonics; (2) the differences, if any, between each claimed invention Axonics contends is obvious and the prior art; (3) the level of ordinary skill in the art; and (4) additional considerations (or secondary considerations), if any, that indicate that the invention was obvious or not obvious. *Id.*; *Dystar*, 464 F.3d at 1360. A claim is obvious if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention or the date of the alleged invention. 35 U.S.C. § 103.

The petitioner in an *Inter Partes* Review ("IPR") of a claim in a patent that results in a final written decision may not assert in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the IPR. 35 U.S.C. § 315(e). A petitioner in an IPR may only request to cancel claims of a patent on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications. 35 U.S.C. § 311(b). The other categories of prior art identified above, including systems and grounds based on applicant admitted prior art, and invalidity allegations under other statutory provisions such as § 112 cannot be the basis of an IPR proceeding and thus are not estopped. 35 U.S.C. §§ 311(b), 315(e); *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1374 (Fed. Cir. 2022). *See also Spex Techs. v. Kingston Tech. Corp.*, No. SACV 16-01790 JVS (AGRx), 2020 WL 4342254, at 16 (C.D. Cal. June 16, 2020) (finding IPR estoppel does not apply to combination of system art with other grounds based on patents or printed publications).

To establish that the asserted claims are invalid due to incorrect inventorship under 35 U.S.C. § 102(f) or other applicable statutory provisions or case law, Axonics must show by clear and convincing evidence that the claim was invented by a third party before the patentee invented the alleged invention, or that the named inventors

did not themselves invent the subject matter sought to be patented. 35 U.S.C. §§ 101, 102(a), 102(f), 102(g); AIPLA's Model Patent Jury Instructions at 33-34 (6.6) (2024); *Teva Pharm. Indus. v. AstraZeneca Pharms. LP*, 661 F.3d 1378, 1383 (Fed. Cir. 2011); *In re Verhoef*, 888 F.3d 1362, 1368 (Fed. Cir. 2018).

"Indefiniteness is a question of law" but may involve underlying questions of fact. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). To establish that the asserted claims are invalid as indefinite (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that Asserted Claims, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

To establish that the asserted claims are invalid as lacking enablement (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence that the patent specification teaches those of skill in the art how to make and use the full scope of the claimed invention without undue experimentation as of the effective filing date of the patent. 35 U.S.C. § 112; *Trs. Of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1361-62 (Fed. Cir. 2018); *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1165 (Fed. Cir. 2019); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007); *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-46 (Fed. Cir. 2005). The Supreme Court in *Amgen* confirmed that "the specification must enable the ***full scope of the invention*** as defined by its claims. ***The more one claims, the more one must enable***." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023). Providing an example in the specification "***may*** suffice" "if the specification also discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose." *Id.* at 611. A specification may only "call for a reasonable amount of experimentation." *Id.* at 612. Claims are particularly problematic when they

seek "to monopolize an entire class of things defined by their function." *See id.* at 613. The "*Wands* factors" may be considered in determining whether undue experimentation is required to make and use the full scope of the claimed invention include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

To establish that the asserted claims are invalid as lacking written description (35 U.S.C. § 112), Axonics must prove by clear and convincing evidence that the disclosure of the application relied upon does not reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

### Medtronic's Position

The Asserted Claims are presumed to be valid, and Axonics has the burden of proving invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

To establish that any of the Asserted Claims are invalid as anticipated under 35 U.S.C. § 102. Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that all the requirements of each claim are present in a single piece of prior art before the claim's priority date. *See* Fed. Cir. Bar Association Model Jury Instructions at 48 (B.4.3b-1); *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1343 (Fed. Cir. 2018).

To establish that any of the Asserted Claims are invalid due to incorrect inventorship under 35 U.S.C. § 102(f), Axonics must prove by clear and convincing evidence that the named inventors did not themselves invent the subject matter sought

to be patented. *In re Verhoef*, 888 F.3d 1362, 1367 (Fed. Cir. 2018); *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997).

To establish that any of the Asserted Claims are invalid as obvious under 35 U.S.C. § 103, Axonics must prove by clear and convincing evidence, on a claim-by-claim basis, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the original application was filed. *See* Fed. Cir. Bar Association Model Jury Instructions at 50 (B.4.3c); *In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir. 2018). A claim is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention." 35 U.S.C. § 103; *see also Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*, 716 F. App'x 1006, 1008 (Fed. Cir. 2017). This requires showing that a person having ordinary skill in the art would have been motivated to combine the teachings of prior art references to achieve the claimed invention and would have had a reasonable expectation success in doing so. *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–78 (Fed. Cir. 2016). Objective indicia of non-obviousness, such as commercial success of the invention, long felt and unresolved need, failure of others, skepticism by experts, industry praise, teaching away, and copying, may be evidence that the invention is non-obvious. *In re Kavanagh*, 851 F. App'x 1028, 1033 (Fed. Cir. 2021).

The petitioner in an *Inter Partes* Review ("IPR") of a claim in a patent that results in a final written decision may not assert in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the IPR. 35 U.S.C. § 315(e); *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022) ("estoppel applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which reasonably could have been asserted against the claims included in the petition"). Although in general IPR estoppel does not apply to system or device

art, "if a patent challenge is simply swapping labels for what is otherwise a patent or printed publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel." *California Inst. of Tech. v. Broadcom Ltd.*, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022).

Axonics also asserts that certain claims are in valid under 35 U.S.C. § 112 for being indefinite, lacking written description, and lacking enabling disclosures. Axonics must prove indefiniteness by clear and convincing evidence. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed Cir. 2015). "A claim is indefinite only if, when read in light of the specification and prosecution history, it fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Niazi Licensing Corp.*, 30 F.4th at 1346; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

The test for written description is whether the specification "conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012). "This test requires an 'objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *id.* There is no requirement that a patent describe the unclaimed features of the infringing product. *See e.g., AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014).

Axonics also "bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013). "[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *In re Wright,* 999 F.2d 1557, 1561 (Fed. Cir. 1993). "Section 112 requires enablement of only the claimed invention, not matter outside the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d

1091, 1100 (Fed. Cir. 2020). As *Amgen* reiterated, "the specification must enable the full scope of the invention *as defined by its claims*." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023). "The dispositive question of enablement does not turn on whether the accused product is enabled." *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306 (Fed. Cir. 2001).

Affirmative Defense 5 Elements: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a)

### Axonics' Position

To the extent that Plaintiffs have made any patented products or licensed others to do so between the respective issuance date of the asserted patents and the filing of this lawsuit on November 4, 2019, and amendment of the complaint adding additional patents on November 26 2019, Medtronic has not marked such products or required its licensees to mark such products, Plaintiffs' claims for relief against Axonics and prayer for damages from Axonics may be limited under 35 U.S.C. § 287(a), including Plaintiffs' failure to provide pre-filing notice of alleged infringement to Axonics.

### Medtronic's Position

Medtronic is seeking to recover damages for any infringement of the Asserted Claims from the date of the filing of the complaint in this action.

Affirmative Defense 6 Elements: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928

### Axonics' Position

Should the Court find that one or more claims of one or more Asserted Patents is valid and infringed by Axonics while also correctly finding that one or more other claims in the same patent(s) are invalid, Medtronic shall recover no costs because it failed to disclaim the invalid claims before filing this suit. 35 U.S.C. § 288.

If a judgment is rendered for Medtronic and it appears that Medtronic, in its specifications, claimed to be, but was not, the original and first inventor or discoverer

of any material or substantial part of the thing patented, no costs shall be included in such judgment because Medtronic failed to disclaim the invalid claims before filing this suit. 28 U.S.C. § 1928.

### Medtronic's Position

Medtronic is entitled to seek costs.  The 35 U.S.C. § 288 affirmative defense does not apply to any issues in this case.  35 U.S.C. § 288 only applies if a patent claim is found invalid prior to the commencement of the lawsuit.  *See, e.g., Bradford Co. v. Jefferson Smurfit Corp.*, 2001 WL 35738792, at *1, 7 (Fed. Cir. Oct. 31, 2001); *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 690 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019); *Cordance Corp. v. Amazon.com, Inc.*, 631 F.Supp.2d 484, 503 (D. Del. 2009). A patentee is not required to disclaim a claim under § 288 if it was not found to be invalid prior to the commencement of the lawsuit.  Likewise, the 28 U.S.C. § 1928 affirmative defense does not apply to any facts or issues in this case.

### Exceptional Case, Fees, And Costs

### Axonics' Position

Axonics incorporates by reference the elements described in Axonics' Position under Section 7(b) for Medtronic's Claim 7 above related to an exceptional case finding.

### Medtronic's Position

Axonics will be unable to prove that Medtronic's case is exceptional under 35 U.S.C. § 285 even if Medtronic does not prevail on the merits. However, Medtronic is entitled to fees and costs pursuant to 35 U.S.C. § 285.

Medtronic "may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001). An

"'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated*." Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014).

(c)     In brief, the key evidence Axonics relies on for each affirmative defense is:

Affirmative Defense 1: Non-Infringement

Although plaintiff bears the burden of proving infringement, to the extent that non-infringement is an affirmative defense, the evidence on which Axonics will rely is provided below.

***No Direct Infringement of the Asserted Claims: Lead Fixation Patents***

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. The remaining Asserted Claims from the 314 and 756 Patents are method claims. For lack of direct infringement, Medtronic fails to identify evidence that Axonics performs the steps of any Asserted Method claims, and Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claims of the 314 and 756 Patents, including at least the limitations that recite, or otherwise depend on, a "plurality of tine elements." Axonics will also present evidence that Axonics' Lead Fixation Accused Products do not infringe under the doctrine of equivalents. Axonics will also present evidence that reliance on the doctrine of equivalents is barred by prosecution history estoppel. Axonics incorporates by reference here the key evidence identified below from Axonics' Affirmative Defense 2 (Prosecution History Estoppel/Prosecution Disclaimer).

This evidence may include: the 314 and 756 Patents, the file histories of the 314

and 756 Patents, patents and applications related to the 314 and 756 Patents, and the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products; technical design, design-related, manufacturing, and regulatory documents pertaining to the Lead Fixation Accused Products evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged infringement; other documents and communications (including emails); test results; discovery responses; testimony from fact witnesses (including deposition designations of relevant deponents); and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

### *No Direct Infringement of the Asserted Claims: Temperature Sensor Patent*

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For lack of direct infringement, Axonics will rely on evidence establishing that the accused Axonics products do not meet the limitations of the asserted claims of the 324 Patent, including at least the limitations that recite, or otherwise depend on,

- "a temperature sensor adapted to provide an output indicative of a temperature of the side of the housing;" "providing, via a temperature sensor of the external device, output indicative of a temperature of the side of the housing;" "a temperature sensor adapted to provide an output indicative of a temperature of a side of the housing;"

- "control circuitry adapted to control the transfer of energy to the implantable medical device based on the output of the temperature sensor to limit a temperature to which a patient is exposed during the transfer of energy to the

implantable medical device;" "controlling the transfer of energy from the primary coil to the secondary coil based on the output indicative of the temperature of the side of the housing to limit a temperature to which a patient is exposed during the transfer of energy to the implantable medical device;"

- "wherein the control circuitry is adapted to limit the transfer of energy between the external device and the secondary coil"

- "wherein the external device is adapted to limit at least one of a temperature of the side and a temperature of a surface of the patient to no higher than a respective predetermined temperature"

- "wherein the control circuit is adapted to limit a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;" "limiting a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to limit a time during which energy is transferred from the primary coil to the secondary coil based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to switch the energy transfer on and off based on the output indicative of a temperature of the side of the housing;" "switching the energy transfer on and off based on the output indicative of a temperature of the side of the housing;"

- "wherein the control circuit is adapted to limit a current driving the primary coil;"

- "wherein the external device further comprises a circuit adapted to monitor recharging of a rechargeable power source of the implantable medical

44

device;"

- "wherein the circuit adapted to monitor recharging is adapted to provide status of the recharging to a user;" and

- "limiting at least one of a temperature of the side and a temperature of a surface of the patient to no higher than a respective predetermined temperature."

Additionally, Axonics' redesigned charger has been on sale since September 2023, and it does not infringe the 324 Patent, and Medtronic does not claim otherwise.

This evidence may include: the 324 Patent, the file history of the 324 Patent, patents and applications related to the 324 Patent, and the file histories of those related patents; the Court's claim constructions; physical samples and pictures of the accused products and Axonics' redesigned charger; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and redesigned charger evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged inducement; other documents and communications (including emails); test results; source code; discovery responses; testimony from fact witnesses (including deposition designations of relevant deponents); and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

### No Indirect Infringement of the Asserted Claims

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence. Axonics additionally will rely on evidence to refute Medtronic's allegations. For indirect infringement, Axonics will provide evidence, for example, that no act by a third party directly infringes an Asserted Claim of any of any of the Asserted Patents. Axonics incorporates by reference here the key evidence identified above from

Axonics' Affirmative Defense 1 (No Direct Infringement of the Asserted Claims of the Lead Fixation and Temperature Sensor Patents) identifying evidence Axonics will provide that there is no direct infringement by or using Axonics' Lead Fixation Accused Products or Recharge Accused Products.

For example, regarding induced infringement under 35 U.S.C. § 271(b) or (f), Axonics also will provide evidence that it does not induce allegedly infringing acts, does not know that any end-user is infringing any asserted claim, does not believe that any end-user is infringing any asserted claim, does not specifically intend any end-user to infringe any asserted claim, does not take any action intended to cause and lead to infringing acts by third parties, does not know that third party actions if taken would constitute infringement, and does not subjectively believe that there is a high probability that any third party acts constitute infringement and took deliberate actions to avoid learning of the infringement. Regarding contributory infringement (35 U.S.C. § 271(c)), Axonics also will provide evidence that it does not know that any end-user is infringing any Asserted Claim, has not especially made or adapted any component for use in an infringing instrumentality or to practice an infringing method, includes components that are staple articles or commodities of commerce that are suitable for substantial non-infringing use.

As additional examples for lack of indirect infringement, Axonics will provide evidence that it believes that its products and the methods used with them do not infringe Medtronic's Asserted Patents when used by third parties and that it does not induce infringement of any Asserted Patent. Axonics will provide evidence that it has designed or redesigned its products to ensure it does not infringe. Additionally, for the Temperature Sensor Patent, instructions Axonics provides discourage uses that could result in the use of the functionality that Medtronic alleges infringes the Temperature Sensor Patent. The evidence will show that Medtronic has failed to identify specific components sufficient to establish contributory infringement or inducing acts by

Axonics, failed to identify acts of inducement that will result in allegedly infringing acts (as opposed to acts that are not accused of infringing), and Medtronic has failed to establish that the Recharge Accused Products lack substantial non-infringing modes of operation. Medtronic has also failed to establish that Axonics was aware of any allegations that it infringed the Asserted Patents until Medtronic filed the Complaints in this case. The evidence will also show that Medtronic's allegations of copying by Axonics are baseless.

This evidence will include the key evidence identified above from Axonics' Affirmative Defense 1 (No Direct Infringement of the Asserted Claims of the Lead Fixation and Temperature Sensor Patents), which is incorporated by reference here. Additionally, this evidence may include internal documents and statements to others confirming Axonics' belief that it does not infringe or induce infringement, documents showing the design or redesign of its products to ensure that they do not infringe, and analyst reports and communications demonstrating Axonics' reasonable belief that its products did not infringe and it did not induce infringement, evidence of what was known in the art at the time of the alleged inducement (including prior art patents and publications, prior art patent applications and prior art products), and testimony from fact witnesses (including deposition designations of relevant deponents); and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

### *No Willful Infringement of the Asserted Claims*

Plaintiff bears the burden of proving infringement, and Axonics relies on Medtronic's inability to establish the elements of this claim by a preponderance of the evidence.[11]  Axonics additionally will rely on evidence to refute Medtronic's allegations. For willful infringement, for example, Axonics will provide evidence that

---

[11] Willful infringement is Medtronic's burden to prove and accordingly is not an affirmative defense nor is it Axonics burden to disprove willful infringement.

it does not willfully infringe (directly or indirectly). Axonics will provide evidence, for example, that neither Axonics nor a third party directly infringes an Asserted Claim of any of the Asserted Patents. Axonics incorporates by reference the key evidence identified above from Axonics' Affirmative Defense 1 (No Direct Infringement of the Asserted Claims of the Lead Fixation and Temperature Sensor Patents and No Indirect Infringement of the Asserted Claims) identifying evidence Axonics will provide that there is no infringement.

For example, Axonics will provide evidence that it did not intentionally infringe or cause others to infringe the Asserted Patents, it did not specifically intend to infringe, it acted consistently with the standards of behavior for its industry, it did not copy any patented product features, it reasonably believed it did not infringe and that the patents were invalid, and it made a good faith effort to avoid infringement (including in the design or redesign of its products), and Axonics has not attempted to cover up any of its actions. Axonics will also provide evidence that, even if it is found to infringe, that infringement was not willful, wanton, malicious, bad faith, deliberate, intentional, consciously wrongful, or flagrant. Axonics will provide evidence that it believes that its products and the methods used with them do not infringe Medtronic's Asserted Patents and that Medtronic's Asserted Patents were invalid. Axonics will provide evidence that it has designed or redesigned its products to ensure it does not infringe. The evidence will show that Medtronic has failed to establish that Axonics was aware of any allegations that it infringed the Asserted Patents until Medtronic filed the Complaints in this case. The evidence will also show that Medtronic's allegations of copying by Axonics are baseless.

This evidence will include the key evidence identified above from Axonics' Affirmative Defense 1 (No Direct Infringement of the Asserted Claims of the Lead Fixation and Temperature Sensor Patents), which is incorporated by reference here. Additionally, this evidence may include internal documents and statements to others

48

confirming Axonics' belief that it does not infringe or induce infringement; internal documents and statements to others confirming Axonics' belief that the Asserted Patents are invalid; Axonics' good faith IPR petitions for which the Patent Office found a reasonable likelihood that Axonics would prevail at Institution (to the extent admitted); documents showing the design or redesign of its products to ensure that they do not infringe; and analyst reports and communications demonstrating Axonics' reasonable belief that its products did not infringe, it did not induce infringement, and the Asserted Patents are invalid; communications between Axonics and Medtronic; evidence of what was known in the art at the time of the alleged inducement (including prior art patents and publications, prior art patent applications and prior art products), and testimony from fact witnesses (including deposition designations of relevant deponents); and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

<u>Affirmative Defense 2: Prosecution History Estoppel/Prosecution Disclaimer</u>

Axonics will provide evidence that Medtronic surrendered claim scope during prosecution related to at least the claim term "plurality of tine elements" in the Lead Fixation through claim amendment, argument before the Patent office, or both. Medtronic is thus barred from attempting to recapture that subject matter through application of the doctrine of equivalents, but Medtronic has impermissibly alleged infringement under the doctrine of equivalents for those claim terms.

Axonics may rely on the following evidence to establish its allegations with respect to its claim that a finding of infringement is barred by prosecution history disclaimer/prosecution history estoppel: the Asserted Patents, the file histories of the Asserted Patents, patents and applications related to the Asserted Patents, and the file histories of those related patents; the Court's claim constructions; discovery responses of both parties; other documents and communications (including emails); testimony from fact witnesses (including deposition designations of relevant deponents); and

expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

Affirmative Defense 3: Waiver/Estoppel

Axonics will provide evidence that Medtronic's claims and recovery are barred by the doctrine of equitable estoppel. Axonics will provide evidence that Medtronic, through misleading conduct, led Axonics to reasonably believe that Medtronic did not intend to attempt to enforce its patents against Axonics; Axonics relied on Medtronic's conduct; and due to Axonics' reliance, Axonics would be materially prejudiced if Medtronic were allowed to proceed with its charge of infringement. For example, Axonics will provide evidence that over a period of years Medtronic engaged in a course of conduct and made a series of statements and interactions that led Axonics to reasonably believe that Medtronic not only did not intend to assert patent infringement but rather welcomed Axonics' presence in what was then a dramatically underserved market for sacral neuromodulation. Axonics will provide evidence that, through these interactions, Medtronic learned about Axonics' plans and technology, including Axonics' confidential information. Medtronic said and did nothing for years, suing Axonics after the tremendous additional expense of Axonics launching its product, to Axonics' detriment.

Next, Axonics will provide evidence that Medtronic's false, deceptive, and misleading statements regarding Axonics' products as compared to Medtronic's products, which preclude Medtronic from coming to equity with clean hands to seek injunctive relief—and especially so when Medtronic has specifically attempted to persuade physicians with responsibility for which sacral neuromodulation products they implant with beliefs that are incorrect and based on Medtronic's false, deceptive, and misleading claims.

In addition, Axonics will provide evidence that Medtronic's claims and recovery are barred by the doctrine of unclean hands based on Medtronic's prosecution

50

of the patents in the family of the asserted 324 Patent, in particular including Medtronic's introduction of new matter into patent application 13/210,569, filed on August 16, 2011, from which U.S. Patent No. 8,725,262 issued without disclosure of such new matter to the US Patent and Trademark Office.

The evidence may include: the prosecution histories of the applications and the patents that allegedly claim priority to U.S. Patent Application 10/836,318 (abandoned); the Asserted Patents, related patents, and their prosecution histories, including particularly the asserted 324 Patent as well as the 262 Patent and the 547 Patent; the Carbunaru published patent application assigned to Boston Scientific; Medtronic's discovery responses in this case, including in particular Medtronic's responses to Axonics' Requests for Admission; the parties' communications before Medtronic sued Axonics, including in particular Medtronic's communications praising Axonics' achievements; the evidence regarding and communications about the parties' meetings; Medtronic's review of Axonics' confidential information about Axonics' accused products; Medtronic's own internal communications and presentations regarding Axonics; documents showing Medtronic's false and misleading statements about Axonics; other documents and communications (including emails); and testimony from fact witnesses (including deposition designations of relevant deponents). . Axonics reserves the right to amend this list, including adding to or removing from it.

Affirmative Defense 4: Invalidity

***Invalidity: Lead Fixation Patents***

Axonics will provide evidence of the invalidity of the Lead Fixation Patents. For example, Axonics will provide evidence that the claims of the Lead Fixation Patents are obvious over the following system in combination with another system or piece of prior art: 2000 Minimally Invasive Method and System in view of one of (a) Medtronic Tined Cardiac Leads, including Models 4011, 6961, 6971, and 6991;

(b) ThinLine II Sterox Implantable Pacing Leads, including Models 430-25S, 430-35S, and 432-35S; (c) U.S. Patent No. 5,902,330 ("Ollivier"); or (d) U.S. Patent No. 5,957,966 ("Schroeppel"). Axonics will provide evidence on the scope and content of the prior art, that the difference, if any, between the claims and the prior art are obvious, the motivation to combine the prior art, the level of ordinary skill, the absence of secondary considerations that show obviousness, and the absence of nexus between the secondary considerations and the alleged invention covered by the claim. Regarding secondary considerations and contrary to Medtronic's allegations, Axonics will provide evidence that there was, for example, no long-felt need, praise of others, commercial success, copying, and near simultaneous invention. Medtronic bears the burden of proving estoppel, but Axonics will provide evidence that it is not estopped on any of the art on which it relies, including because the prior art consists of systems, art that otherwise could not reasonably have been raised during an IPR, or combinations that otherwise could not reasonably have been raised during an IPR. Axonics reserves the rights to rely on any combinations included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly.

Axonics will also provide evidence that the "plurality of tines" term is indefinite under the Special Master's construction.

This evidence may include: the 314 and 756 Patents, the file histories of the 314 and 756 Patents, patents and applications related to the 314 and 756 Patents, and the file histories of those related patents; the Court's claim constructions; prior art references and evidence showing the contents of prior art systems listed above and as described in the November 7, 2022 expert report of Mr. Pless; devices, documents, and any other prior art materials identified in Axonics' exhibit list; discovery responses of both parties; other documents and communications (including emails); testimony and evidence establishing a lack of secondary considerations of non-obviousness,

including as described in the November 7, 2022 expert report of Mr. Pless; evidence of what was known in the art at the time of the alleged invention or priority date of the Lead Fixation Patents; the decisions in IPRs and Medtronic's own contentions and admissions made in the course of the IPRs; the Federal Circuit's decision on the Lead Fixation Patents; testimony from fact witnesses (including deposition designations of relevant deponents); and expert testimony.. Axonics reserves the right to amend this list, including adding to or removing from it.

### *Invalidity: Temperature Sensor Patent*

Axonics will provide evidence of the invalidity of the Temperature Sensor Patent. For example, Axonics will provide evidence that the claims of the 324 Patent are anticipated by U.S. Patent Application Publication 2004/0098068 ("Carbunaru") or the Advanced Bionics/Boston Scientific Bion system ("Bion"). Axonics will also provide evidence that the claims of the 324 Patent are obvious over the following references:

- Carbunaru alone or in view of one of U.S. Patent No. 6,685,638 ("Taylor"), the standard UL 544 ("UL 544"), or the standard UL 60601-1 ("UL 60601-1"), and optionally further in view of U.S. Patent No. 5,702,431 ("Wang");
- PCT Patent Publication No. WO 01/83029 A1 ("Torgerson") in view of either UL 544 or UL 60601-1 alone or in further combination with Taylor, Wang, Taylor and Wang, U.S. Patent No. 4,082,097 ("Mann"), or Taylor and Mann;
- Bion alone or in view of one of Taylor, UL 544, or UL 60601-1, and optionally further in view of Wang; and
- U.S. Patent No. 5,733,313 ("Barreras") in view of either UL 544 or UL 60601-1 alone or in further combination with Taylor, Wang, Taylor and Wang, or Taylor and U.S. Patent No. 6,516,227 ("Meadows").

Medtronic bears the burden of proving estoppel, but no estoppel applies to the

324 Patent because no IPR was instituted, and so there was no final written decision.

Axonics reserves the right to rely on any combinations included in discovery responses, expert reports, or other documents and reserves the right to update these contentions accordingly.

Axonics will provide evidence on the scope and content of the prior art, that the difference, if any, between the claims and the prior art are obvious, the motivation to combine the prior art, the level of ordinary skill, the absence of secondary considerations that show obviousness, and the absence of nexus between the secondary considerations and the alleged invention covered by the claim. Regarding secondary considerations and contrary to Medtronic's allegations, Axonics will provide evidence that there was, for example, no failure of others, commercial success, copying, or positive recognition; and some of the evidence Medtronic has relied upon shows secondary considerations of obviousness.

Axonics will also provide evidence that the Temperature Sensor Patent is invalid for lack of enablement because they did not enable single-enclosure chargers, including without limitation within the range of form factors of the accused product and allegedly embodying Medtronic wireless recharger product, and creating a single-enclosure charger required undue experimentation, as demonstrated by both Axonics' and Medtronic's design efforts. Axonics will also provide evidence that the Temperature Sensor Patent is invalid for lack of enablement also because they did not enable the use of a charger with a temperature sensor with an output indicative of the temperature of the side of the housing or that is configured to measure a temperature indicative of heat resulting from transcutaneous transfer without the side of the housing being conductive, as Medtronic's subsequent design efforts again confirm. Thus, the patents did not teach one of ordinary skill how to make and use the full scope of the claimed invention. Axonics will provide evidence addressing the *Wands* factors for each basis to allege the claims are not enabled. For similar reasons, Axonics will

also provide evidence that the Temperature Sensor Patent lacked written description.

Axonics will also provide evidence that the inventorship of the 324 Patent is incorrect because Claim 5 requires an "adjustable assembly," and the evidence will show that the named inventors confirmed that Mr. Forsberg contributed to that alleged invention and was originally named on the application from which the 324 Patent is a continuation, but was left off of the 324 Patent application.

This evidence may include: the 324 Patent, the file history of the 324 Patent, patents and applications related to the 324 Patent, and the file histories of those related patents; the Court's claim constructions; prior art references and evidence showing the contents of prior art systems listed above and as described in the expert reports of Mr. Irazoqui; devices, documents, and any other prior art materials identified in Axonics' exhibit list; discovery responses of both parties; other documents and communications (including emails); testimony and evidence establishing a lack of secondary considerations of non-obviousness as described in the expert reports of Mr. Irazoqui; physical samples and pictures of the accused products and Medtronic's allegedly embodying products; technical design, design-related, manufacturing, and regulatory documents pertaining to the Recharge Accused Products and Medtronic's allegedly embodying products evidencing their design, structure, function, and operation; training materials, instructions for use, marketing, advertising, website, reporting, or fundraising materials; evidence of what was known in the art at the time of the alleged invention or priority date of the Temperature Sensor Patent; testimony from fact witnesses (including deposition designations of relevant deponents) and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

Affirmative Defense 5: Medtronic's claims for damages are limited under 35 U.S.C. § 287(a)

Even if Medtronic were able to prove that its InterStim and other products may

practice the Asserted Patents, Axonics will provide evidence that Medtronic admitted that it has not marked its products and has not required any licensee to mark its products. Medtronic also admitted that it had not given notice of alleged infringement to Axonics before filing its complaint and amended complaint in this case.

However, on the current record, Medtronic is only seeking damages starting in December 2019, so it may not be necessary for Axonics to present evidence on this defense at trial. (Beyond that, Axonics also disputes Medtronic's entitlement to any damages.)

To the extent Axonics must present evidence on this defense, this evidence may include: the Asserted Patents, the file histories of the Asserted Patents, patents and applications related to the Asserted Patents, and the file histories of those related patents; the Court's claim constructions; other documents and communications (including emails); discovery responses, including Medtronic's responses to Requests for Admission; proof of no embodying products; and proof of no marking and no notice before filing; testimony from fact witnesses (including deposition designations of relevant deponents) and expert testimony. Axonics reserves the right to amend this list, including adding to or removing from it.

Affirmative Defense 6: Medtronic's claims for costs are barred, in whole or in part, under 35 U.S.C. § 288 and/or 28 U.S.C. § 1928

Should the Court find that one or more claims of one or more Asserted Patents is valid and infringed by Axonics while also correctly finding that one or more other claims in the same patent(s) are invalid, Medtronic shall recover no costs because it failed to disclaim the invalid claims before filing this suit.

Exceptional Case, Fees, And Costs

Finally, Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits. On the other hand, Medtronic's requirement that Axonics mount a defense of this matter by

filing and prosecuting the present lawsuit is exceptional under 35 U.S.C. § 285.

This evidence may include: the evidence used in Axonics' defenses, which also illustrates the nature of Medtronic's claims, and Axonics incorporates by reference the key evidence identified above for Axonics' Affirmative Defenses 1 through 6; and Medtronic's litigation tactics and the burden on Axonics.

Axonics may also provide evidence that this case is exceptional because over a period of years, Medtronic engaged in a course of conduct and a series of statements and interactions that led Axonics reasonably to believe that Medtronic not only did not intend to assert patent infringement against Axonics but rather welcomed Axonics presence in what was then a dramatically underserved market for SNM. This evidence may include: evidence cited in Axonics' 10th Supplemental Responses and Objections to Medtronic's Interrogatory No. 11; other documents and communications (including emails); testimony from fact witnesses (including deposition designations of relevant deponents). Axonics reserves the right to amend this list, including adding to or removing from it.

Axonics' Position on Medtronic's Claims For Damages, Other Equitable Relief, And A Finding Of Exceptionality

Plaintiff bears the burden of proving damages, entitlement to equitable relief, and that this case is exceptional. The three remaining Asserted Patents have all expired. Medtronic may not seek damages beyond the latest expiration date of the remaining Asserted Patent of April 30, 2024. Medtronic may not seek supplemental damages. Axonics relies on Medtronic's inability to show that it meets the requirements to obtain the damages, equitable relief, or exceptional case finding that it seeks. Axonics additionally will rely on evidence to refute Medtronic's allegations. For example, Axonics will rely on evidence establishing that Medtronic is not entitled to all or some of the lost profits that it seeks. For example, Axonics will provide evidence that the products Medtronic relies upon do not practice Asserted

Patents and Medtronic has not shown the demand for the patented product, including based on non-patented features and sales of non-patented products. Axonics will show that Medtronic has failed to show the absence of acceptable, non-infringing alternatives.  Consistent with the Court's order on partial summary judgment, such alternatives include Axonics' F15 non-rechargeable neurostimulation product, and Axonics' redesigned charging device as of April 2022 for F15 and as of June 2023 for the redesigned charger. Dkt. 497 at 18, 19.  In addition, Medtronic has not shown that its manufacturing and marketing capacity would be sufficient in the "but for" world. Axonics will provide evidence that Medtronic's lost profits calculations are speculative and flawed, including because they do not adequately consider or address that patients would choose alternative third-line therapies or not to pursue therapies, the timing of allegedly lost sales, or the timing of the release of Medtronic's rechargeable product in the "but for" world. Medtronic has not shown and cannot show a causal relationship between the alleged infringement and alleged lost profits, including based on market dynamics and growth, differences between Axonics' and Medtronic's products, and Medtronic's inability to show it would have obtained additional sales in the "but for" world without Axonics' products.

For a reasonable royalty, assuming liability (which Axonics denies), Axonics will provide evidence that damages for the patents-in-suit would be calculated using running royalty rates for the Lead Fixation and Temperature Sensor Patents far lower than what Medtronic seeks, with the result that any damages award would be a small fraction of what Medtronic seeks.[12] The Lead Fixation and Temperature Sensor Patent

---

[12] Per Special Master Order No. SM-29, Axonics provided updated financial information on June 6, 2024, so that the parties may update their damages calculations. Dkt. No. 372, p. 19. Medtronic served a supplemental expert report on June 17, 2024, and Axonics served a supplemental expert report on June 20, 2024. *Id.* On July 9, 2024, Axonics served its letter brief in support of its request to strike new damages

are expired, so Medtronic cannot seek an injunction based on these patents. Medtronic will be unable to establish that its case against Axonics is exceptional under 35 U.S.C. § 285 even if Medtronic prevails on the merits.

Medtronic affirmatively represented the dates of expiration of the Asserted Patents to the Special Master, has never sought damages before 2019, has never alleged that it provided pre-suit notice, and has never accused F15 of infringement of the Asserted Patents, yet Medtronic refuses to stipulate at trial to any of the foregoing. There is no need to spend time at trial on any of these issues that have never been in dispute.

8.     In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:  each element of the above listed claims and defenses.

9.     Discovery is largely complete except for (i) two depositions of objected to Medtronic trial witnesses that are tentatively scheduled for July 26 and July 30, if Medtronic is permitted to present them at trial and (ii) additional discovery that may be required if the Special Master does not strike Medtronic damages expert's new damages theory in the Third Supplemental Damages Report.

10.     All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1. (Dkt. 451). That filing contains the substantially complete exhibit lists and objections to admission of exhibits.  Any further edits to the parties' respective exhibit lists shall be made promptly upon discovering any deficiency and disclosed to the opposing party.

theory in Medtronic's supplemental expert report served on June 17, 2024. Medtronic served an opposition letter brief on July 12, 2024.

59

Any party may use an exhibit that is listed on the joint exhibit list, subject to all evidentiary objections. Any exhibit, once admitted, may be used equally by each party, subject to any limitations as to its admission or relevance objections. The listing of a document by a party on the joint exhibit list is not an admission that such document is relevant, or admissible, when offered by the opposing side for the purpose that the opposing side wishes to admit the document. Each party reserves the right to object to the relevance of any evidence offered by the other party, at the time such evidence is offered, in view of the specific context in which such evidence is offered.

A party's failure to introduce any exhibit appearing on the joint exhibit list shall not be commented on during trial. Either party may reference the fact that the other party did not introduce evidence of any fact, provided that the party does not refer to the joint exhibit list.

The parties shall make available for inspection physical exhibits to be used at trial, labeled with an exhibit number, by 6:00 p.m. on Sunday, September 1, 2024. Objections with respect to such exhibits should be promptly raised and will be resolved on the schedule described in Section 11 to the extent the parties are unable to reach agreement.

Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial when introduced through a knowledgeable fact witness (live or by deposition) or an expert witness that identified such exhibit in his or her report, unless a party has identified the exhibit as objected to on the exhibit list that will be filed on August 22, 2024.

The parties are diligently meeting and conferring on the scope of the exhibit list following the issuance of the July 11, 2024, Order (Dkt. 497). The parties shall exchange narrowed exhibit lists by August 2, 2024. By August 9, 2024, the parties shall exchange narrowed lists of objections. By August 12, 2024, each party shall

serve on the other party a list of not more than fifty (50) exhibits on which they will meet and confer specifically to attempt to resolve objections. By August 15, 2024, the parties shall confer to attempt to resolve objections, including as to the fifty (50) exhibits the parties identified. By August 22, 2024, the parties shall file an updated version of the exhibit list that contains any remaining objections by either party. Any remaining objections to exhibits will be resolved following the procedures outlined below.

Exhibits to be used solely for impeachment do not need to be included on a party's exhibit list. Closing argument may include any evidence admitted or testimony offered during trial.

11.   Witness lists of the parties have been filed with the Court. The listing of a witness on a party's witness list does not require that party to call that witness to testify, either live or by deposition. However, either party may call at trial any witness appearing on the other party's trial witness list. To the extent that a witness's circumstances change, or a witness otherwise becomes unavailable for trial, each party reserves the right to call that witness by deposition, as set forth below in this Pretrial Order.

**Axonics' Position Issue 1:** Axonics has raised with the Special Master its objections to Medtronic's untimely inclusion of Emily Elswick and Raj Thomas on its witness list, and Axonics has explained in detail the reasons for its objections by letter brief submitted to the Special Master. In summary, Medtronic added two new witnesses to its initial disclosures and trial witness list, violating the Court's post-stay order delegating limited supplementary discovery to the Special Master. Medtronic provided no basis in meet and confer as to why it did not raise this issue timely, asserted without basis that it was not required to seek the Special Master's permission, and failed to explain either (a) why Mira Sahney could not testify despite being a recently former employee or (b) what specific knowledge Raj Thomas and Emily Elswick are intended to testify about that other previously deposed Medtronic

witnesses could not testify about. Medtronic's claim that the parties previously agreed to this is baseless. The parties agreed to provisions for the deposition of late disclosed *trial* witnesses. They did not agree that Medtronic had carte blanche to disclose new witnesses on its untimely and unauthorized amended initial disclosures thus effectively forcing the reopening of deposition discovery in the final stages of pre-trial. Medtronic's late disclosure of two new witnesses without permission lacks substantial justification, is not harmless, and should not be allowed.

**Medtronic's Position Issue 1:** Medtronic has repeatedly explained that the need to disclose Ms. Elswick and Mr. Thomas as potential trial witnesses arose only because Axonics successfully delayed this trial for over a year. During that delay, Ms. Sahney, who was going to serve as Medtronic's corporate representative at trial, left the business. Medtronic therefore needs to replace Ms. Sahney as a witness at trial and identified two witnesses to fill her role. Ms. Elswick is new to the Pelvic Health Unit as of May 28, 2024 and could not have been disclosed earlier. Mr. Thomas is well known to Axonics. Axonics previously sought his deposition but declined to proceed. Medtronic did not violate any order of the Special Master in disclosing these witnesses and, indeed, the parties expressly agreed to allow for such a situation. Dkt. 162 at 2 n.1. In fact, due delays in the trial date caused by Axonics, a similar circumstance arose last year and Axonics deposed two Medtronic trial witnesses long after fact discovery and shortly before the rescheduled trial date. There is no basis for Axonics's objection, which Medtronic has more fully explained in its letter brief to the Special Master.

**Axonics' Position Issue 2:**   Axonics objects to the number of Axonics witnesses on Medtronic's witness list that Medtronic will call or may call live, including because of the undue burden on Axonics. Medtronic is seeking to have Axonics make available live seven senior executives, additional high-ranking employees, and at least eleven individuals in total. Medtronic cannot call this many witnesses in the 20 hours of trial time per side that it proposes. This is in effect forcing

Axonics to prepare for the live direct, redirect, or cross examination of virtually every single witness in the case. This is an unreasonable approach to a timed patent trial, and needlessly burdensome for Axonics, Axonics' witnesses, and counsel. Medtronic should also remove Josh Sharlin from its witness list pursuant to the prior agreement of the parties.

**Medtronic's Position Issue 2:** Medtronic's witness list is shorter than Axonics's witness list—Axonics has identified fifteen current or former Medtronic witnesses that Axonics will call or may call live. Medtronic identified eleven Axonics witnesses. Axonics's objection regarding "undue burden" thus rings hollow; there is more burden on Medtronic and Axonics is taking an even more "unreasonable approach to a timed patent trial." Further, Medtronic has also expressly told Axonics that it will work with Axonics to identify what witnesses Medtronic intends to call at trial as the parties get closer to trial. Medtronic will work with Axonics on any scheduling issues for witnesses and will promptly notify Axonics as soon as it determines that it will not call any witness.

**Axonics' Position Issue 3:** Axonics objects that Medtronic refuses to seek the attendance live at trial of witnesses including Mr. Olson, Mr. Gerber, Mr. Bombeck, Mr. Harper, Ms. Bibb, Ms. Sahney, and Mr. Swoyer. These are all present or former employees of Medtronic.  As the Court stated at the recent hearing on summary judgment and *Daubert* motions, Medtronic will need to present these present and former employees for live testimony at trial. With respect to current employees, Medtronic has stated no reason why it cannot or will not present these witnesses at trial. With respect to the former employees, Medtronic has not shown that it lacks control or otherwise lacks the ability to bring these witnesses merely because they are no longer employed by Medtronic. Medtronic has not shown that it lacks the contractual ability to bring them. Medtronic has not shown that it has asked them if they are willing to attend. In short, Medtronic has not made any showing with respect

to its purported inability to present these witnesses for trial. For each witness Medtronic fails to present at trial despite Axonics' request, Axonics will seek an appropriate adverse inference.

Axonics is willing to agree that Medtronic's witnesses Mr. Albrecht, Mr. Hultgren, Mr. Gaddam, Mr. Monacelli, and Mr. Schulzetenberg need not provide testimony live or by deposition at trial if Medtronic confirms that it will not be offering testimony of these witnesses at trial and the parties are able to reach agreement that the exhibits authenticated by these witnesses during deposition will be admitted other ways at trial.

The parties may use any deposition transcript, including for the above listed witnesses, for any issues being decided as a matter of law by the Court after trial.

**Medtronic's Position Issue 3:** Medtronic has informed Axonics that Mr. Olson, Mr. Bombeck, Mr. Schulzetenberg, and Mr. Swoyer are all third-party former employees who Medtronic does not have any control over. Axonics is intentionally vague to be misleading when it represents that the individuals are "all present or former employees." Axonics now for the first time in this Joint Proposed Final Pretrial Order indicates that Medtronic "refuses" to bring Ms. Bibb or Ms. Sahney live at trial. Axonics has never made that request or stated that it intends to call those witnesses live.  And Ms. Bibb is a former employee who Medtronic has no control over.

Except for good cause, only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).

A party will identify by email to the opposing party the witnesses it intends to call in order, and whether those witnesses will be called live or by deposition, by 6:00 p.m. two calendar days before such witnesses will be called to testify, along with a list of exhibits that a party intends to use with each witness and the

demonstrative exhibits and graphic or illustrative material that will be used by a witness.[13] This provision does not apply to demonstratives, illustratives, or graphics created during testimony or created live in court; demonstratives, illustratives, or graphics to be used for cross-examination; or blow-ups or highlights of exhibits or parts of exhibits or testimony however made, none of which need to be provided to the other side in advance of their use. For example, if the party expects to conduct the examination on Thursday, notice should be given to the opposing party by 6:00 p.m. on Tuesday. The other party shall identify any objections to such witnesses, exhibits, and graphics or illustratives by 8:00 p.m. the same day, and the parties shall meet and confer in good faith to resolve any objections at 8:30 p.m. that same evening. If good faith efforts to resolve any objections fail, the party objecting shall bring its objections to the Court's attention the day prior to the witness being called to the witness stand, or the objection is waived. All demonstratives and illustratives exchanged will be provided in pdf form. While parties will in good faith attempt to identify all witnesses, exhibits, and demonstratives or illustratives two days in advance, to the extent that additional witnesses, exhibits, and demonstratives or illustratives become necessary, the offering party will promptly disclose such additional witnesses, exhibits, and demonstratives or illustratives, and the parties will cooperatively work to timely resolve objections or raise them with the Court.

The parties shall cooperate in good faith regarding the scheduling of live witnesses to work around scheduling conflicts that may exist. If either party does

---

[13] The parties are mindful that the Court previously struck language in Dkt. 162 where the parties requested leave to deviate from the disclosure procedure in Local Rule 16-3 without a full proposal on exchanges. In light of the orderly and agreed exchange of materials provided for above, the parties jointly respectfully request that the exchange of graphic and illustrative materials proceed on the schedule provided for here. The parties request that the Court waive the requirements of L.R. 16-3 to the extent it requires the exchange of demonstratives "at least eleven (11) days before trial."

not call a witness whom the party identified as being called live, that party will still make that witness available for the other party to call live. Each party will notify the other that it may complete its presentation of evidence by at least 6:00 p.m. two calendar days before the expected completion, and the parties shall continue to confer each day thereafter regarding the timing of the completion of evidence until the presentation of evidence is complete.

Fact witnesses who will testify in Court, including rebuttal witnesses, will be excluded from the courtroom except during their own testimony, and they shall not review the transcripts of the trial testimony of other fact witnesses. This provision does not apply to one designated corporate representative for Plaintiff (whom the parties stipulate will be Emily Elswick) and one designated corporate representative for Defendant (whom the parties stipulate will be John Woock), who will be permitted to attend the entire trial (subject to exclusion as appropriate for certain highly confidential information for which the courtroom is sealed). Additionally, retained expert witnesses who have submitted disclosures under Federal Rule of Civil Procedure 26(a)(2)(B) may attend the entire trial and/or review transcripts of openings and trial testimony.

For any witness affiliated with a party called adversely in the case of the opposing party, the party's examination of that witness may go beyond the scope of the direct examination.

Medtronic's list of deposition designations by page and line is attached as Appendix A.

Axonics' list of deposition designations by page and line is attached as Appendix B.

This Pretrial Order contains the substantially complete universe of deposition designations, counter-designations, and objections to admission of deposition

testimony.  Any further edits to the parties' respective designations shall be made promptly upon discovering any deficiency and disclosed to the opposing party.

Any party may use testimony that is designated by another party, to the same effect as if it had initially designated or cross-designated the testimony as its own, subject to all objections and rules regarding the use of depositions.

To the extent the Court permits deposition designations to be played, with respect to those witnesses who are expected to testify by deposition rather than in person, each party has designated the specific pages and lines of deposition testimony of the other side's fact witnesses that it may play during trial should that fact witness be unavailable to testify live.

If an exhibit is referenced in a deposition designation, the exhibit is admitted into evidence if it is included on the joint trial exhibit list and is not otherwise objected to.

All irrelevant and redundant material such as objections and colloquy between counsel will be eliminated when the deposition is viewed at trial.

Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

The party offering the testimony is responsible for preparing video deposition clips of all designated testimony for that witness.

When the witness is called to testify by deposition at trial, the party calling the witness shall provide the Court with two copies of the transcript of the designations and counter-designations that will be read or played.

Prior to calling a witness to testify by deposition at trial, the party calling the witness will introduce the witness with a brief statement identifying the witness's name, title, and employer.  The statement is to be agreed-upon by the parties.

Each party intending to present evidence by way of deposition testimony has

marked such depositions in accordance with L.R. 16-2.7. For this purpose, the depositions identified in Appendices A and B shall be lodged with the Clerk as required by L.R. 32-1.

Medtronic objects to Axonics' affirmative presentation of testimony or portions of testimony by deposition of the following witnesses: Medtronic objects to portions of testimony Axonics has designated as will be indicated in the Axonics tables designating testimony in Appendix B. Medtronic objects to portions of testimony that Axonics has designated as indicated in the tables designating Axonics's testimony.

Axonics objects to Medtronic's affirmative presentation of testimony or portions of testimony by deposition of the following witnesses: Axonics objects to portions of testimony Medtronic has designated as will be indicated in the tables designating Medtronic's testimony in Appendix A. Axonics also objects to the designations of Jodi Bibb, Tom Bombeck, and Mira Sahney, who are former Medtronic employees and were not identified for deposition by Medtronic.

The parties' respective objections to the presentation of testimony by deposition for each of the above witnesses is otherwise included in the attached tables. Axonics has also noted that the designations for Axonics' witnesses who are within the subpoena power of the Court and is outside their Rule 30(b)(6) testimony is hearsay.

The parties request the Court's guidance on the preferred procedures for resolving the remaining substantive objections. If the remaining objections are not resolved at the time of trial or objections arise later, the parties will follow the below process to resolve the remaining objections and the objecting party will raise its objection with the Court the day before the proposed testimony will be played, or the objection is waived.

The parties envision that less testimony will be presented by deposition than

has been designated. No later than 6:00 p.m. two calendar days before a party anticipates calling a witness by deposition, that party shall identify the portions of previously designated deposition testimony that will be presented for a witness to be presented by deposition. No later than 8:00 p.m. the same day, the opposing party shall provide the counter-designations to be presented with the designated testimony, along with any objections to the designated testimony. Objections to counter designations need not be identified in advance of the meet and confer, but should be identified on the meet and confer. No later than 8:30 p.m. the same evening (or two calendar days before the witness will be called by deposition), the parties will meet and confer in good faith to resolve any remaining objections to the designated testimony. If there are objections that remain to be resolved, the party objecting to the designated testimony shall bring its objections to the Courts' attention the day prior to the witness being called by deposition, or the objection is waived.

When a witness's deposition is played or the witness's prior testimony is read into evidence, all deposition designations and counter-designations from a single deposition or trial testimony will be introduced at trial together in the sequence in which the testimony originally occurred.

The offering party shall provide a copy of the edited video deposition to the other party as soon as any final rulings are obtained from the Court and the video editing has been completed and will use its best efforts to provide the video to the other party for review by 8:00 p.m. the day before the testimony is scheduled to be played in Court. In order to reduce the number of duplicative exhibits, where a deposition excerpt references a document by deposition exhibit number and that identical document was also marked as a different deposition exhibit number, production number, or trial exhibit number for use at trial, the parties may confer and create and introduce a single exhibit containing a combination of deposition

exhibit numbers, production numbers, and/or trial exhibit numbers.

12.   The following law and motion matters and motions in limine, and no others, are pending or contemplated:

- Medtronic's motions *in limine* [Dkt. 468];
- Defendant Axonics' Notice Of Motion And Motions In Limine Nos. 1-14 [Dkt. 459];
- Axonics' Request to Strike New Damages Theory and Late Disclosed Witnesses [Discovery Motion to Special Master Keyzer served July 9, 2024].

13.   Bifurcation of the following issues for trial is ordered: none.

14.   The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

15.   Miscellaneous provisions:

The parties will exchange a list of trial exhibits and demonstrative exhibits to be used in connection with opening statements by 2:00 p.m. September 2, 2024, and objections will be provided no later than 4:00 p.m. that same day.  The parties will meet and confer on any objections by 5:00 p.m. local time that same day and will present any unresolved issues to the Court on September 3, 2024.

Plaintiff will present first at trial on the issues of infringement and damages as part of its case-in-chief. Defendant will then respond to Plaintiff's presentation and present first on the issues of invalidity and affirmative defenses in its case-in-chief. Plaintiff will then present its rebuttal case to Axonics' invalidity presentation and affirmative defenses other than non-infringement.

Time a party spends on direct examination, redirect examination, cross examination, deposition designations, and deposition counter-designations counts

against that party's hours limit. Time spent on any disputes or objections raised before the jury will count against the losing party's time. Disputes or objections addressed outside of the presence of the jury do not count against a party's time.

The parties request that the trial be open to the public and not sealed unless a party requests that a particularly sensitive portion be sealed and not open. If a party makes such a request, subject to the Court's approval, and for good cause shown, the courtroom should be cleared for those individuals not qualified under the Protective Order entered in this case, including any corporate representatives of the party not making the request.

Transcripts of any sealed testimony, and exhibits entered while the courtroom is sealed, shall remain under seal until thirty (30) days after the conclusion of the trial. Prior to that time, the parties may designate, by page and line, the portions of the transcript they seek to have filed under seal and the exhibits they seek to have placed under seal, subject to the Court's approval. Counsel for the parties shall be responsible for supplying the envelopes and labels necessary for any materials placed under seal.

<u>The Number of Claims Asserted</u>

No later than August 9, Medtronic will narrow the claims asserted at trial to no more than 4 asserted claims per asserted patent, and a total of no more than 12 asserted claims.

**Axonics' Position**

No later than August 16, Axonics will narrow its prior art combinations to 4 per claim.

**Medtronic's Position**

No later than August 16th, Axonics will narrow to no more than 3 prior art combinations per patent, and a total of no more than 12 prior art combinations.

Dated: _____, 20_____.

_____

UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing document, was served on July 12, 2024 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Pursuant to Local Rule 5.4(c), any other counsel will be served by electronic mail delivery.